UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KRISTEN KING
5708 Stilwell Road
Hamburg, New York 14075

                Plaintiff,

     v.

ARAMARK SERVICES, INC.
1101 Market Street
Philadelphia, Pennsylvania 19107

                Defendant.

**COMPLAINT**

Civ. No.

---

      Plaintiff, KRISTEN KING, by and through her attorneys, GRECO TRAPP, PLLC, for her

Complaint against Defendant, ARAMARK SERVICES, INC., respectfully states:

### JURISDICTION AND VENUE

      1.    This action is authorized by and instituted under Title VII of the Civil Rights Act

of 1964, as amended 42 U.S.C. § 2000e *et seq.* (hereinafter Title VII).  Plaintiff invokes the

jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1343(a)(4), and 1367.  The

matter in controversy arises under an Act of Congress regulating commerce and relating to

unlawful discrimination, harassment, and retaliation, and the claims exceed the sum and value of

$75,000.

      2.    The venue of this action is properly placed in the Western District of New York

pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to

the claims here occurred in that district.    ARAMARK SERVICES, INC. (hereinafter

"ARAMARK") engaged in acts and omissions directed toward and causing harm to KRISTEN

KING (hereinafter "MS. KING") while she was in New York, including but not limited to acts of discrimination, harassment, and retaliation addressed herein.

## PARTIES

3.      Plaintiff, MS. KING, is a citizen of the United States and resides in the Town of Hamburg, County of Erie, State of New York.

4.      At all relevant times, MS. KING was an "employee" as defined in § 701(f) of Title VII.  She was also an "employee" as defined in the New York State Human Rights Law, Executive Law § 290 *et seq*.

5.      Defendant, ARAMARK, was at all relevant times a foreign business corporation authorized to do business in New York.  It is incorporated in Delaware, and its principle place of business is 1101 Market Street, Philadelphia, Pennsylvania 19107.  ARAMARK is a large, publically traded company with over 270,000 employees and a market capitalization of about $8.72B.

6.      At all relevant times, Defendant, ARAMARK, was and still is an "employer" as defined in § 701(b) of Title VII and in New York State Human Rights Law, Executive Law § 292 *et seq*.

7.      Defendant, ARAMARK, has continuously been engaged in an industry affecting commerce within the meaning of § 701(h) of Title VII.

## STATEMENT OF CASE

8.      MS. KING is female.

9.      From between about June 2006 and about June 2010 and from between about April 2012 and September 21, 2017, MS. KING worked for ARAMARK.  During this employment with ARAMARK, MS. KING's performance was always at least satisfactory.

10.     During her initial employment with ARAMARK, MS. KING worked for ARAMARK's operation at Kaleida Health (Buffalo General Hospital) in Buffalo, New York.  In that facility, MS. KING worked as the Director of Food and Nutrition.

11.     ARAMARK had and continues to have substantial operations in the geographical area constituting the Western District of New York.  For example, ARAMARK has employees physically present at an ongoing basis at locations including but not limited to: Sisters of Charity Hospital (Buffalo); Mercy Hospital (Buffalo); Medaille College (Buffalo); Citibank (Buffalo); Citibank (Amherst); North Tonawanda City School District (North Tonawanda); University of Rochester (Rochester); Monroe County Commissary (Rochester); and Monroe County Jail (Rochester).  ARAMARK also has corporate, sales, and distributions operations in North Tonawanda, Grand Island, and Rochester.

12.     In about June 2010, ARAMARK lost its Kaleida Health contract, and MS. KING became laid off.  After becoming laid off, she pursued and obtained a Master of Science degree in Creativity and Innovation, which was conferred in about February 2012.  As she was nearing the end of her degree program, she reached out to her former ARAMARK Vice President of Operations to see what employment opportunities may be available.  MS. KING learned that a General Manager position would soon be available in the food services department of ARAMARK's operation at Valley Health System (hereinafter VHS), and she applied for that position.

13.     After an interview in ARAMARK's office in Atlanta, Georgia and another at VHS in Winchester, Virginia, MS. KING accepted the position of General Manager, Food at VHS.  She then attended a two-week training at ARAMARK's training facility in Chicago, Illinois.  Upon

rejoining ARAMARK, ARAMARK provided MS. KING the benefits of a reinstated employee, rather than designating her as a new hire.

14.     In or about April 2012, MS. KING began working as General Manager, Food at ARAMARK's operations at VHS.  VHS consists of six member hospitals that are spread across Virginia and West Virginia, and her duties as General Manager required that she travel frequently between these facilities.  She also maintained home offices in Virginia and New York.  Given the nature of her job duties, ARAMARK also required that MS. KING be available 24 hours a day and 7 days a week on an as needed basis to address any issues that arose.  ARAMARK provided MS. KING with a company laptop for use at her home offices.

15.     Upon accepting this new position with ARAMARK, MS. KING rented a home with the address of 350 Old Stanley Road, Stanley, Virginia, which was near the VHS Page Memorial Hospital facility.  However, MS. KING, on a regular basis, performed ARAMARK work from her home office in Hamburg, New York.  ARAMARK agreed that MS. KING could work from her New York home office on a regular basis.

16.     When MS. KING began working for ARAMARK at VHS, ARAMARK authorized her to work from her home offices on days that her presence at a specific facility was not required. ARAMARK also provided mileage reimbursement from her Virginia home to and between the various VHS member facilities.  MS. KING was also given an office at Winchester Medical Center (WMC), which is VHS's largest flagship facility.  However, due to space constraints at VHS, MS. KING lost her office at WMS in or about October 2012, requiring her to work from her home offices on a more frequent basis.

17.     ARAMARK has Food and Environmental Services (hereinafter EVS) operations at VHS.  When MS. KING joined ARAMARK's operations at VHS, she became the General

Manager, Multiunit-Food.  Griffith Thomas was the General Manager, Multiunit-EVS.  Griffith Thomas and MS. KING reported to the same District Manager.  The District Manager's district included VHS as well as other health care systems/facilities.  In the chain of command, Griffith Thomas and MS. KING oversaw directors, who oversaw managers.

18.     From April 2012 through December 2015, ARAMARK on a regular basis authorized MS. KING to work from her New York home office, as needed to allow her to care for her ill son.  Given that her job duties required that she be available on an as needed basis, she regularly performed ARAMARK business while in her New York home office, and ARAMARK authorized her to do this.  For example, MS. KING read and responded to emails; conducted conference calls; reviewed data; made business decisions; and analyzed business reports.

