UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

KRISTEN KING,                          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        Case No. 1:19-cv-77
                                       )
ARAMARK SERVICES, INC.,                )
                                       )
        Defendant.                     )

**OPINION AND ORDER**
**(Docs. 5, 6)**

Plaintiff Kristen King has filed this gender-based discrimination, hostile work
environment, and retaliation action against Defendant Aramark Services, Inc. ("Aramark") under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and under the
New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"). (Doc. 1.)
Aramark has filed a Partial Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) seeking dismissal
of Ms. King's NYSHRL claims (Counts 2, 4, and 6) and her federal gender-based discrimination
and hostile work environment claims (Counts 1 and 5). (Doc. 5.) At the same time, Aramark
filed a Motion to Transfer Venue from the Western District of New York ("WDNY") to the
Western District of Virginia ("WDVa") under 28 U.S.C. § 1404(a). (Doc. 6.)

### Background

The complaint includes the following allegations. Ms. King resides in the Town of
Hamburg, County of Erie, State of New York. (Doc. 1 ¶ 3.) At all relevant times, Aramark was
a foreign business corporation authorized to do business in New York. (*Id.* ¶ 5.) Aramark is
incorporated in Delaware and its principal place of business is in Pennsylvania. (*Id.*) Aramark is
a publicly traded company with over 270,000 employees. (*Id.*) It has substantial operations

within WDNY, with employees present at locations in Buffalo and elsewhere within this district. (*Id.* ¶ 11.)

Ms. King worked for Aramark between approximately June 2006 and June 2010, and from approximately April 2012 until September 21, 2017. (*Id.* ¶ 9.) According to the complaint, Ms. King's performance was always at least satisfactory during this employment. (*Id.*) During her initial employment period with Aramark, she worked as Director of Food and Nutrition for Aramark's operation at Kaleida Health (Buffalo General Hospital) in Buffalo, New York. (*Id.* ¶ 10.) In about June 2010, Aramark lost its contract with Kaleida Health, and Ms. King was laid off. (*Id.* ¶ 12.)

After being laid off, Ms. King pursued and obtained a Master of Science degree in Creativity and Innovation, which was conferred in February 2012. (*Id.*) As she was nearing the end of her degree program, Ms. King contacted an Aramark official she knew from her prior period of employment and learned that a General Manager position would soon be available in the food services department of Aramark's operation at Valley Health System ("VHS"). (*Id.*) VHS consists of six hospitals in Virginia and West Virginia. (*Id.* ¶ 14.)

Ms. King applied for the Aramark General Manager position at VHS. After an interview at Aramark's office in Georgia and another interview at VHS in Virginia, Ms. King accepted the position. (*Id.* ¶ 13.) She then attended a two-week training at Aramark's training facility in Illinois. (*Id.*) Aramark provided her with the benefits of a reinstated employee rather than designating her as a new hire. (*Id.*) Upon accepting the General Manager position, Ms. King rented a home in Stanley, Virginia. (*Id.* ¶ 15.)

In or about April 2012, Ms. King began working as General Manager, Food at Aramark's operations at VHS. (*Id.* ¶ 14.) Her duties required that frequent travel between the Virginia and

West Virginia VHS facilities. (*Id.*) Aramark authorized her to work from home on days that her presence at a specific facility was not required. (*Id.* ¶ 16.) Aramark provided her with a company laptop for home use. (*Id.* ¶ 14.) She regularly performed Aramark work from her home in Hamburg, New York and from the Stanley, Virginia home that she rented. (*See id.* ¶¶ 14–16.) She was initially given an office at VHS's largest flagship facility, Winchester Medical Center. (*Id.* ¶ 16.) But she lost that office due to space constraints in or about October 2012, requiring her to work from her home on a more frequent basis. (*Id.*)

On a regular basis from April 2012 through December 2015, Aramark authorized Ms. King to work from her New York home as needed to allow her to care for her ill son. (*Id.* ¶ 18.) On or about October 30, 2013, Aramark approved Ms. King's application for leave under the Family Medical Leave Act ("FMLA") to provide for intermittent leave to care for her ill son. (*Id.* ¶ 19.) That approval provided coverage through November 2014. (*Id.*) She recertified for FMLA leave on March 24, 2015, which provided coverage through November 2015. (*Id.* ¶ 23.) She continued to perform Aramark work while on leave, and during the period prior to her son's death on December 28, 2015 she was in her New York home office performing her Aramark job duties with Aramark's approval. (*Id.*) She also performed Aramark job duties from her New York home office between December 7, 2015 and March 1, 2016 while she was recovering from a surgery. (*Id.*)

Aramark has both "Food" and "Environmental Services" ("EVS") operations at VHS. (*Id.* ¶ 17.) When Ms. King joined Aramark's operations at VHS, she became the General Manager, Multiunit-Food. (*Id.*) Griffith Thomas was the General Manager, Multiunit-EVS. (*Id.*) Ms. King and Mr. Thomas both reported to the same District Manager. (*Id.*) In the fall of 2014, the District Manager position at VHS was vacant. (*Id.* ¶ 20.) Ms. King expressed interest

in that position and upper management told her that a reorganization was occurring. (*Id.*) In or about January 2015, Ms. King learned that Aramark had scheduled Griffith Thomas to interview for the District Manager position. (*Id.*) She immediately contacted Aramark's corporate headquarters and advised that she was also interested in interviewing for the position. (*Id.*)

Aramark scheduled Ms. King to interview on the same day as Mr. Thomas's interview, but she asserts that based on the substance of her own interview, "it was apparent that ARAMARK had already decided that it would hire Griffith Thomas to be District Manager." (*Id.*) Aramark hired Mr. Thomas to be District Manager. (*Id.* ¶ 21.) Mr. Thomas became Ms. King's direct supervisor in about February 2015, and she became the de facto General Manager of both Food and EVS at VHS. (*Id.*)

It is unnecessary to recite here all of Ms. King's allegations supporting her substantive claims. Generally, she alleges that Mr. Thomas, as her District Manager:

> [S]ubjected her to different terms and conditions of employment because of her sex, harassed her because of her sex, created a sex-based hostile work environment, retaliated against her for her numerous complaints of harassment, discrimination, and retaliation, and terminated her because of her sex and in retaliation for her numerous complaints.

(*Id.* ¶ 22.) "During most of her employment, MS. KING was the only female General Manager who reported to Griffith Thomas." (*Id.*) Aramark terminated Ms. King's employment on or about September 21, 2017. (*Id.* ¶ 73.) Additional facts are set forth as necessary below.

## Analysis

"Where district courts are presented with both a motion to dismiss, under Fed. R. Civ. P. 12(b)(6), and a motion to transfer venue, under 28 U.S.C. § 1404(a), they commonly address the venue motion first, and, where transfer is appropriate, leave the motion to dismiss to be decided by the transferee court." *Hart v. Crab Addison, Inc.*, No. 13-CV-6458 CJS, 2014 WL 2865899,

at *2 (W.D.N.Y. June 24, 2014). The court accordingly begins its analysis with the venue motion.

## I. Venue Motion (Doc. 6)

Aramark seeks transfer to WDVa under 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Section 1404(a) represents "merely a codification of the doctrine of *forum non conveniens*" for "the subset of cases in which the transferee forum is within the federal system." *Martinez v. Bloomberg LP*, 740 F.3d 211, 221 (2d Cir. 2014) (quoting *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013)). "[I]n such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine*, 571 U.S. at 60.

The Second Circuit has articulated a non-exhaustive list of factors to consider when determining whether to grant a motion to transfer venue:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006)). This court has also considered the forum's familiarity with the governing law, *E.C.C. Movers LLC v. FairPoint Commc'ns, Inc.*, 18-CV-769V(F), 2019 WL 1936322, at *2 (W.D.N.Y. May 1, 2019), as well as "trial efficiency" and "the interests of justice." *A&A Jewellers Ltd. v. Commemorative Brands, Inc.*, No. 03-CV-0651E(F), 2004 WL 912929, at *1 (W.D.N.Y. Mar. 30, 2004). "No one factor is determinative, nor is there a 'rigid formula for balancing these factors . . . .'" *Moog, Inc. v.*

*Newport Aeronautical, Inc.*, No. 14-CV-00504A(F), 2016 WL 3444238, at *3 (W.D.N.Y.

June 23, 2016) (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y.

2000)).

"[T]he party requesting transfer carries the 'burden of making out a strong case for

transfer,'" and courts in this circuit apply a "clear and convincing evidence standard in

determining whether to exercise discretion to grant a transfer motion." *N.Y. Marine*, 599 F.3d

at 114 (quoting *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521

(2d Cir. 1989)). But the moving party's burden is "less stringent than under the . . . doctrine of

*forum non conveniens* since transfer under § 1404(a) does not result in dismissal." *Bassili v.

Chu*, 242 F. Supp. 2d 223, 232 (W.D.N.Y. 2002). "In deciding a motion to transfer, a court may

consider material outside of the pleadings." *Matthews v. Bell*, No. 6:18-CV-06460 EAW,

2019 WL 1117512, at *1 (W.D.N.Y. Mar. 11, 2019) (quoting *Mohsen v. Morgan Stanley & Co.*,

No. 11 Civ. 6751(PGG), 2013 WL 5312525, at *3 (S.D.N.Y. Sept. 23, 2013)).

Here, there is no dispute that this action could have been brought in WDVa. Since that

requirement of § 1404(a) is satisfied, the court focuses on the factors and considerations relevant

to the convenience of the parties and witnesses and the interest of justice. The parties disagree

about each of the remaining factors, so the court reviews all of them in detail.[1]

---

[1] It is reply memorandum, Aramark invites the court to take judicial notice of an
August 7, 2018 "Transfer Review" memorandum ("Transfer Memo") prepared by a legal intern
at the U.S. Equal Employment Opportunity Commission ("EEOC") Buffalo Local Office.
(Doc. 11-2.) The Transfer Memo includes analysis bearing on where the EEOC Buffalo office
might transfer Ms. King's then-pending charge. Ms. King argues in a sur-reply that the Transfer
Memo is irrelevant to the § 1404(a) motion because the question before the EEOC involved
different criteria and facts. (Doc. 15-2 at 2.) She further contends that the Transfer Memo is not
binding and does not reflect the EEOC's official position or conclusions. (*Id.*) The court has
reviewed the Transfer Memo but comes to its own independent conclusion on the § 1404(a)
issues presented here.

