**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KRISTEN KING, )<br><br>Plaintiff, )<br><br>v. )<br><br>ARAMARK SERVICES, INC., )<br><br>Defendant. ) | Civil Action No. 1:19-cv-00077-GWC |

## DEFENDANT'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT[1]

Pursuant to Local Civil Rule Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 56(a)(1) of the Western District of New York, and the individual rules of this Court, Defendant Aramark Services, Inc. respectfully submits this Statement of Facts in support of its Motion for Summary Judgment that seeks the dismissal of all claims filed by Plaintiff Kristen King ("Ms. King").[2]

## I.      Ms. King's Employment With A Different Aramark Entity.

1.      From June 2005 until June 2010, Aramark Healthcare Support Services, LLC ("Aramark Healthcare") employed Ms. King at its account with the Kaleida Health in Buffalo,

---

[1]      The factual recitation in this Statement of Facts is based largely on the allegations and statements made by Ms. King during her deposition, many of which Aramark denies but accepts, as it must, solely for purposes of its Motion for Summary Judgment.

[2]      Relevant portions of the transcripts from the July 12, 2021 deposition of Plaintiff Kristen King ("Pl. Dep."); August 5, 2021 deposition of Tracy Miller ("Miller Dep."); August 24, 2021 deposition of Jacob Williford ("Williford Dep."); September 30, 2021 deposition of Griffith Thomas ("Thomas Dep."); August 27, 2021 deposition of Rebecca Adams ("Adams Dep."); August 25, 2021 deposition of Kelly Barrett ("Barrett Dep."); September 22, 2021 deposition of Brittany Cubbage ("Cubbage Dep."); August 12, 2021 deposition of Thomas DeGori ("DeGori Dep."); August 17, 2021 deposition of Christopher Harriman ("Harriman Dep."); September 23, 2021 deposition of John Wilson ("Wilson Dep.") were attached to the Declaration of Anne E. Martinez ("Martinez Decl.") as Exhibits 1-20, respectively.

NY area.  Pl. Dep. at 28:13-17, 29:16-30:14.

2.      She first held the position of Retail Manager before being promoted to Director of Food and Nutrition (also known as Food Service Director).  Pl. Dep. at 28:13-21, 29:12-15.

3.      In June 2010, Ms. King's employment with Aramark Healthcare ended because Aramark Healthcare lost its contract with Kaleida Health and another company, Sodexo, got it. Pl. Dep. at 31:6-12.

4.      From June 2010 to April 2012, Ms. King did not hold any job.  Pl. Dep. at 31:20-22.

5.      Instead, Ms. King went back to school to obtain her master's degree in Innovation, Creativity, and Change Leadership, which she completed sometime in 2012.  Pl. Dep. at 12:13-13:1, 31:16-19, 118:5-9.

6.      Since completing her master's degree in 2012, Ms. King has not taken any other educational courses.  Pl. Dep. at 12:13-13:6.

II.     **Aramark's Account With The Valley Health System Account**

7.      From April 23, 2012 until September 21, 2017, Aramark Services, Inc. ("Aramark") employed Ms. King at its account with the Valley Health System ("VHS").  Pl. Dep. at 7:42-4, 34:4-7, 37:15-18, 62:13-17.

8.      During Ms. King's employment with Aramark, VHS included six core hospitals: Hampshire Memorial Hospital in Romney, WV; Page Memorial Hospital in Luray, VA; Shenandoah Memorial Hospital in Woodstock, VA; War Memorial Hospital in Berkeley Springs, WV; Warren Memorial Hospital in Front Royal, VA; and Winchester Medical Center in Winchester, VA.  Pl. Dep. at 77:7-78:12, 198:15.

9.      Winchester Medical Center ("WMC") is VHS' flagship hospital and its headquarters location.  Pl. Dep. at 104:17-105:2, 111:13-14, 111:22-112:3.

10.     VHS contracts with Aramark entities to provide food and facility services at its core hospitals.  Pl. Dep. at 75:23-77:14, Miller Dep. at 149:21-150:16, 168:16-170:1, 199:20-200:6.

11.     The VHS account is a fee-based account, meaning that VHS pays Aramark a flat fee or fixed amount for all of the services rendered by Aramark to VHS.  Williford Dep. at 109:22-110:2.

**III.   Aramark Hired Ms. King To Be The General Manager – Food and Nutritional Services For The VHS Account And Paid Her To Relocate To Winchester, VA Area**

12.     On April 5, 2012, Aramark sent a letter to Ms. King, which offered her the position of General Manager – Food and Nutritional Services for the VHS account, reporting to the District Manager, and she accepted this offer.  *See* Offer Letter, dated April 5, 2012, attached as Exhibit A, at p. 1, "Position/Organization" section, 5; Pl. Dep. at 60:6-61:5, 79:9-17.

13.     Aramark employed Ms. King as an employee-at-will.  Pl. Dep. at 62:18-63:10; Ex. A, at p. 3, "Employment At Will" section.

14.     She initially earned $95,000/year with the potential to receive a discretionary bonus and, at the time of her employment termination, she earned $108,000/year with the potential to receive a discretionary bonus.  Pl. Dep. at 71:18-73:9.

15.     As General Manager – Food and Nutritional Services for the VHS account, Ms. King's job responsibilities included, but were not limited to, managing the food service employees working at each of the six facilities within the VHS account; delivering strong operational performance by executing against Aramark and regulatory agency standards and programs, continually monitoring operations, completing assessments, and developing necessary action plans; establishing and maintaining client satisfaction; interacting with client management, including rounding at the VHS facilities; having responsibility for the business

3

plan and operating budget for the VHS account; and ensuring compliance with Aramark's standards of operation, client contract, and Aramark's Business Conduct Policy.  General Manager Job Description, attached as Exhibit B, at pp. 1-2, "Essential Tasks" section; Pl. Dep. at 85:12-23.

16.    Her job required her to travel frequently between the six different VHS hospitals, which were spread out across Virginia and West Virginia.  Thomas Dep. at 156:14-157:1.

17.    At the time of her hiring, Ms. King lived in Hamburg, NY.  Pl. Dep. at 9:17-22.

18.    Aramark offered to "facilitate [her] relocation to the Winchester, VA area," and on May 18, 2012, Aramark made a $11,006.28 relocation payment to her.  Ex. A, at p. 3, "Relocation" section; Pl. Dep. at 96:6-14.

19.    Rather than move to Winchester, VA from her home in Hamburg, NY, Ms. King continued to maintain her home in Hamburg, NY and rented a house in Stanley, VA, which was approximately sixty-four (64) miles away from WMC.  Pl. Dep. at 9:17-22, 97:17-98:4, 99:8-21, 108:16-21.

20.    Nevertheless, Ms. King kept the $11,006.28 relocation payment.  Pl. Dep. at 96:19-21.

21.    Ms. King's offer letter made clear that she needed to "at all times comply with all existing rules, policies and procedures of ARAMARK, as in effect from time to time, including ARAMARK's Business Conduct Policy [("BCP")]."  Ex. A, at p. 1, "Position/Organization" section; *see also* Aramark's BCP, attached as Exhibit C; Pl. Dep. at 129:8-23, 130:10-12.

22.    Ms. King also testified that she understood that during her employment with Aramark, she had to abide with Aramark policies.  Pl. Dep. at 128:6-9.

23.     As General Manager, Ms. King reported to the District Manager.  Pl. Dep. at 79:21-80:5.

24.     On or about February 1, 2015, Aramark promoted Griff Thomas, who had been the Director of Environmental Services ("EVS") at WMC and then the General Manager – EVS for the whole Valley Health system, to the District Manager position thereby making him Ms. King's new boss.  Thomas Dep. at 106:22-107:1, 107:14-20, 116:5-22, 117:3-12, 176:19-21.

## IV.     Aramark's Anti-Harassment And Anti-Discrimination Policies And Training

25.     Aramark maintained an anti-discrimination policy and an anti-harassment policy throughout Ms. King's employment.  Aramark's Equal Employment Opportunity and Affirmative Action policy, attached as Exhibit D; Aramark's Policy Against Sexual Harassment and Other Workplace Harassment, attached as Exhibit E; Pl. Dep. at 128:10-129:7.

26.     These policies prohibit gender-based discrimination and harassment.  Ex. D, at p. 1, "Equal Employment Opportunity" section; Ex. E, at p. 1, "Other Workplace Harassment" section.

27.     They require employees to immediately report all suspected violations of these policies, and provide multiple channels for employees to do so including a toll-free hotline manned by a third-party.  Ex. D, at p. 3, "Complaints" section; Ex. E, at p. 2, "Complaint Procedure" section; Pl. Dep. at 342:3-7.

28.     They further provide that any such complaints will remain confidential to the extent feasible and that the employee shall not be subjected to any retaliation.  Ex. D, at p. 3, "Responsive Action" section; Ex. E, at p. 2, "Responsive Action" section.

29.     During her employment with Aramark, Ms. King read Aramark's BCP, anti-discrimination policy and anti-harassment policy.  Pl. Dep. at 128:10-129:7, 130:2-12.

30.     Aramark's managers, including Ms. King, Mr. Thomas, Rebecca Adams, and Kelly Barrett, received training regarding Aramark's anti-discrimination and anti-harassment policies.  Pl. Dep. at 130:13-15; Thomas Dep. at 77:16-78:13, 115:10-19; Adams Dep. at 100:11-101:7; Barrett Dep. at 91:11-14.

