UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KRISTEN KING,

                  Plaintiff,

    vs.

ARAMARK SERVICES, INC.,

                  Defendant.

**PLAINTIFF'S COUNTERSTATEMENT OF CONTESTED MATERIAL FACTS**

Civ. No. 1:19-cv-00077-GWC

---

Plaintiff, KRISTEN KING, by and through her attorneys, GRECO TRAPP, PLLC, as and for her Counterstatement of Contested Material Facts in Opposition to Defendant's Motion for Summary Judgment pursuant to Local Rule 56, states as set forth below.  In the interest of brevity and judicial economy and to avoid redundancy, Plaintiff denies each and every factual allegation not herein specifically admitted. Further, the unnumbered section headings are not statements of fact in compliance with court rules and thus are denied without a specific response.

1.      Plaintiff admits only that Ms. King was employed with the Aramark at its account with Kaleida Health. Plaintiff further states that she was employed by Aramark Services, Inc. (hereinafter "Aramark") in June 2005 until June 2010 with it Kaleida Health account in Western New York at Millard Fillmore Gates Hospital in Buffalo, Millard Fillmore Suburban Hospital in Williamsville, and Buffalo General Hospital in Buffalo. King Decl.¶ 2 (Ex. A).

2.      Plaintiff admits.  Plaintiff further states that while Retail Manager Ms. King was identified by Michael Sachs, Aramark Director of Operations, as a high performer and put on the fast track for promotion to the position of Food Service Director. Approximately 6 -8 months after hire she was promoted to the position of Director of Food and Nutrition for Millard

Fillmore Gates Hospital. She was awarded the regional "I Impact" Award by David Feldman, Aramark Vice President of Operations, for changing the culture at Millard Fillmore Gates Hospital and creating a more collaborative environment within the food service department. She was then advanced to Director of Food and Nutrition at the larger Millard Fillmore Suburban Hospital to roll out hotel style room service for patient feeding. This was the first hotel style room service for patient feeding in the northeast. This successful roll out was identified as one of the most challenging by David Feldman, Aramark Vice President of Operations, and Sharon Lagasse, Aramark Operations Manager. They recognized her and her team for their dedication and hard work. Ms. King was then advanced to Director of Food and Nutrition at the larger Buffalo General Hospital and continued working there until approximately June 2010 when Aramark lost the Kaleida Health contract to Sodexo. King Decl.¶ 2 (Ex. A).

3.      Plaintiff admits only that in June 2010 Aramark lost its contact with Kaleida Health and another company, Sodexo, got it.  Plaintiff further states that when Aramark lost the Kaleida Health contract to Sodexo. Scott Perry, Aramark Vice President of Operations, asked her to work with him to close the account which she did. Aramark then asked her to roll out room service at its Catholic Health account South Buffalo Mercy Hospital location which she did. When she completed the roll out approximately two months later her employment ended with Aramark, and she received a severance package. King Decl.¶ 2 (Ex. A).

4.      Plaintiff denies. See ¶ 3.

5.      Plaintiff admits only that Ms. King went back to school to obtain her master's degree in Innovation, Creativity and Change Leadership which she completed sometime in 2012. Plaintiff further states she had received a Bachelor of Arts Degree in Business Management and Marketing in 2002.  She decided to further her education.  She attended the State University of

New York at Buffalo and attained a Master of Science Degree in Creativity and Innovation in approximately February 2012. King Decl. ¶ 3 (Ex. A).

6.      Plaintiff admits.  Plaintiff further states since completing her masters degree she participated in many Aramark training courses as well as becoming nationally certified in ServSafe, participating in a two week training course for facility and environmental services and numerous client trainings.  Ms. King was in the process of completing her application for her doctoral degree in organizational development through the online program at Phoenix University when she was terminated. King Decl.¶ 5 (Ex. A).

7.      Plaintiff admits.  Plaintiff further states she was interested in a lifelong career with Aramark. She was rehired by Aramark, after interviewing with Scott Perry, Aramark Vice President of Operations, Michael McCarthy, District Manager, a human resources director and then, multiple representatives on behalf of the client, Valley Health System ("Valley Health"). Ms. King was selected and began her position as the General Manager of Food and Nutritional Services in the Aramark Healthcare Division with its Valley Health account.  She reported to the District Manager and directly supervised between 150 - 200 employees.  Her salary was $95,000 annually.  She was eligible to receive a discretionary bonus. She was provided with employee benefits available in the salaried benefit program as a reinstated employee as opposed to a new hire. King Decl.¶ 4, 7 (Ex. A).  Ms. King's performance was always at least satisfactory. Each year she received annual discretionary bonuses based on corporate criteria for operations and financial achievement. A salary increase was based on her manager's subjective performance evaluation. She received an increase each year except Performance Year 2016 (10/1/15 to 9/30/16) when her District Manager, Griff Thomas ("Thomas") gave her a 0% increase despite attaining 93.9% of the corporate financial goal which weighed 90% and 100% of corporate

individual objectives which weighed 10% resulting in a 94.5% payout % earning her an annual

discretionary bonus of $15,300. King Decl.¶ 7 (Ex. A), (Thomas Dep. (Ex. C) at 282) (Ex. M,

Ex. N).

8.      Plaintiff denies.  Plaintiff further states Aramark contracts with Valley Health to

provide food and facility services to seven locations: Page Memorial Hospital (hereinafter

"Page") located in Luray, VA, Shenandoah Memorial Hospital (hereinafter "Shenandoah")

located in Woodstock, VA, Winchester Medical Center Hospital (hereinafter "Winchester")

located in Winchester, VA, War Memorial Hospital (hereinafter "War") located in Berkeley

Springs, WV, Warren Memorial (hereinafter "Warren") is located in Front Royal, VA,

Hampshire Memorial Hospital (hereinafter "Hampshire") located in Romney, WV, and Cork

Street Hospital (hereinafter "Cork") located in Winchester, VA.  King Decl.¶ 8 (Ex. A).

9.      Plaintiff admits.

10.     Plaintiff denies. See ¶ 8.

11.     Plaintiff denies.  The Management Agreement between Valley Health and

Aramark is an Aramark management fee account with a guaranteed net budget and incentives.

King Decl.¶ 13 (Ex. A).

12.     Plaintiff admits.  See ¶ 7.

13.     Plaintiff admits that she was an employee- at-will.  Plaintiff further states she

sought rehire by Aramark because was interested in a lifelong career with Aramark.  King Decl.¶

4 (Ex. A).

14.     Plaintiff admits. See ¶ 7.

15.     Plaintiff denies that this is an accurate description of her responsibilities as

General Manager- Food and Nutritional Services for Valley Health.  Plaintiff further states that

the position of General Manager – Multi Service reports to the District Manager, directs multiple

lines of service within a health care facility and/or multiple accounts within a healthcare system.

Generally, this position is responsible for Aramark and client financial accountability;

compliance with Aramark, regulatory agencies, and client standards; lead departments of all

services managed; and provide a unified experience for patients, residents, visitors, and

employees by establishing and maintaining an effective working relationship with other

departments. The essential job duties of a general manager as set forth in its job description (Ex.

O) are as follows:

> Maintains friendly, efficient, Spirit of Service attitude towards customers, co-workers and clients.
>
> Deliver strong operational performance by executing against ARAMARK Healthcare and regulatory agency standards and programs, continually monitoring operations, completing assessments, and developing necessary action plans to provide optimal managed services and drive patient and customer satisfaction.
>
> Ensure compliance to all safety and sanitation standards.
>
> Interact with client management and maintain effective client and customer relations at all levels with client organization, including conducting rounding.
>
> Identify ARAMARK service expansion opportunities.
>
> Provide overall direction for all managers, supervisors, and front-line employees, ensuring employee development, engagement, and compliance with Human Resources-related policies and standards, including conducting applicable rounding.
>
> Develop operation component forecasts and is able to explain variances. Responsible for components
>
> accounting functions. ·
>
> Ensure consistent application to all ARAMARK Healthcare operating systems.
>
> Ensure compliance with all contract obligations.
>
> Responsible for all department budgets, reporting weekly and monthly financial information.
>
> Own relationship and communication with C-suite, and identify and evaluate key-partnerships.

Assists and/or develops a comprehensive business plan and operating budget. Communicates on-going and projected status of business plan to appropriate client liaison. Offers proactive alternatives to address negative deviations from business Ian.

Establishes and maintains client satisfaction achieving and/or exceeding client expectations.

Conducts and/or monitors required client/customer surveys. Initiates action plans to address unfavorable survey results in a timely and effective manner

Reviews and analyzes financial statements, operating reports, budget variance reports and other appropriate financial statements to monitor attainment of financial goals. Initiates action plans to immediately address financial shortfalls. Recommends and manages capital requirements to maximize financial returns.

Establishes and maintains a proactive human resource function to ensure employee motivation, training and development, wage/benefit administration and compliance with established labor regulations.

Maintains all established systems and training programs to provide a safe working environment. Complies with all OSHA regulations and other local, state and federal government regulations.

Recognizes and adopts activities appropriate to the specific needs of the patient/resident population and demonstrates knowledge of specific issues directly related to age of patient/resident population.

Maintains compliance with ARAMARK ' s standards of operation, client contract and within ARAMARK ' s Business Conduct Policy. Maintains all records and reports necessary to comply with ARAMARK /HSS, government and accrediting agency standards, regulations and codes.

Maintains compliance with all requirements of Federal, State and local regulations and guidelines including the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disabilities Act, as amended.

Performs all other related duties.

16.     Plaintiff admits only that the job required her to travel frequently between the

Valley Health hospitals which were spread across Virginia and West Virginia.  Plaintiff further

states the duties of General Manager-Multi Service required her to travel frequently between the

Valley Health facilities. She maintained home offices in both Stanley, VA and Hamburg, NY.

Given the nature of her job duties, Aramark also required that she be available 24 hours a day 7

days a week on a as needed basis to address any issues that arose. Aramark provided her with a company laptop for use at her home offices. King Decl.¶ 11 (Ex. A).

17.     Plaintiff admits.

18.     Plaintiff admits that Aramark offered to facilitate her relocation to the Winchester, VA area and made a $11,006.28 relocation payment to her.  Plaintiff further states that as a General Manager- Food and Nutritional Services for Valley Health she was not assigned a home location. She was to move to the Winchester area. Ms. King preferred the country atmosphere, so she chose and used her relocation payment to cover the costs of locating and moving into her second home in Stanley, VA., which was within her area of responsibility (approximately 2 miles from Page and 64 miles from Winchester). Her teenage son and fiancé remained based in Hamburg, New York although they both lived with Ms. King in Stanley, VA for various periods of time. Her District Manager, Michael McCarthy, was aware of her home in Stanley, VA and did not object. He told her that she was entitled to mileage from her home in Stanley, VA to her locations as well as meals while working. Ms. King was issued a corporate card.  Her expenses were submitted by her and approved by her District Manager. This continued throughout her employment when she reported to District Managers Sam Zamrik, Rick Miller, Tom Finney and Thomas until Thomas discontinued mileage reimbursement following her first hotline complaint on March 27, 2017. When Ms. King began working for Aramark at Valley Health, her District Managers authorized her to work from her home offices on days that her presence at a specific facility was not required.  Ms. King was instructed by her District Managers to be in her office Fridays and Mondays to review the weekly operation and financials. She was also given an office at Winchester. However, due to space constraints at Valley Health, she lost her office at Winchester in or about October 2012. King Decl.¶¶ 8-11 (Ex. A).

19.     Plaintiff only admits that she rented a house in Stanley, VA. which is approximately 64 miles from Winchester Medical Center and continued to maintain her home in Hamburg, NY. See ¶ 18.

20.     Plaintiff admits only that she kept the $11,006.28 relocation payment.  See ¶ 18.

21.     Plaintiff denies. Plaintiff further states that the offer letter states: "You must in good faith and at all times comply with all existing rules, policies and procedures of ARAMARK, as in effect from time to time, including ARAMARK's Business Conduct Policy." (Ex. P).  There is an Aramark Employee Handbook (Ex. Q) which briefly references the Business Conduct Policy, and Equal Employment Opportunity, and Affirmative Action Policy and advises the employee that if he/she would like a copy to "please see your manager" (Ex. Q at KK 42).  It also briefly references the Policy Against Sexual Harassment and Other Workplace Harassment, and advises the employee that if he/she would like a copy to "please see your manager or human resources professional" (Ex. Q at KK 43);  refers to the Family and Medical Leave Act (FMLA) and advises the employee that if he/she would like a copy to "please contact your manager or human resources professional" (Ex. Q at KK 44); and contains a Standards of Conduct which says any violation of any Aramark policy, or any provision included in the handbook is unacceptable and may result in disciplinary action up to and including termination (Ex. Q at KK 44). The Business Conduct Policy, (Ex. R) which applies to all Aramark employees and members of the Board of Directors, requires compliance with the laws (i.e. employment, labor, workplace, health and safety) applicable in the United States, business conduct and practices (i.e. accounting policies) and other policies.  All personnel decisions (i.e. discipline, compensation) must be made without regard to gender among other protected classes. Sexual and other workplace harassment in any form is not to be tolerated. Conduct which

demeans the dignity of an employee or creates an intimidating, hostile or offensive work environment by any employee is prohibited. An employee can complain to his/her supervisor. If that is not appropriate an employee can complain to the next level of management, human resources of the employee's business unit, or the Hotline.  Any supervisor receiving a complaint must contact human resources of the employee's business unit.  An investigation will be conducted and if warranted disciplinary action taken (Ex. R at KK 108-109).   In addition, there is a separate Policy Against Sexual Harassment and Other Workplace Harassment (Ex. S), and Equal Employment Opportunity and Affirmative Action Policy (Ex. T) which also prohibit gender discrimination, harassment, and retaliation states to report it to his/her supervisor. If not appropriate, report to the next level of management or local, regional, or business unit human resources professional. If not appropriate, to the employment relations department. Complaints may also be reported to the hotline. It also requires any supervisor, manager or human resources professional who becomes aware of a complaint of violation of the policy to report it or take corrective action. Failure to do so will subject such person to disciplinary action.  King Decl.¶ 6 (Ex. A).

22.     Plaintiff denies.  Plaintiff further states that she testified that she understood that she had to abide by certain Aramark policies. (King Dep. (Ex. A) at 128)

23.     Plaintiff admits.

24.     Plaintiff admits only that Thomas was promoted from Director of Environmental Services ("EVS") at Winchester to General Manager- EVS for Valley Health and then to District Manager to whom Ms. King reported.  Plaintiff further states Aramark has Food and Environmental Services (hereinafter EVS) operations at Valley Health.  When Ms. King joined Aramark's operations at Valley Health, she became the General Manager, Multiunit-Food.

Thomas, who was the Director of EVS at Winchester, was promoted at the same time to the

General Manager, Multiunit-EVS.  Thomas and Ms. King reported to the same District

Managers, Michael McCarthy, Sam Zamrik, Tom Finney and Rick Miller.  The District

Manager's district included Valley Health as well as other health care systems/facilities. King

Decl.¶ 14 (Ex. A).  In the Fall of 2014, the District Manager position at Valley Health was

vacant.  Ms. King had been identified as a high performer for promotion and had expressed an

interest in such position.  She was told by upper management that a reorganization was

occurring. In November 2014, she learned, unbeknownst to her, Aramark had scheduled Thomas

to interview for the District Manager at Valley Health position.  She immediately contacted

Aramark's corporate headquarters and advised that she was also interested in interviewing for

the District Manager at Valley Health position. Aramark scheduled her interview on the same

day as and consecutive to Thomas's interview; however, based on the duration (20 minutes for

Ms. King's and almost 2 hours for Thomas') and content of her interview (Ms. King was only

questioned relative to her interest in District Manager positions other than Valley Health such as

Providence, RI). Ms. King's interview was a sham. King Decl.¶ 17 (Ex. A).  Thomas was told

during his interview that Ms. King was applying for another District Manager role in Rhode

Island not Valley Health. (Thomas Dep. (Ex. C) at 166-167). In February 2015 Thomas was

promoted to the position of District Manager of Food and EVS. Thomas told Ms. King she was

to perform the position of dual General Manager of Food and EVS. She directly supervised

approximately 400 employees. She performed the duties of dual General Manager of Food and

EVS as the defacto dual General Manager of Food and EVS without any adjustment in pay or

title until it was made official in October 2015. She was informed during the summer of 2015 by

Thomas that if she was officially awarded the position of dual General Manager of Food and EVS she would need to relocate closer to Winchester Medical Center. King Decl.¶ 18 (Ex. A).

25.     Plaintiff admits.

26.     Plaintiff admits.  Plaintiff further states in its anti-discrimination policy that it is the policy of Aramark to recruit, hire, train, promote, transfer, and terminate persons and ensure that all other personnel actions such as compensation, and benefits are administered without regard to sex, gender and other classification protected by applicable federal, state or local law. Further, it is a fundamental expectation that personnel decisions will be based on qualifications, experience and job performance. (Ex. T at ARAMARK_000539-540).  In its harassment policy Aramark states that "sexual harassment includes unwelcome verbal, visual, or physical conduct of a sexual nature that demeans the dignity of an employee through insulting, intimidating, or degrading sexual remarks or conduct, or which has the effect of unreasonably interfering with an individual's work performance or otherwise creates an intimidating, hostile, or offensive work environment".   It "may include a range of subtle... behaviors...[that] may involve individuals of the same or different gender".  "[B]ehaviors may include... sexual jokes...verbal abuse of a sexual nature, commentary about an individual's body, leering,... and other verbal, visual, or physical conduct of a sexual nature."  "Other workplace harassment includes, but is not limited to, any unwelcome verbal, visual or physical conduct which denigrates or shows hostility or aversion toward an individual because of an individual's ...sex, gender ...and that has the purpose or effect of creating an intimidating, hostile or offensive work environment, has the purpose or effect of unreasonably interfering with an individual's work performance, or otherwise adversely affects an individual's employment opportunities." (Ex. S at KK 60).

27.     Plaintiff admits only that suspected violations of these polices are reported to a toll-free hotline. Plaintiff further states that the antidiscrimination policy states that complaints "should" be reported while the anti-harassment policy requires that any employee who is the victim of harassment or has witnessed any conduct that is inconsistent with the policy "must" report it. They both direct the employee to report it to his/her immediate supervisor, if not appropriate to the next level of management or in the alternative to the employee's local, regional, or business unit human resources professional, or if not appropriate to the Employment Relations Department.  Employees can also report complaints to the Employee Hotline or online at www.aramarkhotline.com. Both policies require any supervisor, manager or human resources professional who becomes aware of a complaint of violation of the policy to report it or take corrective action. Failure to do so will subject such person to disciplinary action.  (Ex. T at ARAMARK_000541, Ex. S at KK 61).  While a complaint is made to the hotline, the investigation is done by Aramark Employee Relations and Human Resources Department. (Barrett Dep. (Ex. J) at 412, 128).

28.     Plaintiff admits only that they provide that the employee will not be subjected to any retaliation.  Plaintiff further states that both policies state "confidentiality will be maintained throughout the investigation to the extent permissible by law and to the extent that this does not interfere with Aramark's ability to investigate or take appropriate corrective action." "Intimidation, coercion, threats, retaliation or discrimination against any employee (or other person) for making a complaint under [these policies], assisting in an investigation, or reporting a violation of [these policies]is prohibited.  Anyone engaging in retaliation will be subject to disciplinary action, up to and including dismissal." (Ex. T at ARAMARK_000541, Ex. S at KK 61).

29.     Plaintiff admits.  Plaintiff further states The Business Conduct Policy (Ex. R)
requires compliance by all employees with the employment, labor and workplace laws in the
United States.  All personnel decisions (i.e. discipline, compensation) must be made without
regard to gender among other protected classes.  Sexual and other workplace harassment in any
form is not to be tolerated. Conduct which demeans the dignity of an employee or creates an
intimidating, hostile or offensive work environment by any employee is prohibited. An employee
can complain to his/her supervisor. If that is not appropriate an employee can complain to the
next level of management, human resources of the employee's business unit, or the Hotline.  Any
supervisor receiving a complaint must contact human resources of the employee's business unit.
An investigation will be conducted and if warranted disciplinary action taken (Ex. R at KK 108-
109).

30.     Plaintiff denies. The Aramark training transcripts for Ms. King, Thomas, Rebecca
Adams ("Adams"), and Kelly Barrett ("Barrett") do not show they received training regarding
Aramark's anti-discrimination (Ex. T) and anti-harassment (Ex. S) policies.  (See Ex. U ; Ex. V;
Ex. W; Ex. X).

31.     Plaintiff admits only that her son, Tyler, had a mental health condition for which
he received treatment.  Plaintiff states further that her son lived with her in Stanley, VA for
various periods of time. King Decl.¶ 8 (Ex. A).

32.      Plaintiff admits that she applied for and was approved for intermittent leave
under the Family Medical Leave Act (hereinafter FMLA) due to her son's health condition.
Plaintiff further states that on or about October 30, 2013, Aramark approved Ms. King's
application for leave under FMLA to provide for intermittent leave to care for her ill son. This
approval provided coverage through November of 2014. King Decl.¶ 16 (Ex. A).  Shortly after

13

Thomas became District Manager, her son's illness began to worsen, and, on March 24, 2015, Ms. King recertified for intermittent FMLA leave, which provided coverage through November 2015. King Decl.¶ 26 (Ex. A).  When she would take FMLA time off for her son Thomas would contact her via email and telephone regarding questions or work that needed to be done for Valley Health. King Decl.¶ 27 (Ex. A); Thomas Dep. (Ex. C) at 185-186.

33.     Plaintiff denies.  Plaintiff further states in February 2015 Thomas was promoted to the position of District Manager of Food and EVS. Thomas told Ms. King she was to perform the position of dual General Manager of Food and EVS. She directly supervised approximately 400 employees. Ms. King performed the duties of dual General Manager of Food and EVS as the defacto dual General Manager of Food and EVS without any adjustment in pay or title. On October 6, 2015, Melanie Curry of Aramark Human Resources advised of the details regarding promoting Ms. King to the position of dual General Manager of Food and EVS.  Ms. King was to be given a salary increase of 5% effective September 2015, still be eligible for a merit increase in 2016, salary review for potential increase in May or June 2015, and renter's relocation payment to assist Ms. King in "getting closer to the client's headquarters Winchester Medical Center" due to the dual manager role. (Ex. Y). Despite accepting the position and the 5% salary increase which became effective September 15, 2015, she did not receive her salary increase. She complained to Thomas who failed to correct the situation. It was not until approximately four months later in January of 2016 when a retroactive payment was made to her. (Exs. Y, Z). King Decl.¶ 30 (Ex. A).

