UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KRISTEN KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-77 |
| | ) | |
| ARAMARK SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**
**(Doc. 62)**

On January 14, 2019, Plaintiff Kristen King filed this gender-based discrimination, hostile work environment, and retaliation action against her former employer Defendant Aramark Services, Inc. ("Aramark") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"). The court dismissed the NYSHRL claims under Fed. R. Civ. P. 12(b)(6) in an order dated July 29, 2019. (Doc. 16.) The parties have since been engaged in discovery as to the remaining Title VII claims, which allege sex discrimination (Count 1), retaliation (Count 3), and a hostile work environment ("HWE") (Count 5).

Now pending is Aramark's motion for summary judgment under Fed. R. Civ. P. 56, filed on November 1, 2021. (Doc. 62.) Aramark argues that the HWE claim is time-barred. (Doc. 63 at 11.) Aramark further asserts that all three Title VII claims fail for lack of evidence to support essential elements of each claim. Finally, Aramark contends that, if any of Ms. King's Title VII claims survive, the court should limit her recoverable damages. (*Id.* at 30.) The court heard oral argument on the motion on February 16, 2022.

### Background

The Second Circuit has observed that discrimination cases are "fact-intensive." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  This case is no exception.  Aramark has filed a 41-page, 181-paragraph statement of facts in support of its Rule 56 motion (Doc. 64) together with an appendix of exhibits cited in that motion (Doc. 65).  Ms. King has filed a 105-page, 181-paragraph "Counterstatement of Contested Material Facts" (Doc. 69) and her own appendix of exhibits (Doc. 69-1).  Drawing on the parties' statements and its own review of the record, the court sketches here an overview of the material facts in this case, arranged in generally chronological order.[1]  Additional facts are set forth as necessary in the discussion below.

### Kaleida Health (2005–2010)

Ms. King worked for an Aramark entity[2] at its account with Kaleida Health from June 2005 until June 2010.  She first held the position of Retail Manager before being promoted to Director of Food and Nutrition (also known as Food Service Director).  Ms. King's employment there ended after her employer lost its contract with Kaleida Health in June 2010.

---

[1] Both parties have made efforts to organize the multitude of facts in this case.  For example, two of the numbered paragraphs in Aramark's statement of facts are tables purporting to summarize data about Ms. King's alleged male comparators and about Ms. King's allegations of how her District Manager, Griffith Thomas, treated her. (Doc. 64 ¶¶ 167–168.)  Ms. King objects to both tables as improper. (Doc. 69 ¶¶ 167–168.)  For her part, Ms. King has filed two timelines of events prepared as exhibits to her opposition memorandum. (Docs. 69-13, 70-31.)  The court has made an independent effort to organize the facts that are material to the pending summary judgment motion.

[2] Ms. King states in her December 19, 2021 declaration that Aramark Services, Inc. hired her to work in the Aramark Healthcare Division. (Doc. 69-2 ¶ 2.)  She stated at her July 12, 2021 deposition that she worked for "Aramark Healthcare," (Doc. 65-45 at 14), which Defendant asserts is Aramark Healthcare Support Services, LLC (Doc. 64 ¶ 1).  The precise Aramark entity for which Ms. King worked from 2005 to 2010 is not material to any issue here.

Ms. King then went back to school and obtained a master's degree in Innovation, Creativity and Change Leadership in 2012.

### Acceptance of General Manager Position at VHS; FMLA Leave (2012–2013)

On April 5, 2012, Aramark sent a letter to Ms. King offering her the position of General Manager – Food and Nutritional Services of Aramark's account with the Valley Health System ("VHS"). (Doc. 64-1.) At the relevant times, VHS contracted with Aramark to provide food and facility services to six health facilities in Virginia and West Virginia. (*See* Doc. 69-2 ¶¶ 8, 101.) Winchester Medical Center ("WMC") in Winchester, Virginia is VHS's flagship hospital and headquarters.

Ms. King accepted Aramark's employment offer. She was an at-will employee and she reported to the District Manager. She was given an office at WMC but lost that office in or about October 2012 due to space constraints. (*Id.* ¶ 10.) Ms. King's unit did about $10 million in business annually. (*Id.* ¶ 71.) She directly supervised between 150 and 200 employees. (*Id.* ¶¶ 4, 101.) VHS was one of the largest Aramark accounts in the area. (*Id.* ¶ 21.) The CEO of VHS, Bob Amos, was Ms. King's largest client. (Doc. 65-45 at 115; Doc. 69-2 ¶¶ 43, 103.)

At the time Ms. King was hired she lived in Hamburg, New York. The new job required frequent travel among the VHS hospitals. Aramark offered to facilitate Ms. King's relocation to the Winchester, Virginia area and made a $11,006.28 relocation payment to her on May 18, 2012. Ms. King used the payment to cover the costs of relocating to a home in Stanley, Virginia—approximately 64 miles from Winchester—which she preferred for its country atmosphere. (Doc. 69-2 ¶ 8.)

While renting the home in Stanley, Ms. King maintained her home in Hamburg. (Doc. 69-2 ¶ 8.) Her teenage son and her fiancé lived with her in Stanley periodically but their

primary residence was in Hamburg. (*Id.*) Ms. King's son had a mental health condition for which he received treatment. On or about October 30, 2013, Aramark approved Ms. King's application under the Family Medical Leave Act ("FMLA") to provide for intermittent leave to care for her ill son. (Doc. 69-2 ¶ 16.) At times before and after that FMLA approval, Aramark authorized Ms. King to work from her home in Hamburg to allow her to care for her son. (*See id.* ¶ 15.)

### Griffith Thomas Promoted to District Manager (2015)

When the District Manager position became vacant in fall 2014, Ms. King interviewed for the position. (Doc. 69-2 ¶ 17.) Aramark also interviewed Griffith ("Griff") Thomas for the position. Mr. Thomas had experience as Director of Environmental Services ("EVS") at WMC and had worked as General Manager – EVS for VHS. Ms. King asserts that her interview was a "sham" because it lasted only 20 minutes and because she was only questioned about District Manager positions for locations other than VHS. (*Id.*) It is undisputed that Aramark promoted Griffith Thomas to District Manager for the district that included VHS in February 2015.

Ms. King testified that Mr. Thomas frequently looked at her midsection, where she is heavier, and then looked at her with a "look of disgust on his face" that included a furrowed brow. (Doc. 65-45 at 143–144.) She testified that this occurred two to three times per week, especially when she stood up or sat down. (*Id.* at 146; *see also* Doc. 69-2 ¶ 38.) Mr. Thomas did not say anything to Ms. King during these instances. (Doc. 65-45 at 146.) Ms. King asserts that these events continued to occur through 2017. (*See* Doc. 69-2 ¶ 85.)

Ms. King also testified that, at some point in 2015, while in the WMC cafeteria, Mr. Thomas made a comment about her lunch tray. (Doc. 65-45 at 143.) According to Ms. King, when she arrived at the table with her lunch tray Mr. Thomas said "wow, you must be hungry."

(*Id.*)  Ms. King states that Mr. Thomas made that comment in the presence of the directors who reported to her.  (Doc. 69-2 ¶ 38.)

Ms. King testified that Mr. Thomas made a similar comment at some time in 2016 before August 29.  (Doc. 65-45 at 143, 145–46.)  She recalls that Mr. Thomas made a comment similar to "wow, look at that tray" or "wow."  (*Id.* at 143.)  Another male employee, John Shingleton, was also present; Mr. Thomas did not comment on Mr. Shingleton's tray or on Mr. Thomas's own tray.  (Doc. 69-2 ¶ 38.)

Ms. King further testified that at some point in 2015 Mr. Thomas commented that Ms. King "should go to the gym at 5:30 in the morning because Mr. Merrill, who was the CEO of Valley Health was there, and he [Mr. Merrill] would like to see [Ms. King] actively working out at the gym."  (Doc. 65-45 at 142.)  Ms. King testified that Mr. Thomas made a similar comment in 2016.  (*Id.*; *see also* Doc. 69-2 ¶ 38.)  She also states in her declaration that Mr. Thomas continued to make "demeaning and disparaging comments about my weight" at times in 2017.  (*See* Doc. 69-2 ¶ 85.)

Ms. King testified that during the Valley Health Proposal review in 2015, Mr. Thomas made a joke about women in her presence and in the presence of other male executives.  (Doc. 65-45 at 147–148.)  She does not remember the content of the joke or whether it was sexually explicit.  (*Id.* at 153.)  She remembers it was uncomfortable.  (*Id.*)  All of the men who were present laughed at the joke.  (Doc. 69-2 ¶ 39.)

According to Ms. King, her son's illness began to worsen shortly after Mr. Thomas became District Manager.  (Doc. 69-2 ¶ 26.)  She recertified for intermittent FMLA leave on March 24, 2015.  (*Id.*)  It is undisputed that Aramark approved intermittent FMLA leave through November 2015 due to Ms. King's son's health condition.

**Jacob Williford Hired as Controller (2015)**

Ms. King hired Jacob Williford in April 2015 to work as a controller reporting to her. (*Id.* ¶ 21; *see also id.* ¶ 94.) Ms. King states that Mr. Williford was heavy in the midsection and worked at WMC, where the gym was located. (*Id.* ¶ 38.) Ms. King never heard Mr. Thomas state that Mr. Williford should go to the gym. (*See id.*) She never saw Mr. Thomas stare at Mr. Williford in disgust. (*Id.*)

When a private office became available at WMC, Mr. Thomas directed that it be given to Mr. Williford. (Doc. 69-2 ¶ 22.) Mr. Thomas told Ms. King that this was because Mr. Williford's work required him to maintain financial documents. (Doc. 65-45 at 118.) Mr. Thomas suggested that Ms. King ask Mr. Amos for an office. (*See id.*) Ms. King did so but Mr. Amos told her "you have enough space down in that [sic] nutrition, I'm not allowing anymore offices." (*Id.*) A separate VHS facility—Cork Street Hospital—apparently had available office space but Ms. King asserts that it was a small facility and that she needed a private office at WMC, which was VHS's largest hospital. (*See* Doc. 69-2 ¶ 22.)

Mr. Thomas then told Ms. King that she would have to work in a WMC "fishbowl" conference room where hourly supervisors worked. (Doc. 65-45 at 118; *see also* Doc. 69-2 ¶ 22.) The "fishbowl" provided "zero privacy"; Ms. King states that she was unable to discuss financials on the phone. (Doc. 65-45 at 117.) She complained to Mr. Thomas about having to use the "fishbowl" as an office. (Doc. 69-2 ¶ 22.) She states that Mr. Thomas's male direct reports—Christopher Harriman, Thomas DeGori, Christopher Drayton, and John Wilson—all had private offices. (*Id.*)

According to Ms. King, three months after she hired Mr. Williford, Mr. Thomas began utilizing Mr. Williford's time on accounts other than VHS. (*Id.* ¶ 25.) Ms. King repeatedly

complained to Mr. Thomas about that. (*Id.*) In fall 2015, Mr. Thomas told Ms. King that Mr. Williford would no longer be reporting to her. (*Id.*)

### Ms. King Promoted to Dual General Manager (2015)

In October 2015 Ms. King was officially promoted to dual General Manager of Food and EVS for VHS. (*Id.* ¶ 18.) In this role she managed both the food service operation and the facilities/environmental services operation for the VHS account. She reported to Mr. Thomas while she held this dual role. Ms. King asserts that, in the summer prior to her promotion to this dual rule, Mr. Thomas told her that she would need to relocate closer to WMC if she was officially awarded the dual General Manager position. (*Id.*)

It is undisputed that, on October 6, 2015, Mr. Thomas forwarded to Ms. King an email from Aramark Human Resources ("HR") Director Melanie Curry. Ms. Curry's email provided a summary of the decision "regarding Kristen King's salary and role as a multi-site General manager." (Doc. 65-39 at 1.) The email listed the following:

- **Salary Increase** – Kristen will receive a salary increase of 5% effective September

- **Merit Increase** – Kristen's increase in October 1st will not make her ineligible for a merit increase in 2016. Kristen's salary and increase should be reviewed based on the Merit guidelines and her overall performance in her General Manager role.

- **Relocation** – To assist Kristen in getting closer to the client's headquarters, she will be offered Renter's relocation assistance to move. Please let me know when she would like to move so I can initiate the process with our vendor Cartus.

- **Equity Increase** – In May/June, we can review Kristen's salary again and her overall job performance to consider requesting an equity increase.

(*Id.*) That same day Ms. King emailed Mr. Thomas advising him that she had been "working with a realtor and would like to relocate before the snow falls so please contact Cartus." (*Id.* at 3.) In fall 2015 Aramark made a total of $9,940.53 in relocation payments to Ms. King.

On October 14, 2015, Ms. King emailed Mr. Thomas requesting "a couple more days to complete my teams annual review as well as to enter results in mine." (Doc. 65-37 at 1.) She stated that "[i]t's important to be able to spend the needed time and with just coming back from FMLA, I am just getting caught up operationally." (*Id.*) Mr. Thomas replied the next morning stating: "They have to be in today by 5pm." (*Id.*)

On the evening of Friday, October 30, 2015, Mr. Thomas emailed Ms. King asserting that he had made "numerous attempts to contact you today with phone calls and emails with no response." (Doc. 70-40 at 3.) He referred to certain incomplete tasks and noted that she had not provided him with access to her calendar for two weeks. He wrote that her "lack of any response today and other times, make me suspicious." (*Id.*) He further stated that he had received comments from Ms. King's directors "that they don't know where you are at times." (*Id.*) He concluded that "[i]t would be unacceptable for me not to respond to my boss and it is unacceptable for you as well" and that "[w]e will discuss Monday." (*Id.*) Ms. King responded by email on the evening of Sunday, November 1, 2015 agreeing to discuss the issues and stating, among other things, that "[i]t is difficult to understand where your comment containing the word 'suspicious' is coming from and quite frankly makes me uneasy." (*Id.* at 2.)