19.     On or about October 30, 2013, ARAMARK approved MS. KING's application for leave under the Family Medical Leave Act (hereinafter FMLA) to provide for intermittent leave to care for her ill son.  This approval provided coverage through November of 2014.

20.     In the Fall of 2014, the District Manager position at VHS was vacant.  MS. KING expressed an interest in such position and was told by upper management that a reorganization was occurring.  In or about January 2015, MS. KING learned, unbeknownst to her, ARAMARK had scheduled Griffith Thomas to interview for the District Manager position.  MS. KING immediately contacted ARAMARK's corporate headquarters and advised that she was also interested in interviewing for the District Manager position.  ARAMARK scheduled her interview on the same day as and consecutive to Griffith Thomas's interview; however, based on the substance of MS. KING's interview, it was apparent that ARAMARK had already decided that it would hire Griffith Thomas to be District Manager.

21.     ARAMARK hired Griffith Thomas to be District Manager. Griffith Thomas became MS. KING's direct supervisor in about February 2015, and she became the *de facto* General Manager of both Food and EVS at VHS.

22.     As MS. KING's District Manager, Griffith Thomas subjected her to different terms and conditions of employment because of her sex, harassed her because of her sex, created a sex-based hostile work environment, retaliated against her for her numerous complaints of harassment, discrimination, and retaliation, and terminated her because of her sex and in retaliation for her numerous complaints. During most of her employment, MS. KING was the only female General Manager who reported to Griffith Thomas. Griffith Thomas's other direct reports who managed more than one unit were all male and included: Christopher Harriman, Thomas DeGori, and John Wilson, each who Griffith Thomas treated more favorably.

23.     Shortly after Griffith Thomas became District Manager, Food, MS. KING's son's illness began to worsen, and, on March 24, 2015, she recertified for FMLA leave, which provided coverage through November 2015. She also had Achilles surgery on December 7, 2015, and was on ARAMARK short term disability through March 1, 2016. However, due to the nature of MS. KING's job duties, she continued to regularly perform ARAMARK work while on any and all leaves. During this entire period, MS. KING was in her New York home office performing her job duties, and ARAMARK had approved MS. KING to work from her New York home office. MS. KING's son passed away on December 28, 2015.

24.     During this time and while MS. KING was working from her New York home office, Griffith Thomas discriminatorily denied her request for an extension of time to complete her team's performance reviews in 2015. In comparison, when Jacob Williford, ARAMARK's Unit Controller at VHS and who reported directly to Griffith Thomas at that time, requested a

similar extension to complete performance review 2016, Griffith Thomas replied "don't sweat the deadlines."

25.     Although MS. KING continued to be on disability after her son's death, Griffith Thomas made frequent efforts to communicate with her about her job duties, and he made clear to her that he was unhappy about the work that was backing up because of her absence.  Griffith Thomas intentionally reached out to MS. KING in New York with these communications.  While MS. KING was on FMLA leave, Griffith Thomas also criticized her and complained about her to other ARAMARK employees, accusing her of and blaming her for being unavailable to work. Additionally, prior to MS. KING's son's death, Thomas also questioned whether the severity of her son's illness required her to be on leave in discussions with ARAMARK management employees.

26.     In contrast, Griffith Thomas allowed Jacob Williford to take leave to care for his ill wife—who suffered from a condition similar to MS. KING's son—without interference and allowed Jacob Williford to work from home often and without any complaint or negative comment. MS. KING would later learn that Griffith Thomas was using Jacob Williford to perform many of her job duties in an effort to replace her.

27.     MS. KING returned to work from leave on March 1, 2016.

28.     Immediately upon returning to work, Griffith Thomas began to subject MS. KING to and single her out with discriminatory conduct, unfair criticism, undue scrutiny, and harassment; his conduct created a discriminatory hostile work environment.  Griffith Thomas micromanaged MS. KING's operations at VHS but did not micromanage his male direct reports, including but not limited to, Christopher Harriman, Thomas DeGori, and John Wilson.  Griffith Thomas also

issued discipline to MS. KING for conduct that did not violate any ARAMARK policy and for which he did not discipline his male direct reports.

29.     For example, prior to MS. KING's return to work from leave and while she was working in her New York home office, Griffith Thomas had emailed her and demanded that, on her first three days back from leave, she visit all VHS facilities, which spanned over two states and 600 miles of travel, with no opportunity to reacclimate back to work.  Griffith Thomas did not require his male direct report, Thomas DeGori, to visit all of his facilities immediately upon returning from a four-week leave after surgery.

30.     In an effort to have a smooth transition back to work and to address Griffith Thomas's unrealistic demand, MS. KING contacted Deborah Hetrick, Regional Vice President, at her home office located in Delaware, who was Griffith Thomas's immediate supervisor.  MS. KING advised Deborah Hetrick that she felt discriminatorily targeted and retaliated against by Griffith Thomas.  MS. KING complained that she was uncomfortable reporting to Griffith Thomas and being alone with him because of his conduct.  MS. KING requested that Deborah Hetrick arrange for a neutral third party to mediate a reporting relationship between Griffith Thomas and MS. KING.  Deborah Hetrick refused MS. KING's request and required that MS. KING meet with Griffith Thomas without a neutral third party.

31.     As further discrimination and harassment due to MS. KING's sex and in retaliation for her complaint to Deborah Hetrick, Griffith Thomas began to increasingly target MS. KING and to treat her unfavorably as compared to male direct reports, including but not limited to Thomas DeGori, Christopher Harriman, John Wilson, and Jacob Williford.

32.     For example, Griffith Thomas removed Jacob Williford from reporting to her and made him a direct report to Griffith Thomas.  Griffith Thomas then utilized approximately 50% of

Jacob Williford's time managing the financials and assisting Griffith Thomas's male direct reports at facilities outside of VHS.  MS. KING lost approximately 50% of Jacob Williford's services while incurring 100% of his costs under her VHS budget, impacting her overall performance.  Other direct reports, such as Christopher Harriman, Thomas DeGori, and John Wilson then received Jacob Williford's services without bearing any of the cost.

33.     ARAMARK's agreement with VHS required that Griffith Thomas have at least weekly contact with the VHS facilities for which MS. KING was responsible while she was on leave.  Upon returning to work, MS. KING learned that Griffith Thomas did not arrange for or provide support for several of the VHS facilities she was responsible for while she was out on leave for about three months.  In doing so, Griffith Thomas violated ARAMARK's agreement with VHS.  In contrast, when male direct report, Thomas DeGori, was out on an approximately four-week leave after a surgery in 2017, Griffith Thomas ensured that Thomas DeGori's facilities had daily coverage by general managers, directors, and/or managers.  In fact, Griffith Thomas required MS. KING to provide VHS employees to Thomas DeGori's facilities to provide staffing and coverage and that she, herself, act in Thomas DeGori's place on multiple occasions.