## A. Plaintiff's Choice of Forum

"Ordinarily, the plaintiff's choice of forum is accorded great weight." *Bausch & Lomb Inc. v. Mimetogen Pharm. Inc.*, No. 14-CV-6640, 2015 WL 13574334, at \*4 (W.D.N.Y. Sept. 28, 2015) (citing *In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995) (per curiam)); *see also EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012) ("It is well settled that the plaintiff's choice of forum is 'given great weight.'" (quoting *D.H. Blair & Co.*, 462 F.3d at 107)). "This 'is particularly so when the plaintiff resides in the judicial district where the suit was filed.'" *Mimetogen*, 2015 WL 13574334, at \*4 (quoting *Air-Flo M.G. Co. v. Louis Berkman Co.*, 933 F. Supp. 229, 233 (W.D.N.Y. 1996)); *see also Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc) ("[P]laintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947))); *Lencco Racing Co. v. Arctco, Inc.*, 953 F. Supp. 69, 72 (W.D.N.Y. 1997) ("[P]laintiff's choice of forum should not be changed lightly and should be accorded substantial weight, particularly when the plaintiff resides in the judicial district where the suit was filed.").

But the weight given to this factor is diminished where "(1) the operative facts have little or no connection with the forum chosen by the plaintiff . . . or (2) where plaintiff's residence is not the chosen forum." *EasyWeb*, 888 F. Supp. 2d at 348 (internal quotations omitted). "Where the selected forum is not connected in a meaningful way to the operative facts and is not the plaintiff's residence, the deference to the chosen forum is significantly diminished." *Id.* at 349. "If there is little or no connection of the operative facts to the chosen forum but it is the plaintiff's home district, the plaintiff's choice of forum is entitled to *less* deference even though it still carries some deference as the home district." *Id.* at 349 n.1. "Moreover, [w]here it

appears that the plaintiff was forum shopping and that the selected forum has little or no connection with the parties or the subject matter, plaintiff's choice of forum is entitled to no weight whatever, and the transfer of venue is appropriate.'" *Id.* at 349 (quoting *Pierce v. Coughlin*, 806 F. Supp. 426, 429 (S.D.N.Y. 1992)).

Here, there is no dispute that WDNY is Ms. King's home district. She states in her April 4, 2019 declaration that she "currently reside[s] in and ha[s] always resided in WDNY." (Doc. 8-1 ¶ 20.) She maintains that her selection of WDNY weighs heavily against transfer. She notes in her declaration that she cancelled her lease at her Stanley, Virginia residence after being terminated; that she has always resided in WDNY; and that she maintained a WDNY home office during her entire employment with Aramark. (*Id.* ¶¶ 18, 20.) She also states that she suffered severe emotional distress as a result of Aramark's alleged wrongs against her and that she is disabled and indigent. (*Id.* ¶ 19.) She claims that she would be "exceptionally burdened" if she were required to litigate outside of WDNY. (*Id.* ¶ 20.)

Aramark argues that Ms. King has failed to produce evidence to support her claims that she is disabled or indigent, or that either alleged condition prohibits her from traveling to WDVa. (*See* Doc. 11 at 11.) The court analyzes the convenience and the relative means of the parties (including Ms. King) below, but for present purposes has no difficulty concluding that Ms. King's choice of forum is entitled to deference as her home district. Aramark does not argue that Ms. King's selection of WDNY is a result of forum shopping or that it should be afforded no weight. Instead, Aramark contends that Ms. King's choice should be afforded little weight because, in Aramark's view, there is "little or no connection" to WDNY in this case. As discussed in more detail below, the court concludes that the main set of operative facts relate to WDVa, but there are connections to WDNY in this case that go beyond the mere

fact that Ms. King is a New York resident. Even assuming that this factor should be accorded reduced weight, Ms. King's choice to bring this suit in WDNY still carries some deference.

### B. Convenience of Witnesses

"The convenience of the witnesses is generally considered the most important factor in deciding a motion to transfer venue." *Moog*, 2016 WL 3444238, at *4 (quoting *Truk Int'l Fund, LP v. Wehlmann*, No. 08 Civ. 8462(PGG), 2009 WL 1456650, at *3 (S.D.N.Y. May 20, 2009)). "The convenience of non-party witnesses is accorded more weight than that of party witnesses." *Id.* (quoting *Truk*, 2009 WL 1456650, at *3). "The Court 'does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum'; but rather 'must qualitatively evaluate the materiality of the testimony that the witnesses may provide.'" *Id.* (quoting *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 27 (S.D.N.Y. 2016)). The party seeking transfer on account of the convenience of witnesses "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Id.* (quoting *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978)).

Aramark asserts that all of the non-party potential witnesses identified in the Complaint live in Virginia, North Carolina, or other locations far from WDNY. (Doc. 6-1 at 13.) In support, Aramark cites the March 13, 2019 declaration of Griffith Thomas, which contains a list of 12 individuals who are mentioned in the Complaint and who Mr. Thomas says worked or lived outside of New York during the time that he supervised Ms. King. (*See* Doc. 6-2 ¶ 9.) Mr. Thomas states that he has lived and worked in Winchester, Virginia for the last nine years. (*Id.* ¶ 6.)

Initially, Ms. King asserts that Aramark has submitted no proof of the identity of the witnesses and the nature of their likely testimony. (Doc. 8-2 at 14.) Aramark replies that it has

identified the potentially relevant witnesses as Mr. Thomas plus the 12 individuals listed in his March 13, 2019 declaration.  (*See* Doc. 11 at 9.)  And Aramark asserts that the likely testimony of each witnesses appears in Ms. King's Complaint.  (*Id.*)  The court concludes that Aramark has adequately specified the individuals whom it claims are the key witnesses and their likely testimony.

Citing *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 617–18 (S.D.N.Y. 2016), Ms. King also contends that Aramark's current employees are irrelevant on this factor.  The court agrees with Aramark that *Freeplay Music* does not stand for the proposition that potential witnesses who are current Aramark employees should be ignored in the convenience-of-witnesses analysis.  The court in *Freeplay Music* found that the party witness-employees who were likely to testify were located in both Tennessee and New York, so the location of those witnesses was neutral as to whether to retain the case in New York or transfer it to Tennessee.  *See id.* at 617–18.  *Freeplay Music* therefore actually supports the conclusion that the convenience of employee witnesses is relevant to the convenience analysis, even though in that particular case the employee witnesses were distributed such that neither New York nor Tennessee was more convenient for that group of witnesses as a whole.

That said, courts have held that "the inconvenience of employees or agents of the parties does not weigh as heavily as inconvenience to non-party witnesses."  *Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 437 (E.D.N.Y. 2012) (citing *Payless Shoesource, Inc. v. Avalon Funding Corp.*, 666 F. Supp. 2d 356, 364 (E.D.N.Y. 2009)).  Similarly, although *former* employees of a party are non-party witnesses, their inconvenience receives less weight in the analysis than the inconvenience of other non-party witnesses.  *See id.* ("[F]ormer employees are not entitled to the same deference shown to other non-party witnesses because they are more likely willing to

attend trial than other non-party witnesses."). The court therefore considers the inconvenience each individual that Aramark has identified, adjusting the weight given to each accordingly.

### 1. Griffith Thomas

The Complaint alleges that Griffith Thomas created a sex-based hostile work environment and subjected Ms. King to sex-based harassment, discrimination, retaliation, and termination. (*See* Doc. 1 ¶ 22.) He is undoubtedly a key witness in this case. According to his March 13, 2019 declaration, he has lived and worked in Winchester, Virginia for the last nine years. (Doc. 6-2 ¶ 6.) Ms. King agrees that he resides within WDVa. (Doc. 8-1 ¶ 22.) The court accordingly concludes that WDVa is more convenient for Mr. Thomas than WDNY. It appears that Mr. Thomas still works for Aramark (*see* Doc. 6-2 ¶ 2; *see also* Doc. 8-1 ¶ 22), so the court gives less weight to his inconvenience than it would to an ordinary non-party witness.

### 2. Kelly Barrett

The Complaint alleges that Kelly Barrett assumed the position of Aramark Director of Regional Human Resources in or about July 2017 (about two months before Ms. King was terminated). (*See* Doc. 1 ¶ 63.) According to the Complaint, Ms. King complained to Ms. Barrett about Mr. Thomas's alleged discrimination, harassment, and retaliation, but Ms. Barrett took no action to stop that alleged conduct. (*Id.*) Also according to the Complaint, Ms. Barrett—together with Mr. Thomas—called Ms. King on September 21, 2017 to advise her that she was terminated. (*Id.* ¶ 73.)

Mr. Thomas states in his declaration that Ms. Barrett lived and worked in Charlotte, North Carolina during the time that he supervised Ms. King. (Doc. 6-2 ¶ 9(f).) According to Ms. King, Ms. Barrett now resides in the Eastern District of North Carolina, and the Harrisonburg federal courthouse in WDVa is about a five-hour drive for her. (Doc. 8-1 ¶ 22.) It

would obviously be a much longer drive from North Carolina to WDNY, but the court notes that direct flights are available from Raleigh/Durham, North Carolina to Buffalo.[2] The court concludes that WDNY might be slightly less convenient for Ms. Barrett, mainly because it is geographically further from North Carolina than WDVa is.

It appears that Ms. Barrett is currently an Aramark employee. (*See* Doc. 8-1 ¶ 22.) The court accordingly gives less weight to her inconvenience than it would to an ordinary non-party witness.

### 3.    Tracy Miller and Rebecca Adams

According to the Complaint, Tracy Miller assumed the position of Aramark Regional Vice President in or about July 2016. (Doc. 1 ¶ 39.) Also at that time, Rebecca Adams was Aramark's Regional Director of Human Services. (*Id.*) Ms. King registered complaints about Mr. Thomas with Ms. Miller and Ms. Adams. (*Id.*) Generally, the Complaint includes allegations that Ms. Miller and Ms. Adams failed to properly respond to Ms. King's complaints and were involved in a discipline process that was flawed and that lacked any basis. (*See id.* ¶¶ 39, 40, 42, 44, 53, 55, 58, 73.)