**V.     Ms. King Received Approval For Intermittent FMLA Leave To Care For Her Son.**

31.     Ms. King's son, Tyler King, who primarily lived in New York, had a mental health condition for which he received treatment.  Pl. Dep. at 210:9-23.

32.     She applied for and was approved for intermittent leave under the Family and Medical Leave Act ("FMLA") due to her son's health condition for the time period of March or May of 2015 to November of 2015.   Thomas Dep. 182:6-15.

**VI.    Ms. King Accepted A Position As Dual General Manager – Food and EVS For The VHS Account.**

33.     In January or February 2015, Aramark offered Ms. King the position of Dual General Manager – Food and EVS for the VHS account, which Ms. King accepted.  Pl. Dep. at 76:2-4.

34.     In this role, Ms. King managed both the food service operation and the facilities/environmental services operation for the VHS account.  Pl. Dep. at 11:21-22, 76:2-4; Thomas Dep. at 177:2-11.

35.     She continued reporting to Mr. Thomas while she held this dual role.  Pl. Dep. at 79:18-23.

36.     In November 2015, she received a salary increase.  Pl. Dep. at 102:20-21.

37.     In June 2016, Aramark made a corporate-wide decision that effective October 1, 2016, it would move the facilities/environmental services operation to another line of business (*i.e.*, the Facilities line of business), which was separate from the Healthcare line of business,

with its own District Manager and its own Regional Vice President; this was not a decision made by Mr. Thomas.  Pl. Dep. at 76:10-15, 101:18-102:4, 102:15-17; Miller Dep. at 149:21-150:16, 168:16-170:1, 198:5-201:18; Thomas Dep. at 261:2-263:16, 268:15-123.

38.     As a result of this change, Ms. King's dual General Manager – Food and EVS position ended; she remained as the General Manager – Food for the VHS account and in the Healthcare line of business; the General Manager – EVS position for the VHS account was eliminated; and Timothy Knight became the District Manager – EVS in the Facilities line of business with EVS responsibility for the VHS account.  Pl. Dep. at 81:1-4, 81:18-21, Thomas Dep. at 262:22-263:17; Miller Dep. at 149:21-150:16, 168:16-170:1, 1985-201:18.

39.     Ms. King's salary remained the same even after her dual position ended.  Pl. Dep. at 102:23-103:2.

## VII.   Aramark Again Asks Ms. King To Move To Winchester, VA And She Again Fails To Do So But Keeps Aramark's Relocation Payment.

40.     On October 6, 2015, Mr. Thomas forwarded to Ms. King an email from Ms. Curry that stated, "To assist Kristen in getting closer to the client's headquarters, she will be offered Renter's relocation assistance to move. Please let me know when she would like to move so I can initiate the process with our vendor Cartus." and "Please let us know when you would like to relocate to the Winchester Area so we can contact Cartus," which was a third-party relocation company that Aramark used.  Email Chain, dated October 6, 2015, attached as Exhibit 18 to the Declaration of Griff Thomas ("Thomas Decl. Ex."), at p. 1; Declaration of Griff Thomas ("Thomas Decl.") at ¶44; *see also* Email Chain, dated October 6, 2015 and February 26, 2017, attached as Exhibit F, at bottom of p. 1; Pl. Dep. at 103:5-105:2.

41.     No emails in this chain state that Ms. King only needed to live closer to Winchester, VA while she held the dual General Manager position.   Thomas Decl. Ex. 18.

42.     That same day, Ms. King responded, "I have been working with a realtor and would like to relocate before the snow falls so please contact Cartus." *Id.*, at p. 3.

43.     In the Fall of 2015, Aramark paid a total of $9,940.53 in relocation payments to Ms. King.  Pl. Dep. at 106:22-107:3.

44.     Ms. King never moved closer to Winchester, VA; instead, she continued to maintain a home in Hamburg, NY and renting a house in Stanley, VA until her employment with Aramark ended.  Pl. Dep. at 9:17-22, 97:17-98:4, 99:8-21, 108:16-21, 154:22-155:2.

45.     Ms. King never repaid Aramark for the $9,940.53 of relocation payments that it gave to her in 2015.  Pl. Dep. at 107:4-7.

46.     On March 27, 2017 and April 6, 2017, Rebecca Adams, who was then an Aramark Regional HR Director with HR responsibility for the VHS account, emailed with Ms. King about her failure to relocate to Winchester; the fact that her position required her to be in the VHS locations and not working from a home office; that, in accordance with Aramark's Global Travel & Expense policy, she should not be reimbursed for her mileage for traveling from her rental house in Stanley, VA to WMC, which would constitute her "normal commute" under the Global T&E policy; and that she needed to deduct the 116 miles of her "normal commute" from her mileage total whenever she submitted a mileage reimbursement request for traveling to other locations.  *See* Email Chain, dated April 4 & 6, 2017, attached as Thomas Decl. Ex. 19, at p. 1; Thomas Decl. at ¶45.

## VIII.   Ms. King Took A FMLA Leave Of Absence.

47.     Ms. King applied for and was approved to take a FMLA/short-term disability leave of absence, beginning in early December 2015, for her own medical condition related to her need for surgery on her Achilles.  Pl. Dep. at 186:4-9; Thomas Dep. at 182:16-183:12.

48.     Before her leave started, she notified her teams about who would be standing in for her during her absence and who they could contact if an issue arose.  *See* Dec. 10, 2015 Calendar Notices, attached as Thomas Decl. Ex. 20; Thomas Decl. at ¶46.

49.     During her leave of absence, on December 28, 2015, Ms. King's son passed away unexpectedly.  Pl. Dep. at 186:4-11, 353:16-23.

50.     She was then approved for additional leave while she grieved the loss of her son. Pl. Dep. at 185:6-8, 186:4-20.

51.     In total, Ms. King took her full twelve (12) weeks of FMLA leave from early December 2015 – March 1, 2016.  Pl. Dep. at 186:4-20; Thomas Dep. at 182:16-183:12.

52.     On the morning of February 29, 2016, just before she returned to work, Ms. King sent an email to Aramark employees who reported to her, which stated:

> I first want to thank you all for your professionalism and dedication during my absence. This has been a very difficult time for me and to have a team as strong as you all allowed me to focus on the personal matters. For that, I am forever grateful.
>
> As I transition back to work this week, I will be reviewing the current standing meetings and adjusting as needed. If you see a meeting cancellation in your mailbox, please be sure to "delete all occurrences", not just that one meeting.
>
> I will begin my transition this Wednesday at WMC. I will reach out to you each individually to set up an informal catch up meeting. There will also be an agenda sent out that I would like to have filled out prior to our meeting.
>
> I am looking forward to seeing you all,

Email from K. King, dated February 29, 2016, attached as Exhibit 11 to Martinez Decl.; Martinez Decl. at ¶12.

53.     Later that same day, Mr. Thomas emailed Ms. King about the fact that she had

twice declined to meeting invites to meet with him on Wednesday, March 2, which was the day

that she was returning to work, at WMC, which was her primary location.  His email stated:

> I am concerned that you have twice declined meeting invites for
> March 2nd.  I have explained the meetings are to take place at
> Winchester Medical Center in the Nutrition Services Conference
> Room starting at 9am and that the nature of the meetings requires
> your on-site attendance.  Your role as General Manager requires an
> occasional office day, but the vast majority of your time is to be
> spent working in unit locations.
>
> I cannot approve the three office days you requested this week.
> There are many urgent matters to attend to and I expect you to tour
> at least two of your other facilities on March 3rd and 4th to reconnect
> with your team, clients and assess the operations.  The meetings on
> the 2nd will provide more clarity on where to focus.

Email from G. Thomas, dated February 29, 2016, attached as Thomas Decl. Ex. 21; Thomas

Decl. at ¶47.

54.     Mr. Thomas' email does not state that Ms. King needed to visit all six hospitals

on the same day or even within a three-day period, but rather only states that he just wanted her

to visit two facilities over a two-day period; he testified that he wanted her to do so in order to

observe the operations the facilities and catch up with the employees there.  *Id.*; Thomas Dep. at

197:6-23.  This is consistent with Ms. King's own email to her reports that she was going to "set

up an informal catch up meeting" with each of them individually.  *Compare* Martinez Decl. Ex.

11, at ¶3 *with* Thomas Decl. Ex. 21, at ¶2, sentence 2.

55.     Mr. Thomas did not make Ms. King visit all six hospitals within her first week

back.  Thomas Dep. at 181:21-23, 196:12-200:9.

56.     Additionally, instead of requiring Ms. King to meet him at WMC on her first day

back, Mr. Thomas subsequently offered to meet her close to her rental home in Stanley, VA and

to shorten their agenda for their first meeting.  Email from G. Thomas, dated March 1, 2016, attached as Thomas Decl. Ex. 22, at ¶2; Thomas Decl. at ¶48.

**IX.     Ms. Adams And Mr. Thomas Issued A First Written Warning To Ms. King.**

57.     Aramark's Performance Management Policy outlines recommended disciplinary actions to address unsatisfactory performance and unacceptable behavior, and states:  "It is Aramark's practice generally to advise associates of performance or disciplinary issues and provide them the opportunity to correct the issue as set forth int his Policy.  However, Aramark reserves the right to deviate from this general practice at any time at its sole discretion and with or without advance notice."  Performance Management Policy, dated October 11, 2016, attached as Exhibit G, at p. 1, Section 2.0, ¶2.

58.      Aramark's Performance Management Policy further states, "In all cases, Aramark retains the sole discretion to determine the appropriate form of action and timing. Aramark has no obligation to use any one or more of these steps of discipline prior to terminating an associate."  Ex. G, at p. 2, Section 3.0, ¶13.