34.     Plaintiff admits only that she managed both the food service operation and the facilities/environmental services operation for the Valley Health account.  See ¶ 33.

35.     Plaintiff denies.  Plaintiff further states that prior to Thomas becoming District
Manager in February of 2015 she did not report to Thomas, as they were both General Managers
reporting to the same District Managers. (See ¶ 24).  While Ms. King performed the duties of
dual General Manager of Food and EVS as the defacto dual General Manager of Food and EVS
without any adjustment in pay or title she reported to Thomas and continued to report to Thomas
after she was promoted retroactively to September 15, 2015, to the position of dual General
Manager of Food and EVS. King Decl.¶ 18 (Ex. A).

        Each of Thomas' direct reports within his district was the direct contact for the
client at that specific location.  When Ms. King was hired in April 2012 as the General Manager
of Food for Valley Health, she was required to attend regularly scheduled district meetings,
which were held by the District Manager for his direct reporting managers.  Thomas was the
General Manager of EVS at Valley Health and also attended such district meetings. In February
2015, when Thomas became District Manager of Food and EVS, and made her the defacto
General Manager of Food and EVS at Valley Health, she continued to attend district meetings
that he now chaired as District Manager.  Others who attended those meetings were Thomas
DeGori ("DeGori"), Food Service Director of Ohio Valley Hospitals which became known as
Heritage Valley ("Ohio Valley") with two different locations at Ohio Valley General Hospital
and The Willows. King Decl.¶ 19 (Ex. A); DeGori Dep. (Ex. D) at 52-54.  Christopher Harriman
("Harriman"), the Director of Food and Nutritional Services at Chesapeake Regional Medical
Center ("Chesapeake") and Cedar Manor until September 2019 when he became the General
Manager of Phoebe Putney Health System (Phoebe) with four different locations (Phoebe (North
Campus), Phoebe Putney Memorial Hospital, Phoebe Sumter Medical Center and Phoebe Worth
Medical Center, in the same district. King Decl.¶ 19 (Ex. A); Harriman Dep. (Ex. E) at 110,123-

124, 253, 271-272.  John Wilson ("Wilson") was initially the dual Director of Food and Valet

until 2014/2015 when his title changed to General Manager/ Director of Food and Nutrition and

Valet at Western Maryland Regional Health System ("Western Maryland") with two locations at

Western Maryland Regional Medical Center and Frostburg Nursing Rehabilitation Center.

Although his duties remained the same in 2014/2015 his title was changed at the request of his

client to General Manager/ Director of Food and Nutrition. King Decl.¶ 19 (Ex. A); Wilson Dep.

(Ex. F) at 70-72, 78-79.  Christopher Drayton, Director of Food and Nutrition at Holy Cross

Germantown Hospital, with one location.  Thomas treated his direct reports as equal positions.

DeGori, Harriman, Wilson, Drayton and Ms. King were all directly responsible to interface with,

maintain and retain the client; manage the day-to-day operations; grow the business; manage the

budget; implement and oversee company standards, procedures and programs; supervise and

manage employees; hire, fire and discipline employees; and were held to the same performance

standards. The District Manager would send emails to us as a group relative to these duties. In

addition, they were supervised, managed, evaluated, and disciplined by the District Manager.

King Decl.¶ 19 (Ex. A).

After Ms. King became the defacto dual General Manager of Food and EVS,

Thomas and his manager recognized that because Aramark was changing from two onsite

general managers to one dual general manager another person was needed. They authorized the

hire of a unit financial controller as Valley Health was one of the largest Aramark accounts in

that area with a total managed volume of approximately $25 million.  Ms. King then hired Jacob

Williford in April 2015 to work as the unit controller for Valley Health Food and EVS services

reporting to her. King Decl.¶ 21(Ex. A).  Soon after hire Williford became a direct report to

Thomas.  He then attended the meetings Thomas held for his direct reports and was accountable

for those financial aspects that interfaced with Thomas' other direct reports. King Decl. ¶ 19 (Ex. A).

Thomas was disapproving of Ms. King's weight because she is a woman, and she did not fit the stereotypical image of what a businesswoman should look like.  A couple different times in 2015 and 2016 Thomas said things like Ms. King should go to the gym at 5:30 a.m. because Mr. Merrill, the Valley Health CEO, would be there and would like to see Ms. King actively working out at the gym. This implied to her that she would be more favorably recognized by her client's CEO if she exercised and changed her body image as a woman. Thomas' supervisor admitted that such comments are not appropriate. Miller Dep. (Ex. H) at 121. Thomas did not make these comments to Williford who was heavy in the stomach area and at Winchester where the gym was located. Also, Thomas, would frequently, approximately 2 or 3 times a week, disapprovingly stare in disgust, at Ms. King's midsection, where she was heavier in the belly, especially when she stood up or sat down. He would express his disgust by furrowing his brow. Thomas' supervisor admitted that such conduct is not appropriate. Miller Dep. (Ex. H) at 120. Williford was heavier in his midsection.  Ms. King never saw Thomas disapprovingly stare in disgust at Williford although she was in the presence of Thomas and Williford on many occasions. Ms. King also never saw Thomas stare disapprovingly in disgust at Harriman, or DeGori's midsection even though they were heavier in the stomach area. Thomas also made comments regarding Ms. King's lunch tray implying she was overeating and should not be.  In 2015 the directors who reported to Ms. King were eating lunch with Thomas and her in the Winchester cafeteria. When she arrived at the table where they were all sitting with her tray Thomas said "Wow you must be hungry" implying Ms. King was overeating and should not be in front of all of them. In 2016, before Ms. King received the first written documentation,

when she was walking into the nutritional conference room at Winchester with her cafeteria tray where John Shingleton, Thomas and she were working on some financials/proposals Thomas said "Wow, look at that tray." implying she was overeating and should not be.  Thomas did not comment on Shingleton or Thomas' own tray. Thomas' conduct toward Ms. King was humiliating, offensive, demeaning, degrading, disrespectful, unprofessional and undermining to her position as a manager. King Decl.¶ 38 (Ex. A).

Thomas also told jokes about women.  During the Valley Health Proposal review in 2015 Thomas told a joke about women when Ms. King was with an all-male team with vice presidents present who all laughed except Ms. King who found the conduct humiliating, offensive, demeaning, degrading, disrespectful, unprofessional and undermining to her position as a manager. King Decl.¶ 39 (Ex. A).

Thomas would speak to Ms. King in a condescending tone and was very short when he would answer questions.  She never heard him speak to in a condescending tone to De Gori, Wilson, Harriman, Drayton, Williford, or any male manager.  Instead, Thomas was pleasant, professional, happy to see them, welcoming and spoke highly of them.  King Decl.¶ 20 (Ex. A).  Thomas did not speak to Harriman in condescending tone in person or over the telephone. Harriman Dep. (Ex. E) at 317-318.  In contrast, Thomas would use her performance with Valley Health as a negative example during their district meetings on conference calls and say things in reference to a Valley Health hospital like it was failing in an area and we don't want to be where it is.   When Ms. King asked him why she would be coached on a negative thing during a district call Thomas did not respond.  She never heard him coach or criticize any male manager during a district conference call or in person meeting. He did not act annoyed or agitated because of something Wilson or the other male managers did wrong. When males had

areas of weakness, Thomas would have Ms. King go over and train.  For example, when Drayton

had issues in his cafeteria Ms. King was sent over to his facility to review his retail plan, make

notes, and change things according to Aramark's standards.  Thomas also sent Ms. King to

DeGori's facility to train his patient services manager.  King Decl.¶ 20 (Ex. A).

When an office became available at Winchester for Ms. King Thomas directed

that it be given to Williford.  Thomas told her that her office would be in the "fishbowl" which

was a small conference room with all windows where hourly supervisors did their work.  Ms.

King had no privacy in that office. She could not hold conference calls, discuss financials on the

telephone and or really even look at emails because they were confidential. She would have to

try to locate a room not being used to handle confidential matters and when she could not she

would have to use her car to handle confidential telephone calls and emails. She immediately

complained and continued to complain on many occasions to Thomas regarding his decision to

give Williford the private office which she needed to utilize as the Aramark General Manager at

Valley Health. The male direct reports to Thomas, Harriman, DeGori, Drayton and Wilson, had

private offices which allowed them to speak with employees and clients about confidential

matters, secure confidential documents, and otherwise perform their duties.  King Decl.¶ 22 (Ex.

A); DeGori Dep. (Ex. D) at 106-111; Harriman Dep. (Ex. E) at 129, 332-333; Wilson Dep. (Ex.

F) at 79-80.  Ms. King was the top-level operations manager for Valley Health Food and EVS.

Williford was a unit controller who had no one reporting to him.  He did not manage employees,

operations or handle cash but rather dealt with financial records for Valley Health as well as

other accounts within Thomas' district which were located in multiple states far beyond

Winchester.  As the top-level operations manager, like Wilson, DeGori, Drayton and Harriman,

Ms. King needed a private office on premises at Winchester, the largest hospital in Valley

Health, to handle operational and other confidential matters. While Williford could have easily worked at an office at Cork, Ms. King could not. Cork is a rehabilitation center with less than 15 patient beds.  It is populated mostly with Valley Health offices. Ms. King did not share offices with Williford. She did not keep any of her confidential records or her computer in his office. The phone in Williford's office was given a number assigned to the name Jacob Williford, not Ms. King.  No one contacted her at the phone number in Williford's office as it was recognized to be his office and his phone, not hers. Ms. King did not meet with subordinates in Williford's office and only met with Williford in his office relative to matters he was involved in. The conference room at Winchester, which held 15 to 16 people, was used often by others to hold meetings beyond the size of an office and was booked by anyone, not just Aramark employees, at Valley Health. King Decl.¶ 22 (Ex. A).

   Three months after Williford's hire (Ex. AA) Thomas increasingly utilized Williford's time until approximately 50% of Williford's time was used managing the financials and assisting Thomas's male direct reports at facilities in Thomas' district outside of Valley Health.  Ms. King lost approximately 50% of Williford's services while incurring 100% of his costs under her Valley Health budget, impacting her overall performance. Other direct reports, such as Harriman, DeGori, and Wilson then received Williford's services without bearing any of the cost. Within a few months of Williford's hire Ms. King identified and confirmed that Thomas was having Williford working for accounts other than Valley Health and complained directly to Thomas regarding the need for Williford to commit 100% to Valley Health as its unit controller as hired. Being required by Thomas to absorb Williford's workload as well as hers negatively impacted Ms. King's performance and her team's financial growth. Thomas informed her that he was going to continue to utilize Williford on accounts other than Valley Health.  Ms. King

continued to complain to Thomas repeatedly as Williford was often not at Valley Health where he should have been. Ms. King told Thomas that her client, Bob Amos, the CFO and Vice President of Valley Health, noticed and instructed Ms. King that he expected that anyone assigned to Valley Health should work solely for Valley Health. Thomas said he was going to continue to utilize Williford's services throughout Thomas' district.  No one from the accounts of Harriman, DeGori, or Wilson were assigned by Thomas to support Valley Health.  Finally, in Fall 2015 Thomas told Ms. King that Williford would no longer being reporting to her even though Williford had the title of the Valley Health unit controller and was attached to Valley Health. Williford continued to hold this title through the date of Ms. King's termination, September 21, 2017. King Decl.¶ 25 (Ex. A).

Thomas excluded Ms. King from important financial meetings, met alone with her directors without notice to her, imposed unrealistic deadlines on her and impeded her job performance. King Decl.¶ 23 (Ex. A).

Thomas met with Ms. King's subordinate employees without her knowledge and would tell her afterwards.  He would not do that with his male direct reports. If Thomas needed information from the direct reports of the male managers such as DeGori Thomas would go through them. King Decl.¶ 24 (Ex. A). Thomas never met with DeGori's managers without his knowledge.  If Thomas needed information from DeGori's direct reports he would go through DeGori (DeGori Dep (Ex. D) at 135,160).  Thomas never met with Harriman's direct reports without Harriman's knowledge (Harriman Dep (Ex. E) at 170-171, 309).   Thomas would not meet with Wilson's direct reports without Wilson's knowledge and would give Wilson advance notice of Thomas' visits (Wilson Dep (Ex. F) at 96-97). Thomas would show up at Ms. King's locations without advance notice to her which he did not do to his direct male reports. King

Decl.¶ 24 (Ex. A).  Thomas would meet with Ms. King clients without her knowledge which he did not do to his male direct reports. King Decl.¶ 24 (Ex. A). Williford witnessed Thomas meeting with Ms. King's clients without her being present approximately ten times and could infer it probably another twenty times (Williford Dep. (Ex. G) at 195-196). Thomas never met with DeGori's clients without DeGori present (DeGori Dep. (Ex. D) at 135).  Thomas never met with Harriman's client without his knowledge (Harriman Dep. (Ex. E) at 170, 309).   Thomas would respect the directives his male direct reports clients while he would intentionally disregard the directives of Ms. King's clients to her.   Three months after Thomas became her District Manager he began to poach high performing employees such as Grey Burleson, Director of EVS at Warren, that Ms. King trained and supervised from the Valley Health account. Ms. King told Thomas her client was very upset this was happening and asked Thomas not to poach anymore. Thomas ignored this and two months later (Ex. BB) tried to get Brian Dawes, an employee who was trained at her location, to work for Thomas' male direct report, Harriman at Western Maryland. Thomas also directed Ms. King to cancelled previously scheduled meetings with her client to meet with Thomas instead which he did not do to his male direct reports. King Decl.¶ 24 (Ex. A).  If Wilson's client wanted something Wilson would make sure Thomas knew about it and Thomas would make sure it happened (Wilson Dep (Ex. F) at 94-95). Thomas did not undermine Wilson's authority when it came to the client (Wilson Dep (Ex. F) at 97).

Ms. King was required by Thomas to support other facilities outside of her Valley Health facilities, but her male counterparts were not forced to support facilities outside of their facility. For example, Ms. King supported Holy Cross when Drayton was out of work for medical reasons for approximately four weeks.  On two occasions she also supported Harriman's client at Lake Taylor and Chesapeake.  She also supported Life Bridge and Norton when Thomas

lost their accounts and they had to be transitioned. Aramark does not have a policy stating it is mandatory for Ms. King to support any location other than the one assigned to her. (King Decl.¶ 37 (Ex. A), Miller Dep. (Ex. H) at 240).  Thomas knew that Ms. King's client did not want her working in locations other than Valley Health. (King Decl.¶ 54 (Ex. A)).  She was disciplined for not supporting Norton even though she sent acceptable coverage from Valley Health for 5 of the 9 total weeks because Thomas would not allow Ms. King to make the business decision of who was best to send to Norton. (King Decl.¶ 37 (Ex. A), Thomas Dep (Ex. C) at 205, 227-228). Wilson and DeGori did not support Norton and were not disciplined for not doing so. King Decl.¶ 37 (Ex. A).  Wilson testified that he was not asked to cover Norton as he did not even know what the name Norton was. (Wilson Dep. (Ex. F) at 114). If Wilson's client said Wilson was needed in the hospital and could not provide coverage to another account Thomas would have respected it. (Wilson Dep. (Ex. F) at 90-91). Thomas only asked De Gori to ever cover one location, Lifebridge. (DeGori Dep. (Ex. D) at 132-133). If Harriman could not provide coverage at another location because of commitments to his own location he would tell Thomas he could not provide coverage (Harriman Dep. (Ex. E) at 170). Thomas, as District Manager, was at Norton the last week for the final closing the account as the Director at Norton was already transferred out of the account. King Decl.¶ 37 (Ex. A).

36.     Plaintiff denies.  See ¶ 33.

37.     Plaintiff has no knowledge of whether Aramark made a corporate wide decision that effective October 1, 2016, it would move the facilities/ environmental services operation to another line of business (i.e. the Facilities lines of business) which was separate from the Healthcare line of business with its own District Manager and Regional Vice President and

whether Thomas made the decision. However, Plaintiff states that there is no evidence that Aramark made a corporate wide decision to eliminate dual General Managers.

Further, in or about March 2016, Ms. King began working on a significant project and proposal designed to extend and expand Aramark's existing contract with Valley Health. She worked closely with Carmine DiCicco, Vice President, Strategic Partnerships, whose home office was in Illinois, on the multi-million-dollar Valley Health Proposal.

In May 2016, Ms. King complained to DiCicco that she had complained to Hetrick, Regional Vice President, and Adams, Regional Director of Human Resources, regarding Thomas's conduct, and no action was taken to address the improper conduct.  Later that day, DiCicco instructed Thomas in Ms. King's presence to set up a conference call with Human Resources to resolve these ongoing issues. King Decl.¶ 42 (Ex. A). Thomas admitted that DiCicco told Thomas that Ms. King had complained regarding working with Thomas (Thomas Dep. (Ex. C) at 201.

On or about June 2016 Ms. King was told by her District Manager, Thomas, that a corporate-wide decision was made by Aramark abolishing the dual manager positions. She was first told that her dual role was ending verbally by Thomas either on a phone call or in person. Ms. King was the General Manager of Food which although she performed this role, it did not become official on or about August 1, 2016. Thomas was the District Manager of Food. When Ms. King asked if she could be the General Manager of EVS/Facilities instead of Food he said that a decision was made. Thomas said Aramark eliminated the General Manager of EVS position and replaced it with a District Manager of EVS, Knight, who was employed with Aramark's Higher Education Division and had no healthcare experience. Thomas held Ms. King accountable for the EVS side of the business well after she no longer held the dual position.

24

After she was removed as a dual general manager, she learned at a presentation in Susquehanna in June 2016 with many of the executives from Aramark and Valley Health present that Brian Marsh was a still a dual general manager well after Ms. King was removed.  Her client, the CFO and Vice President of Valley Health, Bob Amos, asked in front of everybody, "If he (Brian) is a dual GM, why is Kristen King not and why did you pull her from EVS."  Thomas said it was a decision between him and Knight. Ms. King's client said he wasn't very happy about this. King Decl.¶ 43 (Ex. A).  Wilson, dual General Manger of Food and Valet was never told there was a problem with him doing both (Wilson Dep. (Ex. F) at 71-72, 94).

38.     Plaintiff admits only that she was the General Manager – Food for Valley Health in the Healthcare Line of Business and Knight became the District Manager. See ¶ 37. Plaintiff additionally states when Knight took this position, Ms. King complained to him that Thomas discriminated, harassed, and retaliated against her.  She advised Knight that Thomas was excluding her from important financial meetings, meeting alone with her clients and directors without her, and was aggressive, condescending, and dismissive when meeting one on one.  Ms. King complained to Knight that Thomas was setting her up for termination.  In response, Knight told Ms. King that she would "never fit into Griff's mold" and suggested that she quit Aramark. She replied that she truly needed help, and he said "I'm staying in my lane and I suggest you do the same."  Knight took no action to address Ms. King's complaints.  After her complaint, Thomas's actions continued unabated. King Decl.¶ 45 (Ex. A).

In or about July 2016, when Miller, whose home office was located in Delaware and who replaced Hetrick as Regional Vice President, visited Winchester, Ms. King relayed her complaints to Miller regarding Thomas.  Miller advised Ms. King that Miller would have Human Resources schedule recurring calls with Thomas, Human Resources, and Ms. King to monitor

and address these issues.  That same day, Ms. King complained again to Adams, Regional

Director of Human Resources.  Ms. King reminded Adams of what Ms. King had previously told

her in April 2016 regarding Thomas's discrimination, harassment, and retaliatory conduct toward

her, and Ms. King told her it had worsened.  Adams said she would set up recurring calls with

Thomas, Adams, and Ms. King. These calls did not begin for several months and not until after

Thomas had issued Ms. King written discipline. King Decl.¶ 46 (Ex. A).

      39.     Plaintiff admits.

      40.     Plaintiff admits.  Plaintiff further states Ms. Curry's October 6, 2015, email

included the details of the dual manager position which included renter's relocation payment to

assist Ms. King in "getting closer to the client's headquarters (Winchester Medical Center)".

Ms. King worked with a realtor to assist her in locating a home to rent closer to Winchester

Medical Center. She began touring rental homes and staying in the area while searching.

Unfortunately, her Achilles heel injury, which occurred prior to her return to work at Aramark in

2012, worsened and surgery was recommended.   Ms. King underwent right heel surgery on

December 8, 2015 and was to be out of work for six to eight weeks. King Decl.¶¶ 30, 31 (Ex. A).

While on short term disability Ms. King's 21-year-old son died unexpectedly on December 28,

2015.  She remained on disability until her return to work on March 4, 2016. King Decl.¶ 32 (Ex.

A). In or about June 2016 Ms. King was told she no longer held the dual General Manager role.

So she continued to live in Stanley, VA as she had previously done as General Manager of Food

since she was no longer required to live closer to the client's headquarters (Winchester Medical

Center). King Decl.¶ 44 (Ex. A).

      41.     Plaintiff denies.  See ¶ 40.

      42.     Plaintiff admits.  See ¶ 40.

43.     Plaintiff admits.  See ¶ 40. Plaintiff further states that she was paid $9,740.24 on November 20, 2015, and $200.29 on December 11, 2015. King Decl.¶ 31 (Ex. A).

44.     Plaintiff only admits that she rented a house in Stanley, VA and continued to maintain her home in Hamburg, NY. See ¶ 40.

45.     Plaintiff admits. Plaintiff further states the Employee Repayment Agreement signed by Ms. King on October 16, 2015, only requires repayment if she voluntarily terminates her employment or if her employment is terminated by Aramark for reason of gross misconduct with twelve months from the effective date authorized on the relocation form. (Ex. CC).

46.     Plaintiff admits only that on April 6, 2017, Adams emailed Ms. King about relocation to Winchester, mileage from her home to Winchester, and her position required her to be and have an office at the Winchester location.   Plaintiff further states that Ms. King advised Adams that when Ms. King accepted the position in April 2012, she was given the option to live within her area of responsibility which she did.  It was the dual General Manager role that prompted Ms. King's need to relocate. She was never previously asked to relocate closer to the client's headquarters (Winchester Medical Center). (Ex. DD).  Ms. King also states that she had complained to multiple managers regarding the discriminatory, harassing, and retaliatory conduct of Thomas, Adams and the failure of management to take corrective action (King Decl. ¶¶ 35 - 75). The April 6, 2017, email, which followed Ms. King's March 27, 2017, Hotline complaint, stated that Ms. King needed to work from her largest client location, Winchester Medical Center, and at an office, knowing Ms. King did not have an office at Winchester Medical Center. (Ex. E, King Decl. ¶¶ 67- 75).

47.     Plaintiff admits only that she applied for and was approved for short term disability for surgery on her Achilles heel. See ¶ 40.