**Ms. King's Leave of Absence (December 2015–March 2016)**

Ms. King underwent surgery on December 8, 2015 to address a heel injury that she sustained before April 2012. (Doc. 69-2 ¶ 31.) She was approved for short-term disability leave. Before her leave started she notified her teams about who would be standing in for her while she was on leave. Also before going on leave, Ms. King and Mr. Thomas met regarding coverage during Ms. King's absence. (Doc. 69-2 ¶ 36.) They agreed that Mr. Thomas would have "at

least weekly contact" with the VHS facilities for which Ms. King was responsible.  (*Id.*; *see also* Doc. 65-45 at 94.)

During her leave of absence, on December 28, 2015, Ms. King's son passed away unexpectedly.  Ms. King remained on leave until early March 2016.

According to Ms. King, during that period of time when she was on leave, Mr. Thomas made "frequent efforts" to communicate with her about her job duties and he "made clear to me that he was unhappy about the work that was backing up because of my absence." (Doc. 69-2 ¶ 33.)  Mr. Thomas asked Ms. King multiple times when she would be returning to work.  (*Id.*)

On the morning of Monday, February 29, 2016, just before she returned to work, Ms. King emailed Aramark employees who reported to her expressing her gratitude for their work during her absence, noting that she would be beginning her transition back to work on Wednesday (March 2) at WMC, and advising that she would be contacting each employee individually to set up an informal catch-up meeting.  (Doc. 65-55.)  Later on February 29, 2016, Mr. Thomas emailed Ms. King stating:

> I am concerned that you have twice declined meeting invites for March 2nd.  I have explained the meetings are to take place at Winchester Medical Center in the Nutrition Services Conference Room starting at 9am and that the nature of the meetings requires your on-site attendance.  Your role as General Manager requires an occasional office day, but the vast majority of your time is to be spent working in unit locations.
>
> I cannot approve the three office days you requested this week.  There are many urgent matters to attend to and I expect you to tour at least two of your other facilities on March 3rd and 4th to reconnect with your team, clients and assess the operations.  The meetings on the 2nd will provide more clarity on where to focus.

(Doc. 65-42.)

Ms. King interpreted Mr. Thomas's email as requiring her to spend her first day back at work at an all-day meeting with him and as requiring that she visit at least two of her locations each day on the two following days.  (*See* Doc. 69-2 ¶ 34.)  She found that plan unrealistic.  (*Id.*

¶ 35.)  In her view, she needed an opportunity to catch up on emails and telephone calls, to identify and prioritize operations, and to reacclimate back to work.  (*Id.* ¶ 34.)

Ms. King contacted Mr. Thomas's immediate supervisor, Regional Vice President Deborah Hetrick.  (*Id.* ¶ 35.)  She advised that she felt Mr. Thomas was discriminatorily targeting her and retaliating against her.  (*Id.*)  She complained that she was uncomfortable reporting to Mr. Thomas and being alone with him because of his conduct.  (*Id.*)  She states that Ms. Hetrick laughed in response.  (*Id.*)  Ms. King asked Ms. Hetrick to arrange for a neutral third party to mediate a reporting relationship between Ms. King and Mr. Thomas.  (*Id.*)  Ms. Hetrick denied that request and required that Ms. King meet with Mr. Thomas without a neutral third party.  (*Id.*)

On the afternoon of March 1, 2016, after speaking with Ms. Hetrick, Mr. Thomas emailed Ms. King regarding a "change of plans for this week."  (Doc. 70-7 at 2.)  He proposed that, rather than meeting in Winchester, they could meet at a location closer to the home that Ms. King was renting in Stanley.  (*Id.*)  Mr. Thomas advised that the meeting involved "[n]o heavy agenda: [1] check in, [2] update on the Valley System[,] [3] next steps."  (*Id.*)

**Return to Work (March 2016)**

According to Ms. King, upon returning to work she learned that Mr. Thomas "did not arrange for or provide support for several of the Valley Health facilities I was responsible for while I was on leave."  (Doc. 69-2 ¶ 36.)  Then, on or about April 20, 2016, Ms. King reported again to Ms. Hetrick "that Thomas's discriminatory, harassing, retaliatory conduct toward me continued unabated, and Thomas was creating a hostile environment."  (*Id.* ¶ 41.)  She told Ms. Hetrick that "Thomas was excluding me from important financial meetings, meeting alone with my directors without notice to me, imposing unrealistic deadlines on me, and impeding my job

10

performance." (*Id.*) That same day, Ms. King made a similar report to Rebecca Adams, the new Regional Director of HR, whom Ms. Hetrick introduced that day at WMC after traveling from Ms. Hetrick's home office in Delaware. (*Id.*) According to Ms. King, Ms. Adams "took no action to stop such conduct." (*Id.*)

In May 2016, Ms. King reported to Aramark Vice President Carmine DiCicco that she had complained to Ms. Hetrick and to Ms. Adams about Mr. Thomas's conduct but that no action had been taken. (*Id.* ¶ 42.) Ms. King had begun working with Mr. DiCicco in March 2016 on a multimillion-dollar "Valley Health Proposal." (*Id.*) Later that day, in Ms. King's presence, Mr. DiCicco instructed Mr. Thomas to set up a conference call with HR to resolve the issues. (*Id.*)

### Aramark Restructuring (June 2016)

In June 2016 Aramark decided at the corporate level to undergo organizational restructuring, separating the "facility" (or EVS) portion of the business into its own line of business—distinct from the "food" portion of the business—with separate Regional Vice Presidents and District Managers for the two separate lines of business. (*See, e.g.*, Doc. 65-46 at 3–4.) Aramark decided that the restructuring would take effect on October 1, 2016. (Doc. 65-48 at 40.) Aramark's corporate-level decision apparently eliminated the General Manager of EVS position (one of the two General Manager positions that Ms. King held) and replaced it with a District Manager of EVS, a job that Timothy Knight took. (Doc. 69-2 ¶ 43; *see also* Doc. 65-48 at 2.) According to Ms. King, Mr. Thomas told her in June 2016 that her dual role would be ending. (Doc. 69-2 ¶ 43.) Ms. King asserts that, in June 2016, after she was removed as a dual general manager, she learned that Brian Marsh was still a dual general manager. (Doc. 69-2 ¶ 43.)

**Coverage for Norton Hospital (Summer 2016)**

On July 8, 2016, Mr. Thomas emailed Ms. King, Mr. Harriman, and Allen Siegel advising of a need to provide ten weeks of coverage for Norton Hospital due to the departure of Aramark's food service director for that hospital. (Doc. 65-27 at 1.) Norton Hospital was within Mr. Thomas's district but not part of VHS. (Doc. 69-2 ¶ 37.) Ms. King mustered personnel from within her team at VHS to provide coverage at Norton for five weeks. (*See id.*) Mr. Thomas was satisfied with the VHS personnel who provided coverage (Doc. 69-4 at 20), and he believed Ms. King was competent to make the decision of who to send, but he disagreed with Ms. King's decision not to go to Norton herself (*id.* at 26).

**Complaints; First Written Warning (July–August 2016)**

In or about July 2016, Ms. King relayed complaints about Mr. Thomas to Tracy Miller, who had taken over from Ms. Hetrick as Regional Vice President. (Doc. 69-2 ¶ 46.) Ms. Miller advised that she would have HR schedule recurring calls with Mr. Thomas, HR, and Ms. King to monitor and address the issues. (*Id.*) That same day, Ms. King complained again to Ms. Adams, Regional Director of HR, and stated that Mr. Thomas's conduct had worsened since she raised the issue in April 2016. (*Id.*) Ms. Adams said that she would set up and attend recurring calls with Mr. Thomas and Ms. King. (*Id.*)

On August 29, 2016, Mr. Thomas met with Ms. King in a WMC conference room. Ms. Adams attended the meeting via telephone. At the meeting Mr. Thomas gave Ms. King an "Employment Action/Disciplinary Notice Form" (the "First Written Warning"). (Doc. 65-8.) A section of the form entitled "Brief Summary" stated:

> For us to have an inclusive and productive environment there has to be complete communication and follow through from you. Over the last few months there have been numerous asks from you which you have not complied. There also is an expectation that you escalate important business details to me, the District Manager.

The following items have been asked of you and you've not completed and/or you did not inform me appropriately.

1. Did not provide written work schedule as directed on multiple occasions May-Aug 2016
2. Did not notify DM of TJC visit site survey at Shenandoah week of July 25, 2016
3. Did not report to site for TJC survey at Shenandoa[h] as requested week of July 25, 2016
4. Assignments are not completed on time: Development plan, Capital Inventory June-July-Aug 2016
5. Made decision with significant financial impact without involving DM, Pepsi Coke Transition July 2016
6. Refused to provide coverage at Norton July 2016
7. Shared confidential organizational changes with client July 2016
8. Does not monitor payroll using Kronos
9. Need to update me about client visit schedule and cancellations for Valet August 10, 2016
10. David Bell incident was not reported immediately upon discovery, was not discovered in a timely matter 8/10
11. Multiple managers report not seeing or knowing how to reach you over past several months.

(*Id.* at 1.) The form bears Mr. Thomas's signature dated August 29, 2016. (*Id.* at 2.)

Ms. Adams did most of the talking during the meeting and covered the 11 items listed on the form. (Doc. 65-45 at 88.) Ms. King stated that she disagreed with the 11 charges. (*Id.*) She also stated that Mr. Thomas was retaliating against her and that Ms. Adams knew that because Ms. King had mentioned it to her before the meeting. (*Id.* at 88–89.) She asserted that "the retaliation is continuing, the disparate treatment is continuing, the sexual harassment is continuing" and that she thought this was unfair. (*Id.* at 89.)

On September 2, 2016, Ms. King gave Ms. Adams a three-page typewritten document that responded to each of the eleven items covered in the First Written Warning. (Doc. 65-9.) On September 10, 2016, Mr. Thomas gave Ms. Adams a three-page typewritten memo that addressed points made in Ms. King's written response. (Doc. 65-30.) On September 29, 2016, Mr. Thomas and Ms. Adams issued a revised version of the First Written Warning that removed six of the eleven items listed on the original version. (Doc. 65-10.) Ms. King requested that the

13

First Written Warning be changed to a verbal warning because she had no prior discipline; that request was denied. (Doc. 69-2 ¶ 61.) She requested a Performance Improvement Plan ("PIP"). That request was also denied; Ms. Adams stated: "It's simple, improve your performance." (*Id.*)

In December 2016 Mr. Thomas and Ms. King both signed a performance review of Ms. King's fiscal year 2016 work. (Doc. 70-11.) Ms. King assigned herself an overall rating of "3- Meets Expectations." (*Id.* at 6.) Mr. Thomas assigned her an overall rating of "2- Inconsistent." (*Id.*) In his year-end comments he wrote, among other things: "Needs to take a stronger role in delivering results and improving communication." (*Id.*)

**Further Complaints; Additional Written Warning (March 2017)**

On March 19, 2017, Aramark Director of Business Development Alexis Duckett told Ms. King that she had observed Mr. Thomas speaking to Ms. King in a rude and condescending way and it did not seem to her that Ms. King and Mr. Thomas were "on the same team." (Doc. 69-2 ¶ 67.) Ms. King complained to Ms. Duckett that Mr. Thomas "did not support me and undermined my management and career" and that Mr. Thomas "discriminated, harassed, and retaliated against me and targeted me relative to my performance even though there were other male employees with worse performance." (*Id.*) Ms. Duckett advised Ms. King that if she needed anything she could come to her. (*Id.*)

Ms. King states that she advised Mr. DiCicco on or about March 21, 2017 that Mr. Thomas's "unfair targeting, discrimination, harassment, and retaliation of/against me had increased since he and I last spoke of it in May 2016." (Doc. 69-2 ¶ 68.) According to Ms. King:

> I advised that Thomas was excluding my participation in team and client meetings, focusing on finding ways to identify and raise any perceived weakness, replacing many of my duties by working with the Unit Controller instead, and speaking to me in a rude, condescending, dismissive, and hostile tone. I advised Carmine

DiCicco that Thomas was discriminating, harassing, and retaliating against me, and setting me up for termination. I also complained that Adams, Regional Director of Human Resources, knew about the situation but had failed to stop such conduct.

(*Id.*)

At a meeting with Mr. Thomas and Ms. Adams on March 27, 2017, Ms. King received a

"Final Written Documentation" signed by Mr. Thomas on that date. (Doc. 65-11.) The "Brief

Summary" section of that form states:

> Did not demonstrate Aramark Leadership Competency of Thinking Strategically by understanding long-term business and financial implications of day-to-day decisions, did not demonstrate an understanding of issues relevant to the broad organization.
>
> You communicated with USFoods about Market Basket 2.15.17 after being directed not to on 1.19.17 and 2.15.17.
>
> Your actions alerted a competitor and added risk to Aramark's ability to migrate purchasing and an estimated $400k+ in annual income and cost reductions for our client. I had instructed you to collect information with your team based on current spending levels and prices with your team.

(*Id.* at 1.) The "Action to be Taken" section of the form states: "Follow directions, review

decisions with financial impact greater than $1,000 with District Manager in advance. Develop

awareness of how financial decisions impact Client and Aramark." (*Id.*)

Ms. King stated at the March 27, 2017 meeting that the allegations were not true and that

the written warning was retaliation for her prior complaints to Aramark leaders about Mr.

Thomas's conduct. (Doc. 65-45 at 157.) She continues to assert that there was no basis for the

discipline and that she complied with Aramark policy and procedure. (Doc. 69-2 ¶¶ 69, 70.)