34.     Throughout March and July 2016, MS. KING's performance exceeded goals and expectations.  During this period, she received praise for her leadership from ARAMARK executives, had positive quality assurance assessments, had positive client meetings, hosted Employee Appreciation Day, on-boarded a new manager, and interacted with high-ranking ARAMARK and VHS executives.

35.     On or about April 20, 2016, Deborah Hetrick, Regional Vice President, whose home office was in Delaware, came to WMC to introduce Rebecca Adams, whose home office was in North Carolina, as the new Regional Director of Human Resources.  During this visit, MS.

KING again reported to Deborah Hetrick that Griffith Thomas's discriminatory, harassing, retaliatory conduct toward her continued unabated, and Griffith Thomas was creating a hostile work environment. For example, Griffith Thomas had excluded MS. KING from important financial meetings, met alone with her directors without notice to her, imposed unrealistic deadlines on her, and impeded her job performance. MS. KING told Deborah Hetrick that she was uncomfortable being alone with Griffith Thomas, and, in response, Deborah Hetrick laughed. Deborah Hetrick advised MS. KING that she would discuss it with Rebecca Adams and advised MS. KING to do the same. MS. KING did as Deborah Hetrick advised and advised Rebecca Adams of her complaints. ARAMARK management took no action to stop such conduct.

36.     In or about March 2016, MS. KING began working on a significant project and proposal designed to extend and expand ARAMARK's existing contract with VHS (hereinafter VHS Proposal). MS. KING worked closely with Carmine DiCicco, Vice President, Strategic Partnerships, whose home office was in Illinois, on the multi-million dollar VHS Proposal. In May 2016, she complained to Carmine DiCicco that she had complained to Deborah Hetrick, Regional Vice President, and Rebecca Adams, Regional Director of Human Resources, regarding Griffith Thomas's conduct, and no action was taken to address the improper conduct. Later that day, Carmine DiCicco instructed Griffith Thomas in MS. KING's presence to set up a conference call with Human Resources to resolve these ongoing issues.

37.     In or about May 2016, Griffith Thomas advised MS. KING that she would no longer be dual General Manager of Food and EVS and would be General Manager, Food only due to a company-wide restructuring. In comparison, Griffith Thomas permitted male General Manager, John Wilson, to remain as Dual General Manager of Food and Valet. Also, male General

Manager, Brian Marsh, at UPMC Susquehanna, who reported to a different District Manager, remained in his role as dual General Manager of Food and EVS (now called Facilities).

38.     In or about July 2016, Timothy Knight was assigned to the position of District Manager, Facilities (previously EVS) for the district that included VHS.  When Timothy Knight took this position, MS. KING complained to him that Griffith Thomas discriminated, harassed, and retaliated against her.  She advised Timothy Knight that Griffith Thomas was excluding her from important financial meetings, meeting alone with her clients and directors without her, and was aggressive, condescending, and dismissive when meeting one on one.  MS. KING complained to Timothy Knight that Griffith Thomas was setting her up for termination.  In response, Timothy Knight told her that she would "never fit into Griffith's mold" and suggested that she quit ARAMARK.  MS. KING replied that she truly needed help, and he said "I'm staying in my lane and I suggest you do the same."  Timothy Knight took no action to address her complaints.  After her complaint, Griffith Thomas's actions continued unabated.

39.     In or about July 2016, when Tracy Miller, whose home office was locations in Delaware and who replaced Deborah Hetrick as Regional Vice President, visited WMC, MS. KING relayed her complaints to her regarding Griffith Thomas.  Tracy Miller advised MS. KING that she would have Human Resources schedule recurring calls with Griffith Thomas, Human Resources, and MS. KING to monitor and address these issues.  That same day, MS. KING complained again to Rebecca Adams, Regional Director of Human Resources.  MS. KING reminded Rebecca Adams of what she had previously told her in April 2016 regarding Griffith Thomas's discrimination, harassment, and retaliatory conduct toward her, and she told her it had worsened.  Rebecca Adams said she would set up recurring calls with Griffith Thomas, Rebecca

Adams, and MS. KING.  However, these calls did not begin for several months and not until after Griffith Thomas had issued MS. KING written discipline.

40.     ARAMARK has a progressive discipline policy, the first step of which is a verbal warning.  Despite this, on or about August 29, 2016, Griffith Thomas issued MS. KING a First Written Warning, dated August 29, 2016, consisting of 11 violations without ever giving her a verbal warning or prior counseling.  Rebecca Adams, who was aware of MS. KING's complaints regarding Griffith Thomas and had taken no action, was present by telephone when Griffith Thomas issued the First Written Warning to MS. KING.

41.     MS. KING disagreed with the items of discipline listed in the First Written Warning, as the items listed were either untrue or did not violate ARAMARK policy (or both).  ARAMARK provided MS. KING only a few days to respond to these untrue allegations and to provide documentation in support of her position.  Thus, MS. KING's response was hindered by this intentionally limited time to respond.  However, she did submit her position and some supporting documentation to Human Resources.   In contrast, ARAMARK provided Griffith Thomas significantly more time to respond to MS. KING's supporting documentation and even allowed Griffith Thomas to delay the meeting until he had finished his response.

42.     On or about September 29, 2016, MS. KING had a meeting with Griffith Thomas and Rebecca Adams to discuss her challenges to the discipline addressed on the First Written Warning.  MS. KING was provided with a Revised First Written Warning, dated September 29, 2016.  Notably, of the 11 items, ARAMARK removed all but four.  With respect to the items that remained, these items of discipline involved conduct for which Griffith Thomas did not discipline male direct reports, including but not limited to, Christopher Harriman, Thomas DeGori, and/or John Wilson.

43.     Additionally, the Revised First Written Warning contained one incident not contained in the First Written Warning.  This violated ARAMARK policy and procedure and deprived MS. KING of the opportunity to respond to this new item, which she disagreed with and was further evidence of discrimination, harassment, and retaliation by Griffith Thomas. Additionally, two of the five items related to EVS operations, which were Timothy Knight's responsibility and no longer MS. KING's responsibility as of May 2016.  Upon information and belief, ARAMARK did not discipline Timothy Knight for such conduct.