Ms. Miller lives in Greenville, Delaware, which is about a four-hour drive from the Harrisonburg federal courthouse. (*See* Doc. 6-2 ¶ 9k; Doc. 8-1 ¶ 22.) It is a somewhat longer drive to WDNY, but the court notes that direct flights are available from Philadelphia to Buffalo. The court concludes that WDNY might be somewhat less convenient for Ms. Miller, mainly because it is geographically slightly further from Delaware than WDVa. It appears that

---

[2] As this court has noted, "[i]ts weather notwithstanding, [Buffalo] is not Siberia, and is easily accessible . . . by air or other means." *A & A Jewellers Ltd. v. Commemorative Brands, Inc.*, No. 03-CV-0651E(F), 2004 WL 912929, at *1 n.15 (W.D.N.Y. Mar. 30, 2004) (brackets in original) (quoting *Mpower Commc'ns Corp. v. Voipld.com, Inc.*, 304 F. Supp. 2d 473, 476 (W.D.N.Y. 2004)).

Ms. Miller is currently an Aramark employee. (Doc. 8-1 ¶ 22.) The court accordingly gives less weight to her inconvenience than it would to an ordinary non-party witness.

Ms. Adams lives in Cary, North Carolina, which is about a four-hour drive from the Harrisonburg federal courthouse. (*See* Doc. 6-2 ¶ 9g; Doc. 8-1 ¶ 23.) It would take her at least twice as long to drive to Buffalo, but the court notes that direct flights are available from Raleigh/Durham, North Carolina to Buffalo. The court concludes that WDNY would be less convenient for Ms. Miller because it is geographically further from her home than WDVa. It appears that Ms. Adams is a former Aramark employee. (Doc. 8-1 ¶ 23.) The court accordingly gives less weight to her inconvenience than it would to an ordinary non-party witness.

### 4. Christopher Harriman, Thomas DeGori, John Wilson, Jacob Williford

The Complaint alleges that Mr. Thomas treated her unfavorably as compared to his male direct reports, including Christopher Harriman, Thomas DeGori, John Wilson, and Jacob Williford. (Doc. 1 ¶ 31.) All four of those individuals are apparently current Aramark employees. (Doc. 8-1 ¶ 22.) The court accordingly gives less weight to their inconvenience than it would to an ordinary non-party witness.

Mr. DeGori lives and works in the Western District of Pennsylvania. (*See* Doc. 6-2 ¶ 9(b); Doc. 8-1 ¶ 22.) By car, Mr. DeGori's location is a little bit closer to Buffalo (about three hours twenty minutes) than to Harrisonburg, Virginia (about four hours fifteen minutes). The court concludes that WDNY would be slightly more convenient for Mr. DeGori than WDVa.

Mr. Harriman lives and works in the Eastern District of Virginia. (*See* Doc. 6-2 ¶ 9(a); Doc. 8-1 ¶ 22.) The WDVa is substantially closer to his residence by car than WDNY. Flying to Buffalo would require taking a connecting flight or a multi-hour drive to get to a city offering a direct flight. The court concludes that WDVa would be more convenient for Mr. Harriman.

Mr. Wilson apparently currently lives in the Eastern District of Virginia. (Doc. 8-1 ¶ 22.) Like Mr. Harriman, WDVa would be more convenient for him than WDNY. Mr. Williford lives and works in WDVa. (*See* Doc. 6-2 ¶ 9(d); Doc. 8-1 ¶ 22.) The WDVa would therefore be substantially more convenient for him than WDNY.

### 5. Deborah Hetrick, Carmine DiCicco, Alexis Duckett, Evelyn Miller, Colleen O'Donnell

Ms. King alleges that she complained about Mr. Thomas's conduct to Deborah Hetrick, Carmine DiCicco, Alexis Duckett, Evelyn Miller, and Colleen O'Donnell. (*See* Doc. 1 ¶¶ 30, 35–36, 49–50, 55, 57–59.) All five of these individuals are apparently former Aramark employees. (Doc. 8-1 ¶ 23.) The court accordingly gives less weight to their inconvenience than it would to an ordinary non-party witness.

Ms. Hetrick resides in Wilmington, Delaware. (*See* Doc. 6-2 ¶ 9(h); Doc. 8-1 ¶ 23.) Similar to the analysis for Tracy Miller, the court concludes that WDNY might be somewhat less convenient for Ms. Hetrick, mainly because it is geographically slightly further from Delaware than WDVa.

Mr. DiCicco lives in the Northern District of Illinois. (*See* Doc. 6-2 ¶ 9(i); Doc. 8-1 ¶ 23.) That is approximately a nine-hour drive from Buffalo and almost a 12-hour drive from Harrisonburg, Virginia. Direct flights are available from Chicago to Buffalo and also to the Charlottesville Albemarle airport, although the latter requires approximately a one-hour drive to Harrisonburg, Virginia. The court concludes that WDNY is slightly more convenient for Mr. DiCicco than WDVa.

Ms. Duckett appears to currently reside in the Eastern District of North Carolina, which is approximately a five-hour drive from the Harrisonburg federal courthouse. (Doc. 8-1 ¶ 23.) Although direct flights are available from Raleigh/Durham, North Carolina to Buffalo, the court

concludes that WDVa is more convenient for Ms. Duckett, mainly because it is geographically closer to her than WDNY.

Evelyn Miller lives in the Eastern District of Pennsylvania. (*See* Doc. 6-2 ¶ 9(j); Doc. 8-1 ¶ 23.) That is approximately a six-hour drive from Buffalo and a four-hour drive from Harrisonburg, Virginia. Direct flights are available from Philadelphia to Buffalo and also to the Charlottesville Albemarle airport, although the latter requires approximately a one-hour drive to Harrisonburg, Virginia. The court concludes that WDVa is slightly more convenient for Evelyn Miller than WDNY.

Finally, Ms. O'Donnell lives in the District of New Jersey, about 4.3 hours by car from the Harrisonburg federal courthouse, and more than six hours from Buffalo. (Doc. 8-1 ¶ 23.) Direct flights are available from nearby Philadelphia to Buffalo and also to the Charlottesville Albemarle airport, although the latter requires approximately a one-hour drive to Harrisonburg, Virginia. The court concludes that WDVa is slightly more convenient for Ms. O'Donnell than WDNY.

### 6. Non-Party Witnesses Identified by Ms. King

Ms. King asserts that WDNY would be more convenient for three sets of non-party witnesses. First, she contends that WDNY would be more convenient for all of her relevant treating physicians and providers, who all reside and work in WDNY and whose testimony she would offer to prove damages. Second, she argues that WDNY would be more convenient for Heather O'Neil, a Hamburg, New York resident whom Aramark also allegedly subjected to discrimination, harassment, hostile work environment, and retaliation. Finally, she maintains that WDNY would be more convenient for her fiancé Robert Strade, who resides in Hamburg,

New York and is a "witness" to Aramark's treatment of Ms. King and to damages. (Doc. 8-2 at 15; *see also* Doc. 8-1 ¶ 21.)

Aramark argues that Mr. Strade and Ms. O'Neil are not particularly important witnesses because their testimony may not be admissible or may not be heard at all if Ms. King does not prevail on her claims. (Doc. 11 at 8–9.) And Aramark maintains that Ms. King's treatment providers are damages witnesses, so their testimony would be unnecessary if Ms. King fails to establish liability. (*Id.* at 9.)

The exact nature of Mr. Strade's and Ms. O'Neil's testimony is unclear at this stage of the case. Presumably Ms. O'Neil's alleged experiences at Aramark would be offered to support Ms. King's hostile-work-environment claim. Absent further details, it appears that Mr. Strade's testimony would probably relate primarily to damages. Based on the relative lack of detail about this testimony, the fact that WDNY might be more convenient for Mr. Strade and for Ms. O'Neil weighs only slightly against transfer to WDVa.

Since the treatment providers would be expert witnesses, their convenience is not particularly relevant to the present analysis. *See Donellan v. Ferag, Inc.*, No. 97 CV 6700(SJ), 1999 WL 33111, at *2 n.3 (E.D.N.Y. Jan. 22, 1999) (convenience of the plaintiff's expert physician and physical therapist was not relevant to transfer analysis). Their convenience is also somewhat less relevant because their testimony would relate solely to damages. *See Cordero v. Delta Air Lines, Inc.*, No. 16-CV-6803 (RA), 2017 WL 5997420, at *3 (S.D.N.Y. Dec. 1, 2017) (doctors' inconvenience was "less significant given that their testimony will go primarily to damages"); *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) (convenience of plaintiff's witnesses was less significant because their testimony "relates to damages and becomes relevant only after the infringement issues are resolved").

### 7. Conclusion as to Convenience of Witnesses

The WDNY is more convenient for the handful of witnesses that Ms. King highlights. But it appears that their testimony is qualitatively less material than the testimony of the other witnesses that the court is considering. Their convenience weighs only weakly against transfer.

For most of the dozen witnesses identified by Aramark, the court has concluded that WDVa is slightly more convenient than WDNY. On the other hand, that is only a relative measure of convenience, since for most of these witnesses travel to *either* WDNY or WDVa would require air travel or a multi-hour drive. Moreover, because all of these witnesses are current or former Aramark employees, their inconvenience weighs less heavily than ordinary non-party witnesses. On balance, the court concludes that the convenience of the witnesses weighs somewhat in favor of transfer to WDVa.

### C. Location of Relevant Documents and Access to Proof

The location of relevant documents and access to proof is "entitled to little weight unless the defendant makes a detailed showing as to the burden it would incur absent transfer." *WD Encore Software, LLC v. The Software MacKiev Co.*, No. 6:15-cv-6566(MAT), 2016 WL 1056628, at *4 (W.D.N.Y. Mar. 17, 2016) (quoting *Royal Ins. Co. of Am. v. Tower Records, Inc.*, No. 02-Civ. 2612(PKL), 2002 WL 31385815, at *6 (S.D.N.Y. Oct. 22, 2002)). Here, Aramark argues that the location of relevant documents and access to proof weighs in favor of transfer to WDVa because relevant materials "likely remain housed in Virginia as well as in Aramark's offices in North Carolina, where key Human Resources witnesses live(d) and work(ed)." (Doc. 6-1 at 15–16.) Aramark also argues that certain relevant archived hard copies may only be available on-site at VHS facilities. (*Id.* at 16.)