59.     This policy also states, "Definition of Unsatisfactory Performance.  Associates are expected to meet expectations and performance standards establishes by Aramark.  Aramark reserves the right to determine, in its sole discretion, that an associate's performance is unsatisfactory."  Ex. G, at p. 2, Section 4.0.

60.     During Ms. King's employment with Aramark, Mr. Thomas observed what he believed to be performance problems with Ms. King.  Thomas Dep. at 202:2-6, 210:18-211:5, 224:1-225:14, 280:6-10; Thomas Decl. at ¶¶4, 6, 9, 11-16, 19, 24, 26.

61.     As these issues were happening, Mr. Thomas tried to address them with Ms. King.  *See*, *e.g.*, Thomas Dep. at 290:19-291:3; Thomas Decl. at ¶¶5-6; Adams Dep. at 229:16-233:11, 286:15-21; Email from G. Thomas, dated October 30, 2015, attached as Thomas Decl.

Ex. 1; Email from G. Thomas, dated June 24, 2016, attached as Thomas Decl. Ex. 2; Email from

G. Thomas, dated July 11, 2016, attached as Thomas Decl. Ex. 3; Emails between G. Thomas

and K. King, dated July 11, 2016 and July 13, 2016, attached Thomas Decl. Ex. 4; Emails

between G. Thomas and K. King, dated July 27, 2016, attached as Thomas Decl. Ex. 5; Emails

between G. Thomas and K. King on various dates in July 2016, attached as Thomas Decl. Ex. 6;

Emails between K. King, R. Sharon and/or G. Thomas, dated July 18, 2016, July 19, 2016 and

August 10, 2016, attached as Thomas Decl. Ex. 7; Email chain, dated August 3, 2016 – August

10, 2016, attached as Thomas Decl. Ex. 8.

62.     Ms. Adams and Mr. Thomas decided to issue a First Written Documentation (aka

first written warning) to Ms. King for what they believed were performance problems.  Adams

Dep. at 130:15-21, 179:12-21, 225:2-18, 229:16-232:12, 286:15-287:3; Thomas Dep. at 222:3-5,

224:1-18, 227:22-228:13; Thomas Decl. at ¶7.

63.     When Ms. Adams and Mr. Thomas were discussing their decision to issue this

first written warning, Mr. Thomas never said anything about Ms. King's gender or her

complaints about him, and Ms. Adams did not have any reason to believe that he wanted to issue

that warning to Ms. King because she is a woman or because she had complained about him.

Adams Dep. at 348:8-349:12.

64.     When they were decided to issue this first written warning to Ms. King, they were

not aware of any complaints of gender discrimination or gender-based harassment made by Ms.

King against Mr. Thomas.  Adams Dep. at 348:23-349:12; Thomas Dep. at 211:6-212:6.

65.     On August 29, 2016, Ms. Adams and Mr. Thomas met with Ms. King in a

conference room at WMC and gave the first written warning to her.  First Written

Documentation, dated August 29, 2016, attached as Exhibit H; Pl. Dep. at 170:17-172:3; Adams

Dep. at 225:2-18, 229:16-232:17, 277:14-18; Thomas Dep. at 224:1-18.

66.    Ms. Adams did most of the talking during the meeting and covered the eleven

items listed in the first written warning.  Pl. Dep. at 172:8-14.

67.    Ms. King alleges that during the August 29, 2016 meeting, Ms. King expressed

her disagreement with the first written warning and her opinion that it was "unfair," and said,

"The retaliation [for taking FMLA to care for her son] is continuing, the disparate treatment is

continuing, the sexual harassment is continuing."  Pl. Dep. at 172:16-173:5, 176:13-177:11.

68.    The first written warning did not result in any change to Ms. King's wages, title,

or other terms and conditions of employment.  Thomas Decl. at ¶8.

69.    During the August 29, 2016 disciplinary meeting, Mr. Thomas and Ms. Adams

felt that Ms. King yelled and interrupted them.  Adams Dep. at 273:16-18; Thomas Decl. at ¶9;

Pl. Dep. 280:7-15 (acknowledging that she does speak with a loud voice and she did interrupt

them).

70.    On September 2, 2016, Ms. King gave Ms. Adams a written document that

responded to each of the eleven items covered in the first written warning.  K. King's September

2, 2016 Response, attached as Exhibit I; Pl. Dep. at 174:6-175:18.

71.    Her response did not establish that any of the items listed in the first written

warning were false, but rather it argued that she had improved her conduct since being

previously counseled by Mr. Thomas on a particular issue, did not deny the issue but tried to

justify it or shift the blame for it, or expressed her disagreement with the level of discipline that

she received.  *Id*.

72.     On September 10, 2016, after receiving Ms. King's response to the first written warning, Mr. Thomas gave Ms. Adams a memo that addressed points made in Ms. King's written response.  Memo from G. Thomas, attached as Thomas Decl. Ex. 9; Thomas Decl. at ¶10.

73.     On September 29, 2016, based on the conversations that they had about first written warning, Mr. Thomas and Ms. Adams issued a revised version of First Written Documentation to Ms. King that removed six of the eleven items listed on the original version. Revised Version of First Written Documentation, dated September 29, 2016, attached as Exhibit J; Pl. Dep. at 299:18-300:8; Adams Dep. at 282:19-283:9; Thomas Dep. at 274:17-20.

**X.     Ms. Adams And Mr. Thomas Issued A Final Written Warning To Ms. King.**

74.     In or around January 2017, Aramark decided that it wanted to try to convince VHS to switch the purchasing of its food products from US Foods, which was VHS' then food supplier, to Sysco, which was Aramark's preferred food supplier, so Aramark decided to conduct a market basket study to collect pricing and spending volume information in order to then develop a proposal for VHS.  Thomas Decl. at ¶11.

75.     Critically, this 2017 market basket study was different from the market basket study that Aramark participated in 2015 because the 2015 market basket study was done at the request of VHS *after* US Foods had already submitted its own market basket study to VHS whereas Aramark wanted to do a 2017 market basket study without the knowledge of US Foods. *See* Thomas Decl. at ¶12.

76.     Mr. Thomas had instructed Ms. King not to tell US Foods about the 2017 market basket study.  Thomas Decl. at ¶13; Email from G. Thomas, dated January 19, 2017, attached as Thomas Decl. Ex. 10, at bottom of page 1.

77.     However, on February 15, 2017, after Mr. Thomas asked Ms. King to update him on the progress with the market basket study and suggested she gather the information for this market basket study from Aramark site directors, Ms. King sent an email to Michael Katz of US Foods that stated, "We will be conducting a market basket study again for 2017" and requesting the pricing and volume information thereby putting US Foods on notice of the market basket study.  Thomas Decl. at ¶¶14-15; Emails between G. Thomas and K. King, dated February 15, 2017 and March 3, 2017, attached as Thomas Decl. Ex. 11, at p. 1, and Thomas Decl. Ex. 13, at p. 1; Emails between G. Thomas and K. King, dated February 15, 2017, attached as Thomas Decl. Ex. 12, at bottom of p. 1.

78.     US Foods responded by requesting a meeting with VHS to re-negotiate prices thereby making it more difficult for Aramark to gain purchasing valued at $450,000 per year. Thomas Decl. at ¶16.

79.     On March 3, 2017, Mr. Thomas learned that Ms. King had informed US Foods about the market basket study.  Thomas Decl. at ¶15.

80.     While Mr. Williford did contact US Foods to try to obtain information from it in order to complete the 2017 market basket study, he did so *after* Ms. King had already informed US Foods on March 3, 2017 that Aramark was conducting that market basket study.  *See* Email from J. Williford, dated March 22, 2017, attached as Thomas Decl. Ex. 14, at bottom of p. 1 - top of p. 2; Thomas Decl. at ¶17.

81.     On March 27, 2017, Ms. Adams and Mr. Thomas decided to issue a Final Written Documentation (aka final written warning) to Ms. King because of her conduct in connection with this US Foods incident.  Final Written Documentation, dated March 27, 2017, attached as Exhibit K; Pl. Dep. at 267:14-268:15; Thomas Decl. at ¶18.

15

82.     When Ms. Adams and Mr. Thomas were discussing their decision to issue this final written warning to Ms. King, Mr. Thomas never said anything about Ms. King's gender or her complaints about him, and Ms. Adams did not have any reason to believe that he wanted to issue that warning to Ms. King because she is a woman or because she had complained about him.  Adams Dep. at 349:20-351:7.

83.     This disciplinary meeting took place in a WMC conference room.  Pl. Dep. at 269:16-19.

84.     During the March 27, 2017 disciplinary meeting, Mr. Thomas felt that Ms. King spoke in a very loud voice, interrupted them, and glared at him.  Thomas Decl. at ¶19; Pl. Dep. 280:7-15 (acknowledging that she does speak with a loud voice and she did interrupt them).

85.     This final written warning did not result in any change to Ms. King's wages, title, or other terms and conditions of employment.  Thomas Decl. at ¶20.

## XI.    Ms. King Complained About Mr. Thomas After Being Disciplined.

86.     On March 27, 2017, after receiving the final written warning, Ms. King called the Aramark Employee Hotline.  Pl. Dep. at 342:8-18, 344:21-345:4.