48.     Plaintiff admits only that before her leave started she notified her teams of who would be standing in during her absence and contact information. Plaintiff further states that she advised that Williford would be standing in for her in her absence for all VH Corporate entities, Rob Sharon for EVS, Tonya Frazier for Food and District Manager Thomas who will be checking in throughout her absence (Ex. FF) King Decl. ¶¶ 67- 75).   Plaintiff further states before going on FMLA her client, Bob Amos, met with Thomas and her regarding coverage during her absence.  Bob Amos and Thomas agreed that Thomas would have at least weekly contact with the Valley Health facilities for which she was responsible while she was on leave. Upon returning to work, Ms. King learned Thomas did not arrange for or provide support for several of the Valley Health facilities she was responsible for while she was out on leave. In doing so, Thomas violated his agreement with Valley Health.  James Fletcher, Director of EVS at Page, told Ms. King he emailed Thomas a few times asking him to come to Page and help with items because Thomas failed to go to Page for a month and a half despite his agreement with Valley Health.  When Thomas finally went to Page, James Fletcher said he wished that Thomas had been there sooner and Thomas told James Fletcher that he could blame Kristen because she is out. Thomas also complained to Williford, and Rob Sharon, Director of EVS for the Southern Region about Thomas' workload and things being backed up because of her absence. King Decl. (Ex. A) ¶¶ 36, 37.

49.     Plaintiff admits.

50.     Plaintiff denies.  See ¶ 40.

51.     Plaintiff denies. Plaintiff states that when her son died she was still on disability for her Achilles repair.  She was also removed from work due to her mental and emotional state and advised Thomas of it.  Thomas told her to apply for FMLA which she did.  She was denied

and told by Sedgwick she should have applied for concurrent short-term disability as her FMLA was exhausted. (King Dep. (Ex. B) at 185-186).

52.     Plaintiff admits.  Plaintiff further states she was to return to work on March 2, 2016.  In February 2016 Thomas sent her two meeting requests asking her to meet him at Winchester for the entire day to work with him on her first day returning to work. Ms. King declined as she needed the opportunity to catch up on emails and telephone calls and identify and prioritize operations so she could efficiently and effectively transition back to work and lead her team.  Prior to her return on February 29, 2017, she emailed her team to tell them that as she transitioned back to work she would be reviewing the current standing meetings and adjusting as needed, would be reaching out to each of them individually to set up an informal catchup meeting as well as to fill out an agenda prior to their meeting. Later that day, Thomas emailed Ms. King and demanded that, on her first three days back from leave, she was to spend the first full day with him at Winchester, and then visit at least two of her locations each day on March 3, 2016, and March 4, 2016. (Ex. GG, King Decl. ¶ 34).  This would require visiting a total of 5 of 7 facilities Ms. King was responsible for which spanned over two states and approximately 600 miles of travel, with no opportunity to reacclimate back to work. She had been out for 3 months and asked for time to re-acclimate, meet one-on-one with her clients and talk with her team which Thomas refused. King Decl. ¶ 34.

53.     Plaintiff admits only that Thomas sent the email quoted dated February 29, 2016 . See ¶ 52.

54.     Plaintiff denies and further states that this contains a legal, not factual, argument. See ¶52.

55.     Plaintiff admits.  Plaintiff further states in an effort to have a smooth transition back to work and to address Thomas's unrealistic demand, Ms. King contacted Hetrick, Regional Vice President, whose home office is located in Delaware, who was Thomas's immediate supervisor.  Ms. King advised Hetrick that Ms. King felt discriminatorily targeted and retaliated against by Thomas.  She complained that she was uncomfortable reporting to Thomas and being alone with him because of his conduct and, in response, Hetrick laughed.  Ms. King requested that Hetrick arrange for a neutral third party to mediate a reporting relationship between Thomas and Ms. King. Hetrick denied Ms. King's request and required that she meet with Thomas without a neutral third party. King Decl. (Ex. A) at ¶ 35.  Thomas was aware that King complained to Hetrick and after Thomas spoke with Hetrick and human resources it was decided that King should be given more time upon her return. Thomas Dep. (Ex. C) at 198-200; Ex. HH.

56.     Plaintiff admits. See ¶¶ 52, 55.

57.     Plaintiff admits.  Plaintiff further states Aramark's Performance Management Policy (Ex. II) is not supposed to be applied discriminatorily, as a means of harassment or retaliation. As a manager Ms. King has been trained in this policy.  Managers we are expected to foster an environment of continuous improvement and high performance.  They are to have ongoing meaningful coaching and feedback discussions with those being supervise about their performance and to immediately address unsatisfactory performance and unacceptable behavior. Aramark has always stressed that the employee is to be advised of the performance or disciplinary issues to provide them an opportunity to correct the issue.  A verbal warning outlining specific performance issues and expectations to improve performance takes place when the subordinate does not respond to coaching or feedback or when more serious performance deficiencies are observed. The performance procedure is progressive as follows: coaching, verbal

warning, written warning, written warning, performance improvement plan (PIP), First Written

Warning and Recommendation for Termination.  While Aramark's policy allows the manager to

deviate from the progressive discipline steps it is only intended for egregious conduct.  Further,

if an employee's conduct violates Aramark's policies such as the Policy Against Sexual

Harassment and Other Workplace Harassment, Equal Employment Opportunity, and Affirmative

Action Policy and Business Conduct Policy are not subject to the performance management

procedures. King Decl. (Ex. A) at ¶ 47; Miller Dep. (Ex. H) at 98.

Although Thomas knew that Harriman had persistent "ongoing, numerous and

frequent Food Safety Issues" for a year Thomas only had numerous discussions with him (Ex.

JJ).  "Food safety is absolutely critical." Barrett Dep. (Ex. H) at 157.  Harriman was not

complying with a critical part of his job, safety standards at Chesapeake for over a year, and

Thomas did not take any action to discipline him. Further, the Business Conduct Policy requires

compliance by all employees with the laws regarding employment, labor, workplace, health and

safety. See ¶ 21.

58.    Plaintiff admits. See ¶57.

59.    Plaintiff admits. See ¶57.

60.    Plaintiff denies that during Ms. King's employment with Aramark, Thomas

observed what he believed to be performance problems with Ms. King. By the time of the Norton

incident, which was July 2016, Thomas had begun to maintain a file on Plaintiff and wrote a note

to that file about Norton. (Thomas Dep. (Ex. C) at 210, Ex. Y).  When Thomas started to

maintain that file, he was aware that Plaintiff had complained to Hetrick, Adams, and DiCicco

about Thomas's conduct. (Thomas Dep. (Ex. C) at 213).  Thomas did not maintain a file on

Harriman, DeGori, Wilson, or Williford (Thomas Dep. (Ex. C) at 202-203).  On the one occasion

Thomas sat with Ms. King to go through the Top 15 report he required her to complete without prior training, and still did not require the male reports to complete, Thomas opened his laptop and Ms. King saw a file on his desktop labeled "Kristen King legal file."  She asked him what she would have done for him to have a legal file on her and he shut his laptop, did not respond, and wanted to continue with the Top 15 training. King Decl. (Ex. A) at ¶ 63.

     In King's FY16 Performance Management Process (Performance Review) **(**Ex. LL) for the period of 10/1/15 – 9/30/16 Ms. King was rated by Thomas as Inconsistently Meeting Expectation and given a 0% annual merit salary increase.  Thus, her salary remained at $107,970 for fiscal year 2017.  Despite this rating, Ms. King received a $15,300 FY 2016 Annual Bonus where performance was measured by Financial and Individual Objectives, which were not Thomas' subjective findings but based on objective standards that could not be altered.  She reached 93.9% of the financial performance measure which was weighted 90% and 100% of individual objectives which was rated 10% which resulted in a total 94.5% payout % which gave her a $15,300 bonus. (Ex. M). In addition, Thomas' Year-End Comments in her FY16 Performance Management Process were inconsistent with her rating and as follows: "Kristen developed an acumen for EVS in 2016 and has expressed an interest in continued development. She has strong experience in Food Services particularly retail.  Kristen has built relationships with many VH leaders.  The stage is set for continued growth in 2017 with Valley Health becoming a tour and reference and training facility for Aramark.  I would like Kristen to develop stronger financial skills and increase use of quarterly QA inspections. Worked with team to earn new business at SMH and Page Meals on Wheels. Needs to take a stronger role in delivering results and improving communication" Ex. MM; King Decl. (Ex. A) at ¶ 64.  Harriman, who Thomas recognized had persistent "ongoing, numerous and frequent Food Safety Issues"

complying with a critical part of his job, safety standards, for December 21, 2017 through December 21, 2018, was evaluated as on target despite not achieving his food safety goal. (Ex. JJ, Thomas Dep. (Ex. C) at 285).  In his Performance Management Process for 2018 (October 1, 2017, through September 30, 2018) In his Manager's Mid-Year End Comments Thomas stated "safety must be consistent" but despite Harriman's failure to do so he was rated as On Target. (Ex. NN). His salary was increased by $3,000. (Ex. OO).  Despite Thomas being concerned about Harriman's ongoing persistent safety issues in September 2019 Thomas promoted Harriman to General Manager of Phoebe and gave him a $26,000 raise (Ex. PP). Within five months thereafter Phoebe became a COVID epicenter. Thomas had no concern that COVID could have spread due to the food safety violations. (Thomas Dep. (Ex. C) 285-287, Harriman Dep. (Ex. E) 263).

Thomas directed that Heather Rizzo, who was a high performer, be rated a "0" and receive no salary increase.  Under Aramark policy and procedure, the General Manager, not the District Manager, is responsible for allocating earned annual merit increases among his or her team.  Thomas undermined Ms. King's authority by directing her as to what salary increase to provide her direct report, Heather Rizzo.  Heather Rizzo told Ms. King that Heather Rizzo had previously complained to Aramark Hotline that Thomas had asked her to falsify financial information, which she refused to do.  In comparison, for fiscal year 2014-15, Thomas directed that Ms. King rate Williford a perfect 4 (the highest level), even though Williford had reported directly to her for approximately half of that fiscal year.  Thomas never sought Ms. King's input, and she would not have rated Williford a perfect 4.  Thomas then gave Williford both a 4% raise and a lump sum bonus. King Decl. (Ex. A) at ¶ 65.

Thomas' Declaration at ¶¶11-16 claims that Ms. King disclosed confidential information to a competitor in requesting information relative to a Market Basket study. She did not. Thomas was aware that Williford requested the same information, but Williford was not disciplined.  King Decl. (Ex. A) at ¶¶ 69-70.  Thomas' Declaration at ¶19 claims Ms. King at the March 27, 2019 disciplinary meeting spoke in a very loud voice, interrupted him and Adams and glared at Thomas.  Ms. King as a naturally loud voice but she never used profanity or called anybody names.  There were interruptions on both sides because they would interrupt her while she was trying to explain so she would interrupt and try to finish her explanation.  She never exhibited behavior of not listening. She has never been unprofessional and has always been respectful of her superiors. She had five previous District Managers and none of them have ever said Ms. King was unprofessional in any way. King Decl. (Ex. A) at ¶¶ 79.

61.    Plaintiff denies. (See CSF ¶ 57). The emails where Mr. Thomas allegedly tried to address those alleged issues were no more than Mr. Thomas merely advising Plaintiff of what the issue was. (*See* Thomas Decl. Exs. 1-8).  Coaching is a part of all management's day-to-day interaction with employees and there needs to be constant coaching, developing, and communicating with individuals. (Adams Dep. (Ex. I) at 115).  It has always been the policy of Aramark that associates be advised of performance or disciplinary issues and provided with an opportunity to correct the issues. (Miller Dep. (Ex. H) at 98).  Managers providing frequent coaching and feedback to associates to address performance issues is something that was part of the performance management process, and some employees would need more of that than others. (Miller Dep. (Ex. H) at 100).  Adams was aware there were several incidents on the First Written Documentation dated August 29, 2016, that Ms. King had not received any prior performance coaching on and had not heard anything about them until she was disciplined for them. (Adams

Dep. (Ex. I) at 274).  In contrast, Jeff Soloway was given multiple opportunities to address

numerous deficiencies, and Mr. Thomas wrote up a plan on what Jeff needed to improve and met

with him weekly to work on that. (King Dep. (Ex. B) at 205-206).  Additionally, when Jacob

Williford would make errors on client documents, Mr. Thomas would provide general guidance

and suggestions on how to handle it better. (Williford Dep. (Ex. G) at 160).

62.     Plaintiff denies. Adams, a human resources manager without any firsthand

knowledge of King's performance, admitted she had no specific recollection of asking Ms.

King's manager, Thomas, or being provided supporting documentation from Thomas before the

First Written Documentation (Adams Dep. (Ex. I) at 231.  On or about August 29, 2016, Ms.

King was given the First Written Documentation by Thomas.  Adams attended by telephone.

(Ex.QQ). It contained 11 items without any supporting documentation.  Ms. King disagreed with

all of them except item 1.  Ms. King told Adams that she was being retaliated against by Thomas

as Ms. King had told Adams previously.  She told them that it was unfair; the disparate

treatment, harassment and retaliation were continuing.  Ms. King asked for a performance

improvement plan ("PIP") but Adams denied it and said that not everybody who gets written up

gets a PIP.  Adams told Ms. King "it's simple: improve your performance". At no time did Ms.

King yell nor was she told by Thomas or Adams that she was yelling.  Her voice is naturally

loud. She never used profanity or called anybody names.  They did not want to give her an

opportunity to explain why the items were unjustified. They would interrupt her while she was

trying to explain so she would interrupt and try to finish her explanation. She never exhibited

behavior of not listening. She asked Adams if supporting documentation demonstrating these

items were not true was provided if they could be removed. Adams gave Ms. King until Friday, 4

days later, to return her response along with any supporting documentation. Ms. King refused to sign the First Written Documentation. King Decl. (Ex. A) at ¶ 48.

63.    Plaintiff denies information or belief to know what Thomas and Adams discussed regarding the First Written Documentation dated August 29, 2016, or whether Thomas said anything about Ms. King's gender or complaints about him.  However, Thomas was aware of Ms. King's complaints regarding his conduct. See ¶ 37. Plaintiff denies Adams did not have any reason to believe that Thomas wanted to issue that warning to Ms. King because she is a woman or because she had complained about him.  Ms. King had complained to Hetrick on or about April 20, 2016, that Thomas's discriminatory, harassing, retaliatory conduct toward her continued unabated, and Thomas was creating a hostile work environment.  Thomas was excluding Ms. King from important financial meetings, meeting alone with her directors without notice to her, imposing unrealistic deadlines on her, and impeding her job performance.  Hetrick advised Ms. King that she would discuss it with Adams, her replacement, and advised Ms. King to do the same.  Ms. King did as Hetrick advised and advised Adams the same day of Ms. King's complaints.  She told Adams that Ms. King felt that Thomas was treating her differently than his male direct reports. He was imposing unrealistic deadlines on her, excluding her from important financial meetings, meeting alone with her directors without notice to her, failing to provide support and negatively interfering with her job performance. Adams took no action to stop such conduct. King Decl. (Ex. A) at ¶ 41.

64.    Plaintiff denies that Adams and Thomas were not aware of any complaints of gender discrimination or gender-based harassment made by Plaintiff against Thomas when they decided to issue this first written warning.  See ¶¶ 60, 63.

65.     Plaintiff only admits that Thomas met with Ms. King in a conference room at Winchester and gave her the First Written Documentation dated August 29, 2016. Plaintiff further states that Adams was only present during the time she was on the telephone.

66.     Plaintiff admits. See ¶ 62

67.     Plaintiff admits. Plaintiff further states that while on Ms. King was on FMLA Thomas questioned whether the severity of her son's illness required her to be on leave in discussions with Aramark employees. Williford, who at the time was officially reporting to Ms. King told her when she returned from FMLA that Thomas questioned the severity of her son's illness requiring her to be on leave. Also, Thomas allowed Williford to take leave to care for his ill wife—who suffered from a condition similar to Ms. King's son—without interference and allowed Williford to work from home often and without any complaint or negative comment. King Decl. (Ex. A) at ¶ ¶ 29, 62.

68.     Plaintiff denies. The unwarranted continued discipline given to Ms. King was setting her up for, and ultimately resulted in termination. King Decl. (Ex. A) at ¶¶ 45, 67, 68, 75, 86, 90, 104, 105.

69.     Plaintiff denies information or belief to know what Thomas and Adams felt during the meeting regarding the First Written Documentation dated August 29, 2016.  See ¶ 62.

70.     Plaintiff admits. Plaintiff further states that during the limited time Ms. King was given she did her best to prepare a response and obtain supporting documentation while she also continued to perform her job.  On September 2, 2016, Ms. King submitted her response along with the supporting documentation she could locate in such time.  King Decl. (Ex. A) at ¶ 49.

71.    Plaintiff denies. Plaintiff refuted the items listed in the First Written Documentation dated August 29, 2016 in the limited time she was given and further states as follows:

*With regard to the item 1 while Ms. King agreed that she did not provide a work schedule directly to Thomas on a few occasions in May -August 2016, there was a computer calendar which Ms. King utilized as well as his other direct reports.*  Thomas, as District Manager, had access to that calendar. Instead of relying on the computer calendar, Thomas sent a task to Ms. King's outlook calendar for Sunday afternoons, the day that she tried to limit the amount of time she worked. In addition, Thomas communicated with Ms. King regularly, so he was aware of her location and forthcoming plans. If he had any questions, Ms. King always carried a cellphone and responded to his calls as quickly as possible. His other direct reports, Wilson, Harriman and DeGori, were not asked by Thomas to send him their weekly calendar. King Decl. (Ex. A) at ¶ 50.  Thomas told Barrett that his management employees who were responsible for more than one location were required to provide a weekly schedule. Barrett Dep. (Ex. J) at 230-231. Thomas told Adams that he requested that all of his General Mangers send him their weekly schedules on Sunday. Adams Dep. (Ex. I) at 236.  Thomas admitted that he did not require all his direct reports to provide their weekly calendar. For example, Harriman and DeGori, both of whom have multiple locations, were not required to provide their weekly schedule to Thomas. Thomas Dep. (Ex. C) at 213-215. DeGori Dep (Ex. D) at 122; Williford Dep. (Ex. G) at 194.

*With regard to items 2 and 3 there was no basis for Thomas' inclusion in this write up that Ms. King did not notify him of the joint commission site survey the week of July 25, 2016, at Shenandoah on July 25, 2016, nor was on site.* Ms. King was notified mid-

morning of July 25, 2016 of their arrival and checked in with her director.  Ms. King had been

there on Friday and knew all was in order. She went there later in the week. Thomas emailed her

because she did not advise him, they were there.  He had been Ms. King's District Manager since

early 2015 and never advised her that she had to immediately contact him. Ms. King would

contact him with results.  She acknowledged that he now wanted to be told as soon as they

arrived moving forward and she would do so in the future. Ms. King was no longer dual General

Manager of Food and EVS.  Knight was the District Manager of EVS and was responsible for

the EVS portion of the inspection, but he was not present at any time of the inspection.  Further,

Ms. King and her team had led approximately 36 successful surveys throughout her time at

Valley Health.  Shenandoah's Department of Health results were so strong that the Department

of Health chose that location to train their staff in approximately late 2016.  King Decl. (Ex. A)

at ¶ 51. Thomas confirmed that Ms. King had overseen approximately 36 successful surveys.

Thomas Dep. (Ex. C) at 229-230).  While Thomas wrote King up for failing to notify him of the

joint commission site survey which focuses on safety he did not even discipline Harriman for

complying with safety standards at his locations for approximately a year. See ¶¶ 57, 60.

**With regard to item 4 there was no basis for Thomas' claim that assignments
are not completed on time: development plan, capital inventory June – July- August 2016.**

With regard to Ms. King's development plan, the process would typically be for the employee to

gather information from end of year review that was covered by their leader and utilized those

targets for their development plan.  The employee would then build a development plan based

off areas identified by their leader. The employee and leader would then meet to review for

accuracy and feedback.  Ms. King was out on FMLA/ disability when her 2015 annual review

was prepared by Thomas. Thomas never spoke with Ms. King regarding her review. Then when

Thomas, Miller and Ms. King were on a call, Thomas mentioned that Ms. King needed to complete the development plan. She requested that he and Ms. King complete it together, as they had not reviewed her annual merit results from 2015.  It was important to know the areas where Thomas identified as opportunities of growth.  As they still had not reviewed Ms. King's strengths and weaknesses or areas of opportunity, it would not be possible to develop a plan. With regard to capital inventory (FADL), the process would typically be that the site director would review this report monthly and identify any items that (a) did not belong on the list due to it being fully depreciated or (b) review item value and location. Valley Health had a unit controller, Williford, who had reported out on all finances including each location's FADL. The results would be reviewed by Ms. King and the unit controller, Williford, and Ms. King would cover items of concern or in question.  Ms. King was unaware prior to this disciplinary notice that the process had changed, and unit controller, Williford, was no longer doing the capital inventory (FADL). King Decl. (Ex. A) at ¶ 52.  Thomas stated he required all direct reports to complete the FADL, Harrman and DeGori never had to prepare a FADL (Thomas Dep. (Ex. C) at 238; Harriman Dep. (Ex. E) at 224; DeGori Dep. (Ex. D) at 129).

   *With regard to item 5 there was no basis for Thomas' claim that Ms. King made a decision with significant financial impact without involving Thomas relative to Pepsi Coke Transition July 2016.*  The typical process would be that the leader would round on the client to gather insight on food and beverage programs and obtain feedback. Then the leader would discuss with the district manager the client's wishes. The leader would work with the client on the task and give updates to the district manager.  When Ms. King was out on FMLA on February 24, 2016, her client began discussion of changing from Pepsi to Coke.  In April 2016 Ms. King discovered that Valley Health was going to switch from Aramark to Capstone

purchasing and move all purchasing to Valley Health as opposed to Aramark.  Ms. King had numerous conversations with Thomas regarding this situation and kept him updated as she received information.  Ms. King told him that they could work with their soda vendors to beat what Capstone was promising Valley Health.  Ms. King was working with Coca- Cola representatives to see if they could build a contract competitive to Capstone.  She received a meeting request for June 28, 2016, to discuss this matter but was not aware they were going to present a full contract proposal, as Ms. King was given nothing prior to the meeting to review. She told Thomas what was presented at the meeting.  While Aramark's pass-through revenue would be reduced by $84,000 as a system they were able to retain over $584,000 in pass-through revenue by keeping the beverage purchasing.  Ms. King did not exclude Thomas from any of the meetings and updated him as things progressed. Male direct reports of Thomas work on projects with clients and implement them with little involvement from Thomas.  When she asked Wilson if he had to run everything by Thomas first he said "Nope as long as the client is happy". King Decl. (Ex. A) at ¶ 53.