### Ms. King Calls the Aramark Employee Hotline (March 2017)

After the meeting, Ms. King complained to Mr. DiCicco about receiving the written

warning. Mr. DiCicco advised Ms. King to call the Aramark Employee Hotline. (*Id.* ¶ 72.) Ms.

King called the Aramark Employee Hotline on March 27, 2017.  The Aramark Employee Hotline call report summary states:

> Ongoing since February 2015, Griff Thomas has been bullying Kristen and he has been, "A nightmare to work for."  Griff violated Kristen's FMLA benefits by forcing Kristen to work while she was out of work on FMLA grieving the loss of her son.
>
> Griff does not offer Kristen any training, coaching, or support.  Kristen feels that Griff intentionally sets her up for failure.
>
> There have been numerous hotline calls made about Griff and the hotline calls are not being taken seriously.  Kristen wants a full investigation launched against Griff.

(Doc. 65-12 at 1.)  A "Supplemental Information" section of the report states that "Griff does not treat Kristen the same way that he treats the other employees."  (*Id.*)  Ms. King testified that she also complained during the hotline call that she felt that Mr. Thomas was discriminating against her, treating her differently than male managers, and continued to violate the FMLA.  (Doc. 69-2 ¶ 74; Doc. 65-45 at 193.)

Aramark Employee Relations Representative Evelyn Miller was in charge of the resulting Hotline investigation.  (Doc. 69-2 ¶ 74.)  Ms. King spoke with Evelyn Miller on March 30, 2017 and provided the names of witnesses and further complained that Mr. Thomas was discriminating and retaliating against her and creating a hostile work environment.  (*Id.*)  On or about April 27, Ms. Miller told Ms. King that the Hotline investigation determined that her complaints were unfounded.  (*Id.* ¶ 76.)  According to Ms. King, the Hotline investigation arrived at that conclusion without ever seeking a written statement from Ms. King and without contacting any of the witnesses whose names she had supplied.  (*Id.* ¶¶ 74, 76.)

### Changes to Mileage and Work-From-Home Arrangements (April 2017)

Meanwhile on April 4, 2017—while the Hotline investigation was still open—Ms. King emailed Ms. Adams, cc'ing Mr. Thomas, requesting an "overview of what you are changing in

regards to relocation, mileage, home office, etc." (Doc. 65-40 at 1–2.) On April 6, 2017, Ms.

Adams replied—cc'ing Mr. Thomas:

> As you know, you were offered relocation in October of 2015 to move from Stanley, VA (where you still currently live), to Winchester, because that is the largest hospital of the Valley Health System and where, as was discussed back in October 2015, the GM position is based. Because you were out on FMLA for three months, between December 2015-March 2016, we extended the relocation timeframe in good faith until February 2017. In exchange for your commitment to move to Winchester, you were given a lump sum payment of $6,000. Subsequently, after signing the relocation agreement (attached for your reference), you stated to Griff that you [would] be neither moving nor paying back the relocation money.
>
> Despite that your refusal to relocate and/or repay the relocation money constitutes [a] breach of the agreement, we nonetheless informed you on March 27, 2017 that we are not asking for you to repay the funds.
>
> Since, however, you will not be moving to Winchester, where your job is based, the following arrangement, which is aligned with our Global T&E policy, will apply going forward:
>
> - The mileage from your house to Winchester will not be expensed.
> - The miles from your home to other worksites will need to be adjusted for the miles from Winchester, as Winchester is your position's home base.
>
> During our call on March 27th, I reinforced that, as a GM, you do not have a home office and that you are expected to be in the locations. Since Winchester is the largest location, that is your home site and you need to be working from that location and have an office there. This was all originally explained to you back in October when you accepted the relocation package. We can review this email if needed via phone however this is effective as of 3.27.17.

(*Id.* at 1.) Ms. King replied that afternoon stating, among other things, that "[t]he relocation was based on acceptance of a dual role GM position which I no longer hold." (*Id.* at 6.) She further stated that working from her office at home was never an issue in the past five years she worked at the VHS account, and inquired, "Why would this all of a sudden change?" (*Id.*) Ms. Adams responded stating, among other things: "As part of the multi-site GM position this role does not have home office days" and that she could not speak to the past "but the expectation is that there are no more home office days moving forward." (*Id.* at 5.)

Ms. King believed that the changes to mileage and her work-from-home arrangements were in retaliation for her Hotline complaint and other complaints. (Doc. 69-2 ¶ 75.) She contacted Aramark Director of Employee Relations Colleen O'Donnell and asserted:

> Thomas had been discriminating against me by issuing unfair and untrue discipline, not adhering to Aramark's progressive discipline policy, making untrue statements about my job performance, and setting me up for termination as a result of discrimination, harassment, and retaliation for my prior complaints about his discrimination, harassment, and retaliation.

(*Id.*) She further complained that she needed help and that, to date, only Mr. DiCicco and Ms. Duckett had taken her complaints seriously. (*Id.*)

### Further Written Warning (May 2017)

Sometime between April 27 and May 9, 2017, Ms. King contacted Ms. Adams "to schedule a meeting to discuss how to successfully continue my employment with Aramark." (Doc. 69-2 ¶ 77.) Ms. King requested that she be placed on a PIP "so that I could know clearly the areas needing improvement and identify specific goals to work toward." (*Id.*) She requested that the meeting be only between Ms. King and Ms. Adams; Ms. Adams agreed and scheduled the meeting for May 9, 2017. (*Id.*) However, on or about May 7, 2017, Ms. King received a meeting request—entitled "way forward"—from Mr. Thomas that scheduled a meeting with him, Ms. Adams, and Ms. King on May 9, 2017. (*Id.*)

At the May 9, 2017 meeting, Ms. King received another "Final Written Documentation," signed by Mr. Thomas. (Doc. 65-13.) The "Brief Summary" stated:

> The purpose of this document/discussion is to highlight essential elements of job performance and leadership competencies required to successfully and fully execute the role of General Manager and gaps in reaching them

> 1. During multiple conversations with multiple participants when discussing cou[n]selings Kristen has demonstrated unprofessional behavior, using loud voice, interrupting, not listening, inappropriate comments.

2. Kristen was instructed on Feb 1 to work with HR to develop a PIP or Warning for Penny Curry.  After 6 requests a document was provided on 4/21 without signatures, not using the standard Aramark form and without HR review.

3. In April, Kristen mentioned she was presenting a catering growth plan to our client the next day.  I reminded her the Final Written Warning requires review and approval for $1k decisions with me in advance.  I intervened and reviewed the document which was incomplete and provided sales growth but no associated costs.  The total scope was $450k.

4. Sent WMC CBR feedback to Kristen 4/20 asking for edit and review with me, spoke with J Shingleton week of 5/5, he was unaware of edits and had given unedited document to client.  I had not received a response from Kristen.

5. Kristen met with a HCT employee and asked him about the leadership of his Aramark GM, DeWayne Jackson.  DeWayne notified me and was upset that Kristen had not approached him and had asked on[e] of his employees to meet to discuss his performance.  This is poor judgment and undermines another Aramark leader.

(*Id.* at 1.)

According to Ms. King, each of the five items on the May 9, 2017 warning "were either untrue or did not violate Aramark policy and procedure." (Doc. 69-2 ¶ 78; *see also id.* ¶¶ 79–83.)  She asserts that she was not allowed to respond to the allegations at the May 9 meeting, that she was not allowed to submit documentation to dispute the allegations, and that the writeup was "not up for negotiation." (*Id.* ¶ 84.)  Although Ms. Adams did most of the talking at the May 9 meeting, Ms. King asked to be put on a PIP "because I did not know what Thomas was expecting from me." (*Id.* ¶ 78.)  Ms. Adams denied that request on the basis that it was unnecessary, that Ms. King was not a candidate for a PIP, and that she and Mr. Thomas had determined Ms. King would not benefit from it.  (*Id.*)

**Complaint to Ms. Barrett: "Setting Me Up for Termination" (July 2017)**

In or about July 2017, Ms. King contacted Kelly Barrett, who had replaced Ms. Adams as Regional Director of HR.  (*Id.* ¶ 86.)  Ms. King conveyed her complaints about Mr. Thomas's

alleged discrimination, harassment, and retaliation, and about Mr. Thomas's alleged failure to provide support, excluding Ms. King from meetings, and "setting me up for termination." (*Id.*)

On July 24, 2017, Mr. Thomas emailed Ms. Adams—cc'ing Tracy Miller—asking that Ms. Adams "[p]lease review the attached termination form with supporting documents." (Doc. 70-23 at 2.) The attached unsigned "Employee Action/Disciplinary Notice Form" identified Ms. King as the subject and listed the category of notice as "Termination." (*Id.* at 4.) Ms. Adams forwarded the email and attachments to Ms. Barrett on July 25, 2017. (*Id.* at 2.) On July 26, 2017, at Ms. Adams's request, Mr. Thomas forwarded the email and attachments to Ms. O'Donnell. (Doc. 70-24 at 2.) Ms. O'Donnell replied on July 27, 2017 stating: "Thanks, Griff. An important factor in determining appropriate next steps is looking at how are these scores as compared to each of her peers? We need to look not only at her scores, but how she stacks up to peers. We can discuss tomorrow." (*Id.*)

According to Ms. King, in July or August 2017 Mr. Thomas had frequent closed-door meetings with Mr. Williford concerning the Valley Health Proposal that Ms. King had been working on for more than a year. (Doc. 69-2 ¶ 89.) Ms. King asked to be included in the meetings. (*Id.*) Mr. Thomas denied that request stating, "Jacob and I got this." (*Id.*)

**"Treat Yourself" Program (Summer 2017)**

Also in summer 2017, Ms. King was working at Mr. Thomas's direction to implement the "Treat Yourself" program throughout Mr. Thomas's district, including at VHS facilities for which Ms. King was responsible. (*Id.* ¶ 87.) According to Ms. King, she held weekly calls for all of Mr. Thomas's direct reports to ensure everyone was in compliance with the multi-step implementation process. (*Id.*) Ms. King testified that Mr. DeGori and Mr. Harriman did not implement the Treat Yourself Program at their facilities and that when she questioned Mr.

Thomas about that he advised her that it was "fine that they're not doing it." (Doc. 65-45 at 123.) Aramark notes that Mr. DeGori testified that he did implement the Treat Yourself program (Doc. 65-52 at 7) and Mr. Harriman testified that he implemented parts of the Treat Yourself program (Doc. 65-53 at 12–13).

**Performance Improvement Plan (August 2017)**

At an August 2017 meeting with Mr. Thomas and with Ms. Barrett present by telephone, Mr. Thomas gave Ms. King a 90-day PIP dated August 11, 2017. (Doc. 65-14.) The PIP listed three "areas of deficient performance": (1) "Patient Satisfaction is below incentive targets"; (2) Overall Retail Satisfaction YTD is below 60% VOC target"; and (3) "Employee Satisfaction is below target." (*Id.* at 3.) The PIP listed the following resources as available to assist Ms. King in completing the improvement plan: "Operating Template, Griff, Kelly, peer managers." (*Id.* at 4.)

Ms. King asserts that the three areas listed in the PIP "were not addressed in any of my prior discipline by Thomas." (Doc. 69-2 ¶ 92.) She states that she asked questions about the PIP at the August 2017 meeting. She asked "why it took so long for the PIP because I had been asking for a PIP . . . since my First Written Documentation." (*Id.*) She also asked "why the PIP did not have specific targets, specific locations or improvement goals." (*Id.*) Ms. King further states that Mr. Thomas failed to meet with her weekly or biweekly to discuss her progress on the PIP, which she states was required under Aramark policy. (*Id.* ¶ 94.)

**Travel with Brittany Cubbage (August 2017)**

Ms. King's car broke down in or around August 2017. Mr. Thomas had told Ms. King that she needed to be at WMC on August 31, 2017.[3] Ms. King asked Mr. Thomas if she could get reimbursed for a rental car and Mr. Thomas told her "no." Ms. King's home in Stanley was approximately one mile from her subordinate Brittany Cubbage, who was Aramark Director of Food at Page Memorial Hospital. (*See* Doc. 69-2 ¶ 97.) Ms. King states that she rode to and from WMC with Ms. Cubbage on August 30, 2017 because they were both required to attend a meeting there on that date. (*Id.*) Ms. Cubbage was approved for a $48.36 travel reimbursement for August 30. (Doc. 70-27.)

According to Ms. King, she also requested that Ms. Cubbage report to WMC on August 31, 2017 because they were both already scheduled to work together on that date. (Doc. 69-2 ¶¶ 96, 98, 99.) Ms. King rode to WMC with Ms. Cubbage on August 31, 2017. (*Id.* ¶ 98.) Ms. King states that Ms. Cubbage then left WMC because her dog had been bitten and she needed to bring him to the veterinarian. (*Id.* ¶ 99.) Ms. King rode home with her fiancé after work. (*Id.*) Ms. King approved a $56.68 travel reimbursement to Ms. Cubbage for August 31. (Doc. 65-16.) The "comment" section of the expense report for that reimbursement states: "Left home for Krist[e]n and dropped off and then went to work at PMH." (*Id.* at 1.)

On Sunday, September 17, 2017, Ms. King emailed Mr. Thomas requesting that her scheduled PIP meeting be rescheduled for Wednesday September 20 or Friday September 22. (Doc. 65-36 at 2.) Mr. Thomas replied that evening stating that "the PIP review is not something

---

[3] According to Ms. King, on that date Aramark was making the final presentation to VHS on the multimillion-dollar Valley Health Proposal that Ms. King had been working on for more than a year. (*See* Doc. 69-2 ¶ 96.)

we can reschedule" and offering to meet her on Monday morning at Warren Memorial Hospital

("WMH"). (*Id.*) On Monday at 6:21 a.m. Ms. King emailed Mr. Thomas stating:

> I am seeing your response now and did not think that it would be an issue to meet
> a different day this week. Especially because you stated that you could not meet at
> WMH when we scheduled this last Monday.
>
> Therefore I did not finish gathering all the needed items for review. I will not be
> able to show all that I've done which concerns me.