44.     MS. KING requested that ARAMARK modify the First Written Warning into a Verbal Warning and that she receive a Performance Improvement Plan ("PIP"), given that she had no prior discipline.  Rebecca Adams denied MS. KING's requests and stated "it's simple, improve your performance."

45.     After this September 29, 2016 meeting, Rebecca Adams had arranged for biweekly telephone conferences with MS. KING, Rebecca Adams, and Griffith Thomas that she advised were to help MS. KING move forward and to correct any performance issues. After only two of these conferences, Griffith Thomas told Rebecca Adams that she was no longer needed, and Rebecca Adams did not participate in future conferences.  Thereafter, Griffith Thomas failed to conduct meetings on a regular basis.  When the calls did occur, Griffith Thomas did not address MS. KING's performance, other than to say she was doing fine.

46.     In advance of these telephone conferences, Griffith Thomas also required MS. KING to complete a "Top 15" report with respect to each of her facilities without having provided a Top 15 training.  At that time, Griffith Thomas did not require direct reports, including but not limited to Christopher Harriman, Thomas DeGori, and John Wilson to complete Top 15 reports.

Thereafter, when Griffith Thomas later required male direct reports to complete Top 15 reports, he provided a thorough Top 15 training on a conference call via a PowerPoint Presentation.

47.     At approximately the end of the fiscal year in September 2016, Griffith Thomas issued a 2.5% annual earned merit increase limit for MS. KING's entire team for the fiscal year October 1, 2015, through September 30, 2016, despite her team showing high performance in significant areas.  In fiscal year 2015-16, Griffith Thomas also provided MS. KING with a 0% earned annual merit salary increase.  Prior to this, she had received a salary increase during each year she worked for ARAMARK.  Additionally Griffith Thomas directed that Heather Rizzo, who was a high performer, be rated a "0" and receive no salary increase.  Under ARAMARK policy and procedure, the General Manager, not the District Manager, is responsible for allocating earned annual merit increases among his or her team.  Griffith Thomas undermined MS. KING's authority by directing her as to what salary increase to provide her direct report, Heather Rizzo.  Heather Rizzo had previously complained to ARAMARK that Griffith Thomas had asked her to falsify financial information, which she refused to do, and further that she felt that she was being discriminated against, harassed by, and retaliated against by Griffith Thomas because of her sex. In comparison, for fiscal year 2014-15, Griffith Thomas directed MS. KING to rate Jacob Williford a perfect 4 (the highest level), even though Jacob Williford had reported directly to MS. KING for approximately half of that fiscal year.  Griffith Thomas never sought MS. KING's input, and MS. KING would not have rated Jacob Williford a perfect 4.  Griffith Thomas then gave Jacob Williford both a 4% raise and a lump sum bonus.

48.     On or about January 10, 2017, MS. KING took the lead on a client tour in Philadelphia concerning the VHS Proposal.  During this visit, Robert Amos, Vice President and Chief Financial Officer of VHS,  and ARAMARK management: Griffith Thomas, John

Shingleton, Alexis Duckett (Director of Business Development), and MS. KING visited two of ARAMARK's premier facilities: Children's Hospital of Philadelphia and CHUBB Insurance. Between March 19 through 21, 2017, MS. KING took the lead in arranging for, preparing, and conducting a further presentation at ARAMARK's Innovation Center in Philadelphia connected to the VHS Proposal. Many VHS executives and ARAMARK executives, including the president of healthcare and Griffith Thomas, were present at this presentation. ARAMARK and VHS executives told MS. KING that the presentation was a significant success.

49.     On March 19, 2017, MS. KING also complained about Griffith Thomas to Alexis Duckett, Director of Business Development, whose home office was located in North Carolina. This conversation began when Alexis Duckett advised MS. KING that she observed Griffith Thomas speaking to MS. KING in a rude and condescending way. Alexis Duckett advised MS. KING that it did not seem like Griffith Thomas and she were on the same team. MS. KING responded to Alexis Duckett that Griffith Thomas did not support her and undermined her management and career. MS. KING advised Alexis Duckett that, when she was out of FMLA leave, Griffith Thomas had discriminated against, harassed, and retaliated against her and targeted her relative to her performance on a group telephone conference even though there were other male employees with worse performance, like Christopher Harriman and Thomas DeGori. MS. KING advised Alexis Duckett that she was afraid to be alone with Griffith Thomas because he was discriminating, harassing, and retaliating against her, had lied about her in the past, and she was afraid that he was setting her up for termination. MS. KING advised Alexis Duckett that MS. KING had complained to Human Resources. Alexis Duckett advised MS. KING that, if she needed anything, she could come to her.

50.     While in Philadelphia for the VHS Proposal, MS. KING advised Carmine DiCicco, Vice President, Strategic Partnerships, that Griffith Thomas's unfair targeting, discrimination, harassment, and retaliation of/against her had increased since he and she last spoke of it in May 2016.  MS. KING advised that Griffith Thomas was excluding her participation in team and client meetings, focusing on finding ways to identify and raise any perceived weakness, replacing many of her duties by working with the Unit Controller instead, and speaking to her in a rude, condescending, dismissive, and hostile tone.  MS. KING advised Carmine DiCicco that Griffith Thomas was discriminating, harassing, and retaliating against her, and setting her up for termination.  MS. KING also complained that Rebecca Adams, Regional Director of Human Resources, knew about the situation but had failed to stop such conduct.

51.     When Griffith Thomas and MS. KING returned from Philadelphia, he retaliated against her for making this complaint to Carmine DiCicco and for her prior complaints.  Upon returning to WMC, Griffith Thomas advised MS. KING that he would no longer allow her to work from her home office.  Prior to this instruction, MS. KING had, for years, worked from her New York and Virginia home offices on about a once weekly basis, taking the time to catch up on data review and paperwork.  In comparison, Griffith Thomas continued to allow Jacob Williford to work from his home office, which was less 10 miles from WMC, where he had a designated office.

52.     Additionally, upon returning from the VHS Proposal at the Innovation Center, Griffith Thomas further discriminated against, harassed, and retaliated against MS. KING by making demeaning comments about her physical appearance.  For example, on multiple occasions, Griffith Thomas looked at MS. KING's lunch tray and said "wow you must be hungry," would stare with disapproval at her midsection, and say that she should visit the fitness center.  On a few occasions, Griffith Thomas said that MS. KING should visit the fitness center early in the morning

because the VHS CEO, Mark Merrill, was there at that time and would like to see that she was exercising.