The court concludes that these arguments fall short of the detailed showing of a burden that is necessary to imbue this factor with any substantial weight. The court presumes that with modern technology most or all relevant documents can be transferred to WDNY without "undue expense." *WD Encore*, 2016 WL 1056628, at *4 (quoting *Coker v. Bank of Am.*, 984 F. Supp. 757, 766 (S.D.N.Y. 1997)). To the extent that this factor weighs at all in favor of transfer to WDVa, it is entitled to little weight in this case.

### D.    Convenience of the Parties

"When analyzing the convenience to the parties, courts often look to the parties' principal places of business and the location of their offices." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 376 (W.D.N.Y. 2018) (quoting *Freeplay Music*, 195 F. Supp. 3d at 618). "The convenience of the parties does not favor transfer when it would merely shift any inconvenience from defendant to plaintiff." *Id.* (quoting *Kiss My Face Corp. v. Bunting*, No. 02CIV2645 (RCC), 2003 WL 22244587, at *3 (S.D.N.Y. Sept. 30, 2003)).

### 1.    Aramark

Aramark's principal place of business is in Philadelphia, Pennsylvania. By car, this is about four and a half hours from Harrisonburg, Virginia and over seven hours from Buffalo, New York. Considering geographical distance alone, WDVa is perhaps somewhat more convenient for Aramark than WDNY. But direct flights are available from Philadelphia to both Buffalo and to the Charlottesville Albemarle airport. And according to the Complaint, Aramark has substantial operations within WDNY, and has corporate, sales, and distribution operations in North Tonawanda, Grand Island, and Rochester, New York. (Doc. 1 ¶ 11.) In light of these

considerations, it appears that WDVa is at best only slightly more convenient for Aramark than WDNY.[3]

Apart from the convenience of Aramark employees themselves as witnesses (discussed above),[4] Aramark argues that its business operations would be substantially disrupted if its employees with responsibilities in the Virginia region were required to travel to WDNY. (Doc. 6-1 at 13.) Other courts have recognized the potential disruption to business posed by the imposition of court proceedings upon employee-witnesses. *See City of Pontiac Gen. Emps. Ret. Sys. v. Dell Inc.*, No. 14-CV-3644 (VSB), 2015 WL 12659925, at *5 (S.D.N.Y. Apr. 30, 2015) (convenience of the parties weighed in favor of transfer from New York to Texas because "lengthy proceedings in New York are more likely to lead to some disruption in Dell's [headquartered in Texas] day-to-day operations"); *Andrews v. A.C. Roman & Assocs., Inc.*, 914 F. Supp. 2d 230, 240 (N.D.N.Y. 2012) (due to potential disruption of business, convenience-of-parties factor weighed in favor of transfer to the Eastern District of New York, which was the place where the overwhelming number of employee-witnesses were located). Ms. King does not dispute this assertion, and the court concludes that potential disruption to Aramark's business operations weighs somewhat in favor of transfer to WDVa.

---

[3] Ms. King asserts that WDNY is not inconvenient for Aramark because Aramark and its affiliate entities are frequent litigants in this district and because Aramark has already retained WDNY-based counsel. (Doc. 8-2 at 18.) Those facts do not materially affect the court's analysis.

[4] Ms. King asserts that WDVa is not a convenient forum for Aramark's employee-witnesses because most of those witnesses do not reside in WDVa. (Doc. 8-2 at 18.) It is true that most of the employee-witnesses do not live in WDVa, but based on the court's analysis above, WDVa remains, on balance, somewhat more convenient than WDNY for most of the non-party witnesses.

All told, the analysis above suggests that WDVa is more convenient for Aramark than WDNY. Ms. King argues that "even assuming" that conclusion is true, the convenience-of-the-parties factor weighs against transfer because transferring the case to WDVa would only shift the inconvenience from one party to the other, and because it would be far more inconvenient for Ms. King to litigate in WDVa than for Aramark to litigate in WDNY. (*See* Doc. 8-2 at 17.) The court therefore considers the inconvenience to Ms. King of litigating this case in WDVa as opposed to her home district, WDNY.

### 2. Ms. King

In support of its motion to transfer, Aramark asserts that "the only convenience factor Plaintiff appears to rely on is that she currently lives in Hamburg, New York and has retained counsel in Buffalo, New York." (Doc. 6-1 at 14.) Aramark maintains that those facts are insufficient to avoid transfer. Aramark further suggests that WDVa would be within commuting distance for her "assuming Plaintiff still maintains her residence in Stanley, Virginia." (*Id.*)

Ms. King maintains that transfer to WDVa would impose an "incredible and disproportionate burden on her." (Doc. 8-2 at 17.) She states in her declaration that she no longer maintains a second residence in Virginia. (*See* Doc. 8-1 ¶ 18.) And she asserts that she suffered severe emotional distress as a result of the alleged discrimination, harassment, and retaliation. (*Id.* ¶ 19.) According to Ms. King, the Veterans Administration (VA) has determined that she is disabled. (*Id.*)[5] Aramark replies that Ms. King has failed to supply "actual evidence" of disability or that medical or financial considerations would make WDVa prohibitive for her. (Doc. 11 at 10–11.)

---

[5] Ms. King also asserts that she is indigent. The court considers that assertion below in its analysis of the relative means of the parties.

"[I]n considering whether the interest of justice would be served by transferring [a] case from plaintiff's home district to an alternative forum the Court may consider plaintiff's special medical difficulties." *Flores v. United States*, 142 F. Supp. 3d 279, 290 (E.D.N.Y. 2015) (quoting *Vassallo v. Niedermeyer*, 495 F. Supp. 757, 760 (S.D.N.Y. 1980)). But *Flores* and other cases suggest that a party resisting transfer on medical grounds should generally supply medical evidence to support such a claim. *See id.* (noting that the plaintiff submitted evidence of her condition in the form of a letter from her psychiatrist opining that travel posed a risk for potentially deadly illness); *NGC Worldwide, Inc. v. Siamon*, No. 3:02CV1760 (JBA), 2003 WL 1987001, at *2 (D. Conn. Apr. 21, 2003) (detrimental effect of travel on defendant's health was "confirmed 'firmly and with medical certainty' by his treating physician" and weighed strongly in favor of transfer to defendant's home state); *Vassallo*, 495 F. Supp. at 760 (plaintiff supplied medical records documenting substantial medical problems that weighed against transfer out of the plaintiff's home district).

Here, Ms. King has supplied her own declaration but no medical evidence or opinion. In particular, Ms. King has not produced any medical evidence or opinion regarding the impact of her VA disability determination or her mental health condition on her ability to travel. The court cannot conclude that the disability referenced in Ms. King's declaration constitutes a special medical difficulty that would weigh against transfer.

That said, the court concludes that, as to the convenience of the parties, transferring this case from WDNY to WDVa would largely just shift the inconvenience from Aramark to Ms. King. This is not a case where "inconvenience for the party moving for transfer could be completely eliminated without substantially adding to the nonmoving party's inconvenience." *Moog*, 2016 WL 3444238, at *5 (quoting *Ward v. Stewart*, 133 F. Supp. 3d 455, 466 (N.D.N.Y.

2015)). To the contrary, transferring this case to WDVa might reduce the inconvenience to Aramark somewhat, but would also substantially add to Ms. King's inconvenience. This factor does not weigh in favor of transfer.

### E. Locus of Operative Facts

"The location of the operative events is [also] a primary factor in determining a § 1404(a) motion to transfer." *Matthews v. Bell*, No. 6:18-CV-06460 EAW, 2019 WL 1117512, at *5 (W.D.N.Y. Mar. 11, 2019) (alteration in original) (quoting *Billing v. Commerce One, Inc.*, 186 F. Supp. 2d 375, 377 (S.D.N.Y. 2002)); *see also Chen v. Arts Nail Putnam Valley Inc.*, No. 1:14-cv-03037 (ALC), 2017 WL 3017712, at *4 (S.D.N.Y. July 14, 2017) (same). "To determine where the locus of operative facts lies, courts look to the site of events from which the claim arises." *Ocean Reef Charters LLC*, 324 F. Supp. 3d at 379 (internal quotation marks omitted) (quoting *Age Grp. Ltd. v. Regal Logistics, Corp.*, No. 06 Civ. 4328(PKL), 2007 WL 2274024, at *3 (S.D.N.Y. Aug. 8, 2007)).

Aramark contends that the "central focus" of the Complaint is "the alleged actions and decisions of Mr. Thomas while he was living and working in Virginia." (Doc. 6-1 at 11.) Ms. King concedes that some operative facts occurred in WDVa but maintains that the locus-of-operative-facts factor does not support transfer because the operative facts occurred in at least ten judicial districts, including WDNY. (Doc. 8-2 at 21.) She lists various locations where she states that she was injured, where she worked, and where relevant decisions were made. (*Id.* at 21–22.) Aramark insists that the locus of operative facts is WDVa. (Doc. 11 at 8.)

Here, the central instigator as described in the Complaint is Mr. Thomas, who lived and worked in Winchester, Virginia at the relevant times. (*See* Doc. 6-2 ¶ 6.) Notwithstanding the fact that Ms. King alleges that she suffered at least some of the effects of Mr. Thomas's conduct

at her home in Hamburg, New York, Mr. Thomas's alleged conduct in Virginia suggests that the principal locus of operative facts is WDVa. *See Tillery v. NYS Office of Alcoholism & Substance Abuse Servs.*, No. 13 Civ. 0035(CM), 2013 WL 6405326, at *5 (S.D.N.Y. Dec. 5, 2013) ("Plaintiff argues that the alleged discrimination and retaliation she suffered affected her in the Southern District of New York; however, because her supervisors were located in Albany, the discriminatory acts occurred in Albany.").