87.     The Aramark Employee Hotline call report summary states:

> Ongoing since February 2015, Griff Thomas has been bullying Kristen and he has been "A nightmare to work for." Griff violated Kristen's FMLA benefits by forcing Kristen to work while she was out of work on FMLA grieving the loss of her son.
>
> Griff does not offer Kristen any training, coaching, or support. Kristen feels that Griff intentionally sets her up for failure.
>
> There have been numerous hotline calls made about Griff and the hotline calls are not being taken seriously. Kristen wants a full investigation launched against Griff

*See* Hotline Call Report, dated March 27, 2017, attached as Exhibit L.

88.     Even though it is not referenced in the Hotline Call Report, Ms. King testified that she also complained during that hotline call that she felt that Mr. Thomas was discriminating against her, treating her differently than male managers, and violating the FMLA.  Pl. Dep. 345:14-346:12.

89.     Aramark's Employee Relations Department investigated Ms. King's hotline complaint.  Adams Dep. at 326:14-16.

90.     Ms. King talked to Evelyn Miller, who was then an Aramark Employee Relations Representative, and Colleen O'Donnell, who was then an Aramark Employment Relations Director, about her hotline complaint.  Pl. Dep. at 347:2-6; Barrett Dep. at 427:17-428:4.

91.     Ms. Miller later told Ms. King that the investigators concluded that the allegations Ms. King made in her hotline complaint were "completely unfounded."  Pl. Dep. at 348:3-13.

## XII.   Ms. Adams And Mr. Thomas Issued Another Final Written Warning To Ms. King.

92.     Even after the First Written Documentation and Final Written Documentation were issued to Ms. King, Ms. Adams and Mr. Thomas continued to observe what they believed to be problems with Ms. King's job performance.  Adams Dep. at 330:20-332:13; Thomas Decl. at ¶26.

93.     On May 9, 2017, Ms. Adams and Mr. Thomas issued another final written warning to Ms. King regarding her performance.  Final Written Documentation, dated May 9, 2017, attached as Exhibit M; Pl. Dep. at 276:2-15; Thomas Decl. at ¶27.

94.     When Ms. Adams and Mr. Thomas were discussing their decision to issue this final written warning to Ms. King, Mr. Thomas never said anything about Ms. King's gender or her complaints about him, and Ms. Adams did not have any reason to believe that he wanted to issue that warning to Ms. King because she is a woman or because she had complained about him.  Adams Dep. at 351:15-352:9.

95.     This disciplinary meeting took place in a WMC conference room.  Pl. Dep. at 277:9-23.

96.     Ms. Adams did most of the talking during this disciplinary meeting.  Pl. Dep. at 278:3-4.

97.     This final written warning did not result in any change to Ms. King's wages, title, or other terms and conditions of employment.  Thomas Decl. at ¶28.

## XIII.   Aramark Issued A Performance Improvement Plan To Ms. King.

98.     Mr. Thomas believed that Ms. King's performance problems still continued. Thomas Dep. at 304:4-10.

99.     He consulted with Human Resources about what to do, including whether to terminate her employment.  Thomas Dep. at 303:17-304:10.

100.    In August 2017, Mr. Thomas had a phone call that included Human Resources (i.e., Kelly Barrett) and Employee Relations (i.e., Colleen O'Donnell), and it was decided that Ms. King should be placed a ninety (90)-day performance improvement plan ("PIP") instead of being terminated.  Thomas Dep. at 308:18-310:10; Barrett Dep. at 248:12-249:5.

101.    On or about August 14, 2017, Kelly Barrett, who had recently replaced Ms. Adams as the Aramark Regional HR Director with HR responsibility for the VHS account, and Mr. Thomas presented Ms. King with the PIP.  *See* Performance Improvement Plan, dated August 14, 2017, attached as Exhibit N; Pl. Dep. at 289:20-290:22; Barrett Dep. 141:22-143:8.

102.    Ms. King and Mr. Thomas attended the August 14, 2017 PIP meeting in person in an office at War Memorial Hospital, and Ms. Barrett attended this meeting by telephone.  Pl. Dep. at 290:16-22, 291:17-19.

**XIV.**   <u>**On August 31, 2017, Ms. King Had A Subordinate Drive Her To Work At Aramark's Expense.**</u>

103.    Aramark has a Global Travel & Expense Policy, which states, in pertinent part:

> **Section 5 – Rental Car**
>
> . . . .
>
> Employees will be reimbursed for the cost of a rental car when working at an out-of-town location traveled to by air, rail, etc. only if a car is required to carry out the employee's normal, daytime, business-related responsibilities and not primarily for after hours or personal use.
>
> . . . .
>
> **Section 6 – Other Transportation**
>
> **Personal Car Usage Guidelines and Reimbursement**
>
> . . . .
>
> Employees will be reimbursed for business usage of personal cars at the current local country reimbursable rate. . . .
>
> An employee's normal commute from their residence directly to the office or mass transit, by car, is not reimbursable.
>
> . . . .
>
> Mileage reimbursement claims need to be net of 'normal commute' miles, when appropriate. For example, you take a one day business trip by airplane. Home to airport is 100 miles roundtrip and your normal commute from home to work is 75 miles roundtrip. Your mileage reimbursement claim is 100 miles less 75 miles, or 25 miles.
>
> . . . .
>
> If your normal commute miles are greater than your business miles, there is no mileage reimbursement claim.

Aramark Global Travel & Expense Policy, attached as Exhibit O, at pp. 13, 15; Pl. Dep. at

327:7-11.

104.    Ms. King was aware of this policy as it had been reviewed with her and she had

read these two sections of it.  Pl. Dep. at 327:7-11, 330:5-10, 331:16-332;1; Barrett Dep. at

220:3-221:8.

105.    In or around August 2017, Ms. King's car broke down.  Pl. Dep. at 322:10-11.

106.    Mr. Thomas had told Ms. King that she needed to be at WMC on August 31,

2017.  Pl. Dep at 322:17-20.

107.    Ms. King asked Mr. Thomas if Aramark would pay for a rental car for her, and he

told her, "No" and that Aramark does not pay for rental cars under such circumstances.  Pl. Dep.

at 322:10-16, 328:22-329:6; Thomas Dep. at 332:16-23.

108.    Ms. King then asked Brittany Cubbage, who was one of her subordinates working

at Page Memorial Hospital in Luray, VA, if she could borrow Ms. Cubbage's car and, after Ms.

Cubbage told her "no," she had Ms. Cubbage drive her to WMC on August 31, 2017, which was

about a 60 mile or one-hour-and-fifteen-minute drive each way for Ms. Cubbage.  Cubbage Dep.

at 17:4-5, 40:9-19, 41:8-9, 71:4-6, 91:6-11; Pl. Dep. at 153:12-17, 333:22-334:6.

109.    No other manager has had Ms. Cubbage pick them up at home and drive them to

their office.  Cubbage Dep. at 88:15-89:1.

110.    Ms. Cubbage has always maintained that on August 31, 2017, she picked Ms.

King up at her house, drove her to WMC, dropped her off, and then returned to Page Memorial

Hospital, which was Ms. Cubbage's worksite, and that her sole reason for going to WMC that

day was to drive Ms. King there.  Cubbage Dep. at 40:9-13 ("From my memory, I remember

dropping Kristen off on August 31st at Winchester and I did not do any work at Winchester

Medical Center that day. I just dropped her off because her car was broke down."), 41:8-9

("From what I remember, I dropped her off and I came back."), 71:4-6 ("I do not remember

20

working with Kristen on August 31st.  I just remember dropping her off."), 78:2-3 ("I just remember dropping her off and then coming back to Page."), 89:10-16.

111.    Ms. King told Ms. Cubbage that she could submit a mileage reimbursement request for driving to/from WMC on August 31, 2017.  Pl. Dep. at 335:11-15, 336:7-9; Cubbage Dep. at 88:1-12.

112.    On September 6, 2017, Ms. Cubbage submitted an Expense Report, which she titled "Kristin" [sic]; requested "Personal Car Mileage" reimbursement for driving from Ms. King's house to WMC and from WMC to Page Memorial Hospital on August 31, 2017; identified the "Business Purpose" as "Transported Kristin [sic] to WMC;" and wrote in the "Comment" section, "Left home for Kristin [sic] and dropped off and then went to work at PMH".  This expense report makes no mention of Ms. Cubbage going to WMC for a meeting. Expense Report, titled "Kristin" and dated September 6, 2017, attached as Exhibit P, at middle of p. 1; Cubbage Dep. at 85:17-87:22, 90:19-23, 105:12-20; Pl. Dep. at 335:16-18.

113.    Ms. King then approved Ms. Cubbage's reimbursement request for her August 31, 2017 mileage.  Pl. Dep. at 335:19-21, 336:7-9.

114.    On September 18, 2017, after learning about this incident, Ms. Barrett conducted an investigation into it.  Barrett Dep. at 235:21-23; Pl. Dep. at 336:11-337:5.

115.    Ms. Barrett had a telephone interview with Ms. Cubbage about what happened on August 31, 2017.  Cubbage Dep. at 73:18-21, 75:5-7, 92:6-10.

116.    Ms. Cubbage told Ms. Barrett that Ms. King had told her that her car was broken and asked to borrow Ms. Cubbage's car, and that after Ms. Cubbage told her that she could not borrow her car, she drove Ms. King from Ms. King's home to WMC, dropped her off at WMC,

21

and then returned to Page Memorial Hospital.  Cubbage Dep. at 40:7-19, 41:4-42:7, 92:11-94:7, 106:6-9; Barrett Dep. at 264:8-18, 267:14-270:2, 270:22-271:5.