   ***With regard to item 6 there was no basis for Thomas' claim that Ms. King refused to provide coverage at Norton July 2016.***  Ms. King was returning from being off on FMLA and was trying to catch up.  She received an email from Thomas asking her for support from within their team to close Norton, an account that he had lost.  There were nine weeks that had to be covered.  It was not required that a direct report of Thomas attend as it could be a director or manager as well.  Ms. King noticed that Thomas had her going for two weeks in a row as well as one other week to Norton, which was a concern due to her heavy workload.  Ms. King spoke with her direct reports to see who could assist.  She was able to cover five of the nine weeks with her team from Valley Health without Ms. King personally having to assist.  Ms. King

checked in with Thomas after the schedule was finalized and all of the weeks were covered.  Ms.

King had previously told Thomas that her client, Bob Amos, did not want her working in

locations other than Valley Health because he said anyone assigned to Valley Health should

work in Valley Health.  She then received this written warning for not attending herself but

DeGori and Wilson, who were also direct reports of Thomas, did not assist at Norton. King Decl.

(Ex. A) at ¶ 54; See ¶ 35.

**With regard to item 7 there was no basis for Thomas' claim that Ms. King**

**shared confidential organizational changes with her client in July 2016**.  Ms. King was made

the defacto dual general manager in February 2015. She was officially the dual general manager

in October 2015.  In early 2016 Thomas advised Ms. King that she would no longer be the dual

General Manager of Food and EVS and would only be the General Manager of Food. She was

very concerned that the facilities side was not running well and asked Thomas if she could stay

on to assist the facilities side until they replaced her.  He said there was not going to be a General

Manager of EVS (aka Facilities), just a District Manager of EVS, Knight. Thomas told Ms. King

not to discuss this with any Valley Health leadership. After a while the directors and executives

at Valley Health were becoming very frustrated because no one was attending meetings such as

infection control, facility readiness meeting, etc.  It appeared as though Ms. King was not

attending to her duties, although she was told by Thomas not to tell her client what was

happening.  This was directly affecting Ms. King's professional reputation, as these Valley

Health individuals believed she was still responsible for these duties and was not doing the job.

Ms. King's subordinates were also not told, which resulted in decreased performance by them

because they believed she was still their supervisor and that she just stopped working with them.

All they thought was that Ms. King was not doing her job. On July 6, 2015, Ms. King called

Thomas and discussed the impact this was having on Valley Health. Thomas agreed that she should start to discuss with their clients what was happening. She then set up a brief meeting with Bob Amos, her client at Winchester, and reported to Thomas what had occurred. Only after Ms. King told Thomas that Bob Amos said he would have rather heard it from someone higher up did Thomas send Ms. King an email stating that he did not advise her she could discuss it with Bob Amos. Ms. King has been employed by Aramark through the company going public to private then private to public. She has never breached any confidentiality policy or statement in the 11 years she worked for Aramark. King Decl. (Ex. A) at ¶ 55. Thomas recalled Ms. King voicing her concerns that her client, Bob Amos, and her EVS employees believed she was still their supervisor and that she just stopped working with them. Thomas Dep. (Ex. C) at 265.

**With regard to item 8 there was no basis for Thomas' claim that Ms. King did not monitor payroll using Kronos.** Ms. King had been doing Kronos until the hire of Valley Health unit controller, Williford. It was Williford's job responsibility to enter and submit payroll in Kronos. Aramark. King Decl. (Ex. A) at ¶ 56; Williford Dep. (Ex. G) at 31, 77-78. Although Ms. King did not submit it, she reviewed it for Food employees only, except during the period that she had responsibility as dual General Manager over Food and EVS. Wilson and Harriman had another employee complete their Kronos. King Decl. (Ex. A) at ¶ 56; Harriman Dep. (Ex. E) at 223-224; Wilson Dep. (Ex. F) at 99-100.

**With regard to item 9 there was no basis for Thomas' claim that Ms. King needed to update him about a client visit schedule and cancellation for Valet in August 10, 2016.** On June 20, 2016, Ms. King advised Thomas that Bob Amos, her Valley Health client, was interested in valet. Emails were exchanged regarding what documents she could use to share with the client. They had a call scheduled for July 29, 2016, but Ms. King was on PTO so it

was cancelled.  She had a follow up call scheduled for August 2, 2016, but it was declined by

Thomas. On August 3, 2016, Wilson sent out an invitation for a tour request at Western

Maryland on August 11, 2016.  On August 3, 2016, Ms. King let David, the meeting organizer,

know that she could not do Wednesday and then next day he told her that he could not do

Thursday.  So she declined the meeting and expected the meeting organizer to send the

cancellation.  Then she sent an email to David and Wilson to have a quick call on August 12,

2016, to see if they could align schedules as she could see the client and Thomas' schedule.  Ms.

King did not include Thomas on this call out of respect for his time as all they were doing was

reviewing calendars to solidify dates.  Ms. King also verbally updated Thomas throughout the

process, even aligning the client tour on a day Thomas was already scheduled to be in Western

Maryland. The tour took place on August 30, 2016, and all parties were involved. King Decl.

(Ex. A) at ¶ 57.  Thomas was aware that Ms. King had a scheduling problem and was trying to

work it out with the other people before letting him know so she did not waste his time.  He

attended the tour. (Thomas Dep. (Ex. C) at 252-253).

   ***With regard to item 10 there was no basis for Thomas' claim that Ms. King did***

***not report the David Bell incident immediately upon discovery and it was not discussed in a***

***timely manner.*** Once notified of a theft Ms. King was to first gather the information so that she

could accurately identify the culprit. You would then review the facts and decide a course of

action. If termination is sought human resources and the next level of management would be

brought in.  On July 18, 2016, Ms. King was notified about a possible theft of petty cash of about

$19 at Shenandoah by Rob Sharon, Director of EVS.  He said that it occurred by David Bell

sometime in May 2016 (when I was the dual Manger of Food and EVS) but Rob Sharon was just

told about it a couple of weeks before by the supervisor.  M. King set up a call with Rob Sharon

and listened to his overview of the situation.  She asked him to write her a statement as well as having the supervisor write a statement.  David Bell was out on FMLA.  Ms. King did not realize that a person could be disciplined while they were out on FMLA so she thought they had time to gather the information.  Ms. King did not notify Thomas or human resources immediately because of this. When she did notify Thomas, he verbally counseled her and she set up an all Aramark leadership call to discuss the proper manner in which a situation such as this would be handled moving forward. King Decl. ¶ 58.

> *With regard to item 11 there was no basis for Thomas' claim that multiple managers' report not seeing or knowing how to reach Ms. King over past several months.*  All of Ms. King's staff knew where she was going to be a week ahead of time, as they would discuss it while rounding on her team. During the time Ms. King was the dual General Manager of Food and EVS she had to split her time between EVS and Food, so it was not uncommon to be at location with one service and not see the other service.  Ms. King was in contact with her direct reports three or more days a week.  All of her direct reports could reach her by telephone or email at any time.  Ms. King never received any communication from any of her direct reports that they had difficulty contacting her. After Ms. King received this write up she contacted her direct reports to confirm they had accurate contact information for her, and they did. Thomas told Ms. King that Williford advised Thomas that she was not present at Winchester working when in fact she was present.  Ms. King was performing a foot traffic study on the other side of the campus in preparation for her proposal to Starbucks.  King Decl. (Ex. A) at ¶ 59.

72.     Plaintiff admits that on September 10, 2016, after receiving Ms. King's response to the First Written Documentation, Thomas gave Adams a memo that addressed points made in Ms. King's written response.  Plaintiff further states that after she provided her supporting

documentation, Adams allowed Thomas significantly more time to respond to Ms. King's

supporting documentation than Ms. King was given to respond to the First Written

Documentation dated August 29, 2016. Then, when the meeting had been rescheduled to give

him time to respond, Thomas cancelled the rescheduled meeting. King Decl. (Ex. A) at ¶ 60.  In

the normal course, Human Resources would ask for supporting documentation from the

supervisor prior to issuing written discipline and would be provided with that in order to

understand what they are addressing.  However, Adams did not specifically recall whether

Thomas provided such supporting documentation (Adams Dep. (Ex. I) at 230, 232).  Plaintiff

further states that item 10 on Thomas's written response incorporated an additional new

allegation that did not appear on the First Written Documentation dated August 29, 2016, for

which she had no opportunity to respond. (King Decl. (Ex. A) at ¶ 61, Ex. RR).

73.     Plaintiff admits only that on September 29, 2016, Thomas and Adams issued a

revised version of the First Written Documentation to Ms. King that removed six of the eleven

items listed on the original version dated August 29, 2016.  Plaintiff further states that it was not

until on or about September 29, 2016, that the meeting with Thomas, Adams and Ms. King to

discuss her challenges to the discipline addressed on the First Written Documentation (Ex. KK)

occurred.  Thomas attended the meeting by telephone while he was driving without even pulling

over which caused repeated connection interruptions during the conversation.  Ms. King was

given a revised write up (First Written Documentation dated September 29, 2016) without any

supporting documentation by Thomas (Ex. SS). Despite that Ms. King had refuted in writing the

eleven items listed in the original First Written Documentation dated August 29, 2016 (Ex. KK),

except not sending Thomas her schedule on several occasions, only six of the eleven items listed

in the original First Written Documentation dated August 29, 2016 (Ex. KK) were removed,

leaving five items.   However, in the revised First Written Documentation dated September 29, 2016, Thomas added to item 5 the following: "After discussion, an employee was terminated for theft at WMC and DM was not notified September 2016".  This violated Aramark policy and procedure and deprived Ms. King of the opportunity to respond to this new item, which she disagreed with, and was further evidence of discrimination, harassment, and retaliation by Thomas. This was an EVS employee.  There was no General Manager of EVS.   Knight was the District Manager of EVS and had responsibility for EVS. As the General Manager of Food this was not Ms. King's responsibility. Ms. King requested that the revised First Written Documentation be changed to a Verbal Warning given that she had no prior discipline. Her request was denied. Ms. King then requested that she receive a Performance Improvement Plan ("PIP"), to clarify the areas of improvement needed.  Her request was denied and Adams stated "It's simple, improve your performance."  King Decl. (Ex. A) at ¶ 61.

After this September 29, 2016, meeting, Adams had arranged for biweekly telephone conferences with Ms. King, Adams, and Thomas that she advised were to help Ms. King move forward and to correct any performance issues. After only a few of these conferences, Thomas told Adams that she was no longer needed, and Adams did not participate in future conferences.  Thereafter, Thomas failed to conduct meetings on a regular basis.  When the calls did occur, Thomas did not address Ms. King's performance, other than to say she was doing fine.  King Decl. (Ex. A) at ¶ 62.

Further, in advance of these telephone conferences, Thomas required Ms. King to complete a "Top 15" report with respect to each of her facilities.   At that time, Thomas did not require direct reports, Harriman, DeGori, and Wilson, to complete Top 15 reports. This is another example of Thomas holding Ms. King to a different standard than his male direct reports.

47

Before any training was given on the Top 15 report Thomas did not require direct reports,

Harriman, DeGori, and Wilson, to complete Top 15 reports. Ms. King was required to fill it out.

She did not understand a lot of the data calculations in it.  On the one occasion Thomas sat with

Ms. King to go through the Top 15 report, he opened his laptop and Ms. King saw a file on his

desktop labeled "Kristen King legal file."  She asked him what she would have done for him to

have a legal file on her and he shut his laptop, did not respond, and wanted to continue with the

Top 15 training.  Thereafter, when Thomas later required male direct reports, Harriman, De Gori,

and Wilson, to complete Top 15 reports, he provided a thorough Top 15 training on a conference

call via a PowerPoint Presentation. King Decl. (Ex. A) at ¶ 63.

74.     Plaintiff denies. Plaintiff further states on or about January 10, 2017, Ms. King

took the lead on a client tour in Philadelphia concerning the Valley Health Proposal.  During this

visit, Bob Amos, and Aramark management: Thomas, Shingleton, Alexis Duckett ("Duckett")

(Director of Business Development), and Ms. King visited two of Aramark's premier facilities:

Children's Hospital of Philadelphia and CHUBB Insurance.  Between March 19 through 21,

2017, Ms. King took the lead in arranging for, preparing, and conducting a further presentation at

Aramark's Innovation Center in Philadelphia connected to the Valley Health Proposal.  Many

Valley Health executives and Aramark executives, including the President of Healthcare and

Thomas, were present at this presentation. Aramark and Valley Health executives told Ms. King

that the presentation was a significant success. King Decl. (Ex. A) at ¶ 66.

On March 19, 2017, while in Philadelphia, Duckett, Aramark Director of

Business Development, whose home office was located in North Carolina, advised Ms. King that

Duckett observed Thomas speaking to Ms. King in a rude and condescending way and it did not

seem like Thomas and Ms. King were on the same team.  Ms. King responded by complaining to

Duckett that Thomas did not support her and undermined her management and career.  Ms. King advised Duckett that Thomas had discriminated, harassed, and retaliated against Ms. King and targeted her relative to her performance even though there were other male employees with worse performance. Ms. King told Duckett that she was afraid to be alone with Thomas because he was discriminating, harassing, and retaliating against her, had lied about her in the past, and Ms. King was afraid that he was setting her up for termination.  Ms. King also told Duckett that she had complained to Human Resources.  Duckett advised Ms. King that, if she needed anything, Ms. King could come to her. King Decl. (Ex. A) at ¶ 67.

While in Philadelphia for the Valley Health Proposal, Ms. King advised DiCicco, Vice President, Strategic Partnerships, that Thomas's unfair targeting, discrimination, harassment, and retaliation of/against her had increased since DiCicco and Ms. King last spoke of it in May 2016.  She advised that Thomas was excluding her participation in team and client meetings, focusing on finding ways to identify and raise any perceived weakness, replacing many of her duties by working with the Unit Controller, Williford, instead, and speaking to her in a rude, condescending, dismissive, and hostile tone.  Ms. King advised DiCicco that Thomas was discriminating, harassing, and retaliating against her, and setting her up for termination.  She also complained that Adams, Regional Director of Human Resources, knew about the situation but had failed to stop such conduct. King Decl. (Ex. A) at ¶ 68.

On or about March 24, 2017, approximately three days after Ms. King's complaint to DiCicco, Thomas advised Ms. King that she needed to report to Winchester on March 27, 2017 to meet with him to review her Top 15.  When Ms. King arrived at Winchester, Thomas called Adams, and issued Ms. King a Final Written Documentation, dated March 24, 2017, (Ex. TT) for an alleged violation of the Market Basket procedure.  (Ex. UU at KK 544).

There was no basis for this discipline.  Ms. King complied with Aramark policy and procedure, as she had done consistently during her tenure with Aramark.  The Final Written Documentation dated March 24, 2017, was further discrimination, harassment, and retaliation by Thomas, and Aramark's management who were aware of but took no action to stop such conduct. Ms. King told them that it was not true and was in retaliation for her complaining to other leadership about Thomas' behavior towards her.  Ms. King was written up regarding the Market Basket Procedure she used even though she had followed the same Aramark standard procedure regarding Market Basket in 2015, when Thomas was also her District Manager, without being written up for it. King Decl. (Ex. A) at ¶ 69. Adams could not recall documenting any inappropriate behavior of Ms. King at this disciplinary meeting. Adams Dep. (Ex. I) at 269.

***There was no basis for Thomas' claim that Ms. King did not demonstrate Aramark Leadership Competency of Thinking Strategically by understanding long- term business and financial implications of day-to-day decision, did not demonstrate an understanding of the issues relevant to the broad organization, communicated with US Foods about Market Basket on 2.15.19 after being directed not to on 1.1.17 and 2.15.17, and  alerted a competitor and added risk to Aramark's ability to migrate purchasing and an estimated $400k+ in annual income and cost reductions for their client.*** A Market Basket is where Aramark compares what it can obtain product for money-wise versus what others can, such as US Foods.  Aramark has a standard operating procedure with regard to conducting a Market Basket.  To begin the Market Basket, specific documentation must be sent to the Supply Chain Regional Distribution Manager.  More specifically, "a completed spreadsheet including descending $ information from the competing supplier (ex. US Foods) of the top 200 items (or 80% of spend) over the most recent three-month period with current pricing". (Ex. UU at KK

544). Ms. King had conducted a market basket in May 2015 at Valley Health with Carrie

Santiago ("Santiago"), Regional Distribution Manager for Aramark.  Ms. King submitted the

documentation and noted to Santiago that the financial information provided was from US

Foods.  Santiago had no issue with this and prepared a report for Valley Health to review

potential cost savings.  The report was sent to the client, who then sent that to Premier, US

Foods.  The following year in May 2016, Ms. King received an email from Thomas asking her to

send him the Market Basket from 2015, which she did.  In December 2016 Aramark and US

Foods partnered with Direct Parent Incentive ("DPI") that gives rebates when you purchase

Premier products from US Foods at the percentage set by US Foods. In order to establish an

accurate target, you must provide US Foods usage reports from all categories purchased. Ms.

King was working with Michael Katz, Regional Manager of US Foods, on gathering this

information so that he could submit the complete documents to US Foods to obtain the DPI

dollars. In December 2016 Ms. King's client, Bob Amos at Winchester, asked that Aramark

provide him with a Market Basket study as soon as possible, as they were thinking of switching

purchasing over to Health Trust.  If this happened Aramark would have lost about $9 million

dollars in business. Ms. King notified Thomas about Valley Health's intent.  Ms. King's client,

Bob Amos, told Viji Vellayan ("Vellayan"), Senior Regional Director of Premier, who partners

with US Foods, that he had requested a Market Basket. Vellayan then communicated that to

Michael Katz, their Regional Director of US Foods and he brought it to Ms. King's attention via

her client. On January 19, 2017, Thomas emailed Ms. King to ask her not to give information to

US Foods, as he would follow up with her on Monday.  Ms. King immediately responded asking

him which process he was talking about: the DPI or market basket, both of which involved

obtaining usage reports from US Foods.  He never responded nor did he meet with Ms. King on

Monday. Ms. King continued to work on the DPI as it needed to be completed that month.  She

also started work on the Market Basket study following Aramark's standard operating procedure,

which is the same procedure she used in 2015 when working with US Foods.  Michael Katz,

Regional Manager of US Foods and Ms. King were finalizing the DPI data and already had all

the purchase history collected. On January 30, 2017, Thomas notified Ms. King that Aramark

had decided not to present Health Trust but instead to provide a Market Basket study.  Ms. King

responded to him to let her know when he would like to connect to draft the response to Ms.

King's client, Bob Amos, but Thomas never connected with her regarding it.  On February 15,

2017, Ms. King contacted Santiago, Aramark Regional Distribution Manager, to notify her

regarding the Valley Health Market Basket request. Santiago responded the next day with a copy

to Thomas for Ms. King to let her know what she needed to conduct the study.  Ms. King advised

Santiago that she had begun working on this. On March 3, 2017, Ms. King was on a conference

call with Thomas and Williford and was covering Market Basket when Thomas told Ms. King

that she was not supposed to get information from US Foods and they should have gathered it

themselves. Ms. King tried to explain that is not what the Aramark instructions state for how a

market basket is conducted, but Thomas ignored her.   On March 10, 2017, Ms. King learned

that, without letting her know, Thomas assigned Williford to work on the Market Basket**.**

Williford advised Santiago, Aramark Regional Distribution Manager, that he had reached out to

US Foods.  Williford was not written up for it by Thomas.  King Decl. (Ex. A) at ¶ 70.

In the Action to be Taken relative to Thomas' Final Written Documentation dated

March 24, 2017, Thomas told Ms. King that she was required going forward to obtain his

advance approval for any financial decisions exceeding $1,000.00.  This required Thomas's

increased oversight and approval, given that Ms. King's unit did about $10 million in business

annually.  Thomas did not require his male direct reports, Wilson, DeGori, Harriman or Williford

to obtain approval for any financial decisions exceeding $1,000.00. Ms. King told Thomas that

compliance with this directive would make it impossible to do her job day to day, as she

managed up to $23 million in total managed volume.  As a Band 6 manager, Ms. King had Band

8 employees reporting to her that had financial responsibilities that exceeded thousands of

dollars. An example would be that a Band 8 production manager that needed to place the

produce order for Winchester often spent over $5,000 per order. On any given week there would

be 28 to 45 orders throughout Valley Health. Because Band 8 and Band 7 managers reported to

Ms. King, she would need to get approval from Thomas for each order over $1,000.  Considering

that Ms. King was responsible for 7 hospitals, it would be impossible to get permission for each

order with an invoice over $1,000. This would have affected their ability to serve the patients,

employees, and visitors of Valley Health in a timely manner with the correct items. It would

have paralyzed Ms. King's business. Thomas created this directive knowing it would be

impossible for Ms. King to comply.  King Decl. (Ex. A) at ¶ 71. Harriman in all of his

experience has never had to get approval for spending over $1,000 (Harriman Dep (Ex. E) at 67).

DeGori did not have a purchasing limit and only had to stay under budget (DeGori Dep. (Ex. D)

at 53. Wilson has never been a situation with a spending limitation (Wilson Dep. (Ex. F) at 48,

127).

     75.    Plaintiff denies. See ¶74.

     76.    Plaintiff denies. See ¶74.

     77.    Plaintiff admits only that she sent an email on February 15, 2017 to Michael Katz

of US Foods in response to an email from Thomas requesting the status of the Market Basket

Study.  See ¶74.

78.     Plaintiff denies. See ¶74.

79.     Plaintiff denies.  See ¶74.

80.     Plaintiff only admits that Williford emailed Carrie Santiago, Aramark Regional

Distribution Manager, regarding the Market Basket Study on March 22, 2017.  Plaintiff further

states that Carrie Sanitago asked Williford if  "US Foods gave [him] a roll up of all spend for the

six hospitals or did they just give it to you by hospital" to which Williford responded that "No

we pulled these ourselves. **We asked a while ago** (emphasis added) but I think [US Foods] are

dragging their feet" Ex. UU at KK 545-546. Thomas never specifically told him not to get

information from US Foods. Williford Dep. (Ex. G) at 155. See ¶ 74.

81.     Plaintiff admits only that a Final Written Documentation dated March 24, 2017,

was given to Ms. King. See ¶ 74.