(Doc. 65-36 at 1.) Mr. Thomas replied at 7:34 a.m.: "Meeting at Warren is fine. I will see you

at 9. Let's go over what you've got." (*Id.*)

According to Ms. King, when she arrived at the putative PIP meeting on Monday

September 18, 2017, Mr. Thomas immediately called Ms. Barrett on the telephone. (Doc. 69-2

¶ 100.) Ms. King states that she was then advised "that I was under investigation for violating

the Business Code of Conduct because of my decision to authorize travel reimbursement for

Brittany Cubbage." (*Id.*) Ms. King further states that her PIP was not discussed at any point

during the meeting. (*Id.*)

Ms. King did not come to work on September 19 or September 20, 2017, and she did not

have any in-person interactions or phone conversations with Mr. Thomas on those dates. She

emailed Mr. Thomas advising that she was out on September 19 for "FML." (Doc. 70-30 at 2.)

She testified at her deposition: "[A]fter that incident where they had told me about this code of

conduct violation . . . . I had a sinking feeling and I was crying and extremely upset and

emotional and I went to my doctor [on September 19, 2017] who pulled me out of work."

(Doc. 65-45 at 186.)

**Second Hotline Complaint (September 19, 2017)**

Also on September 19, 2017, Ms. King called the Aramark Employee Hotline. (Doc. 65-

17.) The call report summary includes notations about the May 9, 2017 Second Final Written

Warning, the August 2017 PIP, and the September 18, 2017 meeting regarding the charged business policy violation related to Ms. Cubbage's travel. A section entitled "Involved Parties" indicates that Kelly Barrett investigated Ms. King's report. (*Id.*) A "Supplemental Information" section summarizes: "Griff mistreats Kristen and picks on her. Kristen has filed reports against Griff but nothing has been done. The harassment continues with Griff since no action has been taken against him." (*Id.* at 2.)

### Termination (September 21, 2017)

At 12:21 p.m. on September 20, 2017, Mr. Thomas emailed Ms. Barrett stating that he was "prepared to tell Bob [Amos] we are terminating Kristen for a BCP [business conduct policy] violation." (Doc. 70-30 at 2.) Later that afternoon, Ms. King sent an email to Mr. Amos and others, and cc'd Mr. Thomas, advising that she was "currently out of work on FML." (Doc. 70-35 at 2; *see also* Doc. 70-34 at 2.)

On September 21, 2017, Mr. Thomas and Ms. Barrett called Ms. King at her rental home in Stanley and told her that her employment was terminated. Ms. Barrett also signed a letter to Ms. King on that date confirming the termination. (Doc. 65-18.)

### Events After Termination; EEOC Complaint

A notation regarding Ms. King's September 19, 2017 report to the Aramark Employee Hotline states that, as of November 13, 2017, "an investigation was conducted and appropriate action has been taken. This call is closed." (Doc. 65-17 at 3.) Ms. King states that no one interviewed her as part of the purported investigation. (Doc. 69-2 ¶ 102.)

Mara Rakowski assumed the position of Aramark general manager for VHS around December 2017. (*See* Doc. 69-8 at 17–18.) Since Ms. King's Aramark employment ended, she

has not held any job and her only sources of income were unemployment compensation, military benefits, and support from her fiancé.

On July 17, 2018, Ms. King signed a Charge of Discrimination to be submitted to the Equal Employment Opportunity Commission ("EEOC"). (Doc. 65-19.)  The charge asserted claims of gender-based hostile work environment harassment, gender-based discriminatory discharge, and retaliation under Title VII.  Ms. King's attorney signed a cover letter for transmittal of the Charge of Discrimination to the EEOC; the letter is dated July 17, 2018 and states "via hand delivery." (Doc. 70-38.)  The EEOC stamped the charge as "received" on July 18, 2018. (Doc. 65-19 at 1.)  On October 17, 2018, the EEOC issued a Dismissal and Notice of Right to Sue. (Doc. 65-56.)  Ms. King filed her complaint in this court on January 14, 2019. (Doc. 1.)

## Analysis

### I.   Rule 56 Standard

"The summary judgment standards are well established." *Lewis v. Siwicki*, 944 F.3d 427, 431 (2d Cir. 2019).  Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019).  The role of the trial judge at the summary judgment stage is not to resolve issues of material fact, but rather to determine whether such issues exist to be decided at trial. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  This standard applies

"whether summary judgment is granted on the merits or on an affirmative defense such as the statute of limitations." *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The court is mindful that the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Still, "summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004).

## II.    Hostile Work Environment (Count 5)

The court begins with the HWE claim—Count 5—because Aramark's summary judgment motion raises a time-bar argument unique to that claim.

Previously in this case, in a Rule 12(b) motion, Aramark attacked Ms. King's HWE claim but not on timeliness grounds. (*See* Doc. 5-1.) Aramark's subsequent Answer raised the statute of limitations as a defense. (Doc. 17 at 47.) Aramark has the burden of proving its limitations defense. *See Renaldi v. Mfrs. & Traders Tr. Co.*, 954 F. Supp. 614, 615 (W.D.N.Y. 1997) ("The burden of establishing an affirmative defense based on a statute of limitations is on the party asserting the defense."); *cf. Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) ("[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense.").

### A.    Time Bar and the Continuing Violation Doctrine

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015)

(quoting 42 U.S.C. § 2000e-5(e)(1)).  "[T]he word 'practice' in this context refers to a discrete

act or single occurrence" and "a discrete retaliatory or discriminatory act 'occurred' on the day

that it 'happened.'"  *Id.* at 79 (cleaned up).  "Consequently, 'discrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges.'"  *Id.*

(quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

> At the same time, however, identifiable discrete actions are not time-barred simply
> because they occurred as part of an ongoing pattern of discrimination or retaliation
> that began outside the statutory period: "Discrete acts such as termination, failure
> to promote, denial of transfer, or refusal to hire are easy to identify. Each incident
> of discrimination and each retaliatory adverse employment decision constitutes a
> separate actionable 'unlawful employment practice.'"

*Id.* (quoting *Morgan*, 536 U.S. at 114).  "Accordingly, claims tied to discrete acts in an ongoing

adverse employment action that occurred within the statute of limitations period are not time-

barred."  *Id.*

Because HWE claims are "different in kind from discrete acts," courts consider "the

entire scope of a hostile work environment claim, including behavior alleged outside the

statutory period . . . so long as an act contributing to that hostile environment takes place within

the statutory period" and the acts complained of "are part of the same actionable hostile work

environment practice."  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75–76 (2d Cir. 2010)

(quoting *Morgan*, 536 U.S. at 105, 120).  Aramark agrees that this is the law, citing *Garcia v.

Yonkers Board of Education*, 188 F. Supp. 3d 353 (S.D.N.Y. 2016).  The court in that case noted

that HWE claims "may be based on events outside the statute of limitations period as long as

(1) the acts occurring before the cutoff constitute part of the same actionable hostile work

environment practice, and (2) at least one act contributing to the claim occurs within the filing

period."  *Id.* at 359 (cleaned up).

Aramark argues that the latter requirement is absent here, asserting that the 300-day statutory period ran from September 21, 2017 to July 18, 2018, and that the only relevant event that occurred during that period was that Ms. King was advised that she was terminated on September 21, 2017. (Doc. 63 at 12.) Ms. King contends that the 300-day statutory period ran from September 20, 2017 to July 17, 2018, and that her termination "and the alleged sham investigation relating to it were withi[n] the statutory filing period" such that "all the prior acts in furtherance of that policy [of discrimination] warrant consideration of this Court." (Doc. 71-1 at 9.) In reply, Aramark insists that "no incident of harassment occurred within the statutory period." (Doc. 73 at 5.)

Counsel for Ms. King represented at the February 16, 2022 hearing that the Charge of Discrimination was hand-delivered to the EEOC on July 17, 2018. The court grants Plaintiff the inference that the July 17, 2018 cover letter accompanying the EEOC Charge of Discrimination marked "via hand delivery" indicates that the Charge of Discrimination was filed on that date. The court therefore concludes that the 300-day statutory period ran from September 20, 2017 to July 17, 2018.

The relevant events that occurred within that period are (1) Mr. Thomas's September 20, 2017 email to Ms. Barrett stating that he was prepared to tell Mr. Amos that Aramark is terminating Ms. King; (2) the September 21, 2017 phone call in which Ms. King was advised that her employment was terminated; and (3) the response to the call Ms. King placed to the Aramark Employee Hotline on September 19, 2017. The court considers these events in turn.

### 1.    The September 20 Email

The court concludes that Mr. Thomas's September 20, 2017 email to Ms. Barrett (Doc. 70-30) is not sufficiently "tied" or "contributing" to the HWE claim to make that claim

timely.  The court acknowledges that the email refers to terminating Ms. King for a business

conduct policy violation, and that the charge against her for the alleged violation (concerning the

travel reimbursement for Ms. Cubbage) was, in Ms. King's view, part of hostile work

environment.  But the email was not sent to Ms. King and nothing about an alleged improper

travel reimbursement is, on its face, sex- or gender-based.

The court recognizes that "when the same individuals engage in some harassment that is

explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile

work environment claim."  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020); *see*

*also Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010) ("A plaintiff may rely

on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact,

sex-based.").  However, Mr. Thomas's September 20, 2017 email to Ms. Barrett cannot qualify

as harassment that is part of the entire alleged course of conduct underlying Ms. King's HWE

claim.  Mr. Thomas did not send the email to Ms. King.  And the content of the email suggesting

that Mr. Thomas was prepared to tell a client that Aramark was terminating Ms. King for a BCP

violation was not abusive, especially since Ms. King was in fact terminated the next day.

### 2.    The September 21 Termination

The court agrees with Aramark that the termination itself was a "discrete" act that cannot

be part of the alleged hostile work environment.  *See Brown v. N.Y.C. Dep't of Educ.*,

513 F. App'x 89, 91 (2d Cir. 2013) (summary order) (letter notifying plaintiff of her termination

could not save her HWE claim "because her termination was a separate and discrete act");

*Garcia*, 188 F. Supp. 3d at 359 (transfer and eventual termination were "discrete acts of

retaliation, not a continuing violation of discrimination").

### 3.      The Response to the September 19 Hotline Call

Ms. King argues that the response to her September 19, 2017 call to the Aramark

Employee Hotline reveals that the investigation was a "sham." (Doc. 71-1 at 9.)  She faults the

investigation for failing to interview her.  (Doc. 69-2 ¶ 102.)  But for purposes of the present

inquiry, the court focuses on whether the "same individuals" engaged in any sex-neutral abuse

within the 300-day statutory period.  *Rasmy*, 952 F.3d at 388.  Here, there is no evidence that Mr.

Thomas directed the investigation procedures.  Thus, even if the investigation was flawed, it

could not constitute part of the same actionable HWE practice.

### B.      Remaining Issues

For the reasons stated above, the court concludes that Ms. King's HWE claim is time-

barred.  It is therefore unnecessary to address here Aramark's alternative arguments for summary

judgment on that claim.  (*See* Doc. 63 at 12–19.)

## III.    Sex Discrimination (Count 1)

"In 1973, the Supreme Court adopted a three-stage, burden-shifting framework for

analyzing employment discrimination cases under Title VII where a plaintiff alleges disparate

treatment but does not have direct evidence of discrimination." *Vega*, 801 F.3d at 82–83 (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under the *McDonnell Douglas* test,

"a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a

member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse

employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Id.*

at 83 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  If the plaintiff

establishes her prima facie case, "[t]he burden then shifts to the employer to 'articulate some

legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell*

*Douglas*, 411 U.S. at 802).  Finally, "[i]f the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

Aramark argues that Ms. King cannot establish her prima facie discrimination case and that she cannot prove pretext.  (Doc. 63 at 20, 27.)  Ms. King disagrees (Doc. 71-1 at 20) but she first argues that the *McDonnell Douglas* test is inapplicable because she has direct evidence of discrimination (*id.* at 18).  The court begins with the question of whether there is such direct evidence.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Villella v. City of Lockport*, No. 17-CV-898S, 2021 WL 3726103, at *6 (W.D.N.Y. Aug. 23, 2021) ("[A] Plaintiff establishes Title VII discrimination either by direct evidence . . . or by the burden shifting analysis from *McDonnell Douglas Corp. v. Green* . . . .").

## A.    No Direct Evidence of Discrimination

"For direct evidence of discrimination, Plaintiff must meet her 'initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the [Civil Rights] Act [of 1964].'" *Villella*, 2021 WL 3726103, at *6 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)); *McCall v. Genpak, LLC*, No. 13-CV-1947 (KMK), 2015 WL 5730352, at *11 (S.D.N.Y. Sept. 30, 2015) (direct evidence "is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII" (quoting *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432–33 (7th Cir. 2005))).  "Plaintiff bears the burden of demonstrating that sex was a motivating factor in her adverse employment action . . . ." *Villella*, 2021 WL 3726103, at *6.  Ms. King argues that Mr. Thomas's comments regarding Ms. King's

lunch tray and that the VHS CEO would like to see her at the gym constitute direct evidence that she was terminated due to sex discrimination. (Doc. 71-1 at 18.)[4]

The court concludes that Mr. Thomas's comments about the lunch tray and about working out are not direct evidence that Ms. King's termination was based on sex discrimination. Examining Ms. King's allegations at the Rule 12(b)(6) stage of this case, the court held that Mr. Thomas's alleged comments about Ms. King's weight were by themselves insufficient to give rise to a plausible inference of gender discrimination. (Doc. 16 at 37–38.) The evidence on summary judgment about these comments is essentially the same. There is no evidence that any of this conduct included any gender-based language.