53.    On or about March 24, 2017, approximately three days after MS. KING's complaint to Carmine DiCicco, Griffith Thomas advised MS. KING that she needed to report to WMC on March 27, 2017 to meet with him to review her Top 15.   When MS. KING arrived at WMC, Griffith Thomas called Human Resources, and ARAMARK issued her a Final Written Warning, dated March 24, 2017, for an alleged violation of the Market Basket procedure.   There was no basis for this discipline.   MS. KING complied with ARAMARK policy and procedure, as she had done consistently during her tenure with ARAMARK.   The Final Written Warning was further discrimination, harassment, and retaliation by Griffith Thomas, and ARAMARK management was aware of but took no action to sop such conduct.

54.    After Griffith Thomas issued this Final Written Warning, he required that going forward MS. KING obtain his approval for any financial decisions exceeding $1,000.00, which required Griffith Thomas's increased oversight and approval, given that her unit did about $10,000,000.00 in business annually.   In comparison, Griffith Thomas did not require male direct reports to obtain approval for these types of financial decisions.

55.    MS. KING complained to Carmine DiCicco that she had received this Final Written Warning.   Carmine DiCicco advised her that he was shocked, and he agreed with her that the Final Written Warning was in retaliation for the complaint that she had recently made to ARAMARK executives during the VHS Proposal.   Carmine DiCicco advised MS. KING that he would call Tracy Miller, Regional Vice President and Griffith Thomas's direct supervisor, to inquire about this discipline.   Soon thereafter, Carmine DiCicco advised MS. KING that he spoke to Tracy Miller, who said "let HR deal with this"; he then advised that MS. KING should call the

ARAMARK Employee Hotline.   Tracy Miller took no action, and Griffith Thomas's discriminatory, harassing, and retaliatory treatment of MS. KING continued unabated.

56.     On or about March 29, 2017, MS. KING contacted the Hotline and complained about Griffith Thomas's discriminatory, harassing, and retaliatory treatment and hostile work environment.  That same day, MS. KING, who was already receiving medical treatment because of ARAMARK's discrimination, harassment, and retaliation, experienced an anxiety attack and went to her doctor for an emergency appointment.   Her doctor took her out of work for approximately four days.

57.     On March 30, 2017, MS. KING had a telephone conference with Evelyn Miller, Employee Relations Specialist, from the Hotline, who was in charge of the investigation.   MS. KING provided the names of witnesses, and she complained that Griffith Thomas was discriminating and retaliating against her and creating a hostile work environment.

58.     On or about April 6, 2017, in retaliation for MS. KING's recent Hotline complaint and other complaints, Griffith Thomas and Rebecca Adams advised MS. KING that she would no longer receive mileage reimbursement for travel from her rented home in Virginia to WMC.  MS. KING contacted Colleen O'Donnell, Director of Employee Relations, and advised her that Griffith Thomas had been discriminating against her by issuing unfair and untrue discipline, not adhering to ARAMARK's progressive discipline policy, making untrue statements about her job performance, and setting her up for termination as a result of discrimination, harassment, and retaliation for her prior complaints about his discrimination, harassment, and retaliation.   MS. KING complained that she needed her help and that, to date, no one had taken MS. KING's complaints seriously or done anything to address her complaints.

59.     On or about April 27, 2017, Evelyn Miller contacted MS. KING and advised her that the Hotline investigation determined that MS. KING's complaints were unfounded.  MS. KING asked Evelyn Miller why she never contacted any of MS. KING's witnesses.  Evelyn Miller said that they contacted only relevant witnesses.

60.     A few days, after MS. KING was advised that the ARAMARK Hotline investigation ended, MS. KING contacted Rebecca Adams, Regional Director of Human Resources, to schedule a meeting to discuss how to successfully continue her employment with ARAMARK.  MS. KING requested to be placed on a PIP so that she could know clearly the areas needing improvement and identify specific goals to work toward.  MS. KING requested a meeting with only her and Rebecca Adams.  Rebecca Adams agreed and scheduled such meeting for May 9, 2017.  However, on or about May 7, 2017, MS. KING received a meeting request from Griffith Thomas that scheduled a meeting with him, Rebecca Adams, and MS. KING in person at WMC on May 9, 2017.

61.     At the May 9, 2017 meeting, Griffith Thomas issued MS. KING a Second Final Written Warning, dated May 9, 2017.  The Second Final Written Warning contained a list of alleged violations of ARAMARK policy and procedure.  Since MS. KING had already been issued a prior Final Written Warning, Rebecca Adams advised MS. KING that the Second Final Written Warning did not matter because "you can't have a written, written, written."  Each of the items listed on the Second Final Written Warning was either untrue or did not violate ARAMARK policy and procedure.  In comparison, Griffith Thomas did not issue discipline to male direct reports, Christopher Harriman, Thomas DeGori, and John Wilson, who engaged in similar conduct. During this May 9, 2017 meeting, Rebecca Adams denied MS. KING's request for a PIP, saying it was not necessary, MS. KING was not a candidate for it, and Rebecca Adams and Griffith

19

Thomas had determined MS. KING would not benefit from it.  Instead, Rebecca Adams advised MS. KING to "improve her performance."  MS. KING was so upset that she went to her doctor, who removed her from work for approximately four days based on the anxiety that she experienced as a result of the discrimination, harassment, hostile work environment, and retaliation that ARAMARK subjected her to.

62.     Griffith Thomas continued to discriminate, harass, and retaliate against MS. KING. For example, Griffith Thomas had more frequent meetings with MS. KING's team without her presence and without notifying her.  In comparison, Griffith Thomas did not meet with male direct reports' teams behind their backs.  In fact, Griffith Thomas would schedule meetings with other teams as to ensure that the appropriate male direct report would also be present.  Griffith Thomas also made additional demeaning and disparaging comments about MS. KING's weight. Additionally, Griffith Thomas held meetings with MS. KING's clients without her presence and without notifying her.  In comparison, Griffith Thomas ensured that male direct reports, including but not limited to, Christopher Harriman, Thomas DeGori, and John Wilson attended client meetings.

63.     In or about July 2017, Kelly Barrett, whose home office was located in North Carolina, replaced Rebecca Adams as Director of Regional Human Resources.  MS. KING complained to Kelly Barrett about Griffith Thomas's discrimination, harassment, and retaliation. MS. KING complained to Kelly Barrett that Griffith Thomas was not providing her any support, excluding her from meetings, and setting her up for termination.  MS. KING also advised Kelly Barrett that she had complained numerous times to numerous ARAMARK management about Griffith Thomas's conduct and that Griffith Thomas retaliated against her because of her complaints.  Kelly Barret took no action to stop such conduct.