Ms. King refers to other circumstances or events that occurred in WDNY and other districts. She correctly states that the connections to WDNY in this case go beyond the mere fact that she is a New York resident, especially because Aramark authorized her to work from her home in WDNY during parts of the relevant time period. She also refers to relevant events that occurred in other districts (*see* Doc. 8-2 at 21–22), including her complaints to Aramark management located in the Eastern District of Pennsylvania (Doc. 1 ¶¶ 36, 48, 50), Rebecca Adams's participation in issuing written discipline from the Western District of North Carolina, and Kelley Barrett's participation there in the decision to terminate Ms. King (*see* Doc. 1 ¶ 73).

It is true that in some cases there can be more than one locus or the locus can be split between multiple districts. Courts in some such cases have found the locus factor to be neutral. *See Ocean Reef Charters LLC*, 324 F. Supp. 3d at 381 ("Where the locus of operative facts is split amongst several forums, or is focused in a forum that is neither the transferor nor the transferee forum, courts have, at minimum, viewed this factor neutrally."); *Lihuan Wang v. Phoenix Satellite Television US, Inc.*, No. 13 Civ. 218(PKC), 2014 WL 116220, at *5 (S.D.N.Y. Jan. 13, 2014) (locus of operative facts in employment discrimination case was not wholly in New York or the District of Columbia; factor weighed against transfer because a portion of the allegedly wrongful conduct and plaintiff's injury occurred in New York); *Fairchild v. Eisai, Inc.*,

No. 3:11cv452 MRK, 2011 WL 3438408, at *3 (D. Conn. Aug. 4, 2011) (locus of operative facts

in FLSA case was split between the New Jersey location of the defendant's headquarters and the

various districts in which the plaintiffs worked; locus factor did not favor either New Jersey or

Connecticut); *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 696–97

(S.D.N.Y. 2009) (finding locus factor neutral where both California and New York were loci of

operative facts).

But just because operative facts might be located in multiple districts does not mean that

the locus factor is invariably neutral. *See, e.g.*, *Tarzy v. Dwyer*, No. 18 Civ. 1456 (JFK),

2019 WL 132280, at *5 (S.D.N.Y. Jan. 8, 2019) (concluding that the "principal" locus of

operative facts was New Jersey). In this case, the court perceives the main set of operative facts

to be located in WDVa, where Mr. Thomas lived and worked. Events in other districts, and the

effects of the alleged wrongful conduct that Ms. King felt in WDNY, do not alter this

conclusion. This factor therefore favors transfer to WDVa. But because of the relevant events in

other districts, the court gives this factor somewhat less weight.

## F.   Availability of Process to Compel Unwilling Witnesses

The court examines the availability of process to compel witnesses with reference to the

witnesses discussed above in Part II.B. For the reasons discussed below, the court concludes that

this factor is essentially neutral because Aramark has not shown that any of the relevant

witnesses would be unwilling to testify. *See Stewart v. Stewart*, No. 1:18-cv-00201-GWC, at 19

(W.D.N.Y. June 4, 2019), ECF No. 33 (noting that availability-of-process factor "concerns the

availability of process to compel *unwilling* witnesses").

### 1.    Griffith Thomas

Aramark asserts that Mr. Thomas would be subject to WDVa's subpoena power because he lives and works within 100 miles of the courthouse there. (Doc. 6-1 at 15.) Ms. King maintains that Mr. Thomas's residence in Virginia is irrelevant because Aramark can compel his testimony without the need for a subpoena. (Doc. 8-2 at 15–16.) The court agrees with Ms. King that, since Mr. Thomas is Aramark's own employee, Aramark will presumably make him available for trial. *See A & A Jewellers Ltd. v. Commemorative Brands, Inc.*, No. 03-CV-0651E(F), 2004 WL 912929, at *1 n.15 (W.D.N.Y. Mar. 30, 2004) (defendant CBI's witnesses "are its own employees, whom CBI will presumably make available for trial"); *see also Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) (noting that "parties can compel the testimony of their own employees without the need for subpoena").

### 2.    Other Current Aramark Employees

The court considers the following group of current Aramark employee-witnesses: Kelly Barrett, Tracy Miller, Thomas DeGori, Christopher Harriman, John Wilson, and Jacob Williford. Aramark argues that all of these witnesses live and work far enough outside WDNY that they would not be subject to this court's subpoena power. And according to Aramark, several of these individuals would be subject to WDVa's subpoena power because they work at VHS facilities or other facilities located in WDVa. Ms. King maintains that the location of Aramark's current employee witnesses has no impact on the availability-of-process factor because Aramark can make them available. For the reasons stated with respect to Mr. Thomas, the court agrees with Ms. King that Aramark can make these employee-witnesses available.

### 3. Former Aramark Employees

The court next considers the following group of former Aramark employees: Rebecca Adams, Deborah Hetrick, Carmine DiCicco, Alexis Duckett, Evelyn Miller, and Colleen O'Donnell. Aramark argues that all of these witnesses live and work far enough outside WDNY that they would not be subject to this court's subpoena power. Ms. King argues that Aramark has failed to supply any evidence that these witnesses would be unwilling to testify if called. The court agrees with Ms. King on this point. *See Encarnacion v. Goord*, No. 12-CV-6180CJS, 2018 WL 3491287, at *5 (W.D.N.Y. July 18, 2018) ("Where the movant fails to present evidence that its witnesses would be unwilling to testify, the ability to compel the attendance of witnesses is not a factor in the transfer-of-venue analysis." (quoting *Williams v. Swack*, No. 12-cv-1552 (CBA), 2013 WL 5423791, at *7 (E.D.N.Y. Sept. 26, 2013))), *report and recommendation adopted*, 2018 WL 3996423 (W.D.N.Y. Aug. 21, 2018).

### G. Relative Means of the Parties

Aramark concedes that it has greater financial resources than Ms. King, but it maintains that this factor does not weigh against transfer to WDVa because, according to Aramark, Ms. King herself has substantial financial means, as evidenced by the fact that she maintained two residences and traveled frequently between them. Ms. King argues that transfer to WDVa would cause her financial difficulties because, according to her declaration, she is disabled, unemployed, and indigent. (Doc. 8-1 ¶ 19.)

This factor is more significant when one party is a corporation and the other party is an individual. *See Xerox Corp. v. Ariz. Digital Prods., Inc.*, No. 08-CV-6480 (CJS), 2011 WL 1432046, at *5 (W.D.N.Y. Apr. 14, 2011) ("[T]he relative means of the parties is a more significant factor when one party is an individual . . . ." (quoting *USA Interactive v. Savannah*

*Air Ctr., LLC*, No. 02 Civ. 3659(LLS), 2002 WL 1808236, at *2 (S.D.N.Y. Aug. 7, 2002))).

Here, Aramark is indisputably a large corporation with substantial resources. Ms. King claims

substantial difficulties in her declaration. For present purposes the court concludes that the

declaration is sufficient to show that Aramark has substantially greater means than Ms. King.

This factor weighs against transfer.

>    H.    **Forum's Familiarity with Governing Law**

Aramark relies on the fact that this factor is "'generally given little weight in federal

courts' because federal courts are deemed capable of applying the substantive law of other

states." *Tole v. Glenn Miller Prods., Inc.*, No. 12 Civ. 6660(NRB), 2013 WL 4006134, at *5

(S.D.N.Y. Aug. 6, 2013) (quoting *AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.*,

326 F. Supp. 2d 525, 531 (S.D.N.Y. 2004)). Ms. King argues that this factor weighs against

transfer because New York is the most appropriate forum to adjudicate her NYSHRL claim, and

because her NYSHRL retaliation claim raises a novel state-law issue. (Doc. 8-2 at 23.) The

court concludes that New York is the preferable venue to resolve the NYSHRL claims. This

factor accordingly weighs somewhat against transfer.

>    I.    **Trial Efficiency and Interests of Justice**

Aramark cites data suggesting that WDNY has an increased caseload and a longer

timeframe for adjudicating disputes than WDVa. (Doc. 6-1 at 18–19.) Ms. King argues that any

difference in caseloads is due simply to the types of cases before each court, and that the small

differential between WDNY and WDVa does not support transfer. Aramark maintains that it is

undisputed that WDVa has fewer cases and faster resolution time than WDNY and that this

factor is proper for the court's consideration and supports transfer to WDVa. (Doc. 11 at 13.)

This court has considered relative congestion in venue analysis. *See Stewart*, No. 1:18-cv-

00201-GWC, at 21 (W.D.N.Y. June 4, 2019), ECF No. 33. The court concludes that this factor weighs somewhat in favor of transfer.

### J. Conclusion as to Venue Motion

As discussed above, the § 1404(a) factors point in different directions in this case. Perhaps the strongest factor favoring transfer to WDVa is the convenience-of-the-witnesses factor. On the other hand, several of the factors weigh against transfer. Given this mixed set of factors and the deference owed to Ms. King's choice of forum, the court concludes that Aramark has failed to show by clear and convincing evidence that transfer should be granted. The court accordingly turns to Aramark's motion for partial dismissal.

## II. Motion for Partial Dismissal (Doc. 5)

### A. Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). The court must also draw all reasonable inferences in the non-moving party's favor. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

### B.  NYSHRL Claims (Counts 2, 4, and 6)

Aramark argues that Ms. King has failed to state an NYSHRL claim because no discriminatory act against her was committed in New York and because she cannot meet the statutory "residency" requirement within that law's extraterritorial application. *See* N.Y. Exec. Law § 298-a.  Aramark also argues that even if Ms. King could satisfy the "residency" requirement, she cannot maintain her NYSHRL claim because that law does not provide a private cause of action against Aramark, which is not a New York corporation.

In order to state a claim under the NYSHRL, "it is necessary to allege either that 'a discriminatory act was committed in New York or that a New York State resident was discriminated against.'"  *Torrico v. Int'l Bus. Machs. Corp.*, 213 F. Supp. 2d 390, 407 (S.D.N.Y. 2002) (quoting *Iwankow v. Mobil Corp.*, 541 N.Y.S.2d 428, 429 (N.Y. App. Div. 1989)). Ms. King appears to argue that her allegations support both pathways to liability.  The court begins by inquiring whether the allegations plausibly allege discrimination within New York.