117.    Ms. Cubbage did not say that she was at WMC on August 31, 2017 to have a work meeting with Ms. King – in fact, Ms. Cubbage does not remember ever having a one-on-one meeting with Ms. King at WMC and only remembers being at WMC on August 31 to drop Ms. King off.  Cubbage Dep. at 40:7-19, 41:4-51:17, 58:16-59:5, 60:22-61:12, 63:16-23, 69:17-19, 71:4-6, 92:11-94:7, 106:6-9; Barrett Dep. at 263:3-264:18, 267:14-22, 271:3-5, 279:13-21, 339:3-340:2.

118.    Ms. Barrett did not do anything during Ms. Cubbage's interview that made Ms. Cubbage feel threatened or intimidated.  Cubbage Dep. at 75:8-11; Barrett Dep. at 403:18-404:2.

119.    Ms. Barrett also had an investigation interview with Ms. King about this incident – Ms. King and Mr. Thomas were at Warren Memorial Hospital while Ms. Barrett participated by phone – during which Ms. King was told that she was under investigation for a potential violation of Aramark's BCP because she approved mileage reimbursement for Ms. Cubbage driving her to WMC on August 31, 2017.  Pl. Dep. at 320:7-13, 336:11-337:5; Barrett Dep. 235:12-23.

120.    Like Ms. Cubbage, Ms. King did not say during her interview that Ms. Cubbage was at WMC on August 31, 2017 to have a work meeting with her as opposed to just driving and dropping her off.  Pl. Dep. at 321:22-322:3; Barrett Dep. at 268:3-6, 269:21-270:2, 279:13-21, 309:12-21, 339:3-340:2.

121.    During her deposition, Ms. King said that on Wednesday, August 30, 2017, Ms. Cubbage also drove Ms. King to WMC because Ms. King needed to be at WMC for a Directors' Meeting on August 30 and she also needed to work with Ms. Cubbage on some documents

together, so she had Ms. Cubbage drive her to WMC on August 30 and work with her on the documents there.  Pl. Dep. at 323:1-16, 336:2-6.  However, the date at issue is *not* Wednesday, August 30, 2017, but rather the date at issue is Thursday, August 31, 2016.

122.    It did concern Ms. Barrett that a subordinate employee (i.e., Ms. Cubbage) was being asked to drive her manager (i.e., Ms. King) like Ms. Cubbage was her taxi service.  Barrett Dep. at 278:16-279:12.

**XV.    Ms. King Did Not Bring Requested Documentation To Her September 18, 2017 PIP Meeting.**

123.    On Monday, September 11, 2017, Ms. King and Mr. Thomas met to discuss her PIP, and Mr. Thomas asked Ms. King to collect specific information and documentation regarding her progress on the PIP to present to him at WMC on the following Monday, September 18, 2017 thereby giving her one week to collect the requested items.  Pl. Dep. at 316:7-317:10; Thomas Decl. at ¶¶29-30.

124.    On the afternoon of Sunday, September 17, 2017, Ms. King emailed Mr. Thomas, asking him to reschedule their Monday morning meeting allegedly because she had a meeting at Warren Memorial Hospital and needed to support the Warren Memorial Hospital operation because someone was on vacation, telling him that she also could not meet on Tuesday because she was scheduled to meet with VHS' CEO on Tuesday, and proposing Wednesday or Friday as alternatives.  Email chain, dated September 17, 2017 and September 18, 2017, attached as Thomas Decl. Ex. 15, at bottom of p. 2.; Thomas Decl. at ¶31.

125.    That same day, Mr. Thomas responded that the PIP review meeting is not something that they could rescheduled and offered to meet her at Warren Memorial Hospital. Thomas Decl. Ex. 15, at top of p. 2.

126.     At 6:21 am on Monday, September 18, 2017, Ms. King responded in an email that said, amongst other things, "I did not finish gathering all the needed items for review." *Id.* at bottom of p. 1.

127.     Mr. Thomas responded at 7:34 am, "Meeting at Warren is fine.  I will see you at 9.  Let's go over what you've got." *Id.* at top of p. 1.

128.     It is undisputed that on September 18, 2019, Ms. King did not have all of the items that Mr. Thomas had given her a week to collect.  *Id.*; *see also* Pl. Dep. at 319:23-320:7.

**XVI.**   **On September 19, 2017, Ms. Barrett and Ms. O'Donnell Made The Decision To Terminate Ms. King's Employment.**

129.     On September 19, 2017, Ms. Barrett and Ms. O'Donnell met, discussed what Ms. Barrett had determined based on her investigation, and decided to terminate Ms. King's employment based on their belief that Ms. King had Ms. Cubbage drive her to WMC (i.e., a drive that constituted Ms. King's normal commute and should not have been paid for by Aramark) at Aramark's expense in violation of Aramark policy and that her performance issues had continued.  Barrett Dep. at 378:6-379:6, 397:21-398:7, 403:18-405:4, 416:5-7, 419:13-15, 427:1-19; *see also* Pl. Dep. at 340:14-341:11 (testifying as to her belief that it was Ms. Adams, Ms. Miller, Ms. Barrett, Ms. O'Donnell, and Christin Joyner, all of whom are women, who made the decision to terminate her employment).

130.     Ms. King was not terminated for food safety violations, failing to submit weekly schedules, Mr. Thomas not knowing where she was, the Voice Of the Customer scores the Valley Health account had received, failing to comply Top 15 reports, client complaints about her, or the VHS account being short staffed.  Barrett Dep. at 409:13-410:15.

131.    Ms. Barrett believes that on September 19, 2017, Ms. Joyner, who was then the Vice President of Human Resources, was made aware of the termination decision.  Barrett Dep. at 428:11-429:18; Miller Dep. at 84:17-21.

132.    The decision to terminate Ms. King was also reviewed with Mr. Thomas, who agreed with it.  Thomas Dep. at 323:21-324:12.

133.    Ms. Barrett never heard Mr. Thomas say anything nor saw him doing anything that suggested he had a discriminatory bias against women.  Barrett Dep. at 410:19-411:22.

134.    Ms. Barrett did not recall anyone ever complaining to her about Mr. Thomas engaging in alleged gender-based harassment, sexual harassment gender discrimination, or retaliation for making a complaint of alleged gender-based harassment or sexual harassment. Barrett Dep. at 411:9-412:10.

**XVII.**  **After Ms. King Was Told She Was Being Investigated For A Violation Of Aramark's BCP Policy, She Stopped Coming To Work, Contacted Sedgwick To Request A Continuous Leave Of Absence And Called The Aramark Employee Hotline.**

135.    Ms. King did not come to work on September 19, 2017 or September 20, 2017, and she did not have any in-person interactions or phone conversations with Mr. Thomas on those dates.  Pl. Dep. at 337:6-9, 340:6-12; Thomas Decl. at ¶32.

136.    She testified, "[A]fter that incident where they had told me about this code of conduct violation and . . . . I had a sinking feeling . . . I went to my doctor [on September 19, 2017] who pulled me out of work."  Pl. Dep. at 338:1-12.

137.    On September 19, 2017, Ms. King contacted Sedgwick, which is Aramark's third-party claims administrator that administers its leaves of absence, and requested a continuous leave of absence.  Pl. Dep. at 185:19-22; Barrett Dep. at 365:21-366:6, 420:17-421:3.

138.   Aramark did not learn about Ms. King's pending request for continuous FMLA leave until September 20, 2017.  Barrett Dep. at 365:21-366:23, 403:11-15, 419:22-23, 420:13-16, 422:19-423:3, 423:20-424:13.

139.   On September 19, 2017, Ms. King also called the Aramark Employee Hotline.  Pl. Dep. at 343:13-15.

140.   The Aramark Employee Hotline call report summary states:

> On 5/9/2017, Kristen had a meeting with human resources because she had previously filed a report against Griff Thomas, but nothing was done. Instead Kristen was given another a write-up rather than talking about how to move forward with the issues reported with Griff. Griff was in the meeting and Kristen felt this was retaliation for filing the report against him.

> Kristen was told that everything was unwarranted. Kristen gave names of witnesses but no one was called in regards to the investigation was done.

> On 8/15/2017, Griff gave Kristen a development plan. Griff just copied and pasted the execution framework. Griff didn't put any thought into this and just made it general. Kristen felt that Griff didn't even care about her development before and he probably only did it now to have it as documentation

> Kristen has always asked Griff for a performance plan in the past to see what she was doing wrong and be able to improve. Griff only kept on giving Kristen write-ups for the issues going on even though she kept on asking for a plan.

> Kristen wasn't given any of her goals and wasn't told any of the targets she needed help on. Griff never met with Kristen in regards to the development plan[].

> On 9/18/2017, Griff was supposed to have a meeting with Kristen. Griff instead called human resources and tried to charge Kristen with a BCP (business conduct policy) violation. Kristen was informed that she was under investigation for this.

> Kristen's car broke down and she asked Griff If the company could pay for a rental car like how they had in the past. Griff stated that the company doesn't do this anymore. Kristen told Griff that she could get a ride from Brittney. Brittney had to leave early from work

and Kristen put in work miles for Brittney so that she could be compensated for this.

Griff told Kristen that was wrong and that she had violated the policy. Griff told Kristen that she wasn't allowed to get milage for this but this wasn't for her, this was for Brittney Griff denied Kristen telling him that she was getting a ride from Brittney.

Later that day, Kristen spoke to Kelly about the issues going on. Kelly stated that she would look into them and investigate

Griff is not available and he doesn't do what he is supposed to do for Kristen's development. Kristen feels that Griff just wants to get her terminated. Griff told Kristen that mileage is not mandatory was it was therefore taken away from her.