82.     Plaintiff denies information or belief to know what Thomas and Adams discussed

regarding the Final Written Documentation dated March 24, 2017, or whether Thomas said

anything about Ms. King's gender or complaints about him.  However, Thomas was aware of

Ms. King's complaints regarding his conduct. See ¶ 37 ,60. Plaintiff denies Adams did not have

any reason to believe that Thomas wanted to issue that warning to Ms. King because she is a

woman or because she had complained about him.  Ms. King had complained to Hetrick on or

about April 20, 2016, that Thomas's discriminatory, harassing, retaliatory conduct toward her

continued unabated, and Thomas was creating a hostile work environment.  Thomas was

excluding Ms. King from important financial meetings, meeting alone with her directors without

notice to her, imposing unrealistic deadlines on her, and impeding her job performance.  Hetrick

advised Ms. King that she would discuss it with Adams, her replacement, and advised Ms. King

to do the same.  Ms. King did as Hetrick advised and advised Adams the same day of Ms. King's

complaints.  She told Adams that Ms. King felt that Thomas was treating her differently than his male direct reports. He was imposing unrealistic deadlines on her, excluding her from important financial meetings, meeting alone with her directors without notice to her, failing to provide support and negatively interfering with her job performance. Adams took no action to stop such conduct. King continued to complain and be subject to retaliation, but no action was taken to stop the conduct. King Decl. (Ex. A) at ¶¶ 35, 41, 42, 45, 46, 48, 65, 67, 72-73.

83.     Plaintiff admits.

84.     Plaintiff denies. See King Decl. (Ex. A) at ¶¶ 48, 79.

85.     Plaintiff denies. The unwarranted continued discipline given to Ms. King was setting her up for her and ultimately resulted in termination. King Decl. (Ex. A) at ¶¶ 45, 67, 68, 75, 86, 90, 104, 105.

86.     Plaintiff admits. Plaintiff further states Ms. King complained to DiCicco that she had received this Final Written Documentation dated March 24, 2017.  DiCicco advised Ms. King that he was shocked, and he agreed with her that the Final Written Warning was in retaliation for the complaint that she had recently made to Aramark executives during the Valley Health Proposal.  DiCicco advised Ms. King that he would call Miller, Regional Vice President, Thomas's direct supervisor, to inquire about this discipline.  Soon thereafter, DiCicco advised Ms. King that he spoke to Miller, who said "let HR deal with this".  He then advised Ms. King that she should call the Aramark Employee Hotline.  Miller took no action, and Thomas's discriminatory, harassing, and retaliatory treatment of Ms. King continued unabated. King Decl. (Ex. A) at ¶ 72.

On or about March 27, 2017, Ms. King contacted the Hotline and complained about Thomas's discriminatory, harassing, and retaliatory treatment and hostile work

environment.  That same day, Ms. King, who was already receiving medical treatment because

of Aramark's discrimination, harassment, and retaliation, experienced an anxiety attack and went

to her doctor for an emergency appointment.  Ms. King's doctor took her out of work for

approximately four days.  King Decl. (Ex. A) at ¶ 73.

On March 30, 2017, Ms. King had a telephone conference with Evelyn Miller,

Employee Relations Specialist, from the Hotline, who was in charge of the investigation.  Ms.

King provided the names of witnesses, and she complained that Thomas was discriminating and

retaliating against her and creating a hostile work environment. The Hotline report (Ex. VV)

does not show all of the information that Ms. King relayed during the hotline call. Ms. King also

said that Thomas was discriminating against her, he treats her differently than her male

counterparts, and he continues to violate the FMLA.  Neither Miller nor anyone else, asked for a

written statement from Ms. King. King Decl. (Ex. A) at ¶ 74.

On or about April 6, 2017, in retaliation for Ms. King's recent Hotline complaint

and other complaints, Thomas and Adams advised Ms. King that she would no longer receive

mileage reimbursement for travel from her rented home in Stanley, VA to Winchester as well as

no longer allowing her to work from her home office. King Decl. (Ex. A) at ¶ 75.  Upon her hire

in 2012 her District Manager, Michael McCarthy, was aware of her home in Stanley, VA and did

not object. He told her that she was entitled to mileage from her home in Stanley, VA to her

locations as well as meals while working. Ms. King was issued a corporate card.  Her expenses

were submitted by her and approved by her District Manager. This continued throughout her

employment when she reported to District Managers Sam Zamrik, Rick Miller, Tom Finney and

Thomas until Thomas discontinued mileage reimbursement following her first hotline complaint

on March 27, 2017. King Decl. (Ex. A) at ¶¶ 8-11, 75; King Dep. (Ex. B) 68-70.  Thomas

continued to allow Williford to work from his home office, which was less than 10 miles from Winchester where he had a designated office.  Williford continued to work from home when his wife had periodic episodes of illness.  Ms. King spoke with Williford on a number of occasions when he was working from home due to his wife's illness.  Ms. King contacted Colleen O'Donnell ("O'Donnell"), Director of Employee Relations, and advised her that Thomas had been discriminating against Ms. King by issuing unfair and untrue discipline, not adhering to Aramark's progressive discipline policy, making untrue statements about her job performance, and setting her up for termination as a result of discrimination, harassment, and retaliation for her prior complaints about his discrimination, harassment, and retaliation.  Ms. King complained that she needed O'Donnell's help and that, to date, no one had taken Ms. King's complaints seriously or done anything to address her complaints except for Carmine Di Cicco and Alexis Duckett. King Decl. (Ex. A) at ¶ 75.

On or about April 27, 2017, Evelyn Miller contacted Ms. King and advised her that the Hotline investigation determined that her complaints were unfounded.  Ms. King asked Evelyn Miller why she never contacted any of the witnesses she supplied, namely, James Fletcher, Robert Sharon, Shannon Loy, and Randy Barrett.  Evelyn Miller said that they contacted only relevant witnesses.  King Decl. (Ex. A) at ¶ 76.

87.     Plaintiff admits. Plaintiff further states this does not reflect a complete report of her complaint. She additionally reported that Thomas was discriminating against her, and he did not treat her the same as male managers among other things. King Dep. (Ex. B) at 345-346.

88.     Plaintiff admits.  See ¶86, 87.

89.     Plaintiff denies.  There is a written step by step procedure for how an investigation is conducted by Aramark. Adams Dep. (Ex. I) at 84.  Neither Miller nor anyone

else, asked for a written statement from Ms. King. King Decl. (Ex. A) at ¶ 74.  The investigation

relative to Ms. King's complaints did not include a statement written or signed by Ms. King, Mr.

Thomas, Ms. Adams or any witness. No witnesses identified by Ms. King were interviewed.

King Decl. (Ex. A) at ¶ 76.

90.    Plaintiff admits only that she spoke with Evelyn Miller and Colleen O'Donnell.

See ¶ ¶ 86, 87, 89; King Decl. (Ex. A) at ¶¶74, 76.

91.    Plaintiff admits.  See ¶ 86; King Decl. (Ex. A) at ¶ 76.

92.    Plaintiff denies.

93.    Plaintiff admits only that she was given a Second Final Written Documentation

dated May 9, 2017.  Plaintiff further states a few days after Ms. King was advised that the

Aramark Hotline investigation ended, Ms. King contacted Adams, Regional Director of Human

Resources, to schedule a meeting to discuss how to successfully continue her employment with

Aramark.  Ms. King requested to be placed on a PIP so that she could know clearly the areas

needing improvement and identify specific goals to work toward.  Ms. King requested a meeting

with only her and Adams to discuss a way to move forward.  Adams agreed and scheduled such

meeting for May 9, 2017.  However, on or about May 7, 2017, Ms. King received a meeting

request subject "way forward" from Thomas that scheduled a meeting with him, Adams, and Ms.

King in person at Winchester on May 9, 2017. King Decl. (Ex. A) at ¶ 77.

At the May 9, 2017, meeting, approximately 12 days after Evelyn Miller advised

Ms. King the hotline investigation determined her complaints were unfounded, Thomas issued

Ms. King a second Final Written Documentation, dated May 9, 2017 (Ex. WW).  The second

Final Written Documentation contained a list of 5 claimed violations of Aramark policy and

procedure.  Since Ms. King had already been issued a prior Final Written Documentation,

Adams advised her that the second Final Written Documentation did not matter because "you can't have a written, written, written." Adams told Ms. King that it was just documenting more things that she was doing wrong. Each of the items listed on the second Final Written Documentation were either untrue or did not violate Aramark policy and procedure. During this May 9, 2017, meeting, Ms. King asked to be put on a PIP because she did not know what Thomas was expecting from her. Ms. King was under the impression that she was doing a good job. She was continuing to grow the business, conduct satisfactory regulatory agency inspections, and roll out many new Aramark and client programs (i.e. Treat Yourself platform, Kronos, Success Share), and other positive things, so this was a surprise to Ms. King. Adams denied Ms. King's request for a PIP, saying it was not necessary, she was not a candidate for it, and Adams and Thomas had determined she would not benefit from it. Ms. King was so upset that she went to her doctor, who removed her from work for approximately four days based on the anxiety that she experienced as a result of the discrimination, harassment, hostile work environment, and retaliation against her. King Decl. (Ex. A) at ¶ 78.

**With regard to item 1, there was no basis for Thomas' claim that during multiple conversations with multiple participants while discussing disciplines Ms. King demonstrated unprofessional behavior, using loud voice, interrupting, not listening, and inappropriate comments.** During the prior counseling conversation when Ms. King was given a First Written Documentation, she was upset because she had not had any formal verbal or any type of notification that her job was on the line or that she was performing poorly. Ms. King's voice is naturally loud, but she never used profanity or called anybody names. There were interruptions on both sides because they would interrupt Ms. King while she was trying to explain, so Ms. King would interrupt and try to finish her explanation. She never exhibited

behavior of not listening. She has never been unprofessional and has always been respectful of her superiors. Ms. King has had five previous District Managers and none of them have ever said she was unprofessional in any way. King Decl. (Ex. A) at 79, Adams Dep. (Ex. I) at 269.

   **With regard to item 2 there was no basis for Thomas' claim that Ms. King was instructed on February 1, 2017, to work with human resources to develop a PIP or warning for Penny Curry, Director Food at Hampshire and War after 6 requests a document was provided on 4/21 without signatures, not using the standard Aramark form and without human resources review.** On February 1, 2017, Ms. King met with Thomas at War after they finished doing a quarterly partnership review.  He told Ms. King that he saw Penny Curry improving and said some other positive things.  Thomas did not tell Ms. King to give Penny Curry a final written warning, however later on he acted as though he did and started asking Ms. King where that written warning was.  Every time he asked Ms. King would either call him or see him and say that it's not appropriate to skip the discipline levels. Ms. King told Thomas that Penny Curry had not even received a verbal warning and that she was on a development plan.  It was not official because there was no written warning and Penny Curry was showing improvements while they were meeting approximately weekly. They covered areas of weakness and how she could improve her performance. Penny Curry resigned shortly after to take a position with a competitor. She told Ms. King she was afraid that if there was ever a change in Ms. King's leadership, that Thomas would terminate her. King Decl. (Ex. A) at ¶ 80. Barrett recalled Ms. King complaining about Thomas' conduct.  In doing an investigation Barrett would normally speak with Ms. King and Penny Curry.  Barrett did not speak with Penny Curry and did not recall speaking with Ms. King. Barrett Dep. (Ex. J) at 211-213.

*With regard to number 3 there was no basis for Thomas' claim that in April 2017 Ms. King mentioned that she was presenting a catering growth plan to their client the next day and that Thomas reminded Ms. King that the Final Written Documentation dated March 24, 2017, required review and approval for $1K decisions with Thomas in advance. Further, that Williford intervened and reviewed the document whose scope was $450,000 which was incomplete and provided sales growth but not associated costs.* In late March 2017, Ms. King's client, Bob Amos, requested that they look at growing their catering. He asked for a basic beginning document that they could start with and scale up or down as a team. Ms. King notified Thomas of Bob Amos' request. Thomas approved and asked that they keep him updated. They did. Thomas was aware that they were preparing it. He appointed Williford as point person for finances. Shingleton and Ms. King worked together to build a catering growth plan. They would look at specific areas and cost centers to try and figure out where they could grow catering. Williford, who reported to Thomas, was responsible to enter any of the associated costs and review it as the system finance person. Ms. King had sent two different meeting requests for Thomas so that they could review what they had so far. He declined both requests and stated that they were to continue working on it, which they did. The client moved the meeting up a couple of weeks and Ms. King notified Thomas immediately that it was changed. Ms. King told the client that they were still working on the first draft but he stated that he wanted to just review what they had so far so that they could make sure they were all on the same page. A catering growth plan was never presented to the client. Ms. King did not send the catering growth plan to Thomas because it was still a working document. The $1,000 spending limit was not applicable because this was a proposal, and nothing was being purchased. Also, Thomas knew Ms. King had been making financial decision greater than $1,000 without his prior approval and did not

question it until this Final Written Documentation dated May 9, 2017. King Decl. (Ex. A) at ¶ 81. Harriman in all of his experience has never had to get approval for spending over $1,000 (Harriman Dep (Ex. E) at 67). DeGori did not have a purchasing limit and only had to stay under budget (DeGori Dep. (Ex. D) at 53). Wilson has never been a situation with a spending limitation (Wilson Dep. (Ex. F) at 48, 127).

*With regard to item 4 there was no basis for Thomas' discipline to Ms. King with regard to Thomas sending Warren CBR feedback to her on April 20, 2017 asking for edit and review with Thomas, spoke with John Shingleton the week of 5/5 who was unaware of edits, had given the unedited document to client and Thomas had not received a response from Ms. King.* The Client Business Review (CBR) was presented quarterly and annually to the clients to review performance in all areas.  Thomas reviewed the CBR and sent feedback to Ms. King for changes he wanted to see.  The past practice of Thomas was to copy the director of the location where Thomas wanted changes made to some of the slides.  Ms. King assumed that the director, Shingleton, was copied on Thomas' email as had been the past practice by Thomas. Ms. King subsequently learned that Thomas did not copy Shingleton on the email.  Williford has presented inaccurate data numerous times in Ms. King's presence such as turnover rate in Hampshire and soil factors for Winchester, Warren and War, and was not disciplined by Thomas. In fact, Thomas would joke with Williford in Ms. King's presence about Money's (Thomas' nickname for Williford) mistakes. King Decl. (Ex. A) at ¶ 82. Williford made errors on projections and other things. When Williford made errors Thomas would make suggestions on how to do it better and provide general guidance. Williford Dep. (Ex. G) at 160.

*With regard to item 5 there was no basis for Thomas' claim that Ms. King met with a HCT employee and asked him about the leadership of his Aramark General Manager*

***DeWayne Jackson.*** Ms. King never met with a Health Care Technologies (HCT) employee and asked him about the leadership of his General Manager Duane Jackson ("Jackson"). When Ms. King was at Warren in a meeting with Karen McClarn in the cafeteria at a table, an HCT employee came up to them and unsolicitedly voiced his concern he had with his boss Jackson. He stated that Jackson was never around, that he was always working on his master's degree, and that he was never in the building. Further, there were many employee issues and jobs were not getting done because Jackson's lack of leadership. Ms. King asked if he had brought it to Jackson's attention. He said it did not matter because Jackson never did anything. Ms. King brought the conversation she had with the HCT employee to Steve K, the District Manager of HCT, when she saw him at Winchester. He told Ms. King that he had not been over to the department lately and Ms. King told him that there has been some grumbling so he might want to take a peek. Ms. King also brought this to the attention of DiCicco, VP of Retention at Aramark, in March 2017 when they did the Aramark Innovation Center tour. He asked Ms. King how HCT was performing, and she told him it was rough and she had numerous employees come to her. King Decl. (Ex. A) at ¶ 83.

At the May 9, 2017, meeting Ms. King was not allowed to respond to or send any supporting documentation to dispute the five items in the second Final Written Documentation, dated May 9, 2017. Ms. King was just told to sit and listen. Adams told Ms. King that the written response was not up for negotiation, this was the write up, it's going to stick, and Ms. King needed to improve her performance. Ms. King would have submitted documentation to try to get this discipline removed if she had been given the opportunity. King Decl. (Ex. A) at ¶ 84.

94.     Plaintiff denies information or belief to know what Thomas and Adams discussed regarding the Final Written Documentation dated May 9, 2017, or whether Thomas said anything

about Ms. King's gender or complaints about him.  However, Thomas was aware of Ms. King's

complaints regarding his conduct. See ¶ 37 ,60.   Plaintiff denies Adams did not have any reason

to believe that Thomas wanted to issue that warning to Ms. King because she is a woman or

because she had complained about him.  Ms. King had complained to Hetrick on or about April

20, 2016, that Thomas's discriminatory, harassing, retaliatory conduct toward her continued

unabated, and Thomas was creating a hostile work environment.  Thomas was excluding Ms.

King from important financial meetings, meeting alone with her directors without notice to her,

imposing unrealistic deadlines on her, and impeding her job performance.  Hetrick advised Ms.

King that she would discuss it with Adams, her replacement, and advised Ms. King to do the

same.  Ms. King did as Hetrick advised and advised Adams the same day of Ms. King's

complaints.  She told Adams that Ms. King felt that Thomas was treating her differently than his

male direct reports. He was imposing unrealistic deadlines on her, excluding her from important

financial meetings, meeting alone with her directors without notice to her, failing to provide

support and negatively interfering with her job performance. Adams took no action to stop such

conduct. King continued to complain and be subject to retaliation but no action was taken to stop

the conduct. King Decl. (Ex. A) at ¶¶  35, 41, 42, 45, 46, 48, 65, 67, 72-76, 86.

95.    Plaintiff admits.

96.    Plaintiff admits.

97.    Plaintiff denies. The unwarranted continued discipline given to Ms. King was

setting her up for her and ultimately resulted in termination. King Decl. (Ex. A) at ¶¶ 45, 67, 68,

75, 86, 90, 104, 105.

98.    Plaintiff denies.  Thomas continued to discriminate, harass, and retaliate against

Ms. King.  For example, Thomas had more frequent meetings with Ms. King's team without her

presence and without notifying her.  In comparison, Thomas did not meet with male direct reports' teams behind their backs.  In fact, Thomas would schedule meetings with other teams as to ensure that the appropriate male direct reports, Harriman, De Gori, Willison and Williford would also be present.  Thomas also continued to disapprovingly stare at Ms. King's midsection and made additional demeaning and disparaging comments about her weight. Thomas did not act that way toward his male direct reports who were heavier in the midsection. Additionally, Thomas held meetings with Ms. King's clients without her presence and without notifying her. King Decl. (Ex. A) at ¶ 85.

In or about July 2017, Barrett, whose home office was located in North Carolina, replaced Adams as Director of Regional Human Resources.  Ms. King complained to Barrett about Thomas's discrimination, harassment, and retaliation.  Ms. King complained to Barrett that Thomas was not providing her any support, excluding her from meetings, and setting her up for termination.  Ms. King also advised Barrett that she had complained numerous times to numerous Aramark management about Thomas's conduct and that Thomas retaliated against her because of her complaints.  Barrett took no action to stop such conduct. King Decl. (Ex. A) at ¶ 86.

In or about summer 2017, Thomas directed that Ms. King meet deadlines that he did not require other male direct reports to meet.  For example, Thomas required that Ms. King meet a deadline for the "Treat Yourself Program" that he did not require Harriman and Drayton to meet.  Treat Yourself was a company menu and all direct reports of Thomas were required to implement the program. King Decl. (Ex. A) at ¶ 87, Thomas Dep. (Ex. C) at 294. Ms. King was chosen by Thomas to implement the Treat Yourself Program ("TYP") throughout Thomas' district.  It addresses how you produce, procure, and present menus and patient service feeding,

which applies to both hospitals and long-term care facilities. The implementation was a multi-week process with multiple steps such as holding recognition, teaching and training on how to speak to patients upon entering the room, statistics/data to collect from patient rounding.  Ms. King held weekly calls for all of Thomas' direct reports to ensure everyone was in compliance. Harriman and Drayton did not comply. When Ms. King would question Thomas regarding Harriman and Drayton's failure to do so, Thomas said it was fine they were not doing it. King Decl. (Ex. A) at ¶ 87; Harriman Dep. (Ex. E) at 218-219.

Also, Thomas did not support Ms. King in preparing and giving key presentations for clients.  When Ms. King was new to EVS, she did a presentation relative to the issues of uniforms not being returned called "Scrubs," which her client requested. Thomas did not support Ms. King in the presentation or even show up for it. In comparison, Thomas did provide this support to male direct reports, such as Harriman, when tasked with giving key presentations. Thomas had Williford go to Harriman's account to work on financials, help build proposals and be in presentations.  Thomas supported Harriman and was present for Harriman's presentations relative to room service and long-term care. King Decl. (Ex. A) at ¶ 88.

In about July or August 2017, Thomas discriminated, harassed, and retaliated against Ms. King by making efforts to remove her from the Valley Health Proposal, the multi-million dollar project that she had presented on in January and March 2017 and had been working on for about 18 months.  Thomas held frequent closed-door meetings with Williford concerning the Valley Health Proposal.  When Ms. King asked to be included in these meetings, Thomas denied her request.  He told Ms. King "Jacob and I got this." King Decl. (Ex. A) at ¶ 89. Williford

In or about August 2017, Thomas held a conference with his direct reports, to discuss performance targets.  During this telephone conference, Ms. King learned that her performance outpaced Harriman's and DeGori's performance in a number of key areas, such as client loyalty, frequency of injury, and inventory management. King Decl. (Ex. A) at ¶ 91.

99.     Plaintiff denies.  Plaintiff further states Thomas determined to terminate her on July 24, 2017.  Thomas prepared a Termination Notice and submitted it for approval to Thomas' manager Miller and Adams from Human Resources. (Ex. XX, YY).  He submitted it to Miller representing that King was missing targets while Thomas knew, for example, that the "Hourly Turnover (Aramark staff at Valley Health) percentage" were not accurate.  Thomas included documents regarding Hourly Turnover rate which negatively reflect on Ms. King even though he knew it was based on EVS employees and the District Manager of EVS, Knight, not Ms. King, was responsible for those numbers. Thomas Dep. (Ex. C) at 305; King Decl. (Ex. A) at ¶ 90.  He also included Voice of the Customer data knowing that his male direct reports were not properly maintaining confidentiality while gathering the information from the customer which artificially inflated their scores as compared to Ms. King's scores.  Wilson Dep. (Ex. F) at 160-161, 170; Harriman Dep. (Ex. E) at 199-201, 210, 212; King Dep. (Ex. B) at 229-230.  Three days later O'Donnell emailed Thomas to advise him "An important factor in determining appropriate next steps is looking at how are these scores as compared to each of her peers? We need to look not only at her scores but how she stacks up to peers." (Ex. YY at ARAMARK_001609).  There is no testimony or documentary evidence that Ms. King's scores were compared to her male peers despite her longstanding complaints of discrimination, harassment, and retaliation. Miller testified that no one ever came to her and said they would like to look at Thomas' other direct reports to see if Ms. King was being treated disparately. (Miller Dep. (Ex. H) at 342).  Defendant

contends that Thomas, Adams, Miller, Barrett, O'Donnell (Employee Relations) and perhaps Joyner (VP HR) allegedly discussed Thomas' decision to terminate Ms. King in emails and/or conference call with Aramark's counsel during July 25, 2017, to August 1, 2017 but have refused to disclose such information. (Ex. YY, ZZ), King Decl. (Ex. A) at ¶ 90.