Ms. King states in her declaration that Mr. Thomas did not make similar comments to Mr. Williford, Mr. Harriman, or Mr. DeGori, all of whom she says were also heavier in the stomach area. (Doc. 69-2 ¶ 38.) Aramark contends that Ms. King's statements on that point are not supported by personal knowledge because Ms. King was not present for most interactions between Mr. Thomas and Mr. Williford, Mr. Harriman, and Mr. DeGori. (Doc. 73 at 7.) Aramark also notes that Mr. Williford, Mr. Harriman, and Mr. DeGori were not asked at their depositions if Mr. Thomas ever made similar comments to them or looked at their midsections. (*Id.*) The court agrees with Aramark on these points.

Ms. King seeks to invoke a "stereotyping" theory under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). (*See* Doc. 71-1 at 10.) In *Price Waterhouse*, the plaintiff had been called,

---

[4] Ms. King relies on a single instance where Mr. Thomas made a joke about women in support of her HWE claim. (*See* Doc. 71-1 at 14.) To the extent that the joke might be relevant to the sex discrimination claim, the court agrees with Aramark that it was no more than a "stray" remark. *See Naumovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019) ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998))).

among other things, "macho"; was told she needed "a course at charm school"; and—the "*coup de grace*"—was instructed to walk, talk, and dress more "femininely" if she wanted to make partner at the accounting firm where she worked.  490 U.S. at 235 (plurality opinion).  Six justices agreed that "such comments bespoke gender discrimination."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) (citing *Price Waterhouse* plurality and concurring opinions).  "It is the law, then, that 'stereotyped remarks can certainly be evidence that gender played a part' in an adverse employment decision."  *Id.*

To answer what constitutes a "gender-based stereotype," courts must examine "the particular context in which it arises, and without undue formalization."  *Id.* at 120.  Courts have held that certain comments reflect gender-based stereotyping and that such comments "constitute evidence that a jury could use to find the presence of discrimination."  *Id.* (citing cases).  But Mr. Thomas's comments about food, weight, and working out are different than the stereotyped and discriminatory remarks in *Price Waterhouse*.  Ms. King seeks to add a gendered gloss to the comments—asserting that they demonstrate that Mr. Thomas disapproved of Ms. King "for not fitting his stereotypical image of a businesswoman."  (Doc. 71-1 at 10.)  But the court declines to join Ms. King in such speculation.  *See Dawson v. Bumble & Bumble*, 246 F. Supp. 2d 301, 320 (S.D.N.Y. 2003) ("[A]s to both the costume and the haircut comments, the gender element here is injected by Dawson herself deductively, by conclusions she draws from those remarks and the inferences of discrimination she asks the Court to make and endorse as well.  The Court cannot accept Dawson's invitation to speculate.").

Similar comments about body weight have been held insufficient to constitute direct evidence or even raise an inference of gender animus.  *See, e.g., Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 331–32 (6th Cir. 2003) (female certified public

accountant failed to adduce direct evidence of gender discrimination against male supervisor who made disparaging remarks about former female employees who were overweight); *Czerwinski v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 394 F. Supp. 3d 210, 220–21 (N.D.N.Y. 2019) (statements about female nurse administrator's weight and references to her working out that lacked any gender-based language were insufficient by themselves to raise a plausible inference that male supervisor's conduct was motivated by gender animus); *Aiello v. Stamford Hosp.*, No. 3:09cv1161(VLB), 2011 WL 3439459, at *14 (D. Conn. Aug. 8, 2011) (male director of radiology's statements to male subordinate radiology technologist regarding his weight were "not related to his gender and therefore cannot be used to support an inference of gender discrimination"); *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234 (KMK), 2010 WL 3932354, at *13–14 (S.D.N.Y. Sept. 29, 2010) (male supervisor's calling female plaintiff's female co-workers "fat ass" was "certainly rude" but was gender-neutral and did not indicate gender animus).

The decision in *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001), does not require a contrary conclusion.  In that case, pilots hired by Delta Airlines, Inc. under an asset purchase agreement between Delta and the pilots' prior employer, Pan American World Airways, Inc., sued Delta alleging age discrimination.  Analyzing those claims on summary judgment under the *McDonnell Douglas* framework, the Second Circuit noted that the Delta manager assigned to investigate and evaluate the Pan Am acquisition "made numerous comments about the age of the Pan Am pilot force, referring to them as 'contaminated' and 'Bad Apples.'"  *Id.* at 468.  The court concluded that when those comments were viewed "against the background of Delta's all-consuming interest in the age and projected retirement rates of the Pan

Am pilots, they inescapably lead to the conclusion that Delta's actions *may* indeed have been motivated by age-based animus." *Id.*[5]

Since the *Abdu-Brisson* court was applying the *McDonnell Douglas* framework, that case did not involve any direct evidence of discrimination. *See Trans World Airlines*, 469 U.S. at 121 ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). The court nevertheless notes that the fourth element of the *McDonnell Douglas* framework requires consideration of whether "the circumstances give rise to an inference of discrimination," *Vega*, 801 F.3d at 83, and will consider Mr. Thomas's comments about weight together with the other circumstances as necessary below.

**B.    *McDonnell Douglas***

Having concluded that Ms. King has not met her burden to show direct evidence of sexual discrimination, the court turns to the burden-shifting *McDonnell Douglas* framework. Aramark does not challenge that Ms. King is a member of a protected class and that she suffered an adverse employment action. Rather, Aramark contends that Ms. King cannot establish her prima facie case of discrimination (Doc. 63 at 20) and that she cannot establish pretext (*id.* at 27). Ms. King disagrees on both points. (Doc. 71-1 at 21–25.) The court is mindful that Ms. King's burden to prove her prima facie case under *McDonnell Douglas* is "minimal." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). At the same time, this burden "is not totally illusory; the plaintiff must point to

---

[5] Although the court concluded that the pilots had established their prima facie case, the court ultimately affirmed the grant of summary judgment to Delta because the plaintiffs "failed to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false." *Id.* at 470.

*some* circumstance that permits an inference of discrimination." *Phillips v. Chertoff*, No. 03 Civ. 4266(GEL), 2005 WL 3466033, at *5 (S.D.N.Y. Dec. 16, 2005).

### 1.     Prima Facie Case—Qualification for Position

Aramark argues that Ms. King has failed to demonstrate her qualification for the position she held at Aramark.  The Second Circuit has held that "being 'qualified' refers to the criteria the employer has specified for the position." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997).  In cases of alleged discriminatory discharge, the Second Circuit has "occasionally analyzed this element in terms of whether plaintiff shows 'satisfactory job performance' at the time of the discharge." *Id.* (citing cases).  "Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Id.*

Relevant to the criteria that Aramark specified for the position that Ms. King held, both parties have submitted copies of an Aramark job description document for "General Manager – Multi Service" dated March 5, 2012.  (Docs. 65-2, 69-16.)  That document includes a position summary and a list of essential tasks.  It also specifies required education and experience, required abilities to use certain equipment, travel requirements, plus lifting requirements and physical demands.  But Aramark does not contend that Ms. King lacked any of the specified education or experience or the abilities to use equipment, travel, or meet physical demands.

Instead, Aramark asserts that Ms. King's performance was unsatisfactory because at the time of her termination she had:

- Received three written warnings and a PIP;

- Engaged in conduct during disciplinary meetings that was perceived as disrespectful;

- Directed Ms. Cubbage to submit for mileage reimbursement and approved the reimbursement in violation of Aramark policy; and

- Failed to bring requested documentation to her September 18, 2017 PIP meeting.

(Doc. 63 at 21.) Ms. King disputes or offers explanations for each of these points, including all of the issues cited in the written warnings. (*See* Doc. 69-2 ¶¶ 50–69 (regarding 11 points in the August 2016 written warning); ¶ 70 (regarding March 2017 written warning); ¶¶ 79–83 (regarding the five points in the May 2017 written warning, including point about alleged unprofessional or disrespectful behavior at disciplinary meetings); ¶¶ 96–100 (regarding alleged travel policy violation); ¶ 100 (regarding documents requested for September 18, 2017 meeting).)

Many of the issues that Aramark has raised regarding the "qualification" element of the prima facie case can be classified as alleged misconduct. The Second Circuit has recognized that "there is a distinction between unsatisfactory job performance and misconduct" and has explained that the "qualification" inquiry "should focus on the plaintiff's competence and whether she possesses the basic skills necessary for performance of the job." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (cleaned up). Still, misconduct can potentially preclude a finding that a plaintiff is "qualified," depending "both on the *kind* of misconduct, i.e., whether it speaks to the plaintiff's competence and job skills, and the *seriousness* of the misconduct, i.e., whether 'in the aggregate' plaintiff still performed [her] job satisfactorily." *Id.*[6]

---

[6] *Jacob v. NYSARC, Inc.*, No. 13 Civ. 1677(KPF), 2014 WL 6750654 (S.D.N.Y. Dec. 1, 2014)—cited by Aramark—is an example of a case where misconduct precluded a finding that the plaintiff was qualified for her position. In that case, the plaintiff was employed as a per-diem direct support professional and was disciplined three times for largely undisputed or indisputable misconduct relating to failures to carry out her assigned duties (such as showering a client), completing required paperwork, arriving late, and leaving a residence before her coverage

Here—as in *Ruiz*—"it is inappropriate to evaluate the employee's misconduct in the context of the *prima facie* case." *Ruiz*, 609 F.3d at 493. As the *Ruiz* court observed, "if the employer is applying its criteria for satisfactory job performance in an inconsistent, arbitrary, or discriminatory manner, then there is a question of fact as to whether the criteria reflect the employer's 'honestly held expectations,' . . . or whether the criteria merely provided a pretext for unlawful discrimination." *Id.* (quoting *Thornley*, 104 F.3d at 30). Here, Ms. King has asserted—and complained—that Aramark applied its disciplinary criteria in a discriminatory manner beginning with the 11-point written warning in August 2016. (*See* Doc. 65-45 at 88–89.) Resolution of that factual issue is inappropriate here; Aramark is not entitled to summary judgment on this prong.

### 2. Prima Facie Case—Circumstances of the Termination

Aramark asserts that Ms. King has not shown that her termination occurred under circumstances giving rise to an inference of gender discrimination. (Doc. 63 at 22.) Ms. King disagrees, arguing that "Thomas' comments and conduct, Aramark's failure to follow routine procedures in terminating King and Thomas' disparate treatment between King and her male counterparts establish discriminatory animus towards King." (Doc. 71-1 at 21.) Aramark replies that Ms. King's assertions on these points are conclusory. (Doc. 73 at 10.)

An inference of discrimination can arise from circumstances including, but not limited to: "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's

---

arrived (thereby jeopardizing the welfare of the clients). *Id.* at *9–10. The court concludes that *Jacob* is distinguishable.

discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).  A showing of disparate treatment—that is, a showing that Plaintiff was treated "less favorably than a similarly situated employee outside [her] protected group"—also supports an inference of discrimination for purposes of making out a prima facie case. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  The court considers "the totality of the evidence" in the light most favorable to Ms. King to evaluate whether she has met the requirements of the fourth prong. *Zdunski v. Erie 2-Chautauqua-Cattaraugus Boces*, No. 1:19-cv-940-GWC, 2022 WL 816010, at *7 (W.D.N.Y. Feb. 16, 2022), *appeal docketed*, No. 22-547 (2d Cir. Mar. 16, 2022).

Ms. King relies on three main categories of circumstances to argue that she has proven the fourth element of her prima facie case: (1) Mr. Thomas's remarks and conduct relating to Ms. King's weight; (2) Aramark's alleged deviation from its practice and policy relative to investigations and terminations; and (3) Mr. Thomas's allegedly more favorable treatment of male comparators.  (Doc. 71-1 at 22–25.)  The court begins with those topics.

### a.    Mr. Thomas's Statements and Conduct

Aramark argues that Ms. King has presented no evidence that Mr. Thomas had a gender-based bias against her.  (Doc. 63 at 22.)  Ms. King maintains that Mr. Thomas's "remarks together with his continuous staring at and expressing disgust for her belly because she did not fit his stereotypical image of a businesswoman, establish an inference of discrimination based on her gender."  (Doc. 71-1 at 22.)  Aramark insists that Mr. Thomas made no statements about Ms. King's gender.  (Doc. 73 at 10.)

The record on summary judgment regarding Mr. Thomas's statements and comments does not contain any overt *gender-based* degrading statements or conduct. *See supra*

Section III.A.  Ms. King offers nothing more than her own speculation that Mr. Thomas's remarks and conduct about her weight were motivated by a belief on his part that she did not fit his stereotypical image of a businesswoman.  Still, as noted above, the court considers Mr. Thomas's statements and conduct as part of its review of the totality of the evidence.

In addition to comments about weight, Ms. King asserts that Mr. Thomas "would speak to me in a condescending tone and was very short when he would answer questions."  (Doc. 69-2 ¶ 20.)  She states that she never heard him speak in a condescending tone to any male manager.  (*Id.*)  Ms. King further states that Mr. Thomas would use her performance with Valley Health as a negative example at meetings or on calls, but that she never heard him criticize any male manager during meetings or calls.  (*Id.*)  The court concludes that, even in the light most favorable to Ms. King, these additional facts do not create an inference of gender discrimination. *Cf., e.g., Stewart v. Fashion Inst. of Tech.*, No. 18-cv-12297 (LJL), 2020 WL 6712267, at *9 (S.D.N.Y. Nov. 16, 2020) ("Plaintiff's beliefs, without more, that the harsh tone and manner of the criticism she received was the product of racial bias is insufficient to create an inference of discrimination.").