64.     In or about summer 2017, Griffith Thomas directed that MS. KING meet deadlines that he did not require other male direct reports to meet.  For example, Griffith Thomas required that MS. KING meet a deadline for the "Treat Yourself Program" that he did not require Thomas DeGori to meet.  Also, Griffith Thomas did not require Christopher Harriman to implement this program at one of his facilities.

65.     Also Griffith Thomas did not support MS. KING in preparing and giving key presentations for clients.  In comparison, he did provide this support to male direct reports such as Christopher Harriman when tasked with giving key presentations.

66.     In about July or August 2017, Griffith Thomas discriminated, harassed, and retaliated against MS. KING by making efforts to remove her from the VHS Proposal, the multi-million dollar project that she had presented on in January and March 2017 and had been working on for about 18 months.  Griffith Thomas held frequent closed door meetings with Jacob Williford concerning the VHS Proposal.  When MS. KING asked to be included in these meetings, Griffith Thomas denied her request.  He told her "Jacob and I got this."

67.     In or about August 2017, Griffith Thomas held a conference with his direct reports, including but not limited to Thomas DeGori, Christopher Harriman, John Wilson, and MS. KING, to discuss performance targets.  During this telephone conference, MS. KING learned that her performance outpaced Christopher Harriman's and Thomas DeGori's performance in a number of key areas, such as client loyalty, frequency of injury, and inventory management.

68.     On or about August 11, 2017, Griffith Thomas placed MS. KING on a 90-day PIP, dated August 11, 2017, which did not specify targets or improvement goals.  He also failed to meet with MS. KING weekly or biweekly to discuss progress on the PIP, as required under ARAMARK policy and procedure.  In comparison, Griffith Thomas worked with male direct report, Thomas

DeGori, on his performance in advance of any discipline or written improvement plan and directed MS. KING to provide assistance to Thomas DeGori.  Griffith Thomas also directed MS. KING to not issue written discipline to Jeff Soloway, and, instead, Griffith Thomas worked with Jeff Soloway to help him avoid further discipline.

69.     On August 29, 2017, MS. KING advised Griffith Thomas that her vehicle was not available for a few days because of a mechanical problem.  In order to service the VHS facilities, MS. KING requested that Griffith Thomas authorize rental vehicle reimbursement, which had been done previously.  He refused.  Griffith Thomas directed that MS. KING be present at WMC on August 31, 2017 because ARAMARK was making the final presentation to VHS on the VHS Proposal.  However, MS. KING was already scheduled to work with Brittany Cubbage, Director of Food at Page Memorial Hospital, on a time sensitive matter.  MS. KING requested that Brittany Cubbage report to WMC to meet on that matter, as MS. KING had previously requested that ARAMARK employees stationed at one facility meet her at another facility to work on a specific project when needed.  Under those circumstances, ARAMARK's policy and procedure entitled the traveling employee to mileage reimbursement.  MS. KING rode to WMC with Brittany Cubbage but did not return home with her.  Based on ARAMARK's policy and procedure, MS. KING approved travel reimbursement for Brittany Cubbage, because MS. KING had ordered her to report to WMC, which was not Brittany Cubbage's home facility.

70.     When MS. KING arrived at WMC on August 31, 2017, Griffith Thomas scheduled MS. KING's attendance at a pre-presentation meeting with him, Tracy Miller, Michael Sachs, Vice President of Strategic Partnerships, Sebastian Mitchell, Regional Vice President of Facilities, and Timothy Knight.  During this meeting, Griffith Thomas had MS. KING explain a number of key things concerning the VHS Proposal and answer any questions.  Griffith Thomas then used this

information to make the VHS Proposal while excluding MS. KING from attendance at the VHS Proposal and the post-proposal debriefing, which was not typical.

71.     On or about September 17, 2017, Griffith Thomas advised MS. KING that he would like to have a meeting on or about September 18, 2017 to review progress on her PIP.  When MS. KING arrived at the meeting, Griffith Thomas called Kelly Barrett, Regional Director of Human Resources, who advised MS. KING that ARAMARK was conducting an investigation into a Code of Conduct violation arising from MS. KING's decision to authorize travel reimbursement for Brittany Cubbage.  At no point during this meeting was MS. KING's PIP discussed.  This constituted discrimination, harassment, and retaliation by Griffith Thomas and caused MS. KING severe emotional distress.  This was the last day that MS. KING was able to work.

72.     On September 19, 2017, MS. KING placed another call to the Hotline complaining again about Griffith Thomas's discrimination, harassment, creation of a hostile work environment, and retaliation.  ARAMARK's continued discrimination, harassment, and retaliation impacted MS. KING's ability to work, causing her to apply for short term disability.

73.     On September 21, 2017, MS. KING received a telephone call from Griffith Thomas and Kelly Barrett, advising MS. KING that she was terminated.  MS. KING immediately called Tracy Miller, Regional Vice President, and told her that MS. KING was unfairly terminated and that what Griffith Thomas was doing to MS. KING was wrong.  Tracy Miller, Regional Vice President, took no action in response to MS. KING's complaint.

74.     Even after ARAMARK terminated MS. KING, it continued to discriminate, harass, and retaliate against her.  For example, ARAMARK failed to provide MS. KING with materials necessary to return her company laptop by mail, despite MS. KING's requests for the necessary material.  Instead, on or about November 14, 2017, ARAMARK contacted MS. KING at her New

York home office and directed MS. KING to return a company laptop to Virginia.  ARAMARK made this demand despite being aware that MS. KING had left Virginia.  When MS. KING offered to return the laptop to one of ARAMARK's many Wester New York facilities, ARAMARK refused to let her do so, forcing her to return to Virginia as a further act of discrimination, harassment, and retaliation.

75.     Griffith Thomas and ARMARK also subjected other female directors, managers and supervisors, including but not limited to Allison Siegel, Director of Food; Heather Rizzo, Manager of EVS; Sondra Davis,  Director of EVS; Heather O'Neil, Director of Food and EVS; Penny Curry, Director of Food; Teresa Davis, Supervisor of EVS; and Charlene Hite, Supervisor EVS, to discrimination, harassment, hostile work environment, and retaliation based on their sex and complaints of discrimination, harassment, hostile work environment, and retaliation.  For example, Griffith Thomas and Aramark subjected them to different terms and conditions of employment than other male employees, undermined their authority, and retaliated against them for complaints to ARAMARK

76.     As a result of the actions of ARAMARK, including but not limited to those described above, ARAMARK treated MS. KING adversely because of her sex and engaged in a pattern and practice of knowing, intentional, willful, and voluntary wrongful discriminatory conduct.