### 1.  Was there a Discriminatory Act Within New York?

Citing *Taperell v. Tegan Lighting, Inc.*, No. 18-CV-3343 (SJF)(ARL), 2019 WL 1118053, at *2 (E.D.N.Y. Mar. 11, 2019), Ms. King argues that the NYSHRL provides a cause of action when discriminatory conduct has an "impact" in New York.  (*See* Doc. 9-1 at 11–12.) The court rejects that argument because it is an incomplete statement of the legal requirements. *Taperell* does not equate the "impact" of discriminatory conduct in New York with a discriminatory at committed "within" New York.

The *Taperell* court explained that, in order to allege discrimination "within" New York, the plaintiff "must allege that an unlawful discriminatory practice 'originated' within New York state, . . . that a discriminatory practice affected the 'terms, conditions or privileges of [her] employment' ([N.Y. Exec. Law] § 296(1)(a)) within New York, or that [defendants] retaliated against her because she complained about such discriminatory practices." *Taperell*, 2019 WL 1118053, at *2 (alterations in original) (quoting *Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1425–26 (S.D.N.Y. 1991)). In other words, the plaintiff's allegations "must satisfy either a 'conduct' or an 'effects' test." *Harte v. Woods Hole Oceanographic Inst.*, No. 10 CV 3916 (RJD) (MDG), 2012 WL 12951525, at *4 (E.D.N.Y. Jan. 6, 2012), *aff'd*, 495 F. App'x 171 (2d Cir. 2012) (summary order).

Here, Ms. King does not argue that her allegations support the "conduct" test—i.e., that any discriminatory act "originated" within New York. Instead, she appears to be arguing that her allegations satisfy the "effects" test—i.e., that Aramark perpetrated discriminatory acts that affected the "terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). But the "employment" so affected must be employment "within New York." *Taperell*, 2019 WL 1118053, at *2; *see also Harte*, 2012 WL 12951525, at *5 (evaluating whether discrimination affected plaintiff's employment "in New York"); *Sherwood*, 772 F. Supp. at 1426 (evaluating whether discrimination affected plaintiff's employment "within New York").

Here, the complaint does not allege discrimination affecting the "terms, conditions or privileges" of employment *in New York*. Here, as in *Harte*, Ms. King was "not employed in New York." *Harte*, 2012 WL 12951525, at *5. As the allegations in the complaint make clear, she was employed at Aramark's operations at VHS, which consists of hospitals in Virginia and West Virginia. Indeed, she rented a home in Virginia because of her Aramark responsibilities in that

part of the country. She had an office at a VHS facility in 2012. (Doc. 1 ¶ 16.) Ms. King argues at some length that she is a New York resident. But that is insufficient to allege discrimination "within" New York. *See Sherwood*, 772 F. Supp. at 1425–26 ("In order to allege discrimination within New York, [the plaintiff] must allege more than her New York residence . . . .").

The fact that Ms. King performed some of her Aramark work at her home office in New York does not alter this conclusion. Ms. King's allegations do not suggest that she was hired as a New York-based employee to work out of her home in New York. This case is therefore unlike *Taperell*, where the employer hired the plaintiff as a New York-based regional sales manager to work out of her New York home office, which was established with the employer's assistance and supplies. *Taperell*, 2019 WL 1118053, at *3. Likewise, this case is distinguishable from *International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F. Supp. 2d 345 (S.D.N.Y. 2007). The plaintiff's place of employment in that case was New York City. *Id.* at 362. This case is also unlike *Bass v. World Wrestling Federation Entertainment, Inc.*, 129 F. Supp. 2d 491, 506 (E.D.N.Y. 2001), because in *Bass* the complaint could be "read liberally to imply that New York was the situs for many of the discriminatory acts." Here, even when read liberally, Ms. King's complaint does not suggest that New York was the "situs" of any significant number of discriminatory acts.

Ms. King's circumstances are much more like the facts in *Meyers v. Medco Health Solutions, Inc.*, No. 09 Civ. 09216(RKE), 2012 WL 4747173 (S.D.N.Y. Oct. 4, 2012). The plaintiff in that case was employed in New Jersey, but regularly worked at least two days per week from her New York residence. *Id.* at *2, 5. The plaintiff's complaints of acts that took place in New Jersey could not sustain NYSHRL claims. *See id.* at *5 ("The mere fact that

plaintiff resided in New York, and may have periodically worked from home, is not sufficient to warrant the application of New York law.").

### 2. Has Ms. King Stated a Plausible Claim Under § 298-a?

Even if there was no discriminatory act "within" New York, the NYSHRL applies to certain acts committed outside of New York. *See* N.Y. Exec. Law § 298-a. Ms. King relies on § 298-a, which provides in pertinent part:

> 1. The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state . . . if such act would constitute an unlawful discriminatory practice if committed within this state. . . .
>
> 3. If a non-resident person or foreign corporation violates any provision of this article by virtue of the provisions of this section, such person or corporation shall be prohibited from transacting any business within this state. . . .

According to Aramark, Ms. King's complaint fails to allege that she was a New York resident during the relevant time period—i.e., early 2016 to September 21, 2017. Alternatively, Aramark maintains that the NYSHRL provides no cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation. The court assumes for present purposes that Ms. King satisfies § 298-a's residency requirement and begins with the latter argument.

Courts in this circuit have held that "the NYSHRL does not provide a cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation." *Curto v. Med. World Commc'ns, Inc.*, 388 F. Supp. 2d 101, 106 (E.D.N.Y. 2005); *see also Harte v. Woods Hole Oceanographic Inst.*, 495 F. App'x 171, 172 (2d Cir. 2012) (summary order) (applying same rule, noting that the New York Court of Appeals had not ruled on the question, but that one intermediate appellate court has consistently so ruled and that "no Appellate Division department has held otherwise, and there is no persuasive evidence that the New York Court of Appeals would decide the issue differently"); *Taperell*, 2019 WL 1118053,

at *2 (same; quoting *Harte*); *Beckett v. Prudential Ins. Co. of Am.*, 893 F. Supp. 234, 238 (S.D.N.Y. 1995) ("[T]he NYHRL does not provide a cause of action to a *New York* resident for discriminatory acts committed *outside* of New York by a *foreign* corporation."); *Hammell v. Banque Paribas*, 780 F. Supp. 196, 199 (S.D.N.Y. 1991) ("Although N.Y. Exec. L. § 298-a permits a New York resident to sue a domestic corporation for discriminatory acts committed outside New York, it does not provide a private civil cause of action to New York residents discriminated against out of state by a foreign corporation."); *Sherwood*, 772 F. Supp. at 1421 (holding that "§ 298-a does not provide claimants with a private civil remedy for out-of-state discrimination by foreign corporations").

Ms. King maintains that *Curto* and similar cases are inapplicable because they address the NYSHRL's administrative remedy instead of a private cause of action. Relying on *Taperell*, Ms. King asserts that the NYSHRL "provides an administrative remedy, rather than a private cause of action, for New York residents where an employer's conduct has no impact in New York." (Doc. 9-1 at 12.) She insists that when the conduct *does* have an impact in New York, then a private cause of action exists. (*Id.*)

Ms. King's argument conflates the distinct analyses for discriminatory conduct within New York and for discriminatory conduct outside New York against a New York resident. For the former, it is unnecessary to look within § 298-a for a private cause of action, since that provision relates to discriminatory acts committed outside of New York. In cases of discriminatory conduct within New York, a private cause of action is available under N.Y. Exec. Law § 297(9). As discussed above, to determine whether the discrimination occurred within New York, courts consider, among other things, whether the "effects" test is satisfied. For the reasons stated above, Ms. King has failed to allege discriminatory conduct within New York.

The same "effects" test does not apply for the latter mode of analysis concerning extraterritorial discriminatory conduct against a New York resident. It is true that non-residents are not protected by § 298-a because they are "unable to demonstrate that the impact of the discriminatory act was felt inside the state." *Ulrich v. Moody's Corp.*, No. 13 Civ. 0008 (VSB) (MHD), 2014 WL 12776746, at *16 (S.D.N.Y. Mar. 31, 2014) (quoting *Hoffman v. Parade Publ'ns*, 933 N.E.2d 744, 748 (N.Y. 2010)). But that statement does not mean that New York residents who are impacted by discriminatory conduct perpetrated by a foreign defendant have a private cause of action.

The "impact" relates to the direct effect on a protected individual. *See Maines v. Last Chance Funding, Inc.*, No. 2:17-cv-05453 (ADS)(ARL), 2018 WL 4558408, at *8 (E.D.N.Y. Sept. 21, 2018) ("The relevant 'impact' within the State that a plaintiff must plead (and later prove) is the direct effect of a discriminatory act on a protected individual—giving rise to a cause of action for that individual—not the attenuated reaction of third parties to such an individual's circumstance." (quoting *Doner-Hendrick v. New York Inst. of Tech.*, No. 11-cv-121, 2011 WL 2652460, at *8 (S.D.N.Y. July 6, 2011))). Pleading such an "impact" says nothing about whether the protected individual has a private cause of action against a foreign corporation. For the reasons stated in *Sherwood* and affirmed in *Curto* and other cases, § 298-a does not provide Ms. King with a private civil remedy for out-of-state discrimination by foreign corporations such as Aramark.

### C. Federal Gender-Based Discrimination Claim (Count 1)

There is no dispute that gender discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. Under the *McDonnell Douglas* test, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a

34

protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). "Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Id.* "The burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

The Second Circuit has cautioned district courts "against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016). The court is mindful that "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). A plaintiff alleging gender discrimination "is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss." *Vega*, 801 F.3d at 84. "Rather, because 'a temporary "presumption" of discriminatory motivation' is created under the first prong of the *McDonnell Douglas* analysis, a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation.'" *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307, 311 (2d Cir. 2015)).