Kristen would like someone else to investigate her case. Kristen doesn't want the same people who investigated the last report to investigate this one.

Griff does not offer Kristen any training, coaching, or support. Kristen feels that Griff intentionally sets her up for failure.

There have been numerous hotline calls made about Griff and the hotline calls are not being taken seriously. Kristen wants a full investigation launched against Griff.

*See* Hotline Call Report, dated September 19, 2017, attached as Exhibit Q; Pl. Dep. at 349:3-11.

141.   Even though it is not referenced in the Hotline Call Report, Ms. King testified that she also complained during that hotline call that she felt that Mr. Thomas was discriminating against her, treating her differently than male managers, and violating the FMLA.  Pl. Dep. at 344:15-346:12.

142.   Aramark was not notified about Ms. King's hotline call until September 20, 2017. Barrett Dep. at 402:6-10, 418:18-19.

143.   Aramark's Employee Relations and Human Resources Departments investigated Ms. King's September 19 hotline complaint.  Barrett Dep. at 412:11-413:1, 128:16-19.

144.    They decided that Ms. King's employment termination was still justified.  Barrett Decl. at ¶¶3-4.

**XVIII. Aramark Informed Ms. King Of The Termination Decision.**

145.    Even though the termination decision was made on September 19, 2017, they did not inform Ms. King of the decision until September 21, 2017.  Barrett Dep. at 417:18-418:4, 419:13-15.

146.    On or about September 21, 2017, Ms. Barrett, with Mr. Thomas on the phone, called Ms. King and informed her of the decision to terminate her employment.  Pl. Dep. at 72:2-6, 34:4-7, 152:7-12; Barrett Dep. at 377:14-15, 417:18-23; Barrett Decl. at ¶5.

147.    Ms. King was at her rental house in Virginia during this termination call.  Pl. Dep. at 153:10-14.

148.    On September 21, 2017, Ms. Barrett also sent her a letter regarding her termination.  *See* Letter from K. Barrett, dated September 21, 2017, attached as Exhibit R; Pl. Dep. at 72:14-18, 142:1-16; Barrett Dep. at 378:1, 417:20-23.

**XIX.   Ms. King's Permanent Replacement Was Female.**

149.    Mara Racowkski, who is also female, replaced Ms. King.  Williford Dep. at 337:7-8.

**XX.    Ms. King Only Looked For A New Job For A Few Months Immediately Following Her Termination, Applied To Only Six Jobs, And Then Withdrew From The Labor Market.**

150.    Since her Aramark employment ended, Ms. King has not held any job, and her only sources of income were unemployment compensation, military benefits (which increased from $287/month to $3,057/month after her Aramark employment ended), and occasional financial support from her fiancé.  Pl. Dep. at 31:23-32:11, 32:12-35:7.

151.    Ms. King only recalled applying to the following six jobs during the two or three months immediately following her employment termination:

- (1) October 2017 - Insight Global' s District Manager job in unknown location;

- (2) October 2017 – Morrison Healthcare Food Services' District Manager job in unknown location;

- (3) October 2017 or January/February 2018[3] – Delaware North's Senior Beverage Manager job in Buffalo, NY;

- (4) October 2017 or January/February 2018[4] – Delaware North's VP Food & Beverage job in Buffalo, NY;

- (5) November 2017 – Sodexo's Change Manager job in Buffalo, NY;

- (6) November 2017 – Sodexo's job of unknown job title in White Plains, NY;

Pl. Dep. at 45:17-55:8.

152.    Ms. King never produced any documents evidencing that she has applied to any jobs other than the six above-identified jobs, and testified that she did not have any documents, emails, or online accounts with job search engines that she could log into in order to determine if she actually did apply to more than just the six above-identified jobs.  Pl. Dep. at 37:19-38:13, 45:17-54:20, 57:14-58:12.

153.    In or around November 2018, Morrison Healthcare contacted Ms. King about a Food Service Senior Director position in Syracuse, NY, but Ms. King did not apply for it and on November 19, 2018, she told them that she was not interested in it.  Pl. Dep. at 42:5-43:20.

154.    Since November 19, 2018, Ms. King has not spoken to anyone about a potential job.  Pl. 60:3-5.

---

[3]    Ms. King could not remember when she applied for the two Delaware North jobs and identified October 2017 and January/February 2018 as possibilities.  Pl. Dep. at 54:12-18.

[4]    *See supra* Footnote 3.

155.     During her post-Aramark job search, Ms. King did not hire a headhunter to try to help her find replacement employment.  Pl. Dep. at 58:13-16.

156.     During her post-Aramark job search, Ms. King did not apply for any work with any temporary employment agencies.  Pl. Dep. at 58:21-59:1.

**XXI.   Ms. King Filed A Charge Of Discrimination And Then This Lawsuit After The EEOC Dismissed It.**

157.     In September 2017, Ms. King hired an attorney to help her with her claims against Aramark.  Pl. Dep. at 11:9-12, 12:2-7.

158.     On July 17, 2018, Ms. King signed a Charge of Discrimination for her attorney to submit to the Equal Employment Opportunity Commission ("EEOC").  Pl. Dep. at 16:12-17:15.

159.     On July 18, 2018, the EEOC received Ms. King's Charge of Discrimination.  Pl. Dep. at 17:16-18:1.

160.     The Charge of Discrimination asserted claims of gender-based hostile work environment harassment, gender-based discriminatory discharge, and retaliation under Title VII of the Civil rights Act ("Title VII").  *See* Charge of Discrimination, attached as Exhibit S, at  p. 28, ¶81; Pl. Dep. at 16:12-17:15.

161.     On October 17, 2018, the EEOC issued a Dismissal and Notice of Right to Sue. *See* Dismissal and Notice of Right to Sue, attached as Exhibit 12 to the Martinez Decl.; Pl. Dep. at 19:14-20:7; Martinez Decl. at ¶13.

162.     On January 14, 2019, Ms. King filed her Complaint in this Action.  Dkt. No. 1.

**XXII.  Ms. King's Allegations To Support Her Claims.**

163.     Mr. Thomas is the only individual who Ms. King has alleged engaged in gender-based harassment, gender-based discrimination, and retaliation for having taken FMLA leave and for allegedly having complained about gender-based harassment or gender-based

discrimination.  Pl. Dep. at 172:22-23, 176:13-177:11, 187:4-4-12, 188:9-13, 244:13-17, 258:5-7, 2701:2-4.

164.   Ms. King's primary argument to support her claim of gender-based harassment and gender discrimination is that Mr. Thomas treated some men better than her.

165.   Ms. King identified five alleged comparators: (1) Tom DeGori; (2) Chris Harriman; (3) Jeff Soloway; (4) Jacob Williford; and (5) John Wilson.  Pl. Dep. at 188:20-189:4, 199:23-200:3.

166.   During her approximately five and one-half years of employment with Aramark, Ms. King only interacted with Mr. DeGori, Mr. Harriman, and Mr. Wilson approximately fifteen times, usually in district meetings that took place either over the phone or in-person, at training sessions, or at conferences.  Pl. Dep. at 190:8-23, 192:17-20, 195:18-196:5.

167.   The record evidence shows the following about her alleged comparators:

|  | Position During The Relevant Period (i.e., 2/1/15 – 9/21/17)[5] | Did Comparator Directly Report To Mr. Thomas At Any Point During The Relevant Period (i.e., 2/1/15 – 9/21/17)? | Account At Which Comparator Worked At Any Point During The Relevant Period (i.e., 2/1/15 – 9/21/17) | Number of Locations For Which He Had Managerial Responsibility During The Relevant Period (i.e., 2/1/15 – 9/21/17) | Did Comparator Earn More or Less Per Year In Salary + Bonus Than Ms. King During The Relevant Period (i.e., 2/1/15 – 9/21/17)? |
|---|---|---|---|---|---|
| **Tom DeGori** | Food Service Director | Yes | Ohio Valley | Two, which were located across the street from each other | Less |

---

[5]   Ms. King did not start reporting to Mr. Thomas until February 1, 2015 and her employment with Aramark, and, therefore, Mr. Thomas' supervision of her, ended on September 21, 2017.  *See supra* SOF ¶¶24, 145-148.

| Chris Harriman | Director of Food and Nutrition | Yes | Chesapeake Regional Medical Center | One | Less |
| --- | --- | --- | --- | --- | --- |
| Jeff Soloway | Assistant EVS Director, Interim EVS Director, and EVS Director | No – Ms. King and then Tim Knight were his direct supervisors. | VHS | None | Less |
| Jacob Williford | Controller | According to Ms. King's testimony, initially Ms. King was his direct supervisor, but later Mr. Thomas was his direct supervisor. | VHS | None | Less |
| John Wilson | Food Service Director (until 4/13/15) and then General Manager | Yes | Western Maryland Regional Medical Center | Two, which were located fourteen miles apart | Less |

Pl. Dep. at 188:20-189:4, 189:15-16, 192:13-16, 194:23-195:4, 195:10-17, 197:23-198:6, 200:10-16, 202:8-10, 202:19, 204:8-10; DeGori Dep. at 51:22-53:6, 54:20-21, 55:5-22; Harriman Dep. at 105:13-17, 106:19-107:4, 114:2-5, 122:20-123:4; Williford Dep. at 36:14-23, 75:9-21, 76:10-18, 174:7-10, 348:3-6, 378:19-20; Wilson Dep. at 70:7-20, 76:18-21, 79:12-19, 84:20-85:2, 287:13-16; Barrett Decl. at ¶6.