100.     Plaintiff admits only that Ms. King was placed on a 90-day PIP. See ¶ 99.

101.     Plaintiff admits only that on August 16, 2017, Ms. King was given a 90-day PIP dated August 11, 2017, from Thomas addressing 3 areas. (Ex. AAA). Plaintiff further states Barrett attended by telephone.  Ms. King asked them why it took so long for the PIP because she had been asking for a PIP for since her First Written Documentation.  Ms. King asked to be placed on a PIP because she could not follow what she was doing wrong because the written discipline Thomas was giving her was so unrelated, had no targets, and were things for which Thomas did not discipline his male reports. The PIP states that Ms. King will be provided with specific goals and ongoing feedback and the PIP Evaluation Form was to be used to mutually review her progress with regard to the execution of the PIP. Ms. King asked them at the meeting why the PIP did not have specific targets, specific locations or improvement goals.  It literally was cut and pasted from Aramark's website and their executional framework. They were the responsibility of all direct reports, but they are not specific targets or goals to reach.   For example, *with regard to area 1, Patient Satisfaction is below incentive targets,* telling Ms. King that she has to work on patient satisfaction when her patient satisfaction scores at Page were 100% did not make sense to her, so she asked for an updated PIP that actually had specific targets and locations.  Ms. King never received it. *With regard to area 2, Overall Retail Satisfaction YTD is below 60% VOC target*, some of Thomas' male direct reports were obtaining their results improperly giving them an unfair advantage in their results.  More

specifically, Thomas' male direct reports were treated differently relative to the Voice of the

Customer ("VOC") program.  The VOC program allowed anybody who purchased food at any of

their retail spaces to log on and report service, quality, and comments.  It was confidential and

the customer was to take a card on the table and go back to their offices.  There was no paper

survey as part of the program. You were supposed to allow the consumer to log on by themselves

privately and put their entries in confidentially. Ms. King observed one of Wilson's managers

sitting at a table and verbally asking patrons as they were exiting the cafeteria how they liked

things and entering their responses into VOC, which was not in accordance with Aramark's

policies and rules of this program.  Ms. King brought it to Thomas's attention because Wilson at

Western Maryland had such a higher scores for VOC.  Thomas allowed Wilson to do it

incorrectly. Wilson Dep. (Ex. F) at 160-161, 170; King Dep. (Ex. B) at 229-231. King Decl. (Ex.

A) at ¶ 92. Then Ms. King noticed that DeGori and Harriman's VOC scores were rising.  What

they were doing was entering the data for the customer as the customer was telling it to them or

their staff or giving it to them. Harriman Dep. (Ex. E) at 199-201, 210, 212; King Dep. (Ex. B) at

229-231, King Decl. (Ex. A) at ¶ 92. ***With regard to area 3, Employee Satisfaction is below

target,*** employee satisfaction scores can be skewed by the client's decisions, which are outside

the control of the Aramark leader.  Valley Health decided to terminate a swipe card program that

allowed employees to charge the food they ate in the cafeteria and pay later.  Many employees

utilized the swipe card program.  The employees were very upset when they learned of this

change of policy at Valley Health and its implementation.  While Ms. King had no responsibility

for such decision, it negatively impacted employee satisfaction scores and retail sales. Lower

wage rates at Valley Health for Valley Health employees in comparison to surrounding hospitals

also impacted employee satisfaction scores and were outside Ms. King's control.  Thomas was

aware of this but failed to take these and other actions outside her control into account relative to

her employee satisfaction scores at Valley Health.  Further, the three areas addressed by the PIP

were not addressed in any of Ms. King's prior discipline by Thomas. King Decl. (Ex. A) at ¶ 92.

Other examples of Ms. King's job performance being scrutinized more closely

and held to a higher standard by Thomas than Thomas' male direct reports is with regard to

100% Prima compliance, restaurant rotation, VOC, and Treat Yourself. King Decl. (Ex. A) at ¶

93.

Thomas also failed to meet with Ms. King weekly or biweekly to discuss her

progress on the PIP, as required under Aramark policy and procedure.  Thomas gave Ms. King a

one-time brief training on how to access data from QuickView and Performance Dashboard on

around August 28, 2017, which she told him left her with questions regarding how the

percentages were being created.  He did not provide any further assistance. In comparison,

Thomas worked with male direct report, Drayton, on his performance in advance of any

discipline or written improvement plan and directed Ms. King to provide assistance to Drayton.

When Drayton had areas of weakness, Thomas would have Ms. King go over and train.  For

example, Drayton had issues in the cafeteria so Thomas sent her over to Drayton's facility to

review Drayton's retail plan, make notes, and change things according to Aramark's standards.

Thomas also sent Ms. King to Drayton's facility to train his patient services manager. Thomas

also spent a lot of one-on-one time with Williford, growing and exposing Williford to Aramark

vice presidents and regional vice presidents. In comparison Thomas diverted assistance from Ms.

King.  Ms. King hired Williford as the Valley Health controller in approximately April 2015 as

she had a 24 million dollar total managed volume. Soon thereafter Thomas began to increasingly

divert Williford from performing work for the Valley Health account to other client accounts in

Thomas' district although Williford was in the Valley Health budget. Ms. King's client knew

Williford was hired as the unit controller for Valley Health. Thomas also made Williford work

on the financials of Aramark accounts other than Valley Health although he was specifically

hired to work for the Valley Health account.  Willford would not be in his Winchester office and

disappear often without any notice to Ms. King at the direction of Thomas. When she would try

to locate Williford she would be told by Williford that Thomas had directed him to be at a client

account other than Valley Health, Thomas had directed him to do work for another account

outside of Valley Health, or Thomas was otherwise aware of Williford's whereabouts when

Williford was not in his office. While Thomas diverted Williford from Ms. King's Valley Health

account negatively impacting her performance and her client, he rendered assistance to the male

direct reports positively impacting their performance and clients.  Thomas also directed Ms.

King to not issue written discipline to Jeff Soloway, and, instead, Thomas worked with Soloway

to help him avoid further discipline.   Aramark was working with Soloway on his performance

issues when he was asked to be removed by the client from the Aramark Sentara account due

lack of follow through among other issues.  Soloway was not terminated. Instead, over Ms.

King's objection, Thomas directed that Soloway be placed in the vacant position of EVS director

who reported directly to Ms. King. Thomas gave Ms. King a worksheet of what she was

supposed to work on with Soloway to improve his performance. While working for Ms. King, he

had numerous deficiencies including employee complaints; unable to work with his team,

scheduling issues, short staffing, not ensuring enough people were on extra projects, very poor

employee relations. job completion issues, and budget issues.  Ms. King wanted to write

Soloway up but was told by Thomas that she could not. Additionally, Thomas failed to support

Valley Health as he agreed to during Ms. King's medical leave from December 7, 2015, through

March 2, 2016.  Multiple Valley Health clients commented upon her return to work that there

was insufficient support by Thomas, especially in the Southern Region. King Decl. (Ex. A) at ¶

94.

Thomas also interfered with Ms. King's ability to hire, fire and discipline

employees which he did not do to his male direct reports.  He forced Ms. King to hire a poor

performer, Soloway, when there were better candidates and would not allow her to discipline

(see paragraph above).  Additionally, when there was a vacancy for Winchester EVS director,

Ms. King talked with her client and they were going to make Heather Rizzo ("Rizzo") the

interim EVS director or assistant EVS director because she had been with Aramark since 2010 or

2011, was an EVS manager and a high performer.  Thomas said that Heather Rizzo was a

discipline problem, which was not true. Heather Rizzo did, however, tell Ms. King that she

called the Hotline to file a complaint relative to Thomas' violation of the Business Conduct

Policy.  He had directed Rizzo to fraudulently change numbers on a report to make the results

look more positive than the actual numbers.  Rizzo refused and contacted the Hotline to report

his conduct.  No investigation was ever done. Rizzo never heard back from the Hotline.  Further,

when Ms. King was on FMLA, Thomas hired a Director of EVS at Winchester, Ronald

Anderson, that Ms. King had not interviewed and did not know anything about. Thomas gave

him a salary $2,000 less than hers. Shortly thereafter later Thomas terminated Ronald Anderson

for performance leaving another vacancy in EVS at Winchester. King Decl. (Ex. A) at ¶ 95.

102.    Plaintiff admits only that Ms. King and Thomas attended the PIP dated August

11, 2017, meeting and Barrett attended by telephone. See ¶ 101.

103.    Plaintiff admits.

104.    Plaintiff admits only that she has read those sections of the Aramark Global
Travel & Expense Policy.

105.    Plaintiff admits only that her car broke down in August 2017.  Plaintiff further
states on August 29, 2017, Ms. King advised Thomas that her vehicle was not available for a few
days because of a mechanical problem.  In order to service the Valley Health facilities, Ms. King
requested permission from Thomas to use a rental car.  Thomas refused and also would not allow
Ms. King to use PTO.  Ms. King had been granted permission from her prior District Managers
(Sam Zamrick, Tom Finney) to use rental cars at Aramark when her car was not working, and
allowed to charge that expense to Aramark.  When Thomas was the District Manager, Ms. King
had a newer car so she had not previously asked for permission to use a rental car except when
she had to fly in and support another facility outside of Valley Health.  In addition to refusing to
grant Ms. King permission to use a rental car Thomas directed that she be present at Winchester
on August 31, 2017 because Aramark was making the final presentation to Valley Health on the
Valley Health Proposal.  Since Ms. King was already scheduled to work on that date with
Brittany Cubbage, Director of Food at Page Memorial Hospital, on time sensitive matters.  Ms.
King had requested that Cubbage report to Winchester to meet on these matters.  Ms. King had
previously requested that Aramark employees stationed at one Valley Health facility meet her at
another Valley Health facility to work on a specific project when needed.  Under those
circumstances, Aramark's policy and procedure entitled the traveling employee to mileage
reimbursement. King Decl. ¶ 96 (Ex. A).

Cubbage and Ms. King lived approximately one mile from each other. Ms. King rode to
and from Winchester with Cubbage on August 30,2017 because they were both required to
attend a Food Directors meeting along with the other Valley Health Food Directors that Ms.

King had scheduled, and Thomas was attending.  Cubbage, Thomas, Miller and Ms. King among others attended a dinner in Winchester that evening.  Cubbage submitted for and was reimbursed for her travel expense to Winchester for August 30, 2017. King Decl. ¶ 97 (Ex. A).

Ms. King also rode to Winchester with Cubbage on August 31, 2017 as they needed to work together to resolve some issues relative to the Meals on Wheels ("MOW") menu and Ms. King needed to assist Cubbage with Prima issues. The finalized MOW menu was essential to continue the process of preparing time sensitive MOW Proposal by Aramark that Ms. King was presenting in approximately 8 business days to MOW. Aramark was seeking renewal of Aramark's contract with MOW for Page and Shenandoah as well as to obtain a new contract with MOW for a new location, Warren. Ms. King's work with Brittney assisted her in securing the Aramark contacts with MOW for all 3 locations: Page, Shenandoah and Warren. King Decl. ¶ 98 (Ex. A).

When they arrived at Winchester on August 31, 2017, Cubbage and Ms. King were both in the Winchester Hospital fishbowl office working on these time sensitive matters. Thomas came by the fishbowl office, said good morning, and asked what they were doing there. Ms. King told him that we were working on Meals on Wheels and Prima.  Subsequently, as required by Thomas, Ms. King attended the pre-presentation meeting with Thomas, Miller, Michael Sachs, Vice President of Strategic Partnerships, Sebastian Mitchell, Regional Vice President of Facilities, and Timothy Knight.  During this pre-presentation meeting, Thomas had Ms. King explain a number of key things concerning the Valley Health Proposal and answer any questions. Thomas then used this information to make the Valley Health Proposal to Ms. King's client, Bob Amos, while excluding Ms. King from attendance at the Valley Health Proposal and the post-proposal debriefing, which was not typical. Cubbage had to leave Winchester and return home as

her dog had been bitten and she needed to bring him to a veterinarian appointment. After she got done at the veterinarian, Cubbage returned to work at Page as it was too late to travel back to Winchester. Ms. King rode home with her fiancé, who was coming to VA from Buffalo. Based on Aramark's policy and procedure, Ms. King approved travel reimbursement for Cubbage, because she had ordered Cubbage to report to Winchester for a necessary business reason, and Winchester was not Cubbage's home facility. Ms. King did nothing to hide her approval of this $56.68 business expense (Ex. BBB). Ms. King did not violate the Business Conduct Policy. King Decl. ¶ 99 (Ex. A).

106.    Plaintiff admits. See ¶ 105.

107.    Plaintiff admits only that Ms. King asked Thomas if she could get reimbursed for a rental car, and that Thomas told her "No." Plaintiff further states that she had been reimbursed by Aramark many times in the past for rental cars, and when she asked Thomas if she could do it again, he simply told her, "No," and that "Aramark is not going to pay for a rental car." King Decl. ¶ 96 (Ex. A); King Dep. (Ex. B) at 322:10-16, 328:1-329:6.

108.    Plaintiff denies. Plaintiff did not ask Cubbage if she could borrow her car. Because Ms. King and Cubbage were supposed to work on the MOW menu and Prima together at Page, but Thomas required Ms. King to be at Winchester that day, Ms. King suggested to Cubbage that they work together at Winchester instead of at Page. King Dep. (Ex. B) at 323:1-16. Since Ms. King's car was being repaired, and Cubbage lived only a mile away from her, Ms. King suggested they drive together. *Id.* Text messages from Cubbage from the afternoon of August 30th, show Cubbage texting Ms. King about driving together to Winchester the next day. Ex. CCC. Cubbage had also suggested the two of them drive together. Cubbage Dep. (Ex. K) at 40:16-18, 91:9-11.

109.     Plaintiff denies. Plaintiff further states that Cubbage never had another manager while she was an Aramark employee besides Ms. King. Cubbage Dep. (Ex. K) at 12:2-17:5. Plaintiff further states that Ms. King did not have an office for Cubbage to drive her to. King Decl. ¶ 99 (Ex. A); King Dep. (Ex. B). at 126:1-2, 71:3-7, 213:9-214:19.

110.     Plaintiff denies. Cubbage does not remember what happened on August 31, 2017. Cubbage Dep. (Ex. K) at 46:23-47:10 ("I know we met, but I don't know what date it was. I don't know if it was the 30th or the 31st or, like I said, a month or two later or before. I don't know." in response to whether Cubbage remembered working alone with Ms. King on Meals on Wheels and Prima menus); Cubbage Dep. (Ex. K) at 41:1-16 ("I don't remember" and "No. Honestly, I do not remember." in response to whether Cubbage saw Thomas coming up to her and Ms. King at Winchester on August 31); Cubbage Dep. (Ex. K) 44:14-19 ("I'm sure we had discussions, but I can't – I don't know what they were about." in response to whether Cubbage recalled discussions with Ms. King regarding Prima menu alterations); Cubbage Dep. (Ex. K) at 70:18-19 (I can't remember, honestly. I know I did take my dog to the vet, I do remember that, yes); Cubbage Dep. (Ex. K) at 31:3-8 ("I don't know if it was the 30th or the 31st. It was a dinner. I do not recall a directors meeting."); Cubbage Dep. (Ex. K) at 47:11-14 ("I don't. Sorry." when asked if she remembers what happened on August 30 and 31) Cubbage Dep. (Ex. K) at 52:12-54:4 ("I don't remember," and "I can't remember if I picked her up and took her to Winchester that day or if she just came to Page and we met here," and "I can't tell you the correct dates. I don't know. I couldn't even remember these texts until I seen them, so" in response to what happened on August 30, 2017. Cubbage does not remember what she did the morning of August 31, 2017 before she dropped her dog at the vet. Cubbage Dep. (Ex. K) at 109:22-110:3 ("I don't

– I do not remember so I cannot, no, I cannot answer that.") in response to can you say under oath what you did the morning before you dropped your dog at the vet.

Cubbage did not drop Ms. King off at Winchester, but instead came inside Winchester to work with Ms. King on MOW and Prima. King Decl. ¶¶ 98-99; Thomas Dep. (Ex. C) at 317:8-318:8  ("I just remember seeing Brittany in the hallway"); Barrett Dep. (Ex. J) at 240:9-241:1 ("[Thomas] was there that morning and saw Brittany in the office," and "saw Brittany at Winchester that morning and asked her what she was doing there"); Barrett Dep. (Ex. J) at 269:11-20 (Thomas saw Cubbage with Ms. King at Winchester on August 31); King Dep. (Ex. B) at 324:21-325:2 (Ms. King and Cubbage were at Winchester working on Prima and Meals on Wheels. "Griff said, hi, good morning to both of us. He said, oh, what are you doing here."); Williford (Ex. G) 296:13-297:2 (In regard to whether he saw Cubbage drop Ms. King off at Winchester, Williford said, "I don't remember seeing them in the car together" and does not remember anything about Ms. King allegedly being dropped off at Winchester on August 31st, 2017); King Dep. (Ex. B) at 333:19-20 (Ms. King and Cubbage were working on documents together at WMC.  Cubbage did not go from Winchester to Page. King Decl. ¶99; King Dep. (Ex. B) at 325:22-326:1 ("So she left, went to take her dog to the vet. After the dog went to the vet, she then returned to work at Page Memorial Hospital."). Cubbage also texted Ms. King at 1:30 PM on August 31st to tell Ms. King that her dog received treatment from the vet for its injuries. Ex. CCC.

111.    Plaintiff admits.  Plaintiff further states Ms. King approved travel reimbursement for Cubbage, because she had ordered Cubbage to report to Winchester for a necessary business reason, and Winchester was not Cubbage's home facility. Ms. King did nothing to hide her

approval of this $56.68 business expense (Ex. BBB). Ms. King did not violate the Business

Conduct Policy. King Decl. ¶ 99 (Ex. A). See ¶ 105.

112.    Plaintiff admits only an Expense Report dated September 6, 2017, for employee

Cubbage for personal car mileage from 1164 E Main St., Stanley, VA to 200 Memorial Drive,

Luray, VA. was submitted in the amount of $56.68.  Plaintiff further states that Williford was

asked by Cubbage how to submit an expense report relative to August 31, 2017. Williford Dep.

(Ex. G) at 311:19 – 312-4. Cubbage had been working for Aramark for two years, knew how to

put an expense report in and denied contacting Williford for help. Cubbage Dep. (Ex. K) at

111:1-9 ("Did I call [Williford] for help for that? No. Again, I was with Aramark for two years,

by that point I knew how to put in an expense report on my own").  The expense report shows

travel from Ms. King's home in Stanley, VA to Page with no indication Cubbage went to a vet

on August 31, 2017.  Ex. BBB at ARAMARK_003293, Cubbage does not remember what she

did the morning of August 31, 2017, before she dropped her dog at the vet.   Cubbage Dep. (Ex.

K) at 109:22-110:3 ("I don't – I do not remember so I cannot, no, I cannot answer that.") in

response to "can you say under oath what you did the morning before you dropped your dog at

the vet"); King Decl. ¶99; King Dep. (Ex. B) at 325:22-326:1 ("So she left [Winchester], went to

take her dog to the vet. After the dog went to the vet, she then returned to work at Page Memorial

Hospital.").

113.    Plaintiff admits only that Ms. King approved Cubbage's travel expense for travel

on August 31, 2017.  See ¶ 111.

114.    Plaintiff denies.  Plaintiff further states that according to Barrett there is a process

for conducting an investigation. Barrett Dep. (Ex. J) at 26:19-27:15  (When conducting an

investigation you should "make sure that you had spoken to every person involved, gotten each

person's story," and "not to make a decision prior to regarding results of the investigation, without getting full facts of what occurred."); Barrett Dep. (Ex. J) at 28:2-29:23, 35:5-11 (Barrett assumes it is important to get either a written statement or a signed statement from the person making the complaint or potential witnesses, and nothing would stop her from sending a statement to a person to have them sign it.); Barrett Dep. (Ex. J) at 32:3-33:2  (if Ms. Barrett was conducting an investigation, she would first interview "the person being complained about," then she "would interview the witnesses, and then the person, you know, that's being complained about, and then if there are additional witnesses that occur in that conversation, finalize with those witnesses, and then a final interview again with that person if we needed to."); Barrett Dep. (Ex. J) at 300:1-12  (in the normal course of an investigation, Barrett maintains a list of questions to ask and keeps notes); Barrett Dep. (Ex. J) at 48:7-49:21  (if Barrett and her team were not doing a proper investigation, or if they received a complaint that her investigation was not fair, she would "escalate that up," and would "give it to someone totally separate, who has no ties," and who would "do a thorough investigation of the whole thing.").

Plaintiff also states that Barrett did not follow her own investigation protocols. First, Barrett did not interview Williford, the person who complained to Thomas, who in turn complained to Barrett about Ms. King approving Cubbage's mileage reimbursement. Barrett Dep. (Ex. J) at 236:4-237:18, 239-40 (Barrett does not recall if she interviewed Williford. If she had, she would have taken notes of the interview. If she had taken notes, she would have produced them for this lawsuit. [Barrett did not produce notes relative to an interview of Williford for this lawsuit.]); Williford Dep. (Ex. G) at 290:2-8, 291:15-17 (Williford does not remember anyone ever talking to him about Cubbage allegedly dropping Ms. King off at Winchester aside from the time Williford originally reported the events to Thomas).

Barrett also failed to properly interview Cubbage in accordance with the proper investigation procedure she laid out. Cubbage (Ex. K) Dep. at 73:1-21  (Barrett's entire interview of Cubbage consisted of Barrett asking Cubbage if she drove Ms. King to Winchester); Cubbage Dep. (Ex, K) at 73:23-75:4 (Barrett never got a written statement from Cubbage or asked her for a written statement); Cubbage Dep. (Ex. K) at 75:21-23 , Barrett Dep. (Ex. J) at 267:23-268:2 (Barrett never asked Cubbage what she was working on August 31, 2017, or if she did any work while she was at Winchester that day, even though Ms. Barrett said it would be important if it was relevant); Cubbage Dep. (Ex. K) at 76:1-3  (Barrett never asked Cubbage if she saw anyone at Winchester on August 31, 2017); Barrett Dep. (Ex. J) at 268:19-22 (Barrett did not ask Cubbage where she went after she left Winchester and before she went to Page); Barrett Dep. (Ex. J) at 326:9-13 (Barrett does not believe she asked Cubbage if she went into Winchester on August 31, 2017); Barrett Dep. (Ex. J) at 326:9-328:9 (There is nothing in Ms. Barrett's interview notes or her investigation notes that indicate she asked Cubbage if she did any work at Winchester on August 31, 2017, whether she dropped Ms. King off at Winchester, if she saw anyone else while she was at Winchester, or if she had any business doing work at Winchester. Ms. Barrett admitted these would have been important questions to ask.)