### b.    Alleged "Sham" Investigation

Ms. King also contends that she can show circumstances giving rise to an inference of gender discrimination because, in her view, Aramark "deviated from its practice and policy relative to investigations and terminations."  (Doc. 71-1 at 22.)  Aramark maintains that Ms. King has no evidence of such deviations and that the cases that Ms. King cites do not hold that such deviations create an inference of gender discrimination.  (Doc. 73 at 11 & n.6.)

Ms. Barrett testified that she investigated the "Brittany Cubbage issue."  (Doc. 65-50 at 11.)  She testified that, according to the investigation:

> Ms. King asked Brittany Cubbage to pick her up from home because her car was broken down, drive her into work that morning, and then there's an expense report showing that she [Ms. Cubbage] drove right back to Page, and she [Ms. King] had previously asked Griff Thomas if she could get a rental car and he told her no.

(Doc. 65-50 at 15.)  According to Ms. Barrett, Ms. Cubbage did not say that she had to be at WMC for work.  (*Id.*)  Ms. Barrett elaborated:

> Brittany and I spoke on the phone verbally, where she shared her feedback on what occurred.  She did not share that there was a meeting [at WMC], she did no[t] share that there was a need to be there, she implied that in the conversation, she said she [Ms. King] is my boss, what was I supposed to do.  When she was asked why she expensed the mileage, she said again, what was I supposed to do.  She did not tell me she needed to be there for work.

(*Id.* at 16.)  Ms. Barrett testified that the version of the events as she understood them did not include any indication that Ms. Cubbage was reporting to WMC for work, worked with Ms. King at WMC that day, or that she only left WMC due to her dog's emergency.  (*Id.* at 24–25.)  Ms. King faults Ms. Barrett for failing to ask questions or take other investigatory steps that would have revealed those details.  (*See generally* Doc. 69 ¶ 114.)

The Second Circuit has declined to hold "that an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action against the accused is, standing alone, sufficient to support an inference of discriminatory intent." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009).  Thus, even if Ms. Barrett's investigation was lacking, that would be by itself insufficient to raise an inference of gender discrimination against Ms. King.  However, "where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent." *Id.*  The court has therefore carefully considered the other evidence that Ms. King has presented.

Before proceeding, however, the court pauses to note that the cases that Ms. King cites do not support her position on this issue.  The plaintiff in *Woodman*—an advertising sales employee for television stations affiliated with Chris-Craft Industries, Inc.—sought to establish an inference of age discrimination on the basis of the transfer of her sales responsibilities to a younger counterpart.  411 F.3d at 77.  Challenging the district court's conclusion that no such inference could be drawn without some evidence that the defendants acted with knowledge of her age relative to that of her replacement, Woodman argued, among other things, that after a merger between Chris-Craft and The News Corporation Ltd., executives at News Corp.'s subsidiary Fox Television Stations, Inc. reviewed employee-specific age information.  Woodman presented expert evidence that officials of acquiring companies generally have access to the personnel records of the acquired company and that they frequently review documents containing employee age information before finalizing a merger.  *Id.* at 86.  However, all of the Fox executives testified that they did not look at any document with age information.  The Second Circuit concluded that, even assuming industry practice was to review employee age information before finalizing a merger, and that such evidence might be a basis to question the credibility of the Fox executives, "that, by itself, would not constitute significant probative evidence raising a genuine issue of material fact as to defendants' knowledge of Woodman's relative age." *Id.*  Thus in *Woodman* deviation from industry practices was insufficient to establish an inference of discrimination.

The plaintiff in *Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006), brought a Title VII claim against his employer, the U.S. Food & Drug Administration, alleging race- and gender-based adverse employment action stemming from his placement on administrative leave with pay during the pendency of a criminal case against him and for five months afterwards while the

employer finished its own investigation. But the issue in *Joseph* was not whether an inadequate investigation could give rise to an inference of discrimination, but instead whether placing an employee on leave during the pendency of an investigation could constitute an adverse employment action. Here, as noted above, Aramark does not challenge the sufficiency of Ms. King's evidence on the "adverse employment action" prong of the prima facie case.

### c.   Male Comparators

Ms. King's third argument is that she can show gender discrimination because, she asserts, Mr. Thomas treated her differently than similarly situated male counterparts. (Doc. 71-1 at 23.) She suggests that Mr. DeGori, Mr. Harriman, Mr. Wilson, Mr. Drayton, and Mr. Williford are all comparators because each of them—like Ms. King—reported directly to Mr. Thomas. (*See id.*) She asserts that Mr. Knight (the individual who assumed the job of District Manager of EVS after the corporate restructuring), Mr. Marsh (whom Ms. King observed was still a dual general manager in June 2016), and Jeff Soloway (discussed below) are also comparators. (Doc. 69 ¶ 165.) Aramark insists that Ms. King "has no evidence that any of her alleged male comparators engaged in conduct comparable to her conduct that resulted in her termination." (Doc. 73 at 10.)

"A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Id.* at 493–94 (quoting *Graham*, 230 F.3d at 40). "[T]he comparator must be similarly situated to

the plaintiff 'in all material respects.'" *Id.* at 494 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

Ms. King argues that the determination of whether she is similarly situated to the comparators should be made by a jury. (Doc. 71-1 at 23.) It is true that "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39; *see also Dotson v. City of Syracuse*, 763 F. App'x 39, 42 (2d Cir. 2019) (summary order) (same, quoting *Graham*). "But this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790–91 (2d Cir. 2007) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). Aramark maintains that this is such a case. (*See* Doc. 63 at 23.) Applying these standards, the court concludes for the reasons below that no reasonable jury could find the alleged comparators to be similarly situated in all material respects.[7]

### i.   Mr. DeGori

Aramark argues that Mr. DeGori was not subject to the same workplace standards as Ms. King because Mr. DeGori was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that Mr. DeGori was the food service director at Ohio Valley Hospital (later renamed Heritage Valley Kennedy). He was responsible for two locations—the hospital and a nursing home across the street—with 45 employees reporting to him, and with a monthly budget of $60,000. (Doc. 65-52 at 3–5.) Ms.

---

[7] The court acknowledges that it found at the Rule 12 stage that Ms. King's allegations about Mr. Harriman, Mr. DeGori, and Mr. Wilson were sufficient to raise an inference of discrimination. (Doc. 16 at 42.) However, that determination was limited to Rule 12 procedural posture. (*Id.* at 41.) With a full factual record, the court is able to closely examine the "similarly situated" prong.

King therefore arguably held a superior title than Mr. DeGori and managed a larger account with a larger number of facilities.

On the other hand, Mr. DeGori—like Ms. King—reported directly to Mr. Thomas. *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) ("[W]hether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purpose of finding them similarly situated."). And according to Ms. King, the District Manager (presumably including Mr. Thomas after his promotion to that position) would send group emails to all of his direct reports, including Mr. DeGori, relative to duties that they all shared. Those duties included: "interface with, maintain and retain the client; manage the day-to-day operations; grow the business; manage the budget; implement and oversee company standards, procedures and programs; supervise and manage employees; hire, fire and discipline employees." (Doc. 69-2 ¶ 19.) Furthermore, Mr. DeGori—like Ms. King and all other Aramark employees—was subject to the Aramark Business Conduct Policy. (Doc. 69-19.) An Aramark employee handbook also describes a four-step process of progressive discipline: verbal counseling, written warning, final written warning and/or suspension, and termination. (Doc. 69-18 at 13.)

Based on these facts, a reasonable jury could conclude that Ms. King and Mr. DeGori were subject to the same discipline standards. But Ms. King has not presented any facts about Mr. DeGori's conduct that could have been the basis for disciplinary action against him. At most, Ms. King notes that she was disciplined for not personally providing coverage at Norton, whereas Mr. DeGori was not disciplined even though he did not personally provide coverage there. (Doc. 69-2 ¶ 37.) But the evidence indicates that Mr. Thomas never asked Mr. DeGori to provide coverage at Norton in the first place. (Doc. 69-5 at 18.)

Apart from the issue of discipline, Ms. King asserts that Mr. DeGori received preferential treatment from Mr. Thomas in a variety of ways. Ms. King asserts that Mr. DeGori had a dedicated private office but she did not. (Doc. 69-2 ¶ 22.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to that issue. Mr. DeGori was responsible for two facilities that were within walking distance of each other, while Ms. King was responsible for—and traveled to—six facilities in different locations. Ms. King and Mr. DeGori also worked in separate regions, and the evidence indicates that office space was limited at WMC. (*See* Doc. 69-2 ¶ 10 (noting space constraints).)

In her declaration, Ms. King asserts that Mr. Thomas would meet with her subordinates without her knowledge but would go through Mr. DeGori when communicating with Mr. DeGori's subordinates. (Doc. 69-2 ¶ 24.) But Ms. King does not explain how she has personal knowledge of that. And Mr. Thomas states in his declaration that he sometimes met with Aramark employees who worked in facilities that Mr. DeGori managed outside of Mr. DeGori's presence. (Doc. 65-21 ¶ 43.)

Ms. King further asserts that Mr. Thomas directed Mr. Williford to work on accounts other than VHS, but that Mr. Thomas did not assign anyone from Mr. DeGori's accounts to support VHS. (Doc. 69-2 ¶ 25.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to this issue. The evidence shows that VHS and Heritage Valley Kennedy are two different systems of different sizes in different locations.

Ms. King states that Mr. Thomas required her to send her weekly calendar to him but did not impose the same requirement upon Mr. DeGori. (Doc. 69-2 ¶ 50.) Here again, no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to this issue.

Ms. King managed and traveled between six facilities whereas Mr. DeGori managed two that were essentially co-located.

Ms. King further states that Mr. Thomas required her to complete a "Top 15" report with respect to each of her facilities, whereas he started requiring Mr. DeGori to complete the reports later, and only after offering a thorough training on a conference call with a PowerPoint presentation. (Doc. 69-2 ¶ 63.) The court concludes that no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to this issue. As general manager of a larger account, Ms. King may have been in the vanguard of certain initiatives. Moreover, she testified that Mr. Thomas did communicate with her about how to complete the report and also sat with her on one occasion to go through it. (Doc. 69-3 at 35.)

Ms. King refers to four other instances where she says that Mr. Thomas scrutinized her job performance more closely or held her to a higher standard than male employees: "100% Prima compliance, restaurant rotation, VOC [the "Voice of the Customer" program], and Treat Yourself." (Doc. 69-2 ¶ 93.) With respect to Mr. DeGori, Ms. King focuses on the VOC program. The VOC program was designed to allow food customers to confidentially report on service and quality and to offer comments. (Doc. 69-2 ¶ 92.) Ms. King states that she observed Mr. DeGori's VOC scores were rising. (*Id.*) She asserts that Mr. DeGori was obtaining those improved results improperly by "entering the data for the customer as the customer was telling it to them or their staff or giving it to them." (*Id.*)

Ms. King states that she reported that conduct to Mr. Thomas, and Mr. Thomas responded: "well, it's working." (Doc. 69-3 at 32.) Thus, in the light most favorable to Ms. King, the evidence indicates that Mr. Thomas allowed the VOC program to be implemented improperly. But there is no evidence that he discriminated against Ms. King in that respect

because Ms. King never used the same allegedly improper technique and never asked Mr. Thomas to do so.  (Doc. 69-3 at 31–32.)

Finally, the court considers Ms. King's assertion that Mr. Thomas required her to obtain his advance approval for any financial decisions exceeding $1,000 but never imposed the same requirement upon Mr. DeGori.  (Doc. 69-2 ¶ 71.)  The evidence shows that this requirement was a corrective action listed on the March 2017 "Final Written Documentation" after the incident involving US Foods.  (Doc. 65-11.)  Ms. King has supplied a detailed response regarding that incident arguing that her conduct was proper.  (Doc. 69-2 ¶ 70.)  She asserts that in the incident for which she was written up she followed "the same Aramark standard procedure regarding Market Basket in 2015" for which she was not disciplined.  (*Id.* ¶ 69.)

Mr. Thomas apparently does not dispute that Ms. King was not disciplined for her conduct regarding the market basket in 2015 but his notes indicate that he did caution her about that incident in 2016.  (Doc. 65-31 at 1.)  He also maintains that the 2017 market basket study differed from the 2015 study "because the 2015 market basket study was done at the request of VHS *after* US Foods had already submitted its own market basket study to VHS whereas Aramark wanted to do a 2017 market basket study without the knowledge of US Foods."  (Doc. 65-21 ¶ 12.)

Regardless of whether Ms. King's conduct on this issue was proper, the court notes that the only other person that she suggests engaged in similar conduct was Mr. Williford.  (*See* Doc. 69-2 ¶ 70.)  The court discusses Mr. Williford's suitability as a comparator below.  No reasonable jury could find that Mr. DeGori engaged in comparable conduct.

### ii.   Mr. Drayton

Aramark argues that Mr. Drayton was not subject to the same workplace standards as Ms. King because Mr. Drayton was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that Mr. Drayton was the director of food and nutrition at Holy Cross Germantown Hospital, with one location. (Doc. 69-2 ¶ 19.) Ms. King therefore arguably held a superior title than Mr. Drayton and managed a larger account with a larger number of facilities.

Mr. Drayton—like Ms. King—reported directly to Mr. Thomas. And according to Ms. King, the District Manager (presumably including Mr. Thomas after his promotion to that position) would send group emails to all of his direct reports, including Mr. Drayton, relative to duties that they all shared. Furthermore, Mr. Drayton—like Ms. King—was subject to the Aramark Business Conduct Policy and presumably also the discipline procedures in the employee handbook.