77.     As a result of the actions of ARAMARK, including but not limited to those described above, ARAMARK willfully and intentionally engaged in a course of conduct designed to make it appear as though MS. KING was discharged for nondiscriminatory reasons.

78.     As a result of ARAMARK's discriminatory, retaliatory, and harassing actions, conduct, and omissions, including, but not limited to those described above, MS. KING has

incurred damages including, but not limited to, lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

## CONDITIONS PRECEDENT TO ACTION

79.     MS. KING has complied with all the jurisdictional prerequisites to this action Pursuant to § 706 of Title VII and 42 U.S.C. § 2000e-5(f) as follows:

a)      In accordance with the time prescribed by § 706(e) of Title VII and 42 U.S.C. § 2000e-5(e), on or about July 17, 2018, MS. KING filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC).

b)      On or about the same date as the aforementioned EEOC charge was filed, the EEOC caused a copy of said charge to be filed with the New York State Division of Human Rights.

c)      By letter dated October 17, 2018, the EEOC sent a notification to MS. KING that she had the Right to Sue within 90 days of the receipt of the notification.  A copy of the EEOC Notice of Right to Sue is attached as **Exhibit A**.

d)      MS. KING has filed this action within 90 days of the receipt of the notifications of the Right to Sue from the EEOC.

## AS AND FOR A FIRST CAUSE OF ACTION

80.     Plaintiff, KRISTEN KING, repeats and re-alleges each and every allegation contained in paragraphs 1 through 79 as though fully set forth herein.

81. During her time as an employee of Defendant, ARAMARK SERVICES, INC., Plaintiff, KRISTEN KING, was subjected to different terms and conditions of employment than similarly situated male employees.

82. Plaintiff, KRISTEN KING, was subjected to a continuing course of sex discrimination by Defendants, ARAMARK SERVICES, INC., its agents, servants, and/or employees.

83. Plaintiff, KRISTEN KING, was required to work in a sexually hostile environment where she was harassed by her supervisors, other agents, servants, and/or employees of Defendant, ARAMARK SERVICES, INC., who were aware that Plaintiff, KRISTEN KING, was subjected to a hostile work environment; however, Defendant, ARAMARK SERVICES, INC., refused to investigate, stop, or prevent the discriminatory behavior from continuing.

84. The effect of the policies and practices pursued by the Defendant, ARAMARK SERVICES, INC., as alleged above, discriminated against the Plaintiff, KRISTEN KING, in ways that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of sex in violation of 42 U.S.C. § 2000e *et seq.*

85. Defendant, ARAMARK SERVICES, INC., knew or in the exercise of reasonable diligence should have known of the wrongful and unlawful actions, conduct, and omissions of its agents, servants, and/or employees and took no remedial action.

86. As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Defendant, ARAMARK SERVICES, INC., discriminated against Plaintiff, KRISTEN KING, with respect to her compensation, terms, conditions, and privileges of employment constituting unlawful sex discrimination in violation of § 703(a) of Title VII of the Civil Rights Acts of 1964, as amended,

42 U.S.C. § 2000e-2(a), thereby entitling Plaintiff, KRISTEN KING, to relief under the provisions of § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5 *et seq*.

87.     Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions were intentional and wanton and done with malice and/or a reckless indifference to Plaintiff, KRISTEN KING's, rights and feelings in violation of § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

88.     As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, incurred damages including, but not limited to lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

89.     As a direct and proximate result of Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, has been damaged in the amount of Two Million Dollars.

90.     Pursuant to § 706(k), 42 U.S.C. § 2000 e-5(k) of Title VII of the Civil Rights Act of 1964, as amended, Plaintiff, KRISTEN KING, is entitled to reasonable costs and attorneys' fees.

91.     Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. §1981a(c), Plaintiff, KRISTEN KING, demands a jury trial as to all issues so triable.

## AS AND FOR A SECOND CAUSE OF ACTION

92.     Plaintiff, KRISTEN KING, repeats and re-alleges each and every allegation contained in paragraphs 1 through 91 as though fully set forth herein.

93.     Plaintiff, KRISTEN KING, invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

94.     Defendant, ARAMARK SERVICES, INC., by and through its agents, servants, and/or employees, treated Plaintiff, KRISTEN KING, adversely because of sex and engaged in a knowing, intentional, willful, and voluntary course of wrongful discriminatory conduct in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et seq*.

95.     Defendant, ARAMARK SERVICES, INC., discriminated against Plaintiff, KRISTEN KING, with respect to compensation, terms, conditions, and privileges of employment because of sex in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et seq*.

96.     Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, were willful and wanton and done with a reckless disregard of Plaintiff, KRISTEN KING's, rights under the Human Rights Law of the State of New York.

97.     As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, incurred damages including, but not limited to lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional

distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

98.     As a result of Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, has been damaged in the amount of Two Million Dollars.

99.     Plaintiff, KRISTEN KING, demands a jury trial as to all issues so triable.

## AS AND FOR A THIRD CAUSE OF ACTION

100.     Plaintiff, KRISTEN KING, repeats and re-alleges each and every allegation contained in paragraphs 1 through 99 as though fully set forth herein.

101.     Defendant, ARAMARK SERVICES, INC., by and through its agents, servants and/or employees, treated Plaintiff, KRISTEN KING, adversely because she complained of and opposed unlawful discriminatory practices on the basis of sex by Defendant, ARAMARK SERVICES, INC.

102.     As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Defendant, ARAMARK SERVICES, INC., has discriminated against Plaintiff, KRISTEN KING, with respect to her compensation, terms, conditions, and privileges of employment and in retaliation for complaining and opposing unlawful discriminatory practices by Defendant, ARAMARK SERVICES, INC., in violation of § 707 of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. 2000e-(3), thereby entitling Plaintiff, KRISTEN KING, to relief under the provisions of § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5.

103.     Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions were intentional and wanton and done with malice and/or a reckless indifference to

Plaintiff, KRISTEN KING's, rights and feelings in violation of § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

104.     As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, incurred damages including, but not limited to lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

105.     As a direct and proximate result of Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff KRISTEN KING, has been damaged in the amount of Two Million Dollars.

106.     Pursuant to § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.  2000e-5(k), Plaintiff, KRISTEN KING, is entitled to reasonable costs and attorneys' fees.