At the pleadings stage, a plaintiff "must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that

directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87. As the Second Circuit has explained:

> An inference of discrimination can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Littlejohn*, 795 F.3d at 312 (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)). The *Littlejohn* court also noted that an inference of discrimination arises "when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312–13. "While the standard for alleging a claim of discrimination is not high, a complaint cannot rest on mere legal conclusions, and the Court 'cannot infer discrimination from thin air.'" *Kuder v. City of Rochester*, 992 F. Supp. 2d 204, 211 (W.D.N.Y. 2014) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)).

Aramark contends that Ms. King's allegations do not establish that the termination decision was made for discriminatory reasons. Aramark asserts that Ms. King has not identified any statements indicating that the termination decision was based on gender, and that she has not identified any similarly situated male comparators who engaged in the same conduct but were not terminated. Aramark further contends that any suggestion of discriminatory bias against Ms. King is weakened because one of the decisionmakers, Ms. Barrett, is also female. Ms. King maintains that the complaint supports a minimal inference of discriminatory motivation because it alleges "(1) the more favorable treatment of employees not in the protected group; (2) that Defendant transferred Plaintiff's job duties to a male coworker; (3) the invidious treatment of others in Plaintiff's protected group; (4) and that Griffith Thomas referred to Plaintiff in gender-based degrading terms." (Doc. 9-1 at 13.)

36

### 1.    Statements or Comments

Regarding gender-based degrading statements, Ms. King highlights the following allegations in the complaint. The complaint alleges that Mr. Thomas made "demeaning comments about her physical appearance." (Doc. 1 ¶ 52.) The complaint lists the following examples of alleged demeaning comments:

> [O]n multiple occasions, Griffith Thomas looked at MS. KING's lunch tray and said 'wow you must be hungry,' would stare with disapproval at her midsection, and say that she should visit the fitness center. On a few occasions, Griffith Thomas said that MS. KING should visit the fitness center early in the morning because the VHS CEO, Mark Merrill, was there at that time and would like to see that she was exercising.

(*Id.*) The complaint also alleges that Mr. Thomas "made additional demeaning and disparaging comments about MS. KING's weight." (*Id.* ¶ 62.) Aramark argues that the alleged comments about weight have no connection to gender, and that the absence of gender-based comments is fatal to Ms. King's claims. (Doc. 10 at 9.)

The court concludes that, by themselves, the allegations concerning Mr. Thomas's comments about Ms. King's weight are insufficient to give rise to a plausible inference of gender discrimination. *See Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234, 2010 WL 3932354, at *14 (S.D.N.Y. Sept. 29, 2010) (ruling on summary judgment that comments directed at the plaintiff describing her as a "fat ass" were "certainly rude" but were "gender neutral statements that do not indicate gender animus"); *Ortega v. N.Y.C. Off-Track Betting Corp.*, No. 97 Civ. 7582(KMW), 1999 WL 342353, at *4 (S.D.N.Y. May 27, 1999) (comments directed at female plaintiff about being overweight failed to support claim that the alleged hostile environment was created by sex-related conduct). Cases where comments about the plaintiff's weight do support an inference of gender discrimination involve the use of gendered language. *See Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 227–28 (1st Cir. 2007) (plaintiff

presented evidence on summary judgment that her co-worker told her she was fat and need to go to the gym, but also supplied evidence that co-worker called her a "whore" and a "bitch"); *Kanios v. UST, Inc.*, No. 3:03CV369 (DJS), 2005 WL 3579161, at *5 (D. Conn. Dec. 30, 2005) (terms like "fat bitch" are "specifically degrading to a woman"). Ms. King's complaint does not include any allegations of similar gendered language.

The court accordingly agrees with Aramark that the complaint in this case fails to allege *gender-based* degrading comments. However, the court disagrees with Aramark's contention that the failure to allege such comments is "fatal" to her gender-based discrimination claim. (Doc. 10 at 9.) Alleging such comments is not essential to a discrimination claim. *See Cao-Bossa v. New York State Dep't of Labor*, No. 1:18-CV-0509 (GTS/TWD), 2019 WL 2743505, at *8 (N.D.N.Y. July 1, 2019) (allegations of discriminatory comments "are not required to create a plausible inference" of discrimination); *Holmes v. Donahoe*, No. 10-CV-1031-A-Sr, 2014 WL 2882850, at *20 (W.D.N.Y. June 25, 2014) (a plaintiff can meet her burden under the fourth element of the *prima facie* case "by showing that the employer treated plaintiff less favorably than a similarly situated employee outside of the protected group"); *see also Littlejohn*, 795 F.3d at 312 (listing circumstances that might support an inference of discrimination in the disjunctive). The court accordingly considers the other alleged circumstances.

## 2.     More Favorable Treatment of Male Employees

The complaint alleges that "Griffith Thomas's other direct reports who managed more than one unit were all male and included: Christopher Harriman, Thomas DeGori, and John Wilson, each who Griffith Thomas treated more favorably." (Doc. 1 ¶ 22; *see also id.* ¶ 31.) According to the complaint, Mr. Thomas treated those men more favorably even though her performance was better than Mr. Harriman and Mr. DeGori's. (*See id.* ¶¶ 49, 67.) The

38

complaint also includes allegations suggesting that male Aramark employees Jacob Williford, Brian Marsh, and Timothy Knight received more favorable treatment. (*See id.* ¶¶ 24, 37, 43.)

"At the pleading stage, allegations that the plaintiff and comparators worked in the same group and were accountable to the same supervisors, but were subjected to disparate treatment may be sufficient to raise an inference of discrimination." *Pagan v. Cty. of Dutchess*, No. 18 CV 1785 (VB), 2018 WL 6591578, at *5 (S.D.N.Y. Dec. 14, 2018) (quoting *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495 (E.D.N.Y. 2016)). To raise an inference of discriminatory motive based on a defendant's more favorable treatment of a comparator, a plaintiff "must plead facts showing that the comparator was 'similarly situated in all material respects'—that is, 'subject to the same workplace standards' as Plaintiff and accused of conduct of 'comparable seriousness' to that of which Plaintiff was accused." *Rothbein v. City of New York*, 18-CV-5106 (VEC), 2019 WL 977878, at *10 (S.D.N.Y. Feb. 28, 2019) (quoting *LeBlanc v. United Parcel Serv.*, No. 11 Civ. 6983(KPF), 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014))); *Holmes*, 2014 WL 2882850, at *20 ("[T]o raise an inference of discrimination, plaintiff must show [s]he was similarly situated in all material respects to the individuals with whom [s]he seeks to compare [herself]."). "Plaintiff cannot survive a motion to dismiss by merely speculating that she was treated differently" than other similarly situated male employees. *Turner v. Nazareth Coll.*, No. 10-CV-6357T, 2011 WL 310787, at *5 (W.D.N.Y. Jan. 28, 2011).

Aramark argues that none of the alleged male comparators are similarly situated individuals who engaged in the same conduct that led to Ms. King's termination. (Doc. 5-1 at 17.) Ms. King maintains that Mr. Harriman, Mr. DeGori, and Mr. Wilson were similarly situated because they were Mr. Thomas's "other direct reports who managed more than one unit." (Doc. 1 ¶ 22.) She argues that Mr. Williford was similarly situated because he also

39

reported directly to Mr. Thomas, and that Mr. Marsh and Mr. Knight were similarly situated even though they reported to different managers because they held roughly the same rank and were subject to the same standards. The court begins with the allegations concerning Mr. Harriman, Mr. DeGori, and Mr. Wilson.

The complaint alleges that Mr. Thomas "micromanaged" Ms. King's operations at VHS but did not micromanage his male direct reports, including Mr. Harriman, Mr. DeGori, and Mr. Wilson. (Doc. 1 ¶ 28.) The complaint also alleges that Mr. Thomas reassigned one of Ms. King's direct-reports, Unit Controller Jacob Williford, to report to Mr. Thomas and to assist male managers who reported directly to Mr. Thomas, including Mr. Harriman, Mr. DeGori, and Mr. Wilson. (*Id.* ¶¶ 24, 32.) According to Ms. King, she lost approximately 50% of Mr. Williford's services while incurring 100% of his costs under her VHS budget. (*Id.*)

The complaint also alleges that Mr. Thomas required Ms. King to visit all VHS facilities immediately after she returned from leave but did not impose the same requirement on Mr. DeGori after he returned from a four-week leave after surgery. (*Id.* ¶ 29.) Mr. Thomas also ensured that Mr. DeGori's facilities had daily coverage while Mr. DeGori was on leave for surgery but failed to arrange for or provide support for several of Ms. King's facilities while she was on leave. (*Id.* ¶ 33.) Ms. King alleges that

> In or about May 2016, Griffith Thomas advised MS. KING that she would no longer be dual General Manager of Food and EVS and would be General Manager, Food only due to a company-wide restructuring. In comparison, Griffith Thomas permitted male General Manager, John Wilson, to remain as Dual General Manager of Food and Valet.

(Doc. 1 ¶ 37.)

Also according to the complaint, Mr. Thomas disciplined Ms. King for certain conduct for which he did not discipline male direct reports, including Mr. Harriman, Mr. DeGori, and Mr. Wilson. (*Id.* ¶¶ 42, 61.) Ms. King alleges that Mr. Thomas failed to meet with her to discuss

progress on the performance improvement plan ("PIP") on which he had placed her. (*Id.* ¶ 68.) In comparison, Mr. Thomas worked with Mr. DeGori on his performance in advance of any discipline or written improvement plan. (*Id.*)

In addition, Ms. King alleges that Mr. Thomas required her to complete a "Top 15" report with respect to each of her facilities without having provided a "Top 15" training. (*Id.* ¶ 46.) At the same time, according to the complaint, Mr. Thomas did not require Mr. Harriman, Mr. DeGori, or Mr. Wilson to complete "Top 15" reports. (*Id.*) And the complaint alleges that Mr. Thomas held meetings with Ms. King's clients outside of her presence and without notifying her, but ensured that male direct reports, including Mr. Harriman, Mr. DeGori, and Mr. Wilson, attended client meetings. (*Id.* ¶ 62.)