168.   Ms. King made allegations about how Mr. Thomas allegedly treated her

differently than her alleged comparators:

| Ms. King's Allegation About How Mr. Thomas Allegedly Treated The Alleged Comparators Better Than Her | What The Record Evidence Shows |
| --- | --- |
| On August 29, 2016, March 27, 2017, and May 9, 2017, Mr. Thomas together with Human Resources issued disciplinary warnings to her, but did not discipline her alleged comparators. *See supra* SOF ¶¶65, 81, 93. | The record evidence shows that Ms. King engaged in the conduct for which she was disciplined. *See supra* SOF ¶¶60-62, 69, 71, 74-81, 84, 92-93. |

| | |
|---|---|
| | Ms. Adams, who is also a woman, was a decisionmaker for each of the disciplinary warnings. *See supra* SOF ¶¶65, 81, 93.<br><br>There is no evidence that any of the alleged comparators engaged in the same conduct as Ms. King that resulted in each of her disciplinary warnings.<br><br>Mr. Soloway was also disciplined.  Pl. Dep. at 205:3-8. |
| In August 2017, Mr. Thomas and Ms. Barrett placed her on a PIP.  *See supra* SOF ¶100. | At least two women were also involved in the decision to place Ms. King on a PIP.  *See supra* SOF ¶100.<br><br>Mr. Thomas and Ms. Barrett also placed Mr. Harriman on a PIP.  Harriman Dep. at 16:10-20; Barrett Dep. at 195:17-196:2; Thomas Dep. at 287:13-16.<br><br>Mr. Thomas also placed Mr. Soloway on a PIP.  Pl. Dep. at 205:3-18. |
| After October 1, 2016, she no longer held the dual General Manager – Food and EVS position, but Mr. Wilson continued to work as a dual General Manager – Food and Valet after October 1, 2016.  *See supra* SOF ¶¶37-39; Wilson Dep. at 75:12-19. | The decision to split the food service business and EVS/facilities business into separate lines of business, which resulted in the end of Ms. King's dual General Manager role, was a corporate-wide decision that was not made by Mr. Thomas.  *See supra* SOF ¶¶37-39.<br><br>The Valet services that Mr. Wilson managed were something that his client said it wanted to have and asked Aramark to let him oversee it.  Valet services also only constituted a small part of his job with the vast majority of his job focused on food services.  Wilson Dep. at 93:17-94:7, 285:13-287:8.<br><br>The VHS account did not have Valet services.  Thomas Decl. at ¶33. |
| In early 2015, Mr. Thomas gave an office at WMC to Mr. Williford, and the other alleged comparators also had private offices, but Mr. Thomas did not give Ms. King a private office. Pl. Dep. at 213:9-11, 214:19.  In March 2017, | Ms. King did not work out of WMC every day, but rather she traveled around to each of the six facilities that she managed.  Thomas Dep. at 195:5-6. |

| | |
|---|---|
| Mr. Thomas stopped allowing her to work from home one or two days each week. Pl. Dep. at 64:16-19, 65:14-68:3, 71:3-14. | Unlike Ms. King, Mr. Williford worked out of WMC every workday. Thomas Dep. at 195:5-6; Williford Dep. at 137:8-10, 140:13. Mr. Thomas also felt that Mr. Williford needed to be in close proximity to the people who worked on the cash records at WMC. Thomas Dep. at 194:1-195:5. |
| | Mr. Williford testified that Ms. King would work in the same office as him when she was at WMC, and that if she needed to have a private phone call or meeting, he would have stepped out of the office. Williford Dep. at 136:20-137:1, 137:14-16, 138:5-7, 356:7-13, 357:2-358:9. |
| | There was also a private, fully enclosed conference room at WMC that Ms. King could have used if she needed to have a private phone call or meeting. Adams Dep. at 347:3-348:7. |
| | When Mr. Thomas became the District Manager, he also offered Ms. King his private office in the Cork Street building, which was located about one mile from WMC. Thomas. Dep. at 189:6-13, 189:23-190:13. |
| | Aramark did have female managers at the VHS account who had private offices. Williford Dep. at 140:7-10. |
| | Ms. Adams is actually the one who told Ms. King on March 27, 2017 that Ms. King did not have a home office and was expected to work from the VHS locations. *See supra* SOF ¶46. |
| | Ms. King agrees that Aramark has a right to change, amend, or remove its prior policies or promises. Pl. Dep. at 122:2-4. |
| | Mr. DeGori, Mr. Harriman and Mr. Wilson worked at different accounts than Ms. King, which had different space constraints, and |

| | |
|---|---|
| | typically worked out of the same office every workday because they did not oversee six separate facilities like Ms. King did.  *See supra* SOF ¶¶8, 15-16; DeGori Dep. at 106:23-107:8; Harriman Dep. at 129:5-9; Wilson Dep. at 79:19-23.<br><br>None of Ms. King's alleged comparators regularly worked from home one or two days each week.  DeGori Dep. at 106:23-107:3; Harriman Dep. at 298:22-299:2; Williford Dep. at 137:8-10, 179:2-6, 179:19-180:12; Thomas Decl. at ¶34. |
| In March 2017, Mr. Thomas started enforcing the Aramark policy of not permitting her to get mileage reimbursement for her normal commute.  Pl. Dep. at 64:20-65:7, 68:4-70:12, 332:12-17. | This is a corporate-wide policy.  Ex. O, at p. 1. "Policy Purpose" section and at p. 15, "Other Transportation – Personal Car Usage Guidelines and Reimbursement" section.<br><br>None of Ms. King's alleged comparators received reimbursement for their normal commutes.  DeGori Dep. at 105:20-106:21; Harriman Dep. at 297:20-298:6; Thomas Decl.  at 35. |
| Mr. Thomas made her send her weekly schedule to him, but he did not make the alleged comparators do that.  Pl. Dep. at 238:1-8, 239:12-240:17. | Unlike her alleged comparators, Ms. King was the only one who managed six separate facilities, and the only one who Mr. Thomas repeatedly had difficulty tracking down and heard from others about not being able to find her.  *See supra* SOF ¶¶8, 15-16; Thomas Dep. at 255:15-256:10; Thomas Decl. at ¶¶36-39. |
| Mr. Thomas made her implement the "Treat Yourself" program related to patient feeding throughout Mr. Thomas' District, but she did not think that Mr. DeGori or Mr. Harriman had to implement it at their facilities.  Pl. Dep. at 221:2-225:3. | Mr. DeGori and Mr. Harriman did actually implement the "Treat Yourself" program at the facilities that they managed.  DeGori Dep. at 65:4-17; Harriman Dep. at 218:6-10, 219:22-220:22. |
| Mr. Thomas allowed Mr. DeGori, Mr. Harriman, and Mr. Wilson to solicit feedback for Voice of the Customer surveys directly from customers, which she did not want to do.  Pl. Dep. at 229:11-231:7. | Ms. King was neither disciplined nor terminated because of her Voice of the Customer scores.  *See supra* SOF ¶¶61, 81, 93, 129-130.<br><br>She has no knowledge of her alleged comparators inputting different information than what customers actually told him in |

| | |
|---|---|
| | order to skew the results.  Pl. Dep. at 232:2-6, 236:6-237:23.<br><br>Mr. Thomas is unaware of any document that prohibited managers from soliciting feedback Voice of the Customer surveys directly from customers.  Thomas Decl. at ¶40. |
| Mr. Thomas used a condescending tone of voice with her and only occasionally used a non-condescending tone of voice with her, but she heard him use what she perceived as a welcoming and happy tone of voice with his male direct reports.   Pl. Dep. at 225:4-23, 227:19-21, 229:11-15. | Mr. Harriman testified that Mr. Thomas would not respond to his emails and used a condescending tone with him in emails, which is how Mr. Thomas primarily communicated with him.  Harriman Dep. at 317:14-318:7. |
| Mr. Thomas micromanaged her, but did not micromanage her alleged comparators.   Pl. Dep. at 238:1-9. | Mr. Harriman and Mr. Wilson testified that Mr. Thomas micromanaged them.  Harriman Dep. at 316:20-21, 317:14-318:7; Wilson Dep. at 191:4-6. |
| In her March 27, 2017 Final Written Documentation, Mr. Thomas instructed her to "review decisions with financial impact greater than $1,000 with District Manager in advance."   Ex. K, at p. 1, "Action to Be Taken" section.  Mr. Thomas did not give the same instruction to the alleged comparators. | There is no evidence that Ms. King actually followed this directive or that it actually had a negative impact on the VHS operation.  Thomas Decl. at ¶¶22-23; Thomas Dep. at 272:8-273:4<br><br>Ms. King received this directive because she engaged in conduct that Mr. Thomas thought evidenced a lack of understanding as to how financial decisions impact Aramark and its client.  Thomas Decl. at ¶24; Thomas Dep. at 273:9-274:8<br><br>Mr. Thomas is unaware of any of the alleged comparators engaging in conduct that evidenced a similar lack of understanding as to how financial decisions impact Aramark and its client.  Thomas Decl. at ¶25. |
| On October 15, 2015, Mr. Thomas responded to Ms. King's request for "a couple more days" to submit the performance evaluations of her subordinates and her own performance results, by stating, "They have to be in today by 5 pm." *See* Email Chain, dated October 14-15, 2015, attached as Thomas Decl. Ex. 16; Thomas Decl. at ¶41.  The next year, on Friday, September 30, 2016, Mr. Williford told | Ms. King and Mr. Williford were not asking for extensions for the same reasons.  While she was asking for an extension of time because she had not yet finished her subordinates' evaluations, which was something over which she had control, Mr. Williford was explaining that he could not access the Aramark system to submit his self-evaluation because the servers were |