Ms. Barret also failed to properly interview Ms. King. Barrett Dep. (Ex. J) at 241:9-242:4; 309:22-310:17 (Barrett never gave Ms. King an opportunity to give a signed statement or review the statement Barrett wrote); Barrett Dep. (Ex. J) at 302:3-6  (Barrett did not ask Ms. King if Cubbage was working at Winchester on August 31, 2017); Barrett Dep. (Ex. J) 311:23-313:3 (Barrett does not recall if she ever asked Ms. King if she ever actually had a PIP meeting with Thomas on September 18, 2021); Barrett Dep. (Ex. J) at 332:9-333:9 (Barrett does not recall ever asking Ms. King why she believed she didn't do anything wrong by driving to

Winchester with Cubbage and approving Cubbage's mileage request, but admits that it would have been important to ask her) King Decl. ¶ 100 (Exhibit A).

Barrett also failed to properly interview Thomas. Barrett Dep. (Ex. J) at 270:7-16. Barrett didn't ask Thomas if he saw Ms. King with Cubbage when he saw Cubbage inside Winchester on August 31); Barrett Dep. (Ex. J) at 270:17-21 (Barrett also does not recall asking Thomas what Cubbage was doing at Winchester, if she supposedly dropped Ms. King off and went to Page.); Barrett Dep. (Ex. J) at 334:3-335:5 (Barrett admitted that it would have been important to ask Thomas what he saw Cubbage doing at Winchester) .

Plaintiff further states Barrett's investigation notes consisted of questions she wrote down during her conversations combined with statements made by the other person and were unclear as to who said what. Barrett Dep. (Ex. J) at 353:7-19 (Barrett said of her investigation notes, "These notes are typically - there's actually an investigation process that is typically more detailed than this, and this was not, this was just done this way."); Barrett Dep. (Ex. J) at 353:23-354:3 ("I mean, these are my notes. This is just me literally writing down as they were talking."); Barrett Dep. (Ex. J) at 324:2-15 (Barrett cannot tell if her notes include a question she was going to ask Cubbage or a statement made by Cubbage); Ex. GGG.

115.    Plaintiff denies. Barrett called Cubbage and asked her one question. Cubbage Dep. (Ex. K) at 73:18-21 ("So HR, Kelly Barrett, called me. And she didn't tell me it was a hotline complaint, she just asked me did I drive Kristen, and basically that was it."); See ¶ 114.

116.    Plaintiff admits only that Cubbage told Barrett that Ms. King had told her that her car was broken down and asked to borrow Cubbage's car, and that after Cubbage told her she could not borrow her car, Cubbage and Ms. King drove from Ms. King's home to Winchester. Plaintiff further states Cubbage did not drop Ms. King off at Winchester, but instead came inside

Winchester to work with Ms. King on MOW and Prima. King Decl. ¶¶ 98-99 (Ex. A); Thomas

Dep. (Ex. C) at 317:8-318:8  ("I just remember seeing Brittany in the hallway"); Barrett Dep.

(Ex. J) at 240:9-241:1 ("[Thomas] was there that morning and saw Brittany in the office," and

"saw Brittany at Winchester that morning and asked her what she was doing there"); Barrett

Dep. (Ex. J) at 269:11-20 (Thomas saw Cubbage with Ms. King at Winchester on August 31);

King Dep. (Ex. B) at 324:21-325:2 (Ms. King and Cubbage were at Winchester working on

Prima and Meals on Wheels. "Griff said, hi, good morning to both of us. He said, oh, what are

you doing here."); Williford Dep. (Ex. G) 296:13-297:2 (In regard to whether he saw Cubbage

drop Ms. King off at Winchester, Williford said, "I don't remember seeing them in the car

together" and does not remember anything about Ms. King allegedly being dropped off at

Winchester on August 31st, 2017); King Dep. (Ex. B) at 333:19-20 (Ms. King and Cubbage were

working on documents together at Winchester).

Plaintiff also states Cubbage did not go from Winchester to Page. King Decl. ¶99 (Ex.

A); King Dep. (Ex. B) at 325:22-326:1 ("So she left, went to take her dog to the vet. After the

dog went to the vet, she then returned to work at Page Memorial Hospital."). Cubbage also

texted Ms. King at 1:30 PM on August 31st to tell Ms. King that her dog received treatment from

the vet for its injuries. Ex. CCC.

117.    Plaintiff admits only that Cubbage does not remember ever having a one-on-one

meeting with Ms. King at Winchester. Cubbage does not remember what happened on August

31, 2017.  See ¶ 110.

118.    Plaintiff denies.

119.    Plaintiff denies. See ¶114. Plaintiff further states that she was not able to give her

side of the story. King Decl. ¶ 100 (Ex. A); Ex. HHH; King Dep. (Ex. B) at 318:3-321:5, 338:1-

5. On or about September 17, 2017, Thomas advised Ms. King that he would like to have a meeting on September 18, 2017, to review her progress on her PIP.  She had a conflict as she was needed in Warren and offered Thomas several dates and times that week to reschedule their meeting. Ms. King did not learn until the morning of September 18, 2017 just before she left to travel to Warren that Thomas was going to hold the meeting in Warren. Ms. King had gathered some documents at Winchester which she wanted to give to Thomas to show him her performance at Valley Health.   She did not have them with her when she learned that the meeting was going forward at Warren. When she arrived at the meeting, Thomas immediately called Barrett on the telephone. Ms. King was advised that she was under investigation for violating the Business Conduct Policy because of her decision to authorize travel reimbursement for Brittany Cubbage. Ms. King had authorized travel to Winchester for Cubbage for August 30, 2017 and August 31, 2017.  She followed Aramark policies regarding travel reimbursement for Cubbage on both dates and did not violate the Business Conduct Policy.  Ms. King was not given any documents regarding the investigation. No one asked her for the details of what occurred on August 30, 2017 or August 31, 2017. Thomas saw Cubbage and Ms. King at Winchester on both dates engaged in work.  Ms. King would have explained had she been given the opportunity to do so by Thomas or Barrett.  Further, at no point during this meeting was Ms. King's PIP discussed nor was there any discussion with Thomas regarding the PIP after Barrett hung up the telephone. Ms. King was crying and upset. Thomas just shut his briefcase and walked out. This continued discrimination, harassment, and retaliation by Thomas caused Ms. King severe emotional distress. She was extremely upset and could not stop crying.  In accordance with Aramark's policies, Ms. King contacted the third-party administrator Sedgwick to report that she was ill, unable to work and going to her physician for treatment.  Ms. King was given until

October 4, 2017, by Sedgwick to submit required documentation to support a short-term disability claim. Ms. King also had active FMLA coverage. King Decl. ¶ 100 (Ex. A).

120.   Plaintiff admits only that there was a telephone call with Barrett. Plaintiff further states when she arrived at the meeting, Thomas immediately called Barrett on the telephone. Ms. King was advised that she was under investigation for violating the Business Conduct Policy because of her decision to authorize travel reimbursement for Brittany Cubbage. Ms. King had authorized travel to Winchester for Cubbage for August 30, 2017 and August 31, 2017.  She followed Aramark policies regarding travel reimbursement for Cubbage on both dates and did not violate the Business Conduct Policy.  Ms. King was not given any documents regarding the investigation. No one asked her for the details of what occurred on August 30, 2017 or August 31, 2017. Thomas saw Cubbage and Ms. King at Winchester on both dates engaged in work. Ms. King would have explained had she been given the opportunity to do so by Thomas or Barrett. King Decl. (Ex. A) at ¶ 100; King Dep. (Ex. B) 338:1-5 (Ms. King wasn't able to give her side of the story, Thomas and Barrett did not take any of her notes, and they did not ask Ms. King her point of view); Barrett Dep. (Ex. J) at 302:3-6 (Barrett did not ask Ms. King if Cubbage was working at Winchester on August 31, 2017).

121.   Plaintiff denies. Plaintiff further states that Ms. King drove with Cubbage to Winchester on both August 30, 2017 and August 31, 2017 (not August 31, 2016) for business reasons. King Decl. (Ex. A) ¶¶ 97-99.   Ms. King rode to and from Winchester with Cubbage on August 30, 2017 because they were both required to attend a Food Directors meeting along with the other Valley Health Food Directors that Ms. King had scheduled, and Thomas was attending. Cubbage, Thomas, Miller and Ms. King among others attended a dinner in Winchester that evening.  Cubbage submitted for and was reimbursed for her travel expense to Winchester for

August 30, 2017. King Decl. ¶ 97 (Ex. A). Ms. King also rode to Winchester with Cubbage on August 31, 2017 as they needed to work together to resolve some issues relative to the MOW menu and Ms. King needed to assist Cubbage with Prima issues. The finalized MOW menu was essential to continue the process of preparing time sensitive MOW Proposal by Aramark that Ms. King was presenting in approximately 8 business days to MOW. Aramark was seeking renewal of Aramark's contract with MOW for Page and Shenandoah as well as to obtain a new contract with MOW for a new location, Warren. Ms. King's work with Brittney assisted her in securing the Aramark contacts with MOW for all 3 locations: Page, Shenandoah and Warren. King Decl. ¶ 98 (Ex. A). On August 31, 2017 Ms. King and Cubbage went to Winchester together because "[Ms. King] was supposed to work with [Ms. Cubbage] on the Meals on Wheels menu," and Ms. King was "also was working on [Ms. Cubbage's] patient menu for treat yourself, because we could not get it into the Prima platform," and so Ms. King said to Ms. Cubbage, "hey, let's just work on it at Winchester, we'll just drive together in Winchester. Instead of me working here at Page, we'll work together at Winchester Medical Center." King. Dep. (Ex. B) at 322:4-323:16 (Ms. King tells her side of the story about the alleged BCP violation).

122.    Plaintiff denies. Plaintiff further states that Barrett stated that it would not concern her if Cubbage drove Ms. King to Winchester "[i]f there was a legitimate business reason for [Cubbage] to be there." Barrett Dep. (Ex. J) at 278:16-280:15.

123.    Plaintiff denies.  Plaintiff further states that Thomas did not ask her to collect specific information and documentation regarding her progress on the PIP to present to him at Winchester on the following Monday, September 18, 2017 thereby giving her one week to collect the requested items.  She, however, had gathered some documents which she wanted to give to Thomas to show him her performance at Valley Health. There is no documentation

indicating that Thomas met with and/or made any request of Ms. King to collect any documentation for a meeting on September 18, 2017. Further, although there was no PIP discussion on September 18, 2017, on September 19, 2021, Thomas emailed King at 8:47 a.m. with a copy to Barrett stating it was a PIP follow up from their PIP meeting the day before despite the fact that there was no PIP meeting on September 18, 2017. His email consisted of 16 categories of documents that he wanted provided to him from all Ms. King's facilities "by the end of the day Wednesday" which was the next day which was impossible to obtain. For example, one of the categories Thomas requested was "Report on Orientation, showing all staff by site, facility and department orientation completed last 12 months".  Ms. King had approximately 200 employees over six different facilities over two states for whom she would have to gather this information which was primarily on paper documents stored in employee files. It would have required at least two to three hours per facility to comply with just this one request. Further, Thomas' male direct reports did not even implement some of these programs let alone have to produce reports to Thomas relative to them. King Decl. at ¶¶ 100, 101 (Ex. A).

124.    Plaintiff admits only that Ms. King emailed Thomas asking him to reschedule the Monday morning meeting (September 18, 2017) because she had a meeting at Warren and needed to support the Warren operation because someone was on vacation, could not meet Tuesday because she was scheduled to meet with the Valley Health CEO and proposing Wednesday or Friday as alternatives. Plaintiff further states that on or about September 17, 2017, Thomas advised Ms. King that he would like to have a meeting on September 18, 2017, to review her progress on her PIP.  Ms. King had a conflict, as she was needed in Warren and offered Thomas several dates and times that week to reschedule their meeting. Ms. King did not learn until the morning of September 18, 2017 just before she left to travel to Warren that

Thomas was going to hold the meeting in Warren that day. Ms. King had gathered some documents at Winchester which she wanted to give to Thomas to show him her performance at Valley Health.   Ms. King did not have them with her when she learned that the meeting was going forward at Warren. When Ms. King arrived at the meeting, Thomas immediately called Barrett, Regional Director of Human Resources, on the telephone. Ms. King was advised that she was under investigation for violating the Business Conduct Policy because of her decision to authorize travel reimbursement for Cubbage. Ms. King had authorized travel to Winchester for Cubbage for August 30, 2017 and August 31, 2017.  Ms. King followed Aramark policies regarding travel reimbursement for Cubbage on both dates and did not violate the Business Conduct Policy.  Ms. King was not given any documents regarding the investigation. No one asked her for the details of what occurred on August 30, 2017 or August 31, 2017. Thomas saw Cubbage and Ms. King at Winchester on both dates engaged in work.   Ms. King would have explained had she been given the opportunity to do so by Thomas or Barrett.  Further, at no point during this meeting was Ms. King's PIP discussed nor was there any discussion with Thomas regarding the PIP after Barrett hung up the telephone. Ms. King was crying and upset. Thomas just shut his briefcase and walked out. This continued discrimination, harassment, and retaliation by Thomas caused Ms. King severe emotional distress. She was extremely upset and could not stop crying.  In accordance with Aramark's policies, Ms. King contacted the third-party administrator Sedgwick to report that she was ill, unable to work and going to her physician for treatment.  Ms. King was given until October 4, 2017, by Sedgwick to submit required documentation to support a short-term disability claim. She also had active FMLA coverage. King Decl.  at ¶¶ 100, 101 (Ex. A).

     125.    Plaintiff admits. See ¶ 124.

126.     Plaintiff admits.  See ¶ 124.

127.     Plaintiff admits.  See ¶ 124.

128.     Plaintiff denies.  Plaintiff further states that September 18, <u>2019</u> is an erroneous date in the SOF seeking this response.  Plaintiff further states that Ms. King had gathered some documents at Winchester which she wanted to give to Thomas to show him her performance at Valley Health. See ¶¶ 123, 124.

129.     Plaintiff denies. Plaintiff further states Thomas made the decision to fire Ms. King. Thomas Dep. (Ex. C) at 323:18-20 ("Q. And were you involved in the decision to terminate Miss King? A. Yes."); King Decl. (Ex. A) at ¶ 104 ("On or about September 21, 2017, I received a telephone call from Thomas and Barrett, advising me that I was terminated."); Barrett Dep. (Ex. J) at 396:2-6 ("Q. Who would you say were the decision makers with respect to the decision to terminate Kristen's employment? A. Kristen's termination was reviewed with myself, Colleen O'Donnell and Griff Thomas."); Ex. XX. Thomas had made up his mind to fire Ms. King on July 24, 2017, and sent a document titled "Kristen King Termination" for review and approval from Aramark HR. King Decl. at ¶ 90 (Ex. A); Ex. XX, YY. Ms. King and Cubbage drove together to Winchester to work on MOW and Prima, and neither their trip or Ms. King's approval of Cubbage's mileage reimbursement request were a violation of Aramark policy. King Decl. at ¶¶ 98-99 (Ex. A). Ms. King never testified that she believed that Adams, Miller, Barrett, O'Donnell, and Joyner made the decision to terminate her employment, she only said that their names were on termination documents that Aramark produced. King Dep. (Ex. B) at 340:14-19. Miller stated, "I don't know the answer to that" when asked who made the decision to fire Ms. King and testified that "[o]f course Griff would have been involved" when asked who was involved in the decision to fire Ms. King. Miller Dep. (Ex. H) at 361:21-23; 363:19-364:7.

Ms. King testified that she believes the decision to terminate her was made by Thomas on July 24, 2017. King Dep. (Ex. B) at 341:12-342:2 ("Q. Do you know when the decision to terminate your employment was made? A. I believe it was made on July 24th of 2017."). Ms. King asked for documentation from Aramark stating the reason for her termination, but Aramark would not provide it to her, and Barrett told her she could only get it with a written subpoena. King Decl. (Ex. A) at ¶105; King Dep. (Ex. B) at 143:22-144:1.

130.    Plaintiff denies. Plaintiff further states Ms. King was discriminatorily and retaliatorily written up, placed on a PIP and eventually fired for (1) failing to submit a weekly schedule to Thomas (Ms. King was written up for not providing a weekly calendar to Thomas, but Thomas admitted that he did not require all his direct reports to provide their weekly calendar. For example, Harriman and DeGori were not required to provide their weekly schedule to Thomas. See ¶71; Thomas Dep. (Ex. C) at 213-215. DeGori Dep (Ex. D) at 122; Williford Dep. (Ex. G) at 194); (2) Valley Health's Voice of the Customer scores (Some of Thomas's male direct reports were obtaining their Voice of the Customer results improperly, giving them an unfair advantage, while Ms. King was placed on a PIP and eventually fired for, in part, having lower Voice of the Customer Scores than some of Thomas's male direct reports. King Decl. (Ex. A) at ¶92; Ex. AAA; Wilson Dep. (Ex. F) at 160-161, 170; Harriman Dep. (Ex. E) at 199-201, 210, 212; King Dep.(Ex. B) 229-230); and (3) Ms. King's alleged failure to comply with Thomas's Top 15 reports (Thomas required Ms. King to complete Top 15 reports, but did not require male direct reports Harriman, DeGori, or Wilson to complete Top 15 reports. King Decl. (Ex. A) at ¶62. Aramark claims that Ms. King was terminated in part for alleged performance issues. Barrett Dep. at 378:6-379:4; 232:10-17. Harriman, one of Thomas's male direct reports in comparison, had persistent "ongoing, numerous and frequent Food Safety Issues" that Thomas

knew about for a year, but instead of writing him up or placing him on a PIP, Thomas only had

numerous discussions with him (Ex. JJ).   Further, the Business Conduct Policy requires

compliance by all employees with the laws regarding employment, labor, workplace, health and

safety. See ¶¶ 21, 57, 60

131.    Plaintiff denies.  Plaintiff further states Barrett does not have any documentation

related to meeting with Joyner on September 19, and does not recall having a conversation with

her on that day. Barrett Dep. (Ex. J) at 429:15-18; 428:19-429:4; 430:23-431:6.

132.    Plaintiff denies. Plaintiff further states Thomas made the decision to fire Ms.

King. Thomas Dep. (Ex. C) at 323:18-20 ("Q. And were you involved in the decision to

terminate Miss King? A. Yes."); King Decl. (Ex. A) at ¶ 104 ("On or about September 21, 2017,

I received a telephone call from Thomas and Barrett, advising me that I was terminated.");

Barrett Dep. (Ex. J) at 396:2-6 ("Q. Who would you say were the decision makers with respect to

the decision to terminate Kristen's employment? A. Kristen's termination was reviewed with

myself, Colleen O'Donnell and Griff Thomas."); Ex. XX. Thomas had made up his mind to fire

Ms. King on July 24, 2017, and sent a document titled "Kristen King Termination" for review

and approval from Aramark HR. King. Decl. (Ex. A) at ¶ 90; Ex. XX, YY.

133.    Plaintiff denies.

134.    Plaintiff denies. Plaintiff further states that she complained to Barrett in or about

July 2017 about Thomas's discrimination, harassment, and retaliation. King Decl. (Ex. A) at ¶

86; Barrett Dep. (Ex. J) at 347:9-15.  Plaintiff also made multiple complaints about Thomas's

discrimination, harassment, and retaliation including but not limited to the human resources

manager Adams (April 20, 2016), Thomas' managers Hetrick (March 1, 2016, April 20, 2016)

and Miller; July 20, 2016); Duckett (March 19, 2017); the Hotline (March 27, 2017 and

September 19, 2019) which is handled by  human resources employee O'Donnell (April 6,

2016); DeCicco (May 20, 2016) See Timeline of King's Complaints and Aramark's Retaliatory

Responses ( Ex. FFF) and Timeline of Events (Ex. L).

135.   Plaintiff admits. Plaintiff further states that she was out on FMLA and short-term

disability leave on September 19 and 20, 2017, and interacted with Thomas via email on both the

19th and the 20th to let him know that she was out on leave. King Decl. (Ex. A) at ¶¶ 100-01;

Ex. III, JJJ, EEE (Email sent by Thomas on September 20, 2017, saying "Kristen emailed me she

was out yesterday for FML"). Thomas was also contacted on the morning of September 20th by

Sedgwick, Aramark's third-party administrator, and told that Ms. King was out on short-term

disability and FMLA leave. King Decl. (Ex. A) at ¶ 103. Ex. KKK, DDD.

136.   Plaintiff admits. Plaintiff further states that her full statement was, "after that

incident where they had told me about this code of conduct violation and I wasn't able to give my

side of the story, they didn't take any of my notes, they didn't ask me my point of view. And I

had a sinking feeling and I was crying and extremely upset and emotional and I went to my

doctor who pulled me out of work. This is the third or fourth time that I was pulled out of work."

King Dep.(Ex. B) 338:1-9.  "I had a sinking feeling in my gut knowing that I wasn't being

treated fairly, knowing that my—my statements were not being taken, that none of my witnesses

were being interviewed.  So that king of sinking feeling, no support from HR, no support from

higher-ups.  This had been ongoing for almost two years, if not longer" King Dep. (Ex. B)

338:20- 339:5.

137.   Plaintiff denies. Plaintiff submitted a short-term disability claim on September 18,

2017, and had been under an active FMLA policy since approximately May of 2017. King Dep.

(Ex. B) at 337:6-338:13; King. Decl. (Ex. A) at ¶ 100.

138.    Plaintiff denies. See ¶ 135, 119 (Ms. King contacted Sedgwick, Aramark's agent, on September 18, 2017 to request FMLA and short-term disability) ; Ex. EEE (Email from Thomas to Barrett dated September 20, 2017 "Kristen emailed me she was out yesterday for FML[.]").

139.    Plaintiff admits only that on September 19, 2017 Ms. King called the Aramark Employee Hotline. Plaintiff further states on September 19, 2017, Ms. King placed a call to the Hotline complaining again about Thomas's discrimination, harassment, creation of a hostile work environment, and retaliation.  She reiterated her prior complaints, and also complained regarding the PIP she was given, and the Business Conduct Policy violation against her. Ms. King also complained again of the failure of management to take action to stop Thomas' conduct and instead retaliating against Ms. King.   She also complained that Aramark's continued discrimination, harassment, and retaliation impacted her ability to work, causing her to apply for short term disability. There was no investigation of this hotline report because no one interviewed Ms. King as a follow up about her September 19, 2017 hotline call. King. Decl. (Ex. A) at ¶ 102.