Based on these facts, a reasonable jury could conclude that Ms. King and Mr. Drayton were subject to the same discipline standards. But Ms. King has not presented any facts about Mr. Drayton's conduct that could have been the basis for disciplinary action against him. She does assert that when Mr. Drayton's performance lagged, Mr. Thomas worked with him and also directed Ms. King to provide Mr. Drayton with assistance and training. (Doc. 69-2 ¶ 94.) But she has not supplied any evidence that Mr. Drayton was disciplined on this basis or for any other reason.

Relevant to performance standards, Ms. King asserts that Mr. Thomas did not provide her with the same level of assistance as he provided to Mr. Drayton. (*Id.*) But the assistance given to Mr. Drayton was for different issues than any issue Mr. Thomas identified with Ms. King

because Mr. Thomas sent Ms. King herself to help Mr. Drayton. (*See id.*; *see also id.* ¶ 20.) No reasonable jury could conclude that Mr. Drayton and Ms. King were similarly situated on this issue.

Ms. King also asserts that Mr. Drayton received preferential treatment from Mr. Thomas in a variety of ways. But a reasonable jury could not find that Ms. King and Mr. Drayton were similarly situated as relevant to these issues for reasons similar to those described above with respect to Mr. DeGori. Mr. Drayton had a private office but he worked in a different location with different space constraints. Ms. King further contends that Mr. Thomas scrutinized her job performance more closely or held her to a higher standard than Mr. Drayton with respect to the "Treat Yourself" program. (Doc. 69-2 ¶ 87.) She states that Mr. Thomas required her to meet a "Treat Yourself" deadline that he did not require Mr. Drayton to meet. (*Id.*) But since Mr. Thomas had selected Ms. King to implement the program district-wide, Ms. King and Mr. Drayton were not similarly situated regarding that program.

### iii.    Mr. Harriman

Aramark argues that Mr. Harriman was not subject to the same workplace standards as Ms. King because Mr. Harriman was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that at the relevant times Mr. Harriman was the food service director at Chesapeake Regional Medical Center, a single-unit client. (Doc. 65-53 at 4–7.) On the other hand, Mr. Harriman—like Ms. King—reported directly to Mr. Thomas. And according to Ms. King, the District Manager would send group emails to all of his direct reports, including Mr. Harriman, relative to duties that they all shared. Furthermore, Mr. Harriman—like Ms. King—was subject to the Aramark Business Conduct Policy and presumably also the discipline procedures in the employee handbook.

Based on these facts, a reasonable jury could conclude that Ms. King and Mr. Harriman were subject to the same discipline standards. The record indicates that for a year prior to December 2018 Mr. Thomas discussed food safety issues with Mr. Harriman but did not issue him a written discipline on that topic until December 17, 2018. (Doc. 70-9 at 2 (discipline for "job performance").) Although the record does not suggest that Ms. King was terminated for food safety issues,[8] the written discipline she received was also for "job performance." (Docs. 65-8, 65-10, 65-11, 65-13.) And Mr. Harriman arguably received more lenient treatment by receiving multiple verbal counselings before receiving a written warning. Nevertheless, the issues for which Ms. King was disciplined are not sufficiently similar to the food safety issues for which Mr. Harriman was disciplined.

As with Mr. Drayton, Ms. King states that Mr. Thomas required her to meet a "Treat Yourself" deadline that he did not require Mr. Harriman to meet. (Doc. 69-2 ¶ 87.) But since Mr. Thomas had selected Ms. King to implement the program district-wide, Ms. King and Mr. Harriman were not similarly situated regarding that program.

Ms. King also asserts that Mr. Harriman received preferential treatment from Mr. Thomas because Mr. Harriman had a dedicated private office but she did not. (Doc. 69-2 ¶ 22.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. Harriman were similarly situated as relevant to that issue. Ms. King and Mr. Harriman worked in separate regions, and the evidence indicates that office space was limited at WMC.

In her declaration, Ms. King asserts that Mr. Thomas would meet with her subordinates without her knowledge but would go through Mr. Harriman when communicating with Mr.

---

[8] Ms. Barrett testified that Ms. King was not terminated for food safety violations. (Doc. 65-50 at 37–38.)

Harriman's subordinates.  (*See* Doc. 69-2 ¶ 24.)  But Ms. King does not explain how she has

personal knowledge of that.  And Mr. Thomas states in his declaration that he sometimes met

with Aramark employees who worked in facilities that Mr. Harriman managed outside of Mr.

Harriman's presence.  (Doc. 65-21 ¶ 43.)

Ms. King states that Mr. Thomas required her to send her weekly calendar to him but did

not impose the same requirement upon Mr. Harriman.  (Doc. 69-2 ¶ 50.)  Here again, no

reasonable jury could find that Ms. King and Mr. Harriman were similarly situated as relevant to

this issue.  Ms. King managed and traveled between six facilities whereas Mr. Harriman

managed a single facility.

### iv.     Mr. Knight

Ms. King presents very few specific factual allegations with respect to Mr. Knight as a

comparator other than to assert that he held a "comparable intermediate managerial position[]."

(Doc. 69 ¶ 165.)  The court perceives Ms. King's main allegation concerning Mr. Knight as a

comparator to be that he was responsible for the EVS portion of a joint commission site survey

in July 2016 but was not personally present, whereas Ms. King's August 2016 First Written

Warning faulted her for not being present at that survey.  (*See id.* ¶ 51; *see also* Doc. 65-8.)

Notably, however, the September 29, 2016 revised written warning removed the points about

failing to appear for the joint commission site survey.  (*Compare* Doc. 65-8 *with* Doc. 65-10.)

### v.     Mr. Marsh

Mr. Marsh also held a dual general manager position with Aramark.  (Doc. 69-2 ¶ 43.)

The primary fact that Ms. King presents regarding Mr. Marsh is that he remained a dual general

manager until "well after" she was removed from that dual role.  (*See id.*)  But there is no

evidence that, like Ms. King, Mr. Marsh was a dual general manager of food and EVS.  Instead,

he was dual general manager of food and valet. (*See* Doc. 69-7 at 4–5.) The VHS account did not have valet services at any relevant time. (Doc. 65-21 ¶ 33.) No reasonable jury could conclude that Mr. Marsh and Ms. King were similarly situated on this issue.

### vi.    Mr. Soloway

Ms. King refers to Mr. Soloway in the context of asserting that Mr. Thomas interfered with her ability to hire, fire, and discipline employees, but she does not dispute that Mr. Soloway was a director who reported to her, and was not a general manager and did not report to Mr. Thomas. (*See* Doc. 69-2 ¶¶ 94–95.) It is unnecessary to reach the "comparable conduct" prong of the inquiry as to Mr. Soloway because the workplace-standards prong is not met. No reasonable jury could find that Mr. Soloway was similarly situated to Ms. King in all material respects.

### vii.    Mr. Williford

The evidence in the light most favorable to Ms. King is that she hired Mr. Williford in April 2015 and he initially reported directly to her, but by fall 2015 Mr. Thomas had Mr. Williford reporting directly to him. The court acknowledges that "whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purpose of finding them similarly situated." *Conway*, 414 F. Supp. 2d at 465. But this factor is not dispositive. Two employees are not "similarly situated" merely because they both report directly to the same superior. *See Batiste v. City Univ. of N.Y.*, No. 16-CV-3358 (VEC), 2017 WL 2912525, at *9 (S.D.N.Y. July 7, 2017) (coworker with same direct supervisor as plaintiff was not "similarly situated").

Ms. King asserts that Mr. Thomas treated Mr. Williford favorably because—even though Mr. Williford had an office a few miles from his home—Mr. Thomas allowed Mr. Williford to

work from home to care for his wife, who suffered from the same mental health condition that Ms. King's son had. (Doc. 65-45 at 112–13; Doc. 69-2 ¶¶ 29, 75.) Ms. King does not dispute that she was also authorized to work from home to care for her son. (Doc. 69-2 ¶ 15.) But she states that she was no longer allowed to work from home after April 6, 2017. (*Id.* ¶ 75.) No reasonable jury could find that she and Mr. Williford were similarly situated at that time, however, because Ms. King's son had passed away by then.

To the extent he received preferential treatment over Ms. King in the form of a private office at WMC, Mr. Williford's situation was substantially different. As a controller, he was presumably subordinate to a general manager. But he was located full-time at WMC, whereas Ms. King's duties required her to travel between the six facilities for which she was responsible.

Ms. King further asserts that Mr. Thomas did not discipline Mr. Williford for reaching out to US Foods in 2017 after Mr. Thomas had assigned Mr. Williford to work on the market basket. (Doc. 69-2 ¶ 70.) However, the circumstances were substantially different by that time since US Foods had already been made aware that Aramark wanted to do a market basket study.

### viii.   Mr. Wilson

Aramark argues that Mr. Wilson was not subject to the same workplace standards as Ms. King because Mr. Wilson was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that Mr. Wilson was initially the dual director of food and valet until 2014 or 2015, when he became "General Manager/Director of Food and Nutrition and Valet" at the Western Maryland Regional Health System. (Doc. 69-2 ¶ 19; *see also* Doc. 65-54 at 3–4.) That account had two facilities that were located 14–15 miles apart: a hospital and an 88-bed nursing rehabilitation center. (Doc. 65-54 at 5.)

Mr. Wilson—like Ms. King—reported directly to Mr. Thomas. And according to Ms. King, the District Manager would send group emails to all of his direct reports, including Mr. Wilson, relative to duties that they all shared. Furthermore, Mr. Wilson—like Ms. King—was subject to the Aramark Business Conduct Policy and presumably also the discipline procedures in the employee handbook.

The court nevertheless concludes that no reasonable jury could find that Mr. Wilson was similarly situated to Ms. King in all material respects. All of the items of alleged disparate treatment involve different circumstances or conduct for the reasons discussed above regarding other alleged male comparators. Although Mr. Wilson retained a dual "general manager" position after Ms. King's dual role was eliminated, Mr. Wilson's dual role was for food and valet, not food and EVS. Insofar as Mr. Thomas required Ms. King to begin completing "Top 15" reports before Mr. Wilson, Ms. King's role as general manager of a larger account put her in a different position regarding the rollout of initiatives.

Regarding Mr. Wilson's private office, Ms. King and Mr. Wilson worked in separate regions, and the evidence indicates that office space was limited at WMC. Regarding Mr. Wilson's alleged deviation from the VOC protocols, there is no evidence that Mr. Thomas discriminated against Ms. King in that respect because Ms. King never used the same allegedly improper technique and never asked Mr. Thomas to do so.

Ms. King further asserts that Mr. Thomas directed Mr. Williford to work on accounts other than VHS, but that Mr. Thomas did not assign anyone from Mr. Wilson's accounts to support VHS. (Doc. 69-2 ¶ 25.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. Wilson were similarly situated as relevant to this issue because they managed different facilities in different regions.

In her declaration, Ms. King asserts that Mr. Thomas would meet with her subordinates without her knowledge but would go through Mr. Wilson when communicating with Mr. Wilson's subordinates. (*See* Doc. 69-2 ¶ 24.) But Ms. King does not explain how she has personal knowledge of that. And Mr. Thomas states in his declaration that he sometimes met with Aramark employees who worked in facilities that Mr. Wilson managed outside of Mr. Wilson's presence. (Doc. 65-21 ¶ 43.)

Ms. King states that Mr. Thomas required her to send her weekly calendar to him but did not impose the same requirement upon Mr. Wilson. (Doc. 69-2 ¶ 50.) Here again, no reasonable jury could find that Ms. King and Mr. Wilson were similarly situated as relevant to this issue. Ms. King managed and traveled between six facilities whereas Mr. Wilson managed two that were only 15 miles apart.

### d.   Other Female Employees

In her complaint, Ms. King raised the issue of alleged discrimination against other female Aramark employees. (*See* Doc. 1 ¶¶ 47, 75.) Ruling on Aramark's motion to dismiss, the court found that Ms. King's allegations on this issue were conclusory. (Doc. 16 at 43.) Although Ms. King refers to certain other female Aramark employees in her Counterstatement of Contested Material Facts, her written declaration, and in her deposition testimony, her memorandum in opposition to Aramark's summary judgment motion does not discuss this alleged discrimination against other female employees. Moreover, Ms. King's claims that other female Aramark employees also experienced or claimed discrimination remain conclusory.

### e.   Decisionmakers

Aramark argues that two of the decisionmakers involved in Ms. King's termination—Ms. Barrett and Ms. O'Donnell—are female and that this undercuts Ms. King's assertion that she was

terminated on the basis of her gender. (Doc. 63 at 22.) Ms. King does not seriously dispute the fact that that Ms. Barrett and Ms. O'Donnell were involved in the termination decision. She repeatedly highlights the draft termination notice that Mr. Thomas circulated to Rebecca Adams and Tracy Miller on July 24, 2017 (Doc. 70-23) in support of her contention that Mr. Thomas had decided to terminate her by that date. But Ms. O'Donnell did not think that termination was the next step at that time. (*See* Doc. 70-24 at 2 (discussing need to compare Ms. King's scores to those of her peers).) And Ms. King herself cites evidence showing that Ms. Barrett and Ms. O'Donnell were also decisionmakers. (*See, e.g.*, Doc. 69-11 at 56 (Ms. Barrett's testimony that she, Ms. O'Donnell, and Mr. Thomas reviewed Ms. King's termination).) The evidence in the light most favorable to Ms. King is that Ms. Barrett and Ms. O'Donnell were decisionmakers but they were not the only decisionmakers because Mr. Thomas was also involved in the termination decision.

As this court has observed, where the decisionmaker "is in the same protected class as plaintiff, claims discrimination become less plausible." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015) (citing *Toliver v. Cmty. Action Comm'n to Help the Econ., Inc.*, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985)). Here, two of the three primary decisionmakers are women, and the court agrees that to some extent this undercuts the plausibility of Ms. King's claim that she was terminated because she is female.