107.     Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(c), Plaintiff, KRISTEN KING, demands a jury trial as to all issues so triable.

### AS AND FOR A FOURTH CAUSE OF ACTION

108.     Plaintiff, KRISTEN KING, repeats and re-alleges each and every allegation contained in paragraphs 1 through 107 as though fully set forth herein.

109.     Plaintiff, KRISTEN KING, invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

110.     During the course of Plaintiff, KRISTEN KING's, employment, Defendant, ARAMARK SERVICES, INC.'s, its agents, servants, and/or employees, treated Plaintiff

adversely in retaliation for her complaints and opposition to unlawful discriminatory conduct and engaged in a knowing, intentional, willful, and voluntary course of wrongful discriminatory conduct in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et seq.*

111.   Defendant, ARAMARK SERVICES, INC., discriminated against Plaintiff, KRISTEN KING, with respect to compensation, terms, conditions, and privileges of employment in retaliation for her complaints and opposition to unlawful discriminatory conduct and in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et seq.*

112.   Defendants, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, were willful and wanton and done with a reckless disregard of Plaintiff, KRISTEN KING's, rights under the Human Rights Law of the State of New York.

113.   As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, incurred damages including, but not limited to lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

114.   As a result of Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, has been damaged in the amount of Two Million Dollars.

115.   Plaintiff, KRISTEN KING, demands a jury trial as to all issues so triable.

## AS AND FOR A FIFTH CAUSE OF ACTION

116.     Plaintiff, KRISTEN KING, repeats and re-alleges each and every allegation contained in paragraphs 1 through 115 as though fully set forth herein.

117.     As a result of these offensive acts, including but not limited to those described above, Defendant, ARAMARK SERVICES, INC., through its agents, servants, and/or employees, created a sexually hostile working environment in which Plaintiff, KRISTEN KING, was intimidated, harassed, and undermined in her attempts to succeed.

118.     Throughout Plaintiff, KRISTEN KING's, employment with Defendant, ARAMARK SERVICES, INC., Plaintiff, KRISTEN KING, brought the above-described unlawful conduct to the attention of her supervisors.

119.     As a result, Defendant, ARAMARK SERVICES, INC., knew or through the exercise of reasonable diligence should have known of the wrongful and unlawful actions, conduct, and omissions of its agents, servants, and/or employees and took no remedial action.

120.     The effects of this hostile working environment were so severe and pervasive that it affected the terms, conditions, and privileges of the Plaintiff, KRISTEN KING's, employment, constituting unlawful sexual harassment in violation of § 703(a) of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-2(a), thereby entitling Plaintiff, KRISTEN KING, to relief under the provisions of § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5.

121.     Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions were intentional and wanton and done with malice and/or a reckless indifference to Plaintiff, KRISTEN KING's, rights and feelings in violation of § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

122.     As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, incurred damages including, but not limited to lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

123.     As a direct and proximate result of the Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, has been damaged in the amount of Two Million Dollars.

124.     Pursuant to § 706(k), 42 U.S.C. § 2000 e-5(k) of Title VII of the Civil Rights Act of 1964, as amended, Plaintiff, KRISTEN KING, is entitled to reasonable costs and attorneys' fees.

125.     Pursuant to § 102(c) of the Civil Rights Act of 1991, 42 U.S.C. §1981a(c), Plaintiff, KRISTEN KING, demands a jury trial as to all issues so triable.

### AS AND FOR A SIXTH CAUSE OF ACTION

126.     Plaintiff, KRISTEN KING, repeats and re-alleges each and every allegation contained in paragraphs 1 through 125 as though fully set forth herein.

127.     Plaintiff, KRISTEN KING, invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

128.     During the course of Plaintiff, KRISTEN KING's, employment, Defendant ARAMARK SERVICES, INC., by and through its agents, servants, and/or employees, subjected Plaintiff, KRISTEN KING to unwelcome comments, insults, and other sexually offensive conduct

thus creating a hostile work environment and engaged in a knowing, intentional, willful, and voluntary course of wrongful discriminatory conduct in violation of the Human Rights Law of the State of New York, Executive Law § 290 *et seq.*

129. Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, were willful and wanton and done with a reckless disregard of Plaintiff, KRISTEN KING's, rights under the Human Rights Law of the State of New York.

130. As a result of Defendant, ARAMARK SERVICES, INC.'s, actions, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, incurred damages including, but not limited to lost past wages, salary, and bonuses; reinstatement to employment or lost future wages, salary, and bonuses; employee benefits; lost employment opportunities; damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; punitive or exemplary damages; and attorneys' fees and costs.

131. As a result of Defendant, ARAMARK SERVICES, INC.'s, wrongful acts, conduct, and omissions, including but not limited to those described above, Plaintiff, KRISTEN KING, has been damaged in the amount of Two Million Dollars.

132. Plaintiff, KRISTEN KING, demands a jury trial as to all issues so triable.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

1. On the first cause of action, Plaintiff demands judgment against Defendant ARAMARK SERVICES, INC., in the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay, front pay, pain, suffering and

mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

2.     On the second cause of action, Plaintiff demands judgment against Defendant ARAMARK SERVICES, INC., in the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay, front pay, pain, suffering and mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

3.     On the third cause of action, Plaintiff demands judgment against Defendant ARAMARK SERVICES, INC., in the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay, front pay, pain, suffering and mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

4.     On the fourth cause of action, Plaintiff demands judgment against Defendant, ARAMARK SERVICES, INC., in the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay, front pay, pain, suffering and mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

5.     On the fifth cause of action, Plaintiff demands judgment against Defendant, ARAMARK SERVICES, INC., in the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay, front pay, pain, suffering and mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

6.      On the sixth cause of action, Plaintiff demands judgment against Defendant, ARAMARK SERVICES, INC., in the amount of Two Million Dollars as actual and compensatory damages for loss of revenue, including back pay, front pay, pain, suffering and mental anguish, and punitive damages together with interest, costs, expenses, and attorneys' fees, and such other and further relief as to this Court may seem just and proper.

Dated:      Buffalo, New York
            January 14, 2019


                                    s/Josephine A. Greco
                                  Josephine A. Greco, Esq., of Counsel
                                  GRECO TRAPP, PLLC
                                  Attorneys for Plaintiff
                                  Office and Post Office Address
                                  1700 Rand Building, 14 Lafayette Square
                                  Buffalo, New York 14203
                                  Telephone Number:  (716) 856-5800
                                  E-mail Address:  jgreco@grecolawyers.com