The complaint goes on to allege that in summer 2017, Mr. Thomas directed Ms. King to meet deadlines that he did not require other male direct-reports to meet. (*Id.* ¶ 64.) "For example, Griffith Thomas required that MS. KING meet a deadline for the 'Treat Yourself Program' that he did not require Thomas DeGori to meet. Also, Griffith Thomas did not require Christopher Harriman to implement this program at one of his facilities." (*Id.*) The complaint also alleges that Mr. Thomas did not support Ms. King in preparing and giving key presentations for clients, but that he did provide that support to male direct reports such as Mr. Harriman. (*Id.* ¶ 65.)

Aramark argues that Mr. Harriman, Mr. DeGori, and Mr. Wilson were not similarly situated to Ms. King because they held different job titles and worked in different locations. At least in the present procedural posture, those distinctions are insufficient by themselves to discount Mr. Harriman, Mr. DeGori, and Mr. Wilson as comparators. Those three men and Ms. King all reported directly to Ms. Thomas and all of them managed more than one unit. At

this stage, absent additional facts, it is reasonable to infer that Ms. King, Mr. Harriman,

Mr. DeGori, and Mr. Wilson were of sufficiently equivalent rank. *See McKnight v. Graphic*

*Controls Corp.*, No. 2000 WL 1887824, at *5 (W.D.N.Y. Dec. 11, 2000) ("[I]ntermediate

managerial positions should . . . be compared with other intermediate managerial positions.").

Moreover, there is no suggestion in the complaint that any workplace rules or standards relevant

to the alleged disparate conduct varied with any of the relevant job titles or duty stations. The

court concludes that the allegations recited above are sufficient to raise an inference of

discrimination.[6]

### 3. Treatment of Other Female Employees

Ms. King maintains that the complaint also supports an inference of discrimination

because it contains allegations regarding the invidious treatment of other female Aramark

employees. She highlights the following passages in the complaint:

> At approximately the end of the fiscal year in September 2016, Griffith Thomas
> issued a 2.5% annual earned merit increase limit for MS. KING's entire team for
> the fiscal year October 1, 2015 through September 30, 2015, despite her team
> showing high performance in significant areas. In fiscal year 2015–16, Griffith
> Thomas also provided MS. KING with a 0% earned annual merit salary increase.
> Prior to this, she had received a salary increase during each year she worked for
> ARAMARK. Additionally Griffith Thomas directed that Heather Rizzo, who was
> a high performer, be rated a "0" and receive no salary increase. Under ARAMRK
> policy and procedure, the General Manager, not the District Manager, is responsible
> for allocating earned annual merit increases among his or her team. Griffith
> Thomas undermined MS. KING's authority by directing her as to what salary
> increase to provide her direct report, Heather Rizzo. Heather Rizzo had previously
> complained to ARAMARK that Griffith Thomas had asked her to falsify financial
> information, which she refused to do, and further that she felt that she was being
> discriminated against, harassed by, and retaliated against by Griffith Thomas
> because of her sex. In comparison, for fiscal year 2014–15, Griffith Thomas
> directed MS. KING to rate Jacob Williford a perfect 4 (the highest level), even
> though Jacob Williford had reported directly to MS. KING for approximately half
> of that fiscal year. Griffith Thomas never sought MS. KING's input, and MS.

---

[6] It is therefore unnecessary to proceed to the parties' arguments about the suitability of
Mr. Williford, Mr. Marsh, and Mr. Knight as comparators.

KING would not have rated Jacob Williford a perfect 4. Griffith Thomas then gave Jacob Williford both a 4% raise and a lump sum bonus. . . .

Griffith Thomas and AR[A]MARK also subjected other female directors, managers and supervisors, including but not limited to Allison Siegel, Director of Food; Heather Rizzo, Manager of EVS; Sondra Davis, Director of EVS; Heather O'Neil, Director of Food and EVS; Penny Curry, Director of Food; Teresa Davis, Supervisor of EVS; and Charline Hite, Supervisor of EVS, to discrimination, harassment, hostile work environment, and retaliation based on their sex and complaints of discrimination, harassment, hostile work environment, and retaliation. For example, Griffith Thomas and Aramark subjected them to different terms and conditions of employment than other male employees, undermined their authority, and retaliated against them for complaints to ARAMARK.

(Doc. 1 ¶¶ 47, 75.) Aramark maintains that the complaint lacks any factual allegations to support Ms. King's assertions that Aramark discriminated against other female employees. (Doc. 10 at 12.)

The court agrees with Aramark that the allegations cited lack any non-conclusory factual allegations of invidious treatment of other female Aramark employees. The allegations regarding salary increases mention that Ms. Rizzo felt that she was being discriminated against because of her sex but supplies no details. The allegation that Mr. Thomas subjected other female directors, managers, and supervisors to discrimination is conclusory; the only "example" given is itself conclusory and again lacks specific details.

### 4.    Alleged Transfer of Plaintiff's Job Duties to a Male Coworker

According to the complaint, while Ms. King was on leave caring for her ill son, Mr. Thomas used Mr. Williford "to perform many of her job duties in an effort to replace her." (Doc. 1 ¶ 26.) Ms. King alleges that in summer 2017, Mr. Thomas "ma[de] efforts to remove her from the VHS Proposal, the multimillion dollar project that she had presented on in January and March 2017 and had been working on for about 18 months." (*Id.* ¶ 66.) "Griffith Thomas held frequent closed door meetings with Jacob Williford concerning the VHS Proposal." (*Id.*)

43

"When MS. KING asked to be included in these meetings, Griffith Thomas denied her request. He told her 'Jacob and I got this.'" (*Id.*)

Aramark points out that the complaint does not actually allege that Mr. Thomas replaced Ms. King with Mr. Williford as General Manager for VHS, or that Mr. Thomas actually succeeded in removing Ms. King from the VHS Proposal. But the complaint plainly does allege that Mr. Thomas reassigned many of Ms. King's job duties to Mr. Williford and excluded Ms. King from meetings about the VHS Proposal between himself and Mr. Williford. The court concludes that this alleged conduct supports an inference of discrimination. *See Shu-Chen Kuo v. Winklevoss Consultants, Inc.*, No. 3:16cv651(JBA), 2018 WL 4623023, at *13 (D. Conn. Sept. 26, 2018) (although a plaintiff can meet her burden by showing that she was replaced by someone outside the protected class, inference of discrimination also applies "where a plaintiff's responsibilities are taken over by existing employees who are not members of the protected class").

Considering the above conclusions, the court finds that Ms. King has alleged facts giving rise to a plausible inference of discrimination.

### D.     Federal Gender-Based Hostile Work Environment Claim (Count 5)

The Second Circuit has explained that:

> To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct (1) "is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex."

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (alteration in original) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). A work environment's hostility should be assessed on the "totality of the circumstances." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23

(1993)).  Potentially relevant factors include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'"  *Id.* (quoting *Harris*, 510 U.S. at 23).  To avoid dismissal under Rule 12(b)(6), a plaintiff "need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'"  *Id.* (alteration in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).  The Second Circuit has "repeatedly cautioned against setting the bar too high" in this context.  *Id.* (quoting *Terry*, 336 F.3d at 148).

Aramark argues that the complaint fails to identify any offensive gender-based comments and that all of the alleged incidents constitute only non-actionable "normal workplace strife." (Doc. 5-1 at 14–15.)  Ms. King maintains that sexually explicit and overtly gender-based comments are not essential to her claim, and that the totality of the factual assertions in the complaint plausibly allege a hostile work environment.  (Doc. 9-1 at 20.)  Aramark replies that Ms. King has alleged "nothing more than a series of isolated and mundane workplace interactions and minor indignities spread out over more than a year." (Doc. 10 at 13.)

Contrary to Aramark's contention, the lack of offensive gender-based comments is not fatal to Ms. King's hostile-work-environment claim.  *See Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002) (rejecting suggestion that sex-based hostile work environment claim can be supported "only by overtly sexual incidents").  The complaint does not state the precise frequency of the alleged discriminatory conduct, but the complaint recounts numerous instances of alleged discriminatory treatment.  Those alleged instances include: denial of a request for extension of time in 2015 while granting a similar extension to Mr. Williford (Doc. 1 ¶ 24);

criticizing her for taking leave to care for her ill son without complaining about Mr. Williford's leave to care for his ill wife (*id.* ¶ 26); micromanaging her but not other male managers (*id.* ¶ 28); disciplining her for conduct for which male managers were not disciplined (*id.* ¶¶ 28, 42, 43); reassigning Mr. Williford (*id.* ¶ 32); failing to provide staffing and coverage for Ms. King (*id.* ¶ 33); excluding Ms. King from meetings (*id.* ¶¶ 35, 50, 62, 66, 70); removing Ms. King's dual General Manager position (*id.* ¶ 37); requiring Ms. King to complete a report and meet deadlines not required of male managers (*id.* ¶¶ 46, 64); undermining Ms. King's authority with respect to allocating merit pay increases (*id.* ¶ 47); making multiple comments about her physical appearance[7] (*id.* ¶ 52); and failing to meet and discuss progress on the PIP as required by Aramark policy (*id.* ¶ 68).

On their own, none of these instances constitute particularly severe conduct. But the quantity of the alleged conduct—and the reasonable inference that some of the conduct was recurrent during Ms. King's employment—plausibly suggests a pervasive hostile environment. Some of the alleged conduct goes beyond a "mere offensive utterance"; especially the alleged criticisms directed at Ms. King for caring for her ill son and the various actions to undermine her authority. The allegations plainly allege unreasonable interference with work performance, including a March 2017 anxiety attack allegedly caused by the discriminatory conduct and a four-day medical absence. (Doc. 1 ¶ 56.) In light of the Second Circuit's caution against setting the bar too high at the pleading stage, the court will not dismiss Ms. King's hostile-work-environment claim.

---

[7] The court concluded above that the alleged comments were not expressly gender-based. The court nevertheless considers the comments as part of the totality of the circumstances.

## Conclusion

Defendant's Motion to Transfer Venue (Doc. 6) is DENIED.

Defendant's Partial Motion to Dismiss (Doc. 5) is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as it seeks dismissal of Ms. King's NYSHRL claims (Counts 2, 4, and 6). The motion is otherwise denied.

Dated this 29 day of July, 2019.

Geoffrey W. Crawford, Judge
United States District Court