| | |
|---|---|
| Mr. Thomas that he could not submit his own self-evaluation because the severs were overwhelmed, and Mr. Thomas responded, "I'm in the same boat, don't sweat the deadline.  Try tomorrow or Monday, that's what I'm going to do."  *See* Email Chain, dated October 15, 2015, attached as Thomas Decl. Ex. 17; Thomas Decl. at ¶42. | overwhelmed with everyone trying to submit their self-evaluations.  *Compare* Thomas Decl. Ex. 16 *with* Ex. Thomas Decl. Ex. 17. |
| Mr. Thomas asked her to provide coverage at Norton Hospital, but did not ask men to provide coverage.  Pl. Dep. at 255:14-21. | Ms. King herself did not go to Norton Hospital to cover it.  Thomas Dep. at 208:18-21; Adams Dep. at 285:8-9.<br><br>Mr. Thomas, Mr. Harriman, and at least two other men (i.e., Al Siegel and a male chef from Mr. Harriman's account) all provided coverage at Norton Hospital.  Thomas Dep. at 208:18-21, 209:6-10; Harriman Dep. at 106:16-21, 169:21-22. |
| Mr. Thomas met with her direct reports without her and tell her after the fact about it. Pl. Dep. at 257:608 | Mr. Thomas sometimes met with the Aramark employees working in the facilities managed by Mr. DeGori, Mr. Harriman, and Mr. Wilson outside of their presence. Thomas Decl. at ¶43. |
| In or around may 2016, Mr. Thomas had Mr. Williford, an Aramark Controller assigned to the VHS account, help with financial tasks for other Aramark accounts within Mr. Thomas' district, including accounts that were managed by men.  Pl. Dep. at 207:19-210:4. | VHS did not pay Mr. Williford's salary. Williford Dep. at 38:19-22, 109:16-110:9, 116:2-22, 117:15-119:10, 200:13-201:20.<br><br>While Mr. Williford did help with financial tasks for other Aramark accounts within Mr. Thomas' district, he still fully performed all of his work for the VHS account.  Williford Dep. at 361:14-363:22; Thomas Dep. at 238:13-241:22.<br><br>Aramark did not terminate Ms. King's employment because something did not get done due to Mr. Williford helping with other Aramark accounts.  *See supra* SOF ¶¶129-130. |
| During her 12-week leave of absence from December 9, 2015 – March 1, 2016, Mr. Thomas did not have any cover for her at the VHS hospitals, and required her to do work while on leave, but that Ms. Thomas made her provide coverage for Mr. DeGori when Mr. | Her own testimony suggests that Mr. Thomas did at times visit the VHS facilities during her leave of absence.  Pl. Dep. at 179:6-19. |

| DeGori allegedly took a leave of absence for a surgery.  Pl. Dep. at 179:6-19, 241:15-243:2. | Before she went out on leave, she arranged to have people cover for her.  *See supra* SOF ¶48.<br><br>There is no evidence that she actually performed work during her leave.  As her leave was ending, she sent an email thanking her teams for covering for her during her leave and allowing her to focus on her personal matters during her leave.  *See supra* SOF ¶52.<br><br>Mr. DeGori never took a leave of absence for surgery or have anyone from outside of his account cover for him when he was not at work.  DeGori Dep. at 133:10-135:2. |

169.    When asked to identify other alleged evidence of gender discrimination, Ms. King pointed to the following things:

a.    Once in 2015 (unknown month), Mr. Thomas allegedly made a joke about women in the presence of Ms. King and others, but Ms. King does not remember anything about the joke.  Pl. Dep. at 253:4-254:5, 258:8-16, 260:6-10.

b.    Once in 2015 (unknown month) and once in 2016 (unknown month), Mr. Thomas allegedly said, "You should go to the [VHS] gym at 5:30 am because Mr. Merrill, who was the CEO of VHS, was there and he would like to see [you] actively working out at the gym." Pl. Dep. at 247:4-248:1.

c.    Once in 2015 (unknown month) and once in 2016 (sometime before August 29, 2016), Mr. Thomas allegedly looked at the amount of food on her lunch tray at WMC and said, "Wow, you must be hungry," "Wow, look at that tray" or just "Wow."  Pl. Dep. at 248:2-15, 249:20-250:2, 250:9-251:2.

d.    Allegedly two or three times a week, Mr. Thomas would look disapprovingly at the size of Ms. King's stomach, meaning that his brow was furrowed, but he

said nothing and made no gestures when he did so.  Pl. Dep. at 248:16-19, 248:23-249:13, 251:3-18.

170.    Ms. King also alleges that other women (i.e., Theresa Davis, Sondra Davis, Heather Rizzo, Allison Siegel) brought complaints of gender discrimination against Mr. Thomas. Pl. Dep. at 254:18-19.

171.    Aramark also does not have any record of any of these women making complaints against Mr. Thomas for alleged gender-based harassment or discrimination.  Barrett Decl. at ¶7.

172.    She could not recall Mr. Thomas saying or doing anything else that she thought constituted gender-based animus.  Pl. Dep. at 206:14-17, 218:10-12, 228:11-14, 241:7-9, 243:17-244:9, 249:14-19, 254:20-255:1, 258:19-259:3.

173.    She admitted that Mr. Thomas never touched her in a sexual manner, never made any sexual propositions to her, never asked for sexual favors in return for giving her a job benefit or having her avoid a negative job consequence, never asked her on a day, and never made any sexually explicit jokes in her presence that she can remember.  Pl. Dep. at 259:15-260:10.

174.    During her deposition, Ms. King suggested that there may have been animosity between her and Mr. Thomas because he was upset about the extra work that he had to do while she was on FMLA leave.

175.    Ms. King alleges that she made the following complaints during her employment with Aramark:

a.    In 2015, 2016 and/or March 2017, Ms. King allegedly complained to multiple Aramark managers (i.e., Deb Hetrick, Carmine DiCicco, Timothy Knight, Alexis Duckett, Sebastian Miller, Michael Sacks and Tracy Miller) about alleged harassment, retaliation

and discrimination by Mr. Thomas.  Pl. Dep. at 13:7-16:18, 270:15-271:4, 362:10-363:8, 364:8-365:21.

        b.      On August 29, 2016 and March 27, 2017, Ms. King allegedly complained to Ms. Adams and/or Mr. Thomas that Mr. Thomas was harassing her because of her gender, discriminating against her by treating her differently than her alleged male comparators, and retaliating against her for taking FMLA leave or complaining about Mr. Thomas' alleged behavior towards her.  Pl. Dep. at 172:16-173:5, 177:3-11, 186:21-189:4, 270:15-271:4, 362:10-263:8, 364:8-365:21.

        c.      In August 2017, Ms. King allegedly complained to Ms. Barrett about alleged harassment, discrimination and retaliation by Mr. Thomas.  Pl. Dep. at 362:10-363:8, 364:8-365:21.

        d.      During her March 27, 2017 Aramark employee hotline call, she allegedly complained about alleged harassment, retaliation and discrimination by Mr. Thomas.  *See supra* SOF ¶88.

        e.      During her September 19, 2017 Aramark employee hotline call, she allegedly complained about alleged harassment, retaliation and discrimination by Mr. Thomas. *See supra* SOF ¶141.

**XXIII. Ms. King Never Enrolled For A Second Master's Degree And Would Not Have Received Full Tuition Reimbursement From Aramark To Obtain Such A Degree.**

176.    Aramark has an Educational Assistance Program whereby eligible salaried employees can get reimbursed up to $5,250 for tuition and course-related fees in connection with obtaining a master's degree that is job-related.  Adams Dep. at 354:9-355:21; Barrett Decl. at ¶8.

177.    Employees need to get approval from Aramark before they enroll in a course for which they seek to obtain tuition reimbursement.  Adams Dep. at 354:17-21.

178.    During this litigation, Ms. King has represented that a portion of her damages are comprised of the hundreds of thousands of dollars that she would have sought from Aramark as reimbursement for obtaining a second master's degree.  Martinez Decl. at ¶14.

179.    She has not specified what type of master's degree she would have sought or explained how it would have been job related.  Martinez Decl. at ¶15.

180.    Ms. King never actually enrolled in a second master's program either during or after her Aramark employment.  Pl. Dep. at 13:2-6.

181.    Even if she had enrolled in a master's program and Aramark had approved her for tuition reimbursement, she would have only been eligible to receive up to $5,250 in tuition reimbursement.  Adams Dep. at 355:14-21; Barrett Decl. at ¶8.

Dated:  November 1, 2021                          Respectfully submitted,
        Philadelphia, Pennsylvania

                                                 MORGAN, LEWIS & BOCKIUS LLP

                                                 By: */s Anne E. Martinez*
                                                 Anne E. Martinez (*admitted pro hac vice*)
                                                 Charles J. Reitmeyer (*admitted pro hac vice*)
                                                 1701 Market Street
                                                 Philadelphia, PA 19103
                                                 Tel.: (215) 963-5718/4841
                                                 Fax: (215) 963-5001
                                                 anne.martinez@morganlewis.com
                                                 charles.reitmeyer@morganlewis.com

                                                 HODGSON RUSS LLP

                                                 Patrick E. Fitzsimmons
                                                 The Guaranty Building
                                                 140 Pearl Street, Suite 100
                                                 Buffalo, NY 14202
                                                 Phone: (716) 848-1710
                                                 Fax: (716) 961-9965
                                                 pfitzsim@hodgsonruss.com