140.    Plaintiff admits. Plaintiff further states that the hotline summary is simply a summary and does not contain the entirety of what she said. King Dep. (Ex. B) at 349:6-11; King. Decl. (Ex. A) at ¶ 102. Aramark did not investigate Ms. King's September 19, 2017 hotline complaint, and no one from Aramark interviewed Ms. King about the complaint. King. Decl. (Ex. A) at ¶ 102; King Dep. (Ex. B) at 349:12-14.

141.    Plaintiff admits.

142.    Plaintiff denies. Ms. King's hotline call was made at 7:36 AM on September 19, 2017. Ex. LLL.

143.    Plaintiff denies. See ¶¶ 139, 140; Barrett Dep. (Ex. J) at 413:2-10 ("I don't know what happened in regards to the hotline results."); Ex. LLL (Aramark hotline report indicating only that Kelly Barrett was interviewed in response to Ms. King's complaint. The hotline report indicates "Kelly will investigate."); Barrett Dep. (Ex. J) at 357:22-358:12 (Barrett did not investigate Ms. King's September 19, 2017 hotline call); Barrett Dep. (Ex. J) at 359:6-9 ("Whoever investigated the hotline, whatever date that was, would have spoken to myself, to Griff, to her. Again, I was not investigating this hotline."); King. Decl. (Ex. A) at ¶ 102 ("no one interviewed me as a follow up about my September 19, 2017 hotline call."); Thomas Dep. at 316:13-317:1 (When asked about a hotline investigation about Ms. King getting a ride from Cubbage, Thomas said, "I don't believe I was involved in a hotline call discussion of it."). Miller Dep. (Ex. H) at 365:4-18 ("I was not aware of any hotline calls" and "I do not know emphatically what the process is" when asked who investigates hotline complaints).

144.    Plaintiff denies. Aramark did not investigate Ms. King's September 19 hotline complaint, and the hotline complaint had no bearing on Aramark's decision to terminate Ms. King. See ¶¶ 132, 140.

145.    Plaintiff denies. Thomas, one of the people making the decision to fire her, sent an email on September 20, 2017, saying, "My client meeting is at 430, I am prepared to tell Bob we are terminating Kristen for a BCP violation. If the plan has changed, let me know[.]"  Ex. EEE. The original decision to terminate Ms. King was made on July 24, 2017. King. Decl. (Ex. A) at ¶ 90; Ex. XX, YY. Ms. King was first told that she was being terminated on September 21, 2017. King. Decl. (Ex. A) at ¶ 104; Barrett Dep. (Ex. J) at 377:14-15.

146.    Plaintiff denies. Plaintiff further states that she received a call on September 21, 2017, from both Thomas and Barrett advising her that she was terminated. King Decl. (Ex. A) at

¶ 104; King Dep. (Ex. B) at 152:7-12. Ms. King asked Barrett for documentation regarding Ms. King's termination and Barrett stated that Ms. King would receive it in the mail. Thomas had been actively discriminating, harassing, creating a hostile work environment and retaliating against Ms. King since he became her District Manager on February 1, 2015. She immediately called Miller, Regional Vice President and Thomas' boss, and told her that Ms. King was unfairly terminated and that what Thomas was doing to her was wrong.  Miller took no action in response to Ms. King's complaint. King. Decl. (Ex. A) at ¶ 104

147.    Plaintiff admits only that Ms. King was at her home in Virginia when she received the termination call. King had rented this home for five years. King Dep. (Ex. B) at 97:22-98:4; 153:10-14.

148.    Plaintiff admits only that she was mailed a termination letter dated September 21, 2017 signed by Barrett. Plaintiff further states she received the letter of termination from Aramark dated September 21, 2017.  She was not provided with any written documentation regarding the reason for her termination.  Ms. King contacted Barrett and requested a copy of documentation stating the reason for Ms. King's termination.  Barrett told Ms. King that she would need a written subpoena to obtain it. King Decl. ¶ 105 (Ex. A).

Even after Aramark terminated Ms. King, it continued to discriminate, harass, and retaliate against her.  For example, Aramark failed to provide her with materials necessary to return her company laptop by mail, despite her requests for the necessary material.  Instead, on or about November 14, 2017, Aramark contacted Ms. King at her New York home office and directed her to return a company laptop to Virginia.  Aramark made this demand despite being aware that Ms. King had left Virginia.  When she offered to return the laptop to one of Aramark's many Western New York facilities, Aramark refused to let Ms. King do so, forcing

her to return to Virginia as a further act of discrimination, harassment, and retaliation. King Decl. ¶ 106 (Ex. A).

149.     Mara Rakowski was hired in the Winter of 2017 as the General Manager of Food and EVS for Valley Health and reported to both Thomas as District Manager of Food and Knight as District Manager of EVS. Williford Dep. (Ex. G) at 337-340.   She complained to Williford regarding Thomas on more than one occasion although Williford could not recall on how many occasions.  Williford Dep. (Ex. G) at 341-342.  She complained that Thomas micromanaged her. Williford could not recall her other complaints. Thomas would ask Williford about Mara Rakowski's whereabouts on more than one occasion but he could not put a number on how many occasions. Williford Dep. (Ex. G) at 342. She resigned her position in approximately early 2019 and the position was still open when Williford left his position up to six months later.  Williford Dep. (Ex. G) at 339, 345-346.

150.     Plaintiff admits.  Plaintiff further states based on the discrimination, harassment and retaliation she was subjected to, she received medical care and treatment during her employment which has continued to the present.  After her termination Ms. King wanted to believe she would be able to work despite her condition.  After her termination she had and continues to have panic attacks, severe anxiety, severe depression, and PTSD as a result of Aramark's conduct.  She has been unable to trusts others.  She never feels safe.  She does not sleep.  She has trouble with relationships.  She cannot think.  She is unmotivated.  She does not believe she ever will be the same. Ms. King has been prescribed many medications in an effort to treat her symptoms, some of which she no longer remembers the names. Unfortunately, in her attempt to seek employment, she realized what her physician was telling her, that she was unable to work, was accurate.  Ms. King had difficulty concentrating during phone calls, and submitting

applications online, among other things.  Her physician instructed her to focus on treatment as

her symptoms were getting worse.  Ms. King admitted to herself that she was incapable of

working and has not been able to return to gainful employment since then despite continued

treatment. King Decl. ¶ 107 (Ex. A).

151.    Plaintiff denies. Ms. King applied for a position at Sodexo and testified numerous

times that she may have applied to additional jobs outside of the ones listed in ¶ 151 of

Defendant's Statement of Facts. King. Dep. (Ex. B) at 46:9-23; 51:11-22; 57:13-19; 54:1-3; See

¶ 150.

152.    Plaintiff admits only that Ms. King did not produce documents evidencing that

she has applied to more than the jobs listed in ¶ 151 of Defendant's Statement of Facts and

testified that she did not have any documents evidencing additional applications. Ms. King

testified that she had made accounts with Monster.com, Indeed.com, and Glassdoor.com, but that

she doesn't remember her usernames and passwords. King Dep. (Ex. B) at 59:1-10; See ¶ 150.

153.    Plaintiff admits only that in or around November 2018, Morrison Healthcare

contacted Ms. King about a Food Service Senior Director position in Syracuse, NY, but Ms.

King did not apply for it. Plaintiff further states that she turned down applying for the job

because she "was not capable" due to the mental and emotional issues that she was going

through. King Dep. (Ex. B) at 43:7-44:3. Ms. King told Ms. Ward, her former colleague at

Aramark, who at the time worked for Morrison Healthcare and contacted Ms. King about the job,

that the job wouldn't work because of Ms. King and her fiancé's "current obligation" when the

truth was that Ms. King was too embarrassed to tell Ms. Ward that the real reason she couldn't

work. King. Dep. (Ex. B) at 45:1-8; See ¶ 150.

154.    Plaintiff admits. See ¶ 150.

155.     Plaintiff admits. See ¶ 150.

156.     Plaintiff admits.  See ¶ 150.

157.     Plaintiff admits.

158.     Plaintiff admits only that on July 17, 2018 Ms. King signed a Charge of

Discrimination to be submitted to the EEOC.

159.     Plaintiff admits only that the EEOC stamped the Charge of Discrimination

Received July 18, 2018. Plaintiff further states it was hand-delivered to the EEOC on July 17,

2017. Greco Decl. ¶ 5.

It was cross filed with the New York State Human Rights Division and includes claims for

gender-based discrimination, hostile work environment, and retaliation against Defendant under

the New York Human Rights Law, N.Y. Exec. Law Section 290 seq. Defendant moved to

dismiss Ms. King's state causes of action and her federal gender-based discrimination and hostile

work environment claims.  Her state court claims were dismissed on July 30, 2019 by Decision

and Order of this Court which also denied Defendant's Partial Motion to Dismiss requesting

dismissal Plaintiff's federal court discrimination and hostile work environment claims (Dkt. 16).

160.     Plaintiff admits.

161.     Plaintiff admits.

162.     Plaintiff admits.

163.     Plaintiff denies. Plaintiff further states that in addition to Thomas engaging in

gender-based harassment, gender-based discrimination, and retaliation, other Aramark

management, including Adams, Miller, Hetrick, Barrett, O'Donnell, Knight, Sachs, Sebastian

Mitchell and Evelyn Miller engaged in retaliation by failing to take corrective action, denying

her work opportunities following Ms. King's complaints and failing to properly investigate

Thomas' claims regarding Ms. King.  See ¶¶ 24, 35, 37, 41, 42, 45, 46, 48, 52, 55, 57, 62, 63, 67,

71, 72, 73, 74, 82, 86, 87, 89, 93, 94, 97, 98, 99, 105, 114, 115, 119, 120, 148.  Plaintiff further

states that she felt the people she reported Thomas' actions to were treating her differently than

others because they failed to act. (King Dep. (Ex. B) at 188).

164.    Plaintiff denies.  Plaintiff further states that Thomas made gender-based

disapproving looks and remarks and jokes based on his stereotyped perception of what a

businesswoman should look like. See ¶¶ 35, 163.

165.    Plaintiff admits only that DeGori, Harriman, Soloway, Williford, and Wilson are

comparators.  Plaintiff further states that Brian Marsh, the dual General Manager at

Susquehanna, and Knight who was a District Manager and acted in the General Manager

position of EVS are also comparators. See ¶¶ 21, 26 -29, 35, 37, 38. Plaintiff also states that

these are all comparable intermediate managerial positions. The workplace

rules/standards/policies relevant to the disparate conduct claimed did not vary with the job titles

or location.

166.    Plaintiff denies.  Plaintiff further states that she had more than approximately

fifteen interactions with DeGori, Harriman, and Wilson, as each of these individuals and Ms.

King, all direct reports of Thomas, participated in weekly district meetings/conference calls that

were chaired by Thomas.  See ¶ 35; Harriman Dep. (Ex. E) at 114-115, 257; DeGori Dep. (Ex.

D) at 111-115; Wilson Dep. (Ex. F) at 207-210.  In addition, they attended various other

meetings that were scheduled such as District Meetings (DeGori Dep. (Ex. D) at 100), and

overlapping work related matters (See ¶71; King Decl. (Ex. A) ¶ 57).

167.    Plaintiff objects to Defendant's Statement of Fact number 167 which is an

unnumbered chart without corresponding citations to factual information and thus cannot be

responded to as presented.  Therefore, Plaintiff denies.  Plaintiff further states that some of the matters in this chart have been addressed. See ¶¶ 35, 37, 60.

168.    Plaintiff objects to Defendant's Statement of Fact number 168 which is an unnumbered chart with 16 rows and 2 columns (some rows appear to be interrelated and others are not) and thus cannot be fairly responded to as presented.  Therefore, Plaintiff denies. Plaintiff further states that Plaintiff incorporates her Declaration (Ex. A) and the entirety of her Counterstatement of Contested Material Facts, as well as stating the following:

First row: See ¶¶ 35, 57, 60-62, 65, 69, 71, 73, 74, 75-76, 77, 78-79, 80, 81, 84, 92, 93, 98, 99, 101, 114-122.

Second row: See ¶¶ 100, 101; Harriman Dep. (Ex. E) at 272-273; Ex. AAA at ARAMARK_000091; Ex. NNN at ARAMARK_003185.

Third row:  See ¶¶ 35, 37, 38-39.

Fourth row: See ¶ 8, 15, 16, 18, 35, 46, 86. Miller Dep. (Ex. H) at 142; Thomas Dep. (Ex. C) at 194.

Fifth row:  See ¶¶ 18, 86.

Sixth row:  See ¶¶ 8, 15-16, 71.

Seventh row:  See ¶¶ 98, 101.

Eighth row:  See ¶¶ 61, 81, 93, 99, 101, 129-130.

Ninth row:  See ¶¶ 35, 38, 74.

Tenth row:  See ¶¶ 35, 60, 63, 74, 82, 93, 98, 101.

Eleventh row:  See ¶¶ 74, 93.

Twelfth row:  See Ex. OOO; King Decl. ¶ 27; Williford Dep. (Ex. G) at 377; Harriman Dep. (Ex. E) at 267; DeGori Dep. (Ex. D) at 161-162.

Thirteenth row:  See ¶¶ 35, 71.

Fourteenth row: See ¶¶ 35, 63, 82, 98.

Fifteenth row: See ¶¶ 35, 98, 101, 129-130; Williford Dep. (Ex. G) at 115.

Sixteenth row: See ¶ 48, 52; King Dep. (Ex. B) at 241, Errata Sheet; Thomas Dep. (Ex. C) at 249-250.

169.    Plaintiff denies.  Plaintiff further states as follows:

a.      Plaintiff denies.  Thomas told jokes about women.  During the Valley Health Proposal review in 2015 Thomas told a joke about women when Ms. King was with an all-male team with vice presidents present who all laughed except Ms. King who found the conduct humiliating, offensive, demeaning, degrading, disrespectful, unprofessional and undermining to her position as a manager. King Decl.¶ 39 (Ex. A). See ¶ 35.

b.      Plaintiff denies.  A couple different times in 2015 and 2016 Thomas said things like Ms. King should go to the gym at 5:30 a.m. because Mr. Merrill, the Valley Health CEO, would be there and would like to see Ms. King actively working out at the gym. This implied to her that she would be more favorably recognized by her client's CEO if she exercised and changed her body image as a woman. Thomas' supervisor admitted that such comments are not appropriate. Miller Dep. (Ex. H) at 121. Thomas did not make these comments to Williford who was heavy in the stomach area and at Winchester where the gym was located. King Decl.¶ 38 (Ex. A). See ¶¶ 35, 98.

c.      Plaintiff denies.  Plaintiff further states Thomas made comments regarding Ms. King's lunch tray implying she was overeating and should not be.  In 2015 the directors who reported to Ms. King were eating lunch with Thomas and her in the Winchester cafeteria. When she arrived at the table where they were all sitting with her tray Thomas said "Wow you must be

hungry" implying Ms. King was overeating and should not be in front of all of them. In 2016, before Ms. King received the first written documentation, when she was walking into the nutritional conference room at Winchester with her cafeteria tray where John Shingleton, Thomas and she were working on some financials/proposals Thomas said "Wow, look at that tray." implying she was overeating and should not be.  Thomas did not comment on Shingleton or Thomas' own tray. Thomas' conduct toward Ms. King was humiliating, offensive, demeaning, degrading, disrespectful, unprofessional and undermining to her position as a manager. King Decl.¶ 38 (Ex. A). See ¶¶ 35, 98.

       d.    Plaintiff denies.  Plaintiff further states Thomas, would frequently, approximately 2 or 3 times a week, disapprovingly stare in disgust, at Ms. King's midsection, where she was heavier in the belly, especially when she stood up or sat down. He would express his disgust by furrowing his brow. Thomas' supervisor admitted that such conduct is not appropriate. Miller Dep. (Ex. H) at 120. Williford was heavier in his midsection.  Ms. King never saw Thomas disapprovingly stare in disgust at Williford although she was in the presence of Thomas and Williford on many occasions. Ms. King also never saw Thomas stare disapprovingly in disgust at Harriman, or DeGori's midsection even though they were heavier in the stomach area. King Decl.¶ 38 (Ex. A); See ¶¶ 35, 98.  Plaintiff further states that there was never a period of time during her employment when Thomas stopped doing that altogether. King Dep. (Ex. B) at 251-252.

170.    Plaintiff admits that she has alleged that other women have brought complaints of gender discrimination, harassment and retaliation against Thomas.

171.    Plaintiff denies information and belief as to what Aramark has maintained a record of relative to complaints of discrimination, harassment, hostile work environment and

retaliation based on gender.  Plaintiff further states as set forth in Ms. King's Declaration, she has made many complaints to management regarding discrimination, harassment, hostile work environment and retaliation based on her gender and management either failed to document such complaints or has not produced the written documentation of such complaints.

Plaintiff further states that regarding Allison Siegel, she told her client, Virginia Hospital Center, that she would have to leave the client's account because she could not work with Thomas. Thomas did not admit that Allison Siegel made a Hotline complaint regarding gender discrimination, harassment and/or retaliation. Thomas would only admit Allison Siegel complained that she was frustrated working with him and he was removed from the Virginia Hospital Center account. Allison Siegel continued working with Virginia Hospital Center and reported to a different manager.  Hetrick, Thomas' manager, told Thomas that he was removed from the account for not being truthful with the client by intentionally omitting information about an employee. Thomas said he was instructed by Hetrick to intentionally omit information about the employee when speaking with the client. (Thomas Dep. (Ex. C) at 129-135). Hetrick told Thomas that he did not do anything wrong, was not in any kind of trouble, sometimes these things happen and Aramark will reassign his responsibilities. (Thomas Dep. (Ex. C) at 133-134).

Mara Rakowski, who was hired in the Winter of 2017 as the General Manager of Food and EVS for Valley Health and reported to both Thomas as District Manager of Food and Knight as District Manager of EVS also made complaints regarding her manager, Thomas, on multiple occasions.  Williford Dep. (Ex. G) at 337-342.  She resigned her position in early 2019 and the position was still open when Williford left his position up to six months later Williford Dep. (Ex. G) at 339-340, 345-346.

Heather Rizzo told Ms. King that she complained to the Aramark Hotline that Thomas had asked her to falsify financial information, which she refused to do. No investigation was ever done. Heather Rizzo never heard back from the Hotline. Thomas subsequently tried to have Ms. King rate the performance of Heather Rizzo, who was a high performer, at the lowest level, "0", ensuring she would receive no salary increase and refused to allow Ms. King to advance her to a vacant different position. King Decl. ¶¶ 65, 95; See ¶¶ 60, 101.

172.    Plaintiff denies. Plaintiff further states that she complained to Barrett in or about July 2017 about Thomas's discrimination, harassment, and retaliation. King Decl. (Ex. A) at ¶ 86; Barrett Dep. (Ex. J) at 347:9-15. Plaintiff also made multiple complaints about Thomas's discrimination, harassment, and retaliation including but not limited to the human resources manager Adams (April 20, 2016), Thomas' managers Hetrick (March 1, 2016, April 20, 2016) and Miller; July 20, 2016); Duckett (March 19, 2017); the Hotline (March 27, 2017 and September 19, 2019) which is handled by human resources employee O'Donnell (April 6, 2016); and DiCicco (May 20, 2016). See Timeline of King's Complaints and Aramark's Retaliatory Responses (Ex. FFF) and Timeline of Events (Ex. L).

173.    Plaintiff admits only that Thomas never touched her in a sexual manner, never made any sexual propositions to her, never asked for sexual favors in return for giving her a job benefit or having her avoid a negative job consequence, and never asked her on a date. Plaintiff further states Thomas told jokes about women. During the Valley Health Proposal review in 2015 Thomas told a joke about women when Ms. King was with an all-male team with vice presidents present who all laughed except Ms. King who found the conduct humiliating, offensive, demeaning, degrading, disrespectful, unprofessional and undermining to her position as a manager. King Decl.¶¶38, 39, 85 (Ex. A). See ¶¶ 35, 169.

174.     Plaintiff denies.  Plaintiff further states that Thomas complained regarding the validity of Ms. King's need for FMLA and the workload backing up while she was out. He did not complain about the validity of Williford's wife's illness and his need to work from home often and without complaint or negative comment to assist her.  See ¶¶ 32, 48, 67.

175.     Plaintiff admits only that the complaints listed in a through b are among the many complaints that she made to Aramark managers regarding gender discrimination, gender harassment and retaliation. See Timeline of Events (Ex. L); Timeline of King's Complaints and Aramark's Retaliatory Responses (Ex. FFF). Plaintiff further states that these complaints include but are not limited to the following:

        a.      See ¶¶ 37, 38, 46, 55, 60, 63, 74, 82, 86, 94; Exs. L, FFF.

        b.      See ¶¶ 62, 63, 74; Exs. L, FFF.

        c.      See ¶ 98; Exs. L, FFF.

        d.      See ¶¶ 86-88; Exs. L, FFF.

        e.      See ¶ 141; Exs. L, FFF.

176.     Plaintiff admits only that there is a program that eligible salaried employees can get reimbursed for tuition and costs in obtaining a job-related degree. Plaintiff further states she was in the process of completing her application for her doctoral degree in organizational development through the online program at Phoenix University when she was terminated. King Decl. ¶ 5 (Ex. A).

177.     Plaintiff denies information or belief to know whether employees have to get approval from Aramark before they enroll in a course for which they seek to obtain tuition reimbursement. Plaintiff further states that no documentation has been produced by Defendant relative to this employee benefit. Plaintiff would have complied with the requirements of the

employee benefit program relative to obtaining her doctorate and sought to get reimbursed for tuition and costs in the total maximum amount allowed in obtaining this job-related degree had she not been terminated.

178.    Plaintiff denies. See ¶¶ 176, 177.

179.    Plaintiff denies. See ¶¶ 176, 177, 150.

180.    Plaintiff admits. See ¶¶ 176, 177, 150.

181.    Plaintiff denies. Plaintiff further states that no documentation has been produced by Defendant relative to this employee benefit. Plaintiff would have complied with the requirements of the employee benefit program relative to obtaining her doctorate and sought to get reimbursed for tuition and costs in the total maximum amount allowed in obtaining this job-related degree had she not been terminated.


Dated:  Buffalo, New York                    *s/Josephine A. Greco*
        December 20, 2021                    Josephine A. Greco, Esq.