### f.   Mara Rakowski

As noted above, Mara Rakowski assumed the position of Aramark general manager for VHS around December 2017—after Ms. King's termination in September that year. Aramark contends that Ms. King's prima facie case is further undermined by the fact that her replacement was a woman. (Doc. 63 at 24.) The court agrees. *Cf. Inguanzo v. Hous. & Servs., Inc.*,

621 F. App'x 91, 92 (2d Cir. 2015) (summary order) ("Inguanzo's replacement by another

Hispanic woman further undermines her race and gender discrimination claims."); *Bratek v.*

*Merck & Co.*, No. 91-CV-0252E(F), 1993 WL 124747, at *5 (W.D.N.Y. Apr. 16, 1993) (hiring

of a female to replace female plaintiff undermined inference of discrimination); *see also*

*Randolph v. CIBC World Mkts.*, No. 01 Civ.11589(RWS), 2005 WL 704804, at *12 (S.D.N.Y.

Mar. 29, 2005) ("Where no evidence giving rise to an inference of discrimination has been

presented, the fact that a plaintiff is replaced with an individual within his protected class

undermines his attempt to establish a *prima facie* case of discrimination." (quoting *Morris v.*

*N.Y.C. Dep't of Sanitation*, No. 99 CV 4376(WK), 2003 WL 1739009, at *5 (S.D.N.Y. Apr. 2,

2003))).

    For all of the above reasons, the court concludes that Ms. King has failed to establish her

prima facie case of discrimination.  For completeness, the court considers the remaining prongs

of the *McDonnell Douglas* framework.

### 3.    Legitimate, Non-Discriminatory Basis for Termination

    The second prong of the framework imposes a burden on Aramark to articulate a

legitimate, non-discriminatory basis for Ms. King's termination.  Aramark asserts that there is

such a basis because Ms. King violated Aramark policy in connection with the travel

reimbursement for Ms. Cubbage and because of "continued performance issues."  (Doc. 63

at 28.)  Ms. King argues that her performance "was always at least satisfactory" (Doc. 69 ¶ 7)

and that it is, in her view, "highly suspect" that Aramark would terminate a longstanding

employee for approving a $56.58 mileage reimbursement.  (Doc. 71-1 at 28.)

    On this prong of the *McDonnell Douglas* framework, Aramark's burden is one of

"production," not proof.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981);

*Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  Aramark's burden here is "light"; it need not "*persuade* the court that it was motivated by the reason it provides; rather, it must simply *articulate* an explanation that, *if true*, would connote lawful behavior." *Id.* (emphasis on "articulate" and "if true" added).  Aramark has done that.  Although Ms. King argues that Aramark's explanation is untrue, it is unnecessary to make that determination here.

### 4.     Pretext

On the final prong of the *McDonnell Douglas* framework, the burden is on Ms. King to show that the reasons that Aramark's explanation for the termination are a pretext for discrimination.  "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage, but a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistencies, implausibilities, and contradictions in the employer's explanation, to defeat summary judgment at this stage." *Litten v. GM Components Holdings, LLC*, No. 19-CV-926S, 2022 WL 706971, at *8 (W.D.N.Y. Mar. 9, 2022) (cleaned up).

Aramark argues that Ms. King cannot establish that its explanation is a pretext for discrimination or that discrimination was the "but-for" cause of the termination.  (Doc. 63 at 28.) According to Aramark, Ms. King cannot meet her burden by arguing that her conduct did not warrant termination because, in Aramark's view, "her subjective disagreement with Aramark's business determination is insufficient to establish that Aramark's proffered reason was false, or that the true motivation for its decision was unlawful discrimination or retaliation." (*Id.* at 29.) Ms. King insists that she has identified "strong evidence of an inference of discrimination" based upon "the same evidence that comprised her prima facie case, without more." (Doc. 71-1 at 25.) Aramark argues that "[t]his is not enough." (Doc. 73 at 12.)

The Second Circuit has stated that "[t]o meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004).  Aramark attempts to distinguish *Back* by noting that there was "direct evidence" of discrimination in that case. *Back*, 365 F.3d at 124.  There is no such direct evidence in this case, *see supra* Section III.A, but that does not necessarily preclude a showing of pretext.  Even absent direct evidence, it is theoretically possible for a plaintiff to demonstrate pretext by relying only upon "the evidence comprising the prima facie case, without more." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (no direct proof of discriminatory animus).

However, for the reasons discussed above, the evidence comprising Ms. King's prima facie case is insufficient to demonstrate pretext. *See supra* Section III.B.  In her discussion of the retaliation count, Ms. King offers further argument on the pretext prong.  She argues that Aramark's explanation suffers weaknesses and implausibilities because: (1) it is "highly suspect" that Aramark would terminate a longstanding employee for approving a $56.58 mileage reimbursement; and (2) the investigation into her alleged BCP violation was a "sham." (Doc. 71-1 at 28.)  The court considers those arguments here.

### a.   Termination for Allegedly Minor Violation; "Sham" Investigation

Ms. King suggests that it is implausible that she might be terminated for an alleged violation that she asserts was valued only at $56.58; in her view, the "punishment" cannot plausibly fit the "crime."  But courts have rejected similar arguments. *See Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, No. 17cv7895 (DF), 2020 WL 5209779, at *12 (S.D.N.Y. Sept. 1, 2020) (whether alleged "minor infraction" was "significant enough to warrant Plaintiff's termination" is for the employer—not the court—to decide).

Moreover, Aramark's conclusion at the time it terminated Ms. King was not simply that Ms. King had improperly approved a $56.58 mileage reimbursement, but that Ms. King had improperly directed a subordinate to drive out of her way to deliver Ms. King to her workplace. (*See* Doc. 65-50 at 22 (Ms. Barrett's testimony that she would be concerned if Ms. King had utilized Ms. Cubbage as a "taxi service").)

Ms. King maintains that her travel with Ms. Cubbage did not violate policy and that Aramark would have realized that if its investigation had not been a "sham." The court considered the "sham investigation" argument above in the context of the prima facie case of discrimination. *See supra* Section III.B.2.b. The court returns to that issue briefly here for purposes of the pretext prong.

An employer's investigatory procedures can be relevant "if they give rise to an inference that the investigation was a sham designed to mask Defendant's discriminatory agenda." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515 (S.D.N.Y. 2010). On the other hand, "[a]n employer is entitled to summary judgment even if the investigation into the alleged misconduct was inadequate and the employee was disciplined based upon a hastily formed conclusion, so long as the employer was not motivated by discriminatory animus." *Del Pozo v. Bellevue Hosp. Ctr.*, No. 09 Civ. 4729(SAS)(DF), 2011 WL 797464, at *5 (S.D.N.Y. Mar. 3, 2011); *see also Jordan v. Olsten Corp.*, 111 F. Supp. 2d 227, 236 (W.D.N.Y. 2000) ("Title VII does not protect Jordan if, as she alleges, Markiewicz conducted a shoddy investigation into the allegations and subsequently made a poorly informed decision to fire her."). Here, Ms. King has pointed to potential flaws in Ms. Barrett's investigatory procedures, but nothing about the procedures themselves give rise to any inference of retaliatory motive.

61

**b.    Performance**

Aramark further maintains that Ms. King was terminated due to "continued performance issues." (Doc. 63 at 28.) As noted above, Ms. King argues that her performance "was always at least satisfactory." (Doc. 69 ¶ 7.) The parties plainly disagree about how to characterize Ms. King's work performance. But that does not create a triable issue because the role of the court is not to "delve into the question of which portrayal is the correct one because this Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Dorman v. Webster Cent. Sch. Dist.*, 576 F. Supp. 2d 426, 431 (W.D.N.Y. 2008) (quoting *Weiss v. Morgan Stanley Inv. Mgmt.*, No. 05 CV 3310(GBD), 2008 WL 821813, at *6 (S.D.N.Y. Mar. 27. 2008)).

For all of these reasons, Aramark is entitled to summary judgment on Count 1.

## IV.    Retaliation (Count 3)

The court evaluates Ms. King's Title VII retaliation claim under the *McDonnell Douglas* burden-shifting test described above. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). To establish a prima facie case of Title VII retaliation, Ms. King must show that: (1) she "engaged in a protected activity"; (2) Aramark "was aware of that activity"; (3) she suffered "a materially adverse action"; and (4) there was "a causal connection between the protected activity and that adverse action." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014)). Aramark argues that Ms. King cannot establish the fourth element. (Doc. 63 at 25.) Aramark further contends that even if Ms. King could establish a prima facie case of retaliation, her claim still fails because Aramark has shown a legitimate non-retaliatory basis for the termination and Ms. King cannot establish pretext. (*Id.* at 27–30.)

A.     **Prima Facie Case—Causation**

Aramark maintains that Ms. King cannot establish the requisite causal connection for her retaliation claim because the only protected activity that she engaged in within two months of her September 21, 2017 termination was her September 19, 2017 hotline complaint, about which, according to Aramark, Ms. Barrett and Ms. O'Donnell had no knowledge at the time they had decided to terminate Ms. King. (*See* Doc. 63 at 26–27.) Ms. King asserts that she can establish causation because of her September 19, 2017 hotline complaint and because of her July 2017 complaint to Ms. Barrett. (Doc. 71-1 at 27.)

The Second Circuit has stated that a plaintiff "can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). The Second Circuit "has not drawn a bright line defining, for purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation." *Id.* But the Second Circuit has held "that five months is not too long to find the causal relationship." *Id.* (citing *Gorman-Bakos*, 252 F.3d at 555).

Ms. King's complaint to the hotline on September 19, 2017 was indeed very close in time to her termination on September 21, 2017. However, Ms. Barrett testified that when she met with Ms. O'Donnell on September 19, she did not know that Ms. King had called the hotline, and that Aramark was not made aware of the hotline call until September 20, 2017. (Doc. 65-50 at 33, 44.)[9] By that time, Aramark had already decided to terminate Ms. King. *See LaMarca v.*

---

[9] Ms. King attempts to dispute this (*see* Doc. 69 ¶ 142) but the only evidence she cites is a record of the hotline call confirming that Ms. King placed the call at 7:36 a.m. on September 19, 2017. (Doc. 70-37.) That does not prove that *Aramark* knew of the hotline call at

*City of Niagara Falls, N.Y.*, No. 13-CV-00970-WMS-JJM, 2016 WL 8674161, at \*13

(W.D.N.Y. Feb. 12, 2016) ("Employers need not suspend previously planned employment

actions upon discovering that a discrimination complaint has been filed, and their proceeding

along lines previously contemplated, though not yet definitively determined, is no evidence

whatever of causality." (cleaned up)), *report and recommendation adopted* (W.D.N.Y. May 23,

2016), ECF No. 56.

Ms. King states that in July 2017 she complained to Ms. Barrett about Mr. Thomas's

alleged discrimination, harassment, and retaliation. (Doc. 69-2 ¶ 86.)  She was terminated on

September 21, 2017—within three months of that complaint.  Aramark cites *Jean v. Acme Bus*

*Corp.*, No. CV 08-4885(ARL), 2012 WL 4171226, at \*12 (E.D.N.Y. Sept. 19, 2012), for the

proposition that no inference of causation can be drawn when the gap in time is greater than two

months.  But the court in *Jean* did not so hold; the temporal gap in that case was only five to

seven weeks.  And the *Jean* court specifically acknowledged the Second Circuit's statement in

*Gorzynski* that a five-month gap is not too long.  *Id.*

Aramark also argues that Ms. King must present some evidence beyond timing to

establish the requisite causal connection.  (Doc. 63 at 26.)  In support of that argument, Aramark

cites *Garone v. United Parcel Service, Inc.*, No. 00-CV-6722 (ILG), 2001 WL 984914 (E.D.N.Y.

July 12, 2001).  The court in that case stated that "[e]vidence of temporal proximity alone . . . is

insufficient as a matter of law to prove the causal connection element of a retaliation claim." *Id.*

at \*4.  This court, however, has held otherwise.  *See Martin v. Performance Trans. Inc.*,

408 F. Supp. 3d 272, 280 (W.D.N.Y. 2019) (timing "might be enough to establish a prima facie

---

that time, however, because the hotline is staffed by a third-party provider.  (*See* Doc. 65-45
at 189.)

case" (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)); *see also Stewart v. Fashion Inst. of Tech.*, No. 18-cv-12297 (LJL), 2020 WL 6712267, at *14 (S.D.N.Y. Nov. 16, 2020) ("[T]emporal proximity alone can support a causal connection at the prima facie stage . . . ."). The court concludes that Aramark is not entitled to summary judgment on Count 3 on this basis. Since Aramark does not challenge any of the other elements of the prima facie case, the court proceeds to consider the remaining prongs of the *McDonnell Douglas* retaliation framework.

### B.   Legitimate, Non-Retaliatory Basis for Termination

The second prong of the framework imposes a burden on Aramark to articulate a legitimate, non-retaliatory basis for Ms. King's termination. Aramark has done so for the reasons stated above. *See supra* Section III.B.3.

### C.   Pretext

On the final prong of the *McDonnell Douglas* framework, the burden is on Ms. King to show that the reasons that Aramark's explanation for the termination are a pretext for retaliation. For the reasons stated above in the context of the discrimination claim, no reasonable jury could conclude that Ms. King has met that burden. *See supra* Section III.B.4.

## V.   Remaining Issues

Because the court concludes that Aramark is entitled to summary judgment on all of the remaining counts, it is unnecessary to reach Aramark's additional arguments seeking to limit recoverable damages.

**Conclusion**

Aramark Services, Inc.'s Motion for Summary Judgment (Doc. 63) is GRANTED.

Dated this ⁹ᵗʰ day of May, 2022.

Geoffrey W. Crawford, Judge
United